1  EMMA LUEVANO (SBN 198421)
   eyl@msk.com
2  COREY G. SINGER (SBN 300334)
   cgs@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
4  Los Angeles, California  90067-3120
   Telephone: (310) 312-2000
5  Facsimile: (310) 312-3100

6  Attorneys for Defendant
   AMERICAN BROADCASTING
7  COMPANIES, INC.

8           UNITED STATES DISTRICT COURT

9           CENTRAL DISTRICT OF CALIFORNIA

10

11  RAPHAELLE BARDET, in her          CASE NO. 2:22-CV-816
    representative capacity, and on behalf
12  of all others similarly situated,     **DECLARATION OF EMMA**
                                          **LUEVANO IN SUPPORT OF**
13              Plaintiff,                **DEFENDANT AMERICAN**
                                          **BROADCASTING COMPANIES,**
14         v.                             **INC.'S NOTICE OF REMOVAL**

15  AMERICAN BROADCASTING            (Removed from LASC Case No.
    COMPANIES, INC., a foreign       22STCV00195)
16  corporation; and DOES 1 through 50,
    inclusive,                       (Federal Question Jurisdiction: 28
17                                   U.S.C. §§ 1331, 1441)
              Defendants.
18                                   [*Civil Cover Sheet, Notice of Removal,*
                                     *and Certificate of Interested Parties*
19                                   *and Corporate Disclosure Statement*
                                     *filed concurrently herewith*]
20

21

22

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP
28

---

**DECLARATION OF EMMA LUEVANO IN SUPPORT OF NOTICE OF REMOVAL**

# TABLE OF EXHIBITS

**Exhibit A** - Complaint.................................................................2

**Exhibit B** - Summons.................................................................2

**Exhibit C** - Civil Case Cover Sheet and Civil Case Cover Sheet Addendum
and Statement of Location...........................................................2

**Exhibit D** - Notice of Case Assignment .........................................2

**Exhibit E** - Proof of Service of Summons........................................2

**Exhibit F** – Answer to Plaintiff's Unverified Complaint ......................2

**Exhibit G** - National Code of Fair Practice for Network Television Broadcasting ...2

**Exhibit H** – 2018 Memorandum of Understanding re Network Code ....................2

**DECLARATION OF EMMA LUEVANO IN SUPPORT OF NOTICE OF REMOVAL**

## DECLARATION OF EMMA LUEVANO

I, Emma Luevano, declare:

1.     I am an attorney at law duly licensed to practice law in the State of California and admitted to practice before this Court.  I am a partner, through my professional corporation, with the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Defendant American Broadcasting Companies, Inc. ("Defendant").  I have personal knowledge of the following facts and, if called and sworn as a witness, could and would competently testify thereto.

2.     Attached hereto as Exhibit A is a true and correct copy of the Complaint filed by Plaintiff on January 3, 2022, in the Superior Court of California, County of Los Angeles (the "State Court Action"), and served on Defendant on January 6, 2022.

3.     Attached hereto as Exhibit B is a true and correct copy of the Summons issued on January 3, 2022, and served on Defendant on January 6, 2022.

4.     Attached hereto as Exhibit C is a true and correct copy of the Civil Case Cover Sheet, filed on January 3, 2022, and served on Defendant on January 6, 2022.

5.     Attached hereto as Exhibit D is a true and correct copy of the Notice of Case Assignment – Unlimited Civil Case, filed on January 3, 2022, and served on Defendant on January 6, 2022.

6.     Attached hereto as Exhibit E is a true and correct copy of the Proof of Service of Summons, filed on January 10, 2022, which my office obtained electronically from Westlaw.

7.     Attached hereto as Exhibit F is a true and correct copy of Defendant's Answer to Plaintiff's Unverified Complaint, filed on February 4, 2022 and served on Plaintiff on February 4, 2022.

8.      Attached hereto as Exhibit G is a true and correct copy of the collective bargaining agreement applicable to the services that Plaintiff purportedly provided to Defendant known as the 2014-2018 Screen Actors Guild – American Federation of Television and Radio Artists ("SAG-AFTRA") National Code of Fair Practice for Network Television Broadcasting (the "Network Code"), and to which Defendant is a party.  Defendant obtained a copy of the Network Code through the SAG-AFTRA website.  *See* https://www.sagaftra.org/files/2014-2018_network_television_code_v13.pdf.

9.      Attached hereto as Exhibit H is a true and correct copy of the 2018 Memorandum of Agreement reflecting modifications to the Network Code agreed upon by SAG-AFTRA and the broadcast television networks (including Defendant) for the term of July 1, 2018 to June 30, 2021 ("MOA").  Defendant obtained a copy of the MOA through the SAG-AFTRA website.  *See* https://www.sagaftra.org/files/2018MOA-TV-National-Code.pdf.

10.     To the best of my knowledge, no "Doe" defendants have been served with the Summons and Complaint in the State Court Action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of February, 2022, at Pasadena, California.


_____
Emma Luevano

Mitchell Silberberg & Knupp LLP

4

**DECLARATION OF EMMA LUEVANO IN SUPPORT OF NOTICE OF REMOVAL**

# EXHIBIT A

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Elihu Berle
Electronically FILED by Superior Court of California, County of Los Angeles on 01/03/2022 04:55 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Lozano,Deputy Clerk

1   FRANK H. KIM, State Bar No. 264609
        *fkim@kim-legal.com*
2   **KIM LEGAL, APC**
    3435 Wilshire Blvd, Suite 2700
3   Los Angeles, CA 90010
    Telephone: (323) 482-3300
4   Facsimile: (866) 652-7819

5   HELEN U. KIM, State Bar No. 260195
        *helen@helenkimlaw.com*
6   **HELEN KIM LAW, APC**
    3435 Wilshire Blvd, Suite 2700
7   Los Angeles, CA 90010
    Telephone: (323) 487-9151
8   Facsimile: (866) 652-7819

9   *Attorneys for Plaintiff RAPHAELLE BARDET*

10

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

11

### FOR THE COUNTY OF LOS ANGELES

12

| | |
|---|---|
| 13   RAPHAELLE BARDET, in her representative capacity, and on behalf of all others similarly situated, | Case No.: 22STCV00195 |
| 14 | |
| 15 | COMPLAINT |
| 16           Plaintiff, | (1)   Failure to Pay Wages |
| 17       v. | (2)   Failure to Provide Rest Breaks |
| | (3)   Waiting Time Penalties |
| 18   AMERICAN BROADCASTING COMPANIES, INC., a foreign corporation; and | (4)   Failure to Provide Itemized Wage Statements |
| 19   DOES 1 through 50, inclusive, | (5)   Unlawful and Unfair Business Practices |
| 20           Defendants. | **(6)**   PAGA Penalties Pursuant to Labor Code §2699, *et seq.* |
| 21 | |
| 22 | |

23

24       Plaintiff Raphaelle Bardet ("Plaintiff"), in her representative capacity, and on behalf of

25   all others similarly situated, hereby alleges as follows:

26

### <u>INTRODUCTION</u>

27       1.       Plaintiff submits this class action on behalf of all other similarly situated current

28   and former independent contractors who worked for American Broadcasting Companies, Inc.

("ABC") and DOES 1 through 50, inclusive (each, a "Defendant" and together, "Defendants").

2. Plaintiff alleges that Defendants failed to comply with California's labor laws that protect employees in connection with their work in and for "Good Morning America." Plaintiff seeks damages, penalties, interest, attorneys' fees, costs and equitable restitutionary and injunctive relief.

3. Additionally, Plaintiff brings this representative action under the Private Attorneys General Act of 2004, Labor Code § 2699, *et seq*. ("PAGA"). Plaintiff seeks to recover civil penalties as an individual aggrieved employee, on behalf of the State of California, and for all current and former non-exempt employees of Defendants who suffered one or more Labor Code violations alleged herein, including non-exempt employees misclassified as independent contractors.

## JURISDICTION AND VENUE

4. The Superior Court of the State of California has jurisdiction in this matter because Plaintiff is a resident in the State of California and Defendants are qualified to do business in and regularly conduct business in California. Further, no federal question is at issue because the claims are based solely on California law.

5. Venue is proper in this judicial district and the County of Los Angeles, California, because Plaintiff, and other persons similarly situated, performed work for Defendants in the County of Los Angeles, Defendants maintain offices and facilities and transact business in the County of Los Angeles, and Defendants' illegal policies and practices that are the subject of this action were applied, at least in part, to Plaintiff and other persons similarly situated in the County of Los Angeles.

## THE PARTIES

6. Plaintiff is an individual who worked for Defendants in Los Angeles County during the statutory period.

7. On information and belief, Defendant ABC is now, and at all times mentioned in this complaint, was, a corporation organized and existing under the laws of the State of Delaware and qualified to do business in California.

8. Plaintiff does not know the true names or capacities, whether individual, partner,

or corporate, of Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, said Defendants are sued under such fictitious names, and Plaintiff prays for leave to amend this complaint when the true names and capacities are known. Plaintiff is informed and believes and thereon alleges that each of Defendants designated as a DOE was responsible in some way for the matters alleged herein and proximately caused Plaintiff and members of the general public and the Class to be subject to the illegal employment practices, wrongs, and injuries complained of herein.

## **LABOR CODE § 2810.3**

9.      Plaintiff is informed and believes and based thereon alleges that at all times material to this complaint, that ABC partners with third party staffing agencies to procure workers to perform on the premises or worksite of ABC as part of its or their regular course of business. Plaintiff is informed and believes and based thereon alleges that at all times material to this Complaint, ABC employs more than twenty-five (25) workers, is a client employer within the meaning of Labor Code § 2810.3, and is jointly and severally liable with any third party staffing agency for the violations alleged herein.

## **ALLEGATIONS COMMON TO AT LEAST ONE CAUSE OF ACTION**

10.     On information and belief, the show, "Good Morning America" is produced by ABC.

11.     On or about February 25, 2021, Defendants hired Plaintiff as an independent contractor and as a background talent to dance and appear on Good Morning America in exchange for payment of at least $1,000.

12.     Plaintiff performed her duties for over four hours under the direction and control of Defendants with no duty-free rest break. Despite performing all of her duties, Defendants have filed to pay Plaintiff her promised wage. As a result of Defendants' violation of California law, Plaintiff was denied her fundamental employment rights, including but not limited to, the right to duty-free rest breaks (or compensation therefor), the right to prompt payment of wages upon termination of employment, and the right to accurate, itemized wage statements.

## CLASS ACTION ALLEGATIONS

13. **Class Definition:** for the period from four years from the filing of this lawsuit (including applicable tolling periods) (the "Class Period"), all of Defendants' current and former non-exempt background talent who worked in California as an independent contractor (the "Class" or "Class Members").

14. In addition to the Class Members, Plaintiff seeks to pursue claims on behalf of the following subclasses:

      **a. Unpaid Wage Subclass:** all current and former independent contractors who did not receive their promised pay;

      **b. Rest Break Subclass:** all current and former independent contractors who worked one or more shifts of three and one-half (3.5) hours or, under Wage Order No. 12-2001, four (4) hours or more;

      **c. Waiting Time Penalty Subclass:** all former independent contractors who separated from their employment with Defendants; and

      **d. Wage Statement Subclass:** all current and former independent contractors who received a payment of wages.

15. The potential class is of a significant number. Joinder of all current and former employees individually would be impracticable.

16. Plaintiff's claims are typical of the claims of the class because Defendants uniformly subjected all non-exempt employees to the same violations of the Labor Code, the applicable IWC Wage Order, and the Business and Professions Code.

17. This action involved common questions of law and fact because the action focuses on Defendants' systematic course of illegal policies and practices, which were applied to all non-exempted employees in violation of the Labor Code, the applicable IWC Wage Order, and the Business and Professions Code, which prohibits unfair business practices arising from such violations.

18. Plaintiff will fairly and adequately protect the interests of all Class Members.

**PAGA ALLEGATIONS**

19.     Plaintiffs bring this action pursuant to the Private Attorneys General Act of 2004 ("PAGA"), California Labor Code § 2698 *et seq*. on a representative basis.  All current and former workers and employees of Defendants are aggrieved employees.

**ALLEGATIONS RELATING TO DEFENDANTS' FAILURE TO PAY WAGES IN VIOLATION OF LABOR CODE §§ 222 and 223**

20.     As a result of misclassifying its employees as independent contractors, Defendants failed to maintain a policy that compensates aggrieved employees their promised wages in violation of Labor Code §§ 222 and 223. As a result, Defendants are liable for civil penalties pursuant to California Labor Code.

**ALLEGATIONS RELATING TO DEFENDANTS' FAILURE TO PAY MINIMUM AND OVERTIME WAGES IN VIOLATION OF LABOR CODE §§ 510, 1194**

21.     As a result of misclassifying its employees as independent contractors, Defendant failed to maintain a policy that compensates non-exempt employees for all overtime hours worked.  Moreover, Defendant's policy and practice is to misclassify employees as independent contractors in order to deny paying them overtime wages.  As a result of the violations of California Labor Code §§ 510 and 1194 for failure to pay overtime, Defendant is liable for civil penalties pursuant to California Labor Code §§ 558 and 2698 *et seq*.

**ALLEGATIONS RELATING TO DEFENDANTS' FAILURE TO PROVIDE OFF-DUTY MEAL AND REST BREAKS IN VIOLATION OF LABOR CODE §§ 226.7, 510, 1194**

22.     As a result of misclassifying its employees as independent contractors, Defendants failed to maintain a policy that provides their employees with off-duty meal and rest periods as required by California law.  Plaintiff and the aggrieved employees worked in one or more shifts in excess of three and one-half, four, five, and six hours (as applicable) without being provided at least a ten-minute rest break or a thirty-minute meal break (as applicable) in which they were relieved of all duties, as required by Labor Code §§ 226.7 and 512.  Defendant failed to pay Plaintiff and the aggrieved employees the premium compensation mandated by Labor

Code § 226.7(b) for these missed meal and rest periods.  As a result of the violations of California Labor Code §§ 226.7 and 512, Defendant is liable for civil penalties pursuant to California Labor Code §§ 558 and 2698 *et seq*.

### ALLEGATIONS RELATING TO DEFENDANTS' FAILURE TO FURNISH ACCURATE WAGE STATEMENTS IN VIOLATION OF LABOR CODE §§ 226 and 226.3

23.     As a result of misclassifying its employees as independent contractors, Defendants failed to maintain their affirmative obligation to furnish accurate records regarding the rates of pay for their California employees.  For example, Defendants failed to keep accurate records of Plaintiffs' and other aggrieved employees' gross wages earned, total hours worked, net wages earned, and all applicable hourly rates and the number of hours worked at each hourly rate.  As a result of the violations of California Labor Code § 226(a), Defendant is liable for civil penalties pursuant to California Labor Code §§ 226.3 and 2698 *et seq*.

### ALLEGATIONS RELATING TO DEFENDANTS' UNTIMELY PAYMENT OF WAGES IN VIOLATION OF LABOR CODE §§ 201-204, 210, and 1194.5

24.     As a result of misclassifying its employees as independent contractors, Defendants failed to maintain all times relevant herein, Defendants were required by law to pay employee wages in a timely manner, pursuant to the mandates of the Labor Code and all regulations promulgated thereunder.  Defendants have violated California Labor Code §§ 201-204 by willfully failing to pay all compensation due and owing to all former non-exempt employees at the time employment was terminated. Plaintiff and the other aggrieved employees were not paid their promised pay.  Pursuant to the Labor Code, the aggrieved employees are entitled to recover up to thirty (30) days of wages due to Defendants' willful failure to comply with the statutory requirements of the Labor Code.

### ALLEGATIONS RELATING TO DEFENDANTS' WILLFUL MISCLASSIFICATION IN VIOLATION OF LABOR CODE § 226.8

25.     Defendants violated Labor Code section 226.8 by knowingly and willfully misclassifying Plaintiff and other aggrieved employees as independent contractors in order to

avoid complying with their tax obligations and their obligations under the Labor Code. As such, Plaintiff and the other aggrieved employees are entitled to penalties of not less than $5,000 and not more than $15,000 for each violation. Further, Plaintiff contends that Defendants have engaged in a pattern or practice of misclassifying employees that is willful. As such, Plaintiff and other aggrieved employees are entitled to penalties in the amount not less than $15,000 and not more than $25,000 for each violation.

## FIRST CAUSE OF ACTION

### Failure to Pay Wages

### [Cal. Labor Code §§ 218, 218.5, 218.6]

### (Against All Defendants by Plaintiff on Behalf of the Class and Subclasses (a))

26.    Plaintiff re-alleges and incorporates by reference the above paragraphs as though fully set forth herein.

27.    Defendants failed to pay Plaintiff her wages due in exchange for work in and for Good Morning America on February 25, 2021, in violation of Labor Code § 218.5.

28.    As a direct and proximate cause of Defendants' failure and refusal to pay said compensation, Plaintiff have been deprived of their rightfully earned wages.  Plaintiff is entitled to recover such amounts of unpaid wages earned by them, plus interest thereon, attorney's fees and costs, and applicable civil and statutory penalties.

29.    As a direct and proximate cause Defendants' failure and refusal to pay said compensation, Plaintiff and the Unpaid Wage Subclass have been denied their rightfully due wages.  Plaintiff and the Unpaid Wage Subclass are entitled to recover such amounts of unpaid wages, plus interest thereon, attorneys' fees and costs, and applicable civil and statutory penalties.

## SECOND CAUSE OF ACTION

### Failure to Provide Rest Breaks

### [Cal. Labor Code §§ 512, 226.7]

### (Against All Defendants by Plaintiff and Subclass (b))

30.    Plaintiff re-alleges and incorporates by reference the above paragraphs as though

fully set forth herein.

31.     In accordance with the mandates of the California Labor Code and the applicable IWC Wage Order, Plaintiff and the Rest Break Subclass had the right to take a 10-minute rest break for every four (4) hours worked or major fraction thereof.

32.     As a pattern and practice, Defendants regularly failed to provide Plaintiff and the Rest Break Subclass their duty-free rest periods and did not provide proper compensation for this failure.

33.     Such a pattern and practice of administration of corporate policy as described herein is unlawful and creates an entitlement to recovery by the Plaintiff and the Rest Break Subclass identified herein, in a civil action, for the balance of the unpaid premium compensation pursuant to Labor Code § 226.7 and the applicable IWC Wage Order, including interest thereon.

## THIRD CAUSE OF ACTION

### Waiting Time Penalties

### [Cal. Labor Code § 201.5]

### (Against All Defendants by Plaintiff on Behalf of the Class and Subclass (c))

34.     Plaintiff re-alleges and incorporates by reference the above paragraphs as though fully set forth herein.

35.     Plaintiff is informed and believes and based thereon alleges that Defendants' willfully failed to pay all wages due and owing to Plaintiff and the Waiting Time Penalty Subclass at the termination of their employment.

36.     The conduct of Defendants and their agents and employees as described herein was willfully done by Defendants in violation of the rights of Plaintiff and the Waiting Time Penalty Subclass.

37.     As a direct and proximate cause of Defendants' willful failure to provide timely wages upon termination of employment, Plaintiff and the Waiting Time Penalty Subclass have suffered, and continue to suffer, substantial losses related to the use and enjoyment of such wages and lost interest on such wages. Plaintiff and the Waiting Time Penalty Subclass are entitled to recover penalties against Defendants in an amount to be determined at trial pursuant to Labor

Code § 203, which provides that an employee's wages shall continue as a penalty until paid, for a period of up to thirty (30) days from the time they were due.

## FOURTH CAUSE OF ACTION

### Failure to Furnish Accurate Itemized Wage Statements

### [Cal. Labor Code § 226]

### (Against All Defendants by Plaintiff on Behalf of the Class and Subclass (d))

38.     Plaintiff re-alleges and incorporates by reference the above paragraphs as though fully set forth herein.

39.     During the Class Period, Defendants failed to provide Plaintiff and the Wage Statement Subclass with timely and accurate itemized wage statements in writing showing each employee's number of hours worked at each hourly rate, in violation of California Labor Code § 226.

40.     During the Class Period, Plaintiff and the Wage Statement Subclass suffered injury, and continue to suffer injury, as a result of Defendants' failure to provide timely and accurate itemized wage statements, as Plaintiff and the Wage Statement Subclass could not promptly and easily determine from the wage statement alone one or more of the following: the gross wages earned, the total hours worked, all deductions made, the net wages earned, the name and address of the legal entity or entities employing Plaintiff and the Wage Statement Subclass, and all applicable hourly rates in effect during each pay period, including the corresponding number of hours worked at each hourly rate.

41.     As a direct and proximate cause of the aforementioned violations, Plaintiff and the Wage Statement Subclass have suffered actual damages in an amount according to proof at trial, and seek all wages earned and due, plus interest thereon. Additionally, Plaintiff and the Wage Statement Subclass are entitled to an award of costs, expenses, and reasonable attorneys' fees, as well as other available remedies.

## FIFTH CAUSE OF ACTION

### Unfair and Unlawful Business Practices

### [Cal. Bus. & Prof. Code § 17200 *et seq*.]

**(Against all Defendants by Plaintiff on Behalf of the Class)**

42.     Plaintiff re-alleges and incorporates by reference the above paragraphs as though fully set forth herein.

43.     Each and every one of Defendants' acts and omissions as heretofore described constitute unfair and unlawful business practices under California Business and Professions Code § 17200 et seq.

44.     Defendants' violations of California wage and hour laws constitute a business practice because Defendants' aforementioned acts and omissions were done repeatedly over a significant period of time, and in a systematic manner, to the detriment of Plaintiff and the Class Members.

45.     Defendants have avoided payment of earned wages and other benefits, as required by the California Labor Code, the California Code of Regulations, and the applicable IWC Wage Order.

46.     As a result of Defendants' unfair and unlawful business practices, Defendants have reaped unfair and illegal profits during the Class Period at the expense of Plaintiff, Class Members, and members of the public. Defendants should be made to disgorge their ill-gotten gains and to restore them to Plaintiff and the Class Members.

47.     Defendants' unfair and unlawful business practices entitle Plaintiff and the Class Members to seek preliminary and permanent injunctive relief, including but not limited to orders that Defendants account for, disgorge, and restore Plaintiff and Class Members the wages and other compensation unlawfully withheld from them. Plaintiff and Class Members are entitled to restitution of all monies to be disgorged from Defendants in an amount subject to proof at trial.

## SIXTH CAUSE OF ACTION

**Private Attorney General Act of 2004**

**[Cal. Labor Code § 2698 *et seq.*]**

**(Against all Defendants by Plaintiff on Behalf of the Aggrieved Employees)**

48.     Plaintiff re-alleges and incorporates by reference the above paragraphs as though fully set forth herein.

COMPLAINT

49.     PAGA expressly establishes that any provision of the California Labor Code which provides for a civil penalty to be assessed and collected by the LWDA, or any of its departments, divisions, commissions, boards, agencies or employees for a violation of the California Labor Code, may be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself, and other current or former employees.

50.     The "aggrieved employees" under California Labor Code § 2699(c) are all current and former non-exempt employees who suffered one or more Labor Code violations alleged herein, including non-exempt employees who are and were misclassified as independent contractors.

51.     Plaintiff seeks to recover PAGA civil penalties through a representative action for violation of the Labor Code provisions alleged above.

52.     On September 22, 2021, Plaintiff filed a claim notice online with the California LWDA, LWDA Case No. CM-845548-21 describing the factual and legal violations described herein, and mailed the same via certified mail to Defendants.  To date, Plaintiff has not received a response.  Now that sixty-five days have passed from Plaintiff notifying Defendants of these violations, Plaintiff has exhausted her administrative requirements for bringing a claim under PAGA.

53.     Plaintiff was compelled to retain the services of counsel to file this court action to protect the interests and the interests of other similarly aggrieved employees, and to assess and collect the civil penalties owed by Defendants.  Plaintiff has thereby incurred attorneys' fees and costs, which she is entitled to receive under California Labor Code § 2699.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.     For compensatory damages in an amount to be proven at trial;

2.     For interest on the unpaid wages at 10% per annum;

3.     For waiting time penalties;

4.     For reasonable attorneys' fees and cost of suit;

5.    For restitution and disgorgement of profits according to proof from Defendants' unfair and unlawful business practices;

6.    For an order certifying the action as a class action;

7.    For an order appointing Plaintiff as a class representative and Plaintiff's counsels as class counsels;

8.    For civil penalties due to Plaintiffs, other aggrieved employees, and the State of California according to proof pursuant to Labor Code §§ 558 and 2699(a); and

9.    For such other and further relief as this Court deems just and proper.

DATED:  November 10, 2021            **KIM LEGAL, APC**
                                     **HELEN KIM LAW, APC**


                         By:    _____
                                    */s/ Frank H. Kim*
                                Frank H. Kim, Esq.
                                Helen U. Kim, Esq.
                                *ATTORNEYS FOR PLAINTIFF*

# EXHIBIT B

Electronically FILED by Superior Court of California, County of Los Angeles on 01/03/2022 04:55 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Lozano,Deputy Clerk

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AMERICAN BROADCASTING COMPANIES, INC., a foreign corporation; and DOES 1 through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

RAPHAELLE BARDET, in her representative capacity, and on behalf of all others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Stanley Mosk Courthouse
Superior Court of California, County of Los Angeles
111 N. Hill St., Los Angeles, CA 90012

| CASE NUMBER: *(Número del Caso):* |
|---|
| 22STCV00195 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Frank H. Kim; Kim Legal, APC, 3435 Wilshire Blvd., Suite 2700, Los Angeles, CA 90010; (323) 482-3300

DATE: 01/03/2022
*(Fecha)*

Sherri R. Carter Executive Officer / Clerk of Court
Clerk, by          R. Lozano          , Deputy
*(Secretario)*          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*

under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)          ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

# EXHIBIT C

Electronically FILED by Superior Court of California, County of Los Angeles on 01/03/2022 04:55 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Lozano,Deputy Clerk

Case 2:22-cv-00816-GW-MAA   Document 1-1   Filed 02/07/22   Page 21 of 328   Page ID #:24

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Frank H. Kim (SBN 264609)<br>KIM LEGAL, APC<br>3435 Wilshire Blvd, Suite 2700<br>Los Angeles, CA 90010<br>TELEPHONE NO.: (323) 482-3300      FAX NO.:<br>ATTORNEY FOR *(Name):* Raphaelle Bardet | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 N Hill St.
MAILING ADDRESS: 111 N Hill St.
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Bardet v. American Broadcasting Companies, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| ☑ **Unlimited**<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ **Limited**<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 22STCV00195<br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☑ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☑ is   ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☑ Large number of separately represented parties
   b. ☑ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☑ Substantial amount of documentary evidence
   d. ☑ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):*  Labor Code violations and UCL.
5. This case ☑ is   ☐ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date:  January 3, 2021
Frank H. Kim
(TYPE OR PRINT NAME)                            ▶  *Frank Kim*
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
**CIVIL CASE COVER SHEET**
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
*www.courtinfo.ca.gov*

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.**  If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1.  This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet.  In item 1, you must check **one** box for the case type that best describes the case.  If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below.  A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.**  A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit.  A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading.  A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.**  In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or
    toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-
      domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
      harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

| SHORT TITLE: Bardet v. WAD Productions, Inc. et al. | CASE NUMBER 22STCV00195 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Court Filing Location (Column C) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.

2. Permissive filing in central district.

3. Location where cause of action arose.

4. Mandatory personal injury filing in North District.

5. Location where performance required or defendant resides.

6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.

8. Location wherein defendant/respondent functions wholly.

9. Location where one or more of the parties reside.

10. Location of Labor Commissioner Office.

11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | **A**<br>Civil Case Cover Sheet Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: Bardet v. WAD Productions, Inc. et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☑ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 2 of 4

| SHORT TITLE: Bardet v. WAD Productions, Inc. et al. | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: Bardet v. WAD Productions, Inc. et al. | CASE NUMBER |
|---|---|

**Step 4:** **Statement of Reason and Address**: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| **REASON:**<br><br>✓ 1.  ✓ 2.  ✓ 3.   4.   5.   6.   7.   8.   9.   10.   11. | ADDRESS: |
|---|---|
| CITY: | STATE: | ZIP CODE: |

**Step 5:** **Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: ___January 3, 2021___

_Frank Kim_
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

# EXHIBIT D

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES**<br><br>COURTHOUSE ADDRESS:<br>Spring Street Courthouse<br>312 North Spring Street, Los Angeles, CA 90012<br><br>**NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | Reserved for Clerk's File Stamp<br><br>**FILED**<br>Superior Court of California<br>County of Los Angeles<br>**01/03/2022**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ R. Lozano _____ Deputy |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>22STCV00195 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|
| ✔ Elihu M. Berle | 6 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 01/04/2022
   (Date)

**Sherri R. Carter, Executive Officer / Clerk of Court**

By R. Lozano , Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

# EXHIBIT E

Electronically FILED by Superior Court of California, County of Los Angeles on 01/10/2022 02:41 PM Sherri R. Carter, Executive Officer/Clerk of Court, by L. Smith,Deputy Clerk

Case 2:22-cv-00816-GW-MAA   Document 1-1   Filed 02/07/22   Page 31 of 328   Page ID #:44

**POS-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Frank H. Kim, Esq. | SBN: 264605
Helen Kim Law, APC
3435 Wilshire Blvd., Suite 2700 Los Angeles, CA 90010

TELEPHONE NO.: (323) 487-9151 | FAX NO. (866) 652-7819
E-MAIL ADDRESS
ATTORNEY FOR *(Name):* Plaintiff: Raphaelle Bardet, in her representative capacity, and on behalf of all others similarly situated

*FOR COURT USE ONLY*

**Los Angeles County Superior Court - Stanley Mosk Courthouse**

STREET ADDRESS: 111 North Hill Street

MAILING ADDRESS:

CITY AND ZIP CODE: Los Angeles, CA 90012

BRANCH NAME: Stanley Mosk Courthouse - Central District

| | |
|---|---|
| PLAINTIFF: **Raphaelle Bardet, in her representative capacity, and on behalf of all others similarly situated**<br>DEFENDANT: **American Broadcasting Companies, Inc., a foreign corporation; et al.** | CASE NUMBER:<br>**22STCV00195** |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>**Bardet v. ABC** |

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-complaint
   f. ☑ other *(specify documents):* **Civil Case Cover Sheet Addendum and Statement of Location; Notice of Case Assignment – Unlimited Civil Case; Voluntary Efficient Litigation Stipulations; Order Pursuant to CCP 1054(a), Extending Time to Respond by 30 Days When Parties Agree to Early Organizational Meeting Stipulation**

3. a. Party served *(specify name of party as shown on documents served):*
      **American Broadcasting Companies, Inc., a foreign corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      **CSC - Lawyers Incorporating Service c/o Nicole Stauss - Registered Agent for Service of Process**
      **Age: 35 Weight: 260 Hair: Black Sex: Female Height: 6'0" Eyes: Brown Race: African American**

4. Address where the party was served: **CSC - Lawyers Incorporating Service**
   **2710 Gateway Oaks Dr Ste 150N**
   **Sacramento, CA 95833-3502**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **1/6/2022**   (2) at *(time):* **3:19 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3b):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):*            **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

POS010-1/245936

PETITIONER: Raphaelle Barbot, in her representative capacity, and on behalf of all others similarly situated    CASE NUMBER:

RESPONDENT: **American Broadcasting Companies, Inc., a foreign corporation; et al.**    **22STCV00195**

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):*      (2) from *(city):*

(3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) *(Code Civ. Proc., § 415.30.)*

(4) ☐ to an address outside California with return receipt requested. *(Code Civ. Proc., § 415.40.)*

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐   Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of *(specify):* **American Broadcasting Companies, Inc., a foreign corporation**
under the following Code of Civil Procedure section:

| | |
|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name: **Krystalyn Souza - ON-CALL LEGAL**

b. Address: **2476 Overland Avenue, Third Floor  Los Angeles, CA 90064**

c. Telephone number: **(310) 858-9800**

d. **The fee** for service was: **$ 158.93**

e. I am:

(1) ☐ not a registered California process server.

(2) ☐ exempt from registration under Business and Professions Code section 22350(b).

(3) ☑ registered California process server:

(i) ☐ owner   ☐ employee   ☐ independent contractor.

(ii) Registration No.: **PS-047**

(iii) County: **Yuba**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **1/7/2022**

**ON-CALL LEGAL**
**2476 Overland Avenue, Third Floor**
**Los Angeles, CA 90064**
**(310) 858-9800**
**www.OnCallLegal.com**

_____
**Krystalyn Souza**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶

# EXHIBIT F

Electronically FILED by Superior Court of California, County of Los Angeles on 02/04/2022 06:04 PM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Perez,Deputy Clerk

1  MITCHELL SILBERBERG & KNUPP LLP
   EMMA LUEVANO (SBN 198421), eyl@msk.com
2  COREY G. SINGER (SBN 300334), cgs@msk.com
   2049 Century Park East, 18th Floor
3  Los Angeles, CA  90067-3120
   Telephone: (310) 312-2000
4  Facsimile: (310) 312-3100

5  Attorneys for Defendant
   AMERICAN BROADCASTING
6  COMPANIES, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   FOR THE COUNTY OF LOS ANGELES

10         CENTRAL DISTRICT, SPRING STREET COURTHOUSE

11  RAPHAELLE BARDET, in her representative       CASE NO.  22STCV00195
    capacity, and on behalf of all others similarly
12  situated,                                      Judge:     Hon. Elihu M. Berle
                                                   Dept:      6
13          Plaintiff,
                                                   **DEFENDANT AMERICAN**
14      vs.                                         **BROADCASTING COMPANIES, INC.'S**
                                                   **ANSWER TO PLAINTIFF'S**
15  AMERICAN BROADCASTING                          **UNVERIFIED COMPLAINT**
    COMPANIES, INC., a foreign corporation;
16  and DOES 1 through 50, Inclusive,              Filed:     January 3, 2022
                                                   Trial:     Not Set
17          Defendants.

18

19

20

21

22

23

24

25

26

27

Mitchell
Silberberg &   28
Knupp LLP

─────────────────────────────────────────────────────────
        **DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

Defendant American Broadcasting Companies, Inc. ("Defendant"), by and through its counsel, hereby answers the unverified Complaint filed by Plaintiff Raphaelle Bardet ("Plaintiff") as follows:

## GENERAL DENIAL

Pursuant to the provisions of California Code of Civil Procedure Section 431.30(d), Defendant denies, both generally and specifically, each and every material allegation in the Complaint, and specifically denies that Plaintiff or any alleged aggrieved employee of any putative class or representative action (hereinafter, "aggrieved employee") has been, is, or will be damaged in the amount alleged, or in any manner or sum whatsoever, or is entitled to any recovery or remedy of any type whatsoever, by reason of any of Defendant's acts, conduct, or omissions.

## SEPARATE AFFIRMATIVE DEFENSES

Without waiving or excusing Plaintiff's burden of proof or the burden of proof of any aggrieved employee, or admitting that Defendant has any burden of proof, or admitting that any of these affirmative defenses are in fact affirmative defenses as to which Defendant bears the burden of proof as opposed to matters on which Plaintiff and/or the aggrieved employee bears the burden of proof, Defendant asserts the following separate affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Cause of Action)

1.     The Complaint, in whole or in part, fails to state facts sufficient to constitute a cause of action brought on behalf of Plaintiff and/or any aggrieved employee.

## SECOND AFFIRMATIVE DEFENSE
### (Practice Required by Collective Bargaining Agreement)

2.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because the alleged misconduct is the result of Defendant's

Mitchell
Silberberg &
Knupp LLP

DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT

performance of its obligations under the collective bargaining agreement governing the services that Plaintiff and/or any other aggrieved employee purportedly provided to Defendant.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Exhaust under Collective Bargaining Agreement)

3.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because Plaintiff was required to exhaust contractual remedies by submitting all such claims to the grievance and arbitration procedures set forth in the collective bargaining agreement governing the services that Plaintiff and/or any other aggrieved employee purportedly provided to Defendant, and Plaintiff and/or the aggrieved employee failed to do so in a timely manner.

## FOURTH AFFIRMATIVE DEFENSE

### (LMRA Section 301 Preemption)

4.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because they are preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) *et seq.*, and barred by the applicable statute of limitations set forth in *Del Costello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 169 (1983).

## FIFTH AFFIRMATIVE DEFENSE

### (Collective Bargaining Agreement Preemption)

5.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because any recovery on Plaintiff's Complaint, or any purported cause of action therein, is preempted under the National Labor Relations Act, 29 U.S.C. Section 151, *et seq*.

## SIXTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

6.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, by the applicable statutes of limitations, including without limitation, the limitations periods prescribed in California Labor Code Section 203, California Labor Code Section 2699.3, California Labor Code Section 1194.2, the one-year limitations period contained

Mitchell Silberberg & Knupp LLP

3

in California Code of Civil Procedure ("CCP") Sections 340(a) and (b), the two-year limitations period contained in CCP Section 339(1), the three-year limitations period contained in CCP Section 338, the four-year limitations period contained in CCP Section 337(a), the four-year "catch all" statute of limitations contained in CCP Section 343, the four-year limitations period contained in California Business and Professions Code Section 17208, the applicable statute of limitations set forth in *Del Costello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 169 (1983), and any other applicable limitations period contained in the applicable collective bargaining agreement(s).

### SEVENTH AFFIRMATIVE DEFENSE

### (Res Judicata and Collateral Estoppel)

7.      Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because of res judicata and/or collateral estoppel.

### EIGHTH AFFIRMATIVE DEFENSE

### (Laches)

8.      Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, by the doctrine of laches.

### NINTH AFFIRMATIVE DEFENSE

### (Waiver)

9.      Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because such claims have been waived, discharged, and/or abandoned.

### TENTH AFFIRMATIVE DEFENSE

### (Estoppel)

10.      Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because Plaintiff and the aggrieved employees are estopped by their own conduct to claim any right to damages or other relief from Defendant.

Mitchell Silberberg & Knupp LLP

4

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

11.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, by unclean hands and/or inequitable or wrongful conduct.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Consent/Ratification)**

12.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, by Plaintiff's and the aggrieved employees' express or implied consent to the conduct of which they complain and/or ratification of that conduct.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Lack of Willfulness or Knowing or Intentional Conduct)**

13.     Neither Plaintiff nor any aggrieved employee is entitled to any penalty or liquidated damages award, including, but not limited to any penalties or liquidated damages under California Labor Code Sections 201, 201.5, 202, 203, 204, 218, 218.5, 218.6, 226, 226.3, 226.7, 226.8, 510, 512, 558, 558.1, 1194, 1194.2, 1194.5, and/or 2699; the Industrial Welfare Commission Wage Orders; and/or penalties alleged in the Complaint.  That is because, at all relevant times, Defendant did not act willfully, knowingly, or intentionally.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Good Faith)**

14.     Neither Plaintiff nor any aggrieved employee is entitled to any penalty or liquidated damages award, including, but not limited to any penalties or liquidated damages under California Labor Code Sections 201, 201.5, 202, 203, 204, 218, 218.5, 218.6, 226, 226.3, 226.7, 226.8, 510, 512, 558, 558.1, 1194, 1194.2, 1194.5, and/or 2699; the Industrial Welfare Commission Wage Orders; and/or penalties alleged in the Complaint.  That is because, at all relevant times, Defendant acted in good faith and had reasonable grounds for believing that Defendant did not violate relevant laws or the specified provisions.

Mitchell
Silberberg &
Knupp LLP

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

### FIFTEENTH AFFIRMATIVE DEFENSE

#### (Compliance or Substantial Compliance with Legal Obligations)

15.   Defendant complied, substantially complied, or sought in good faith to comply, with all obligations under any federal, state, and/or local law.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (Impossibility / Impracticability of Performance)

16.   Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, to the extent the collective bargaining agreement applicable to the services that Plaintiff purportedly provided made it impossible and/or impracticable for Defendant to comply with any federal, state, and/or local law.

### SEVENTEENTH AFFIRMATIVE DEFENSE

#### (Release or Settlement)

17.   Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because such claims have been released or settled in exchange for full and adequate consideration.

### EIGHTEENTH AFFIRMATIVE DEFENSE

#### (Accord and Satisfaction)

18.   Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, by the doctrine of accord and satisfaction.

### NINETEENTH AFFIRMATIVE DEFENSE

#### (After-Acquired Evidence)

19.   Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred and/or their damages must be reduced, in whole or in part, to the extent there is any after-acquired evidence of her misconduct.

Mitchell
Silberberg &
Knupp LLP

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

## TWENTIETH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

20.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are barred, in whole or in part, because Plaintiff and each aggrieved employee have not appropriately nor adequately mitigated their alleged damages.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Offset/Setoff)

21.     If Plaintiff or any aggrieved employee have sustained any damages, which Defendant specifically denies, Defendant is entitled under the equitable doctrine of setoff and recoupment to offset obligations owed to Defendant by Plaintiff and/or the aggrieved employee against any judgment that may be entered.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (No Actual Injury)

22.     Plaintiff's and the aggrieved employees' claims brought under California Labor Code Section 226 are barred on the ground that Plaintiff and the aggrieved employees did not suffer any actual injury as a result of any alleged violation of Section 226 by Defendant.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Apportionment of Responsibility)

23.     The alleged damages, injuries, and/or losses suffered by Plaintiff and aggrieved employees, if any, proximately resulted from the negligence or conduct of parties, persons, and/or entities other than Defendant, and Defendant's liability, if any, is therefore altogether barred or limited in direct proportion to the percentage of fault actually attributable to Defendant.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Comparative Fault of Plaintiff)

24.     Plaintiff's alleged damages, injuries, and/or losses, if any, were proximately caused and contributed to by the negligence, breach of contract, or other fault or misconduct of Plaintiff or Plaintiff's agents and/or the aggrieved employee or aggrieved employee's agents and, by reason thereof, any recovery by Plaintiff and/or any aggrieved employee against Defendant must be

Mitchell
Silberberg &
Knupp LLP

7

1   reduced by an amount equal to the proportionate fault of Plaintiff or Plaintiff's agents and/or the

2   aggrieved employee or aggrieved employee's agents pursuant to applicable law.

3                  **TWENTY-FIFTH AFFIRMATIVE DEFENSE**

4                              **(No Double Recovery)**

5        25.     To the extent Plaintiff is entitled to any recovery, which Defendant denies, Plaintiff

6   and each aggrieved employee are barred and precluded from securing any double recovery.

7                  **TWENTY-SIXTH AFFIRMATIVE DEFENSE**

8                            **(No Representative Action)**

9        26.     Plaintiff has failed to allege and cannot prove the facts and prerequisites necessary

10  for the maintenance of a representative action under the California Labor Code Private Attorneys

11  General Act of 2004 ("PAGA").

12                 **TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

13                              **(Lack of Standing)**

14       27.     Plaintiff's claims and the claims of each aggrieved employee, or some of them, are

15  barred, in whole or in part, for lack of standing, including their lack of standing and inadequacy to

16  represent any PAGA representative action.

17                 **TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

18              **(Failure to Comply with PAGA Requirements)**

19       28.     Claims, or any threatened claims, by Plaintiff and/or aggrieved employees brought

20  under PAGA are barred, in whole or in part, due to Plaintiff's and each aggrieved employee's

21  failure to comply with PAGA administrative requirements, including but not limited to the failure

22  to provide the Labor and Workforce Development Agency with sufficient notice of her claims

23  and/or otherwise meet the requirements of PAGA.

24                 **TWENTY-NINTH AFFIRMATIVE DEFENSE**

25                        **(Unconstitutionality of Penalties)**

26       29.     Plaintiff and each aggrieved employee are not entitled to recover any penalties or

27  liquidated damages, such as but not limited to, those Plaintiff and each aggrieved employee seek

28  under or based upon California Labor Code Sections 201, 201.5, 202, 203, 204, 218, 218.5, 218.6,

Mitchell
Silberberg &
Knupp LLP

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

226, 226.3, 226.7, 226.8, 510, 512, 558, 558.1, 1194, 1194.2, 1194.5, and/or 2699, the Industrial Welfare Commission Wage Orders or otherwise, and any award of such penalties or damages would, in general or under the facts of Plaintiff's and the aggrieved employee's particular claims, violate Defendant's constitutional rights under the provisions of the United States and California Constitutions including, but not limited to, the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution and the excessive fines and the cruel and unusual punishment clauses of the Eighth Amendment of the United States Constitution, as well as the due process and excessive fines clause contained in the California Constitution.  In addition, the penalties sought by Plaintiff under PAGA would impermissibly result in awards that are "unjust, arbitrary and oppressive, or confiscatory" within the meaning of California Labor Code Section 2699(e)(2) and that, in any event, would require reduction under the discretion and limitations and conditions mentioned in California Labor Code Section 2699(e)(1).

## THIRTIETH AFFIRMATIVE DEFENSE

### (Constitutional Defects in PAGA)

30.     Any finding of liability under PAGA or the manner in which penalties accrue would violate the due process clause of the Fourteenth Amendment to the United States Constitution, and of Article I, Section 7 of the California Constitution, because the standards of liability and remedies under these statutes are unduly vague and subjective, and permit retroactive, random, arbitrary, and capricious punishment that serves no legitimate governmental interest.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### (Due Process and Equal Protection)

31.     The Complaint, to the extent it seeks exemplary damages or penalties, violates Defendant's right to equal protection under the United States and California Constitutions, violates Defendant's right to procedural due process under the Fourteenth Amendment of the United States Constitution, and under Article I, Section 7 of the Constitution of the State of California, and violates Defendant's right to substantive due process under the Fifth and Fourteenth Amendments of the United States Constitution and, therefore, fails to state a cause of action upon which exemplary, double, or punitive damages or penalties may be awarded.

Mitchell
Silberberg &
Knupp LLP

9

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### (Penalties Cannot Be Determined on a Representative or Community-Wide Basis)

32.     Plaintiff's claims for penalties under PAGA cannot be determined on a representative or community-wide basis.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Representative Action Not Manageable)

33.     Defendant alleges that this action is not properly maintained as a representative action because of the difficulties likely to be encountered in the management of a representative action.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (*De Minimis* Doctrine)

34.     The Complaint, and each purported cause of action contained therein, is barred to the extent the *de minimis* doctrine applies to Plaintiff's and/or the allegedly aggrieved employees' claims.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Class Requirements Cannot Be Met)

35.     Defendant alleges that Plaintiff has failed to and cannot satisfy the requirements for the maintenance of a class, representative, or collective action, including, and without limitation, ascertainability, predominance, typicality, adequacy of representation (of both the proposed class representative and proposed class counsel), and superiority, and further alleges that public policy considerations do not favor such a certification.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Failure to Exhaust Administrative and Internal Remedies)

36.     Plaintiff's Complaint and any purported cause of action alleged therein is barred by the failure of Plaintiff and/or the allegedly aggrieved employees to exhaust administrative and internal remedies available under state and federal laws, including, without limitation, the California Labor Code, and Defendant's internal policies and procedures.

Mitchell
Silberberg &
Knupp LLP

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

### THIRTY-SEVENTH AFFIRMATIVE DEFENSE

#### (Unjust Enrichment)

37.     Plaintiff and/or the allegedly aggrieved employees are barred from relief, in whole or in part, to the extent it results in an unjust enrichment to Plaintiff and/or any person on whose behalf relief is sought.

### THIRTY-EIGHTH AFFIRMATIVE DEFENSE

#### (No Employment Relationship/Wrong Party)

38.     Each purported cause of action in the Complaint is barred, in whole or in part, because Defendants did not employ Plaintiff and were not his joint employer, and Plaintiff wrongfully identified Defendants as parties to the action.

### THIRTY-NINTH AFFIRMATIVE DEFENSE

#### (Declaratory/Injunctive Relief Improper)

39.     Any claims by Plaintiff for equitable relief are barred because Plaintiff has an adequate and complete remedy at law, and/or cannot make the other requisite showings to obtain equitable relief, including but not limited to declaratory or injunctive relief.

### FORTIETH AFFIRMATIVE DEFENSE

#### (No Ratification of Third Party Actions)

40.     Plaintiff and/or the allegedly aggrieved employees are barred from relief, in whole or in part, to the extent it results in an unjust enrichment to Plaintiff and/or any person on whose behalf relief is sought.

### FORTY-FIRST AFFIRMATIVE DEFENSE

#### (Reservation of Rights)

41.     Defendant presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated affirmative defenses available, and it reserves the right to assert additional defenses in the event that investigation and discovery indicate that they would be appropriate, and particularly in the event a class is certified in this matter, as such event could give rise to additional affirmative defenses based on the identities of the class members then before the Court.

Mitchell
Silberberg &
Knupp LLP

11

## **PRAYER FOR RELIEF**

WHEREFORE, Defendant prays for judgment as follows:

1.      That Plaintiff and each aggrieved employee take nothing by reason of the Complaint, and that the Complaint and each cause of action be dismissed with prejudice on the merits;

2.      That class and representative status be denied;

3.      That judgment be entered in favor of Defendant and against Plaintiff and, if any class or representative action is allowed to proceed, against each aggrieved employee of any purported class or representative action;

4.      That Defendant be awarded its reasonable attorneys' fees and costs of suit, as provided by law; and

5.      That the Court order such other and further relief in favor of Defendant as the Court deems just and proper.


DATED:  February 4, 2022              Respectfully submitted,

MITCHELL SILBERBERG & KNUPP LLP
EMMA LUEVANO
COREY G. SINGER


By: _____
Emma Luevano
Attorneys for Defendant
AMERICAN BROADCASTING
SERVICES, INC.

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

# **PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and am not a party to this action; my business address is Mitchell Silberberg & Knupp LLP, 2049 Century Park East, 18th Floor, Los Angeles, CA 90067, and my business email address is m1b@msk.com.

On February 4, 2022, I served a copy of the foregoing document(s) described as **DEFENDANT AMERICAN BROADCASTING SERVICES, INC.'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT** on the interested parties in this action at their last known address as set forth below by taking the action described below:

| | |
|---|---|
| **KIM LEGAL, APC** | **HELEN KIM LAW, APC** |
| FRANK H. KIM, ESQ. | HELEN U. KIM, ESQ. |
| 3435 Wilshire Blvd., Suite 2700 | 3435 Wilshire Blvd., Suite 2700 |
| Los Angeles, CA  90010 | Los Angeles, CA  90010 |
| Telephone: 323-482-3300 | Telephone: 323-487-9151 |
| Facsimile: 866-652-7819 | Facsimile: 866-652-7819 |
| fkim@kim-legal.com | helen@helenkimlaw.com |
| *Attorneys for Plaintiff Raphaelle Bardet* | *Attorneys for Plaintiff Raphaelle Bardet* |

☑ **BY PLACING FOR COLLECTION AND MAILING**: I placed the above-mentioned document(s) in sealed envelope(s) addressed as set forth above, and placed the envelope(s) for collection and mailing following ordinary business practices. I am readily familiar with the firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at 2049 Century Park East, 18th Floor, Los Angeles, California 90067-3120 in the ordinary course of business.

☑ **ELECTRONIC MAIL**: By serving the above-mentioned document electronically on the parties at the e-mail address(es) indicated above and, to the best of my knowledge, the transmission was complete and without error in that I did not receive an electronic notification to the contrary.

☐ **BY ELECTRONIC SERVICE:**  Pursuant to California Rule of Court 2.251(b)(1)(B), the parties listed above were served electronically via the **FIRST LEGAL** e-filing portal

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on February 4, 2022, at Los Angeles, California.

*Mark Betti*
Mark Betti

Mitchell
Silberberg &
Knupp LLP

---

**DEFENDANT'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**<br>**Branch Name:** Spring Street Courthouse<br>**Mailing Address:** 312 North Spring Street<br>**City, State and Zip Code:** Los Angeles CA 90012 | |
| **SHORT TITLE:** RAPHAELLE BARDET vs AMERICAN BROADCASTING COMPANIES, INC. | **CASE NUMBER:**<br>22STCV00195 |
| **NOTICE OF CONFIRMATION OF ELECTRONIC FILING** | |

The Electronic Filing described by the below summary data was reviewed and accepted by the Superior Court of California, County of LOS ANGELES. In order to process the filing, the fee shown was assessed.

**Electronic Filing Summary Data**

Electronically Submitted By:   Legal Connect
Reference Number: 5305753_2022_02_05_02_01_15_754_5
Submission Number: 22LA00154125
Court Received Date: 02/04/2022
Court Received Time: 6:04 pm
Case Number: 22STCV00195
Case Title: RAPHAELLE BARDET vs AMERICAN BROADCASTING COMPANIES, INC.
Location: Spring Street Courthouse
Case Type: Civil Unlimited
Case Category: Other Employment Complaint Case
Jurisdictional Amount: Over $25,000
Notice Generated Date: 02/07/2022
Notice Generated Time: 9:41 am

**Documents Electronically Filed/Received**          **Status**

Answer                                              Accepted

**Comments**
Submitter's Comments:

Clerk's Comments:

**Electronic Filing Service Provider Information**
Service Provider: Legal Connect
Contact: Legal Connect
Phone: (800) 909-6859

# EXHIBIT G



# 2014-2018 SAG-AFTRA
## National Code of Fair Practice for Network Television Broadcasting

## 2014-2018 SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING

### TABLE OF CONTENTS

| Paragraph | Subject | Page |
|---|---|---|
| 1. | Length of Contract | 1 |
| 2. | Principal Performers | 1 |
| 2.A. | Dramatic Programs | 1 |
| 2.B. | Non-Dramatic Programs | 3 |
| 3. | Performers Who Speak Five Lines or Less | 6 |
| 4. | Commercial Performers and Announcers Off-Camera | 8 |
| 5. | Groups & Choruses | 11 |
| 5.A. | Group Dancers | 11 |
| 5.B. | Chorus Singers | 16 |
| 6. | Specialty Acts | 20 |
| 7. | Sportscasters | 21 |
| 8. | Background Actors | 23 |
| 9. | Live Signature Numbers | 27 |
| 9.A. | Standard Non-Commercial Openings and Closings and Musical Signatures | 27 |
| 10. | Promotional Announcements | 28 |
| 11. | Sustaining Programs | 32 |
| 12. | Rates for Programs in Excess of Two Hours and Morning News Programs | 32 |
| 13. | Periods of Rehearsal and Rates | 32 |
| 14. | Rehearsal Days | 33 |
| 15. | Overtime | 33 |
| 16. | Rest Between Days | 35 |
| 17. | Minimum Daily Call | 36 |
| 18. | Minimum Session | 37 |
| 19. | Guaranteed Days of Employment | 37 |
| 20. | Rehearsal on Strip Programs | 38 |
| 21. | Reading Session | 39 |
| 22. | Rest Periods | 39 |
| 23. | Meal Periods | 39 |
| 24. | Commercial | 41 |
| 25. | Wardrobe, Hairdress, Make-up and Incidental Rehearsal | 41 |
| 26. | Announcers and Performers Who Appear in More Than One Commercial Announcement | 42 |
| 27. | Classification of Background Actors in Commercial Announcement | 42 |
| 28. | Live Repeat Program | 43 |
| 29. | Retakes & Recording After Scheduled Final Performance Day | 43 |
| 30. | Previews | 43 |
| 31. | Warm-Ups | 43 |
| 32. | After-Shows | 44 |
| 33. | Models | 44 |
| 34. | Contractor for Group Singers or Group Dancers | 44 |
| 35. | Understudies | 45 |
| 36. | Stand-Ins and Dance-Ins | 45 |
| 37. | Multiple Programs Which are Part Sustaining and Part Commercial | 46 |
| 38. | Notice on Multiple Performances (Call Boards) | 46 |
| 38.A. | Vacations | 47 |
| 38.B. | Holidays | 47 |
| 39. | Hazardous Performances | 47 |
| 39.A. | Work in Smoke & Hazardous Substances | 49 |
| 40. | Payment for Multiple Sponsorship of Programs | 49 |
| 41. | Commercials on Segmented Programs | 49 |
| 42. | Remotes | 50 |

| | 43. | Compensation for Traveling and Location Work | 50 |
|---|---|---|---|
| **Paragraph** | | **Subject** | **Page** |
| | 44. | Program Auditions | 52 |
| | 45. | Talent Auditions, Individual Video Tests, and Individual Voice Tests; Calls for Group Dancers | 52 |
| | 46. | Doubling | 53 |
| | 47. | Definition of a Line | 55 |
| | 48. | Definition of Background Actors | 55 |
| | 49. | Cast Credits | 55 |
| | 50. | Cosmetic Alterations and Nudity | 56 |
| | 51. | Dressing Rooms | 56 |
| | 52. | Minimum Scales | 57 |
| | 53. | Programs on Multiple Stations Commonly Owned | 57 |
| | 54. | Exclusivity | 57 |
| | 54.A. | Term Contracts – Serials | 58 |
| | 55. | Engagements | 59 |
| | 56. | Overscale Contracts | 60 |
| | 57. | Additional Services | 61 |
| | 58. | Cancelled Individual Engagements | 61 |
| | 59. | Cancelled Programs | 61 |
| | 60. | Postponed Programs | 62 |
| | 61. | Payment | 63 |
| | 62. | Deductions for Social Security and Withholding Taxes | 64 |
| | 63. | Disability Insurance | 64 |
| | 64. | Non-Waiver of Rights | 65 |
| | 65. | Notice on Group Singers, Group Dancers and Announcers | 65 |
| | 66. | Individual Contracts | 65 |
| | 67. | Standard Clause for Individual Contract | 65 |
| | 68. | Standard SAG-AFTRA Engagement Contract for Single Television Broadcast and for Multiple Television Broadcasts Within One Calendar Week | 66 |
| | 68.A. | Stunt Performers | 71 |
| | 68.B. | Stunt Coordinators | 71 |
| | 69. | Supplemental Markets; Pay Television; Basic Cable | 72 |
| | 70. | Programs Covered by Collective Bargaining Agreement | 73 |
| | 71. | Definition of Network Program | 73 |
| | 72. | Recorded Programs Covered by Collective Bargaining Agreement | 73 |
| | 73. | Replay of Recorded Programs | 74 |
| | 74. | Closed Circuit Programs | 90 |
| | 75. | People Covered | 91 |
| | 76. | News Service | 94 |
| | 77. | Children's Programs | 95 |
| | 78. | Waivers | 95 |
| | 79. | Retroactivity | 95 |
| | 80. | Modification of Present Contract | 95 |
| | 81. | Waiver of Cause of Action | 96 |
| | 82. | Individual Contracts Beyond Term of Code | 96 |
| | 83. | Definitions | 96 |
| | 84. | Union Shop | 96 |
| | 85. | SAG-AFTRA Rules | 97 |
| | 86. | Admission to Premises | 97 |
| | 87. | Production Memorandum & Remittance Report | 97 |
| | 88. | Use of Recordings for Reference, File, Audition, Trailer or Promotional Purposes | 98 |
| | 89. | Letters of Adherence | 98 |
| | 90. | Producer Bound by Other AFTRA or SAG-AFTRA Codes | 98 |
| | 91. | Bond or Certified Check | 98 |
| | 92. | Unfair Producer | 98 |
| | 93. | No-Strike Clause | 99 |
| | 94. | Production Prosecuted | 99 |
| | 95. | Grievance and Arbitration | 99 |
| | 96. | Check-Off | 103 |

| 97. | No Discrimination/Affirmative Action | 103 |
|---|---|---|
| **Paragraph** | **Subject** | **Page** |
| 97.A. | Alcoholism and Drug Abuse | 107 |
| 98. | Review Board | 107 |
| 99. | Separability | 107 |
| 100. | Guidelines – Employment of Minors | 107 |
| 101. | Cost of Living | 109 |
| 102. | AFTRA Health and Retirement Funds | 109 |
| 102.A. | AFTRA Industry Cooperative Fund | 114 |
| 103. | Excess Feeds to Struck Stations | 114 |
| 104. | Simulcasts | 114 |
| 105. | Title of Code | 114 |

| **Exhibit** | **Subject** | |
|---|---|---|
| A | Prime Time Supplement | 116 |
| B | Transfer of Rights | 117 |
| C | Cost of Living Adjustment | 119 |
| D | Supplemental Markets | 120 |
| E | Original Employment Pay TV, Video Disc/Video Cassette Provisions | 128 |
| F | Stunt Driving Guidelines | 134 |
| G | Statement - Alcoholism, etc. | 135 |
| H | Paragraph 97 Report (EEO Statistics) | 136 |
| I | Promotional Announcer Session Report | 137 |
| J | Transfer of Rights (Promotional Announcements) | 138 |

| **Sideletter** | **Subject** | |
|---|---|---|
| 1 | Re: Par. 55.B. Upgrading | 140 |
| 2 | Re: Direct Projection | 141 |
| 3 | Re: Par. 75.A. Other Union Contracts | 142 |
| 4 | Re: Par. 91 Certified Checks | 143 |
| 5 | Re: Par. 92 Notice of Recording Sessions | 144 |
| 6 | Re: News Use of Legitimate Stage Excerpts | 145 |
| 7 | Re: Par. 102 Health and Retirement Remittances | 146 |
| 8 | Re: Dancers' Hazard | 147 |
| 9 | Re: Still Photos | 148 |
| 10 | Re: Singers' Technology Committee | 149 |
| 11 | Re: Physical Disability | 150 |
| 12 | Re: Payroll Systems | 151 |
| 13 | Re: Serials | 152 |
| 14 | Re: Promos For Affiliates | 153 |
| 15 | Re: Warm-Ups | 154 |
| 16 | Re: Edited Down Programs | 155 |
| 17 | Re: Contract Adjustment Committee - Changes in Code Structure | 156 |
| 18 | Re: Reporting of Disabilities | 157 |
| 19 | Re: Excerpts | 158 |
| 20 | Re: Cable Exhibition | 159 |
| 21 | DELETED | 160 |
| 22 | DELETED | 161 |
| 23 | Re: "Knee Work" | 162 |
| 24 | Re: Announcers Promotional Announcements | 163 |
| 25 | DELETED | 164 |
| 26 | DELETED | 165 |
| 27 | Re: Meal Periods | 166 |
| 28 | Re: Breakdown Services | 167 |
| 29 | Re: Programs Made For New Media | 168 |
| 30 | Re: Programs Reused In New Media | 174 |
| 31 | Re: Syndication Sideletter | 185 |
| 32 | Re: Sign Language | 187 |
| 33 | Re: Exhibit H | 188 |
| 34 | Re: Background Actors and Sound Recordings Code | 189 |
| 35 | Re: Serial Contracts | 190 |

| **Sideletter** | **Subject** | |
|---|---|---|
| 36 | Re: Daytime Drama Committees | 191 |
| 37 | Re: Morning News Programs | 192 |
| 38 | Re: Bona Fide Amateur | 193 |
| 39 | Re: Promotional Launch Period | 194 |
| 40 | Exhibitor / Distributor | 195 |
| 41 | Committee on Alternative Digital Broadcast Channels | 196 |
| 42 | Experimental New Media Projects | 197 |
| 43 | Entertainment Jurisdiction | 198 |
| 44 | Vacation Requests | 199 |
| 45 | Use of Personal Vehicles on Serial Locations | 200 |
| 46 | Stunt Coordinators | 201 |
| 47 | Covered Performer | 202 |
| 48 | Committee on Non Serial Scripted Dramatic Production | 204 |
| 49 | Committee on Value Added Promotions | 205 |
| 50 | Holding Areas | 206 |
| 51 | Live Linear Television | |
| 52 | New York City Sick Leave Act And Other Similar Laws | |
| 53 | License of Non-Exhibit A Free TV, Pay TV or Basic Cable Programs To Secondary Digital Channels | |
| 54 | Syndication License for Canada Only | |
| 55 | License of Non-Exhibit A Dramatic Programs Made for Basic Cable to a Different Basic Cable Service | |
| 56 | Stand-Ins | |
| 57 | High Budget Dramatic SVOD Programs | |

**Letters**

| | |
|---|---|
| Hiring Executive Statement | 207 |
| Casting Director Letter | 208 |
| Schedule of Minimums for Announcers Off-Camera – Multiple Performances in a Calendar Week | 209 |

iv

**SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS**
**(SAG-AFTRA)**

**(Affiliated with the American Federation of Labor
and the Congress of Industrial Organizations)**

**2014-2018**

**SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE
FOR NETWORK TELEVISION BROADCASTING**

**RATE SCHEDULE AND CONDITIONS**

1.   **LENGTH OF CONTRACT**

November 16, 2014–**June 30, 2018** (both inclusive).

2.   **PRINCIPAL PERFORMERS**

A.   Dramatic Programs

(1)   Performers Subject to the SAG-AFTRA Television Agreement:

> Performers employed on network prime time dramatic television motion pictures shall be covered exclusively by the 2014-2017 SAG-AFTRA Television Agreement

(2)   Other Principal Performers
The Following Dramatic Program rates and conditions apply to non-network or network non-prime-time dramatic programs, including but not limited to daytime serials and book musicals for broadcast.

Program Fees; Rehearsal Hours & Days:

Performers Who Speak More Than Five (5) Lines; Singing and Dancing Soloists and Duos; Announcers-on-Camera Regardless of Lines; Stunt Persons and Puppeteers.

(a)   Single Program Performances (other than serials):

(i)   Program Fees:

| Program Length | Rate Effective 11/17//13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours – Performer | Included Rehearsal Hours | Included Release Days | Included Rehearsal Days | Regular Rehearsal Days | Minimum Daily Call – Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| ** 5 minutes or less | 264 | 271 | 279 | 287 | 1.5 | 1.5 | 1 | 1 | 1.5 | |
| over 5 to 15 min. | 529 | 542 | 558 | 575 | 3 | 3 | 1 | 1 | 3 | |
| over 15 to 30 min. | 846 | 867 | 893 | 920 | 10 | 7 | 2 | 3 | 4 | |
| over 30 to 45 min. | 971 | 995 | 1025 | 1056 | 10 | 12 | 3 | 4 | 4* | |
| over 45 to 60 min. | 1,137 | 1165 | 1200 | 1236 | 18 | 12 | 3 | 4 | 4* | |
| over 60 to 90 min. | 1,388 | 1423 | 1466 | 1510 | 26 | 17 | 4 | 5 | 4* | |
| over 90 to 120 min. | 1,675 | 1717 | 1769 | 1822 | 34 | 22 | 5 | 6 | 4* | |

Effective November 16, 2008, Principal Performers on dramatic programs, in lieu of receiving initial compensation based upon program fees as above, shall receive the initial compensation set forth under either the Legacy Exhibit A rates or as

applicable, the SAG-AFTRA Television Agreement rates, (which are listed below). All other terms and conditions of employment for such Performers and all conditions regarding re-use of such performances shall be those provided in the SAG-AFTRA "front of the book."[1]

**SAG-AFTRA Television Agreement Rates**

| Applicable Rate | Rate Effective 71/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Day Rate | 859 | 880 | 906 | 933 |
| Three-Day Rate | 2,173 | 2,227 | 2,294 | 2,363 |
| Weekly Rate | 2,979 | 3,053 | 3,145 | 3,239 |

**Legacy Exhibit A Rates**

| Applicable Rate | Rate Effective 71/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Day Rate | 889 | 911 | 938 | 966 |
| Three-Day Rate | 2,248 | 2,304 | 2,373 | 2,444 |
| Weekly Rate | 3,083 | 3,160 | 3,255 | 3,353 |

\* For performers only, on shows of one (1) hour or longer, on one camera day, minimum daily call is six (6) hours.

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

\*\* Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates listed above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

(b)   Serials (single program performance and multiple performances in one calendar week)

Schedule applicable to performers (excluding announcers) on serials.

(i)   Program Fees:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| \*\* 5 minutes or less | 243 | 248 | 254 | 260 |
| over 5 to 15 min. | 486 | 496 | 508 | 521 |
| over 15 to 30 min. | 725 | 740 | 759 | 778 |

---

[1]The program rates listed above for the period on and after November 16, 2008 are for residual calculation purposes only.

| | | | | |
|---|---|---|---|---|
| over 30 to 45 min. | 846 | 863 | 885 | 907 |
| over 45 to 60 min. | 969 | 988 | 1,013 | 1,038 |
| over 60 to 90 min. | 1,210 | 1,234 | 1,265 | 1,297 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

(ii)    A program fee, in accordance with the schedule set forth above, will be paid for each program in which a performer appears.   For each applicable reconciliation period, the Producer will compare the number of days worked by a performer against the number of program fees payable to that performer.   If the number of days worked by the performer exceeds the number of program fees payable to the performer for such period, each such excess work day shall be paid for at the rate of $345.00 for performers employed on programs of less than one (1) hour ($460.00 for programs of one (1) hour or longer).   The applicable reconciliation period shall be a period of twenty-six (26) weeks for principal performers under term contracts and a period of two (2) weeks for all other principal performers.

(iii)    For definitions and conditions applicable to hours and days, see Paragraphs 15, 16 and 43.

B.    Non-Dramatic Programs - Program Fees, Rehearsal Hours & Days for Performers Who Speak More Than Five (5) Lines; Singing and Dancing Soloists and Duos; Announcers-On-Camera Regardless of Lines; Puppeteers; Stunt Persons:

(1)    Single Program Performance:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours-Performer | Included Rehearsal Hours-Announcer | Included Rehearsal Days | Regular Rehearsal Days | Minimum Daily Call - Hours |
|---|---|---|---|---|---|---|---|---|---|
| **5 minutes or less | 263 | 270 | 278 | 286 | 1.5 | 1.5 | 1 | 1 | 1.5 |
| over 5 to 15 min. | 524 | 537 | 553 | 570 | 3 | 3 | 1 | 1 | 3 |
| over 15 to 30 min. | 863 | 885 | 912 | 939 | 10 | 7 | 2 | 3 | 4 |
| over 30 to 45 min. | 966 | 990 | 1,020 | 1,051 | 18 | 12 | 3 | 4 | 4* |
| over 45 to 60 min. | 1,094 | 1,121 | 1,155 | 1,190 | 18 | 12 | 3 | 4 | 4* |
| over 60 to 90 min. | 1,383 | 1,418 | 1,461 | 1,505 | 26 | 17 | 4 | 5 | 4* |
| over 90 to 120 min. | 1,667 | 1,709 | 1,760 | 1,813 | 34 | 22 | 5 | 6 | 4* |

* For performers only, on shows of one (1) hour or longer, on one camera day, minimum daily call is six (6) hours.

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

3

\*\* Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

(2)      Multiple Performances in One (1) Calendar Week:

Schedule restricted to performers on non-dramatic programs and to announcers-on-camera; restricted to performers in the same show each day within the calendar week.

**Program of 15 minutes or less**

| Performances Per Week | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | 524 | 537 | 553 | 570 | 3 | 1 | 1 |
| 2 | 970 | 994 | 1,024 | 1,055 | 7 | 2 | 0 |
| 3 | 1,362 | 1,396 | 1,438 | 1,481 | 11 | 3 | 0 |
| 4 | 1,620 | 1,661 | 1,711 | 1,762 | 15 | 4 | 0 |
| 5 | 1,886 | 1,933 | 1,991 | 2,051 | 19 | 5 | 0 |

**Program over 15 to 30 minutes**

| Performances Per Week | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | 863 | 885 | 912 | 939 | 10 | 2 | 3 |
| 2 | 1,620 | 1,661 | 1,711 | 1,762 | 16 | 4 | 3 |
| 3 | 1,858 | 1,904 | 1,961 | 2,020 | 22 | 5 | 2 |
| 4 | 2,040 | 2,091 | 2,154 | 2,219 | 28 | 6 | 1 |
| 5 | 2,357 | 2,416 | 2,488 | 2,563 | 34 | 7 | 0 |

**Program over 30 to 45 minutes**

| Performances Per Week | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | 966 | 990 | 1,020 | 1,051 | 18 | 3 | 4 |
| 2 | 1,561 | 1,600 | 1,648 | 1,697 | 22 | 5 | 4 |
| 3 | 1,853 | 1,899 | 1,956 | 2,015 | 28 | 6 | 3 |
| 4 | 2,229 | 2,285 | 2,354 | 2,425 | 32 | 6 | 3 |
| 5 | 2,741 | 2,810 | 2,894 | 2,981 | 38 | 7 | 2 |

**Program over 45 to 60 minutes**

| Performances Per Week | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | 1,094 | 1,121 | 1,155 | 1,190 | 18 | 3 | 4 |
| 2 | 1,762 | 1,806 | 1,860 | 1,916 | 22 | 5 | 4 |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3 | 2,092 | 2,144 | 2,208 | 2,274 | 28 | 6 | 3 |
| 4 | 2,512 | 2,575 | 2,652 | 2,732 | 32 | 6 | 3 |
| 5 | 3,088 | 3,165 | 3,260 | 3,358 | 38 | 7 | 2 |

**Program over 60 to 90 minutes**

| Performances Per Week | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | 1,383 | 1,418 | 1,461 | 1,505 | 26 | 4 | 5 |
| 2 | 1,993 | 2,043 | 2,104 | 2,167 | 28 | 5 | 6 |
| 3 | 2,405 | 2,465 | 2,539 | 2,615 | 34 | 6 | 5 |
| 4 | 3,031 | 3,107 | 3,200 | 3,296 | 36 | 7 | 4 |
| 5 | 3,873 | 3,970 | 4,089 | 4,212 | 40 | 7 | 4 |

**Program over 90 to 120 minutes**

| Performances Per Week | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days |
|---|---|---|---|---|---|---|---|
| 1 | 1,667 | 1,709 | 1,760 | 1,813 | 34 | 5 | 6 |
| 2 | 2,357 | 2,416 | 2,488 | 2,563 | 36 | 7 | 6 |
| 3 | 2,721 | 2,789 | 2,873 | 2,959 | 40 | 7 | 6 |
| 4 | 3,531 | 3,619 | 3,728 | 3,840 | 40 | 7 | 6 |
| 5 | 4,451 | 4,562 | 4,699 | 4,840 | 40 | 7 | 6 |

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

Minimum Session and Minimum Daily Call - Same as per Par. 2.B.(1); for special provisions applicable to strip shows (except serials) see Paragraph 20.

(3)  News Shows - Sixth (6th) or Seventh (7th) Performance:

In the case of news shows only, the following may be applied to the sixth (6th) or seventh (7th) performance in one (1) calendar week of a news announcer (covered by the provisions of Par. 75 hereof) and announcer-on-camera thereon:

| Number of Performances | Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours |
|---|---|---|---|---|---|---|
| 6 | 15 Minutes | 2,045 | 2,096 | 2,159 | 2,224 | 23 |
| 7 | | 2,251 | 2,307 | 2,376 | 2,447 | 27 |
| 6 | 30 Minutes | 2,511 | 2,574 | 2,651 | 2,731 | 40 |
| 7 | | 2,675 | 2,742 | 2,824 | 2,909 | 40 |
| 6 | 60 Minutes | 3,327 | 3,410 | 3,512 | 3,617 | 40 |
| 7 | | 3,633 | 3,724 | 3,836 | 3,951 | 40 |
| 6 | 90 Minutes | 4,351 | 4,460 | 4,594 | 4,732 | 40 |
| 7 | | 4,858 | 4,979 | 5,128 | 5,282 | 40 |
| 6 | 120 Minutes | 5,121 | 5,249 | 5,406 | 5,568 | 40 |
| 7 | | 5,887 | 6,034 | 6,215 | 6,401 | 40 |

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

5

Included rehearsal days, regular rehearsal days, minimum session and minimum daily call - same as for five (5) performances a week in Par. 2.B.(2) except that in the case of programs of fifteen (15) minutes or less there shall be six (6) included rehearsal days for six (6) performances per week and seven (7) included rehearsal days for seven (7) performances per week.

C. <u>Special Rates for Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53):</u>

<u>Performers Who Speak More Than Five (5) Lines; Singing and Dancing Soloists and Duos; Announcers On-Camera Regardless of Lines, Puppeteers:</u>

(1) <u>Single Program Performance - Program Fees:</u>

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours |
|---|---|---|---|---|---|
| **5 minutes or less | 201 | 206 | 212 | 218 | 1.5 |
| over 5 to 15 min. | 399 | 409 | 421 | 434 | 3 |
| over 15 to 30 min. | 507 | 520 | 536 | 552 | 10 |
| over 30 to 45 min. | 611 | 626 | 645 | 664 | 18 |
| over 45 to 60 min. | 692 | 709 | 730 | 752 | 18 |
| over 60 to 90 min. | 871 | 893 | 920 | 948 | 26 |
| over 90 to 120 min. | 1,048 | 1,074 | 1,106 | 1,139 | 34 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fees plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours. See Paragraph 18.

(2) <u>Multiple Performances in One (1) Calendar Week – Same Show:</u>

2 performances per week at 1¾ times the single rate
3 performances per week at 2¼ times the single rate
4 performances per week at 2¾ times the single rate
5 performances per week at 3 times the single rate

All other terms and conditions set forth in Paragraph 2.B. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

3. **<u>PERFORMERS WHO SPEAK FIVE LINES OR LESS</u>**

A. <u>Single Program Performance (other than serials) – Program Fees:</u>

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days | Daily Call – Hours |
|---|---|---|---|---|---|---|---|---|
| ** 5 minutes or less | 159 | 163 | 168 | 173 | 1.5 | 1 | 0 | 1.5 |
| over 5 to 15 min. | 317 | 325 | 335 | 345 | 3 | 1 | 0 | 3 |
| over 15 to 30 min. | 407 | 417 | 430 | 443 | 5 | 1 | 0 | 4 |
| over 30 to 45 min. | 441 | 452 | 466 | 480 | 8 | 2 | 0 | 4 |

6

| over 45 to 60 min. | 502 | 515 | 530 | 546 | 8 | 2 | 0 | 4 |
| over 60 to 90 min. | 570 | 584 | 602 | 620 | 10 | 2 | 0 | 4 |
| over 90 to 120 min. | 653 | 669 | 689 | 710 | 12 | 2 | 0 | 4 |

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

B.   Special Rates for Programs on Multiple Stations Commonly Owned (As specified in Paragraph 53):

Program Fees:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours |
|---|---|---|---|---|---|
| ** 5 minutes or | 100 | 103 | 106 | 109 | 1.5 |
| over 5 to 15 min. | 203 | 208 | 214 | 220 | 3 |
| over 15 to 30 min. | 263 | 270 | 278 | 286 | 5 |
| over 30 to 45 min. | 295 | 302 | 311 | 320 | 8 |
| over 45 to 60 min. | 334 | 342 | 352 | 363 | 8 |
| over 60 to 90 min. | 407 | 417 | 430 | 443 | 10 |
| over 90 to 120 | 474 | 486 | 501 | 516 | 12 |

All other terms and conditions set forth in Paragraph 3.A pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

C.   Serials:

(1)   Program Fees:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| ** 5 minutes or less | 136 | 139 | 142 | 146 |
| over 5 to 15 min. | 268 | 273 | 280 | 287 |
| over 15 to 30 min. | 344 | 351 | 360 | 369 |
| over 30 to 45 min. | 374 | 381 | 391 | 401 |
| over 45 to 60 min. | 421 | 429 | 440 | 451 |
| over 60 to 90 min. | 480 | 490 | 502 | 515 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

(2)    A program fee, in accordance with the schedule set forth above, will be paid for each program in which a performer appears.  For each two (2) week reconciliation period, the Producer will compare the number of days worked by a performer against the number of program fees payable to that performer.  If the number of days worked by the performer exceeds the number of program fees payable to the performer for such period, each such excess work day shall be paid for at the rate of $145.00 for the performers employed on programs of less than one (1) hour ($170.00 for programs one (1) hour or longer).

(3)    For definitions and conditions applicable to hours and days, see Paragraphs 15, 16, and 43.

4.    **COMMERCIAL PERFORMERS AND ANNOUNCERS OFF-CAMERA**

Announcers and other performers delivering or otherwise participating in commercial announcements (as program announcements, hitch-hikes, cow-catchers, cut-ins or otherwise); these rates are applicable only to services which are broadcast as "live" performances, as described in Par. 73.E. of this Code.

A.    Fees – Commercial Performers:

(1)    Single Separate Announcement or One Single Announcement in Show:

| On-Camera Performers | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Principal Performers | 738 | 756 | 779 | 802 |
| Singing or Dancing Groups of: | | | | |
| 3 to 5 | 541 | 555 | 572 | 589 |
| 6 to 8 | 477 | 489 | 504 | 519 |
| 9 or more | 396 | 406 | 418 | 431 |

| Off-Camera Performers | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Principal Performers | 553 | 567 | 584 | 602 |
| Singing or Dancing Groups of: | | | | |
| 3 to 5 | 312 | 320 | 330 | 340 |
| 6 to 8 | 270 | 277 | 285 | 294 |
| 9 or more | 219 | 224 | 231 | 238 |

| | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Background Actors | 152 | 156 | 161 | 166 |
| Hand Models and Physical Demonstrators | 393 | 403 | 415 | 427 |

| | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session – Hours | Minimum Daily Call – Hours |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| On-Camera | 3 | 1 | 0 | 2 | 3 |
| Off-Camera | 2 | 1 | 0 | 2 | 2 |

      (2)    <u>Single Hitch-Hike or Cow-Catcher</u>:

| | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Fee Per Announcement | 358 | 367 | 378 | 389 |

      (3)    <u>Single Cut-in</u>:

| | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Fee Per Announcement | 332 | 340 | 350 | 361 |

      (4)    <u>Cut-Ins Defined</u>:

Cut-ins are those announcements inserted on a network program but which are released to a lesser portion of the network (but consisting of more than one station).

B.    <u>Program Fees – Announcers-Off-Camera (Voice Over)</u>:

      (1)    <u>More Than Ten (10) Lines – Program Fee</u>:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days | Minimum Daily Call – Hours |
|---|---|---|---|---|---|---|---|---|
| ** 5 minutes or less | 147 | 151 | 156 | 161 | 1.5 | 1 | 1 | 1.5 |
| over 5 to 15 min. | 293 | 300 | 309 | 318 | 2 | 1 | 0 | 2 |
| over 15 to 30 min. | 462 | 474 | 488 | 503 | 3 | 1 | 0 | 3 |
| over 30 to 45 min. | 570 | 584 | 602 | 620 | 4 | 1 | 1 | 2 |
| over 45 to 60 min. | 645 | 661 | 681 | 701 | 4 | 1 | 1 | 2 |
| over 60 to 90 min. | 825 | 846 | 871 | 897 | 5 | 2 | 0 | 3 |
| over 90 to 120 min. | 1,009 | 1,034 | 1,065 | 1,097 | 6 | 2 | 0 | 3 |

In all cases, the rate for delivery or participating in delivery of a commercial announcement (regardless of line count) is that set forth in subparagraph (1) and such services are excluded from services covered in subparagraph (2). Included in services covered by subparagraph (2) are such services as openings and closings, lead-ins and lead-outs, billboards, promotional or public service announcements, so long as the aggregate line count is ten (10) or less.

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

9

(2)     <u>Ten (10) Lines or Less – Program Fee</u>:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours | Included Days | Regular Days | Minimum Daily Call –Hours |
|---|---|---|---|---|---|---|---|---|
| ** 5 minutes or less | 147 | 151 | 156 | 161 | 1.5 | 1 | 1 | 1.5 |
| over 5 to 15 min. | 293 | 300 | 309 | 318 | 2 | 1 | 0 | 2 |
| over 15 to 30 min. | 323 | 331 | 341 | 351 | 3 | 1 | 0 | 3 |
| over 30 to 45 min. | 341 | 350 | 361 | 372 | 4 | 1 | 0 | 4 |
| over 45 to 60 min. | 383 | 393 | 405 | 417 | 4 | 1 | 0 | 4 |
| over 60 to 90 min. | 448 | 459 | 473 | 487 | 5 | 2 | 0 | 3 |
| over 90 to 120 min. | 519 | 532 | 548 | 564 | 6 | 2 | 0 | 3 |

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.  See Paragraph 18.

(3)     <u>Multiple Performances in One (1) Calendar Week, Same Show</u>[1]

2 performances per week at 1¾ times the single rate
3 performances per week at 2¼ times the single rate
4 performances per week at 2¾ times the single rate
5 performances per week at 3 times the single rate

C.     <u>Extra Rehearsal</u>:

(1)     All performers other than groups, choruses, background actors, hand models and physical demonstrators: $25.00 per hour; $28.00 per hour effective November 16, 2015.

(2)     Group Dancers: $25.00 per hour; $28.00 per hour effective November 16, 2015.
Chorus Singers: $25.00 per hour; $28.00 per hour effective November 16, 2015.

(3)     Background Actors, Hand Models and Physical Demonstrators: $11.00 an hour.

D.     See Paragraph 26 for multiple commercials in a program.

E.     See Paragraph 7F for provision covering off camera sports announcements.

---

[1] See rate sheet at the end of the Code for actual rates for multiple performances in one (1) calendar week, same show.

10

5.    **GROUPS & CHORUSES**

(Soloists and Duos receive principal performer's scale)

A.    Group Dancers (Three (3) or more Dancers)

(1)    Program Fees:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| ** 5 minutes or less | 304 | 312 | 321 | 331 |
| over 5 to 15 min. | 608 | 623 | 642 | 661 |
| over 15 to 30 min. | 944 | 968 | 997 | 1,027 |
| over 30 to 60 min. | 1,174 | 1,203 | 1,239 | 1,276 |
| over 60 to 90 min. | 1,343 | 1,377 | 1,418 | 1,461 |
| over 90 to 120 min. | 1,559 | 1,598 | 1,646 | 1,695 |

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

Dancers on non-serial dramatic programs

Effective November 16, 2008, Dancers on non-serial dramatic programs, in lieu of receiving initial compensation based upon program fees as above, shall receive the initial compensation set forth under either the Legacy Exhibit A rates or as applicable, the SAG-AFTRA Television Agreement rates (which are listed below). All other terms and conditions of employment for such Dancers and all conditions regarding re-use of such performances shall be those provided in the SAG-AFTRA "front of the book."

**Legacy Exhibit A Rates**

| Day Rate | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo/Duo | 889 | 911 | 938 | 966 |
| 3-8 | 779 | 798 | 822 | 847 |
| 9+ | 680 | 697 | 718 | 740 |
| Rehearsal | 523 | 536 | 552 | 569 |

| Weekly Rates | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo/Duo | 2,857 | 2,928 | 3,016 | 3,106 |
| 3-8 | 2,616 | 2,681 | 2,761 | 2,844 |
| 9+ | 2,382 | 2,442 | 2,515 | 2,590 |

**SAG-AFTRA Television Agreement Rates**

| Day Rate | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo/Duo | 859 | 880 | 906 | 933 |
| 3-8 | 752 | 771 | 794 | 818 |
| 9+ | 657 | 673 | 693 | 714 |
| Rehearsal | 505 | 518 | 534 | 550 |

| Weekly Rates | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo/Duo | 2,760 | 2,829 | 2,914 | 3,001 |
| 3-8 | 2,531 | 2,594 | 2,672 | 2,752 |
| 9+ | 2,300 | 2,358 | 2,429 | 2,502 |

(2)    Rehearsal Hours & Days:

| Program Length | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session - Hours | Minimum Daily Call – Hours |
|---|---|---|---|---|---|
| ** 5 minutes or less | 1.5 | 1 | 1 | 1.5 | 1.5 |
| over 5 to 15 min. | 8 | 2 | 0 | 3 | 4 |
| over 15 to 30 min. | 19 | 4 | 0 | 3 | 3 |
| over 30 to 60 min. | 29 | 4 | 0 | 3 | 5* |
| over 60 to 90 min. | 35 | 5 | 0 | 3 | 5* |
| over 90 to 120 min. | 35 | 6 | 0 | 3 | 5* |

* Minimum Daily Call is six (6) hours on one (1) camera day for shows of one (1) hour or longer.

** Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

(3)    Special Rates for Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53):

Program Fees:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 | Included Rehearsal Hours |
|---|---|---|---|---|---|
| over 15 to 30 min. | 602 | 617 | 636 | 655 | 20 |
| over 30 to 60 min. | 800 | 820 | 845 | 870 | 30 |
| over 60 to 90 min. | 891 | 913 | 940 | 968 | 36 |
| over 90 to 120 min. | 1,424 | 1,460 | 1,504 | 1,549 | 36 |

All other terms and conditions set forth in Paragraph 5.A. and 5.C. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

(4)    On all Additional Rehearsal Days worked or credited, the Minimum Session and Minimum Daily Call shall be six (6) hours; provided, however, that a meal period of not more than two (2) hours may be given without breaking the session.

In those instances where a Producer or his/her representative is aware at the time dancers are being offered employment that work in excess of six (6) consecutive days may be necessary, the Producer will so inform the dancers prior to engagement of their services.

If there have been recurring cases of scheduling dancers for an excessive number of consecutive days of work, the matter may be referred to the joint

SAG-AFTRA-Producers Special Committee in an effort to find a mutually acceptable solution to the problem.

(5)    For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20, except that for dancers who dance, a rehearsal day in a rehearsal hall shall consist of no more than six (6) out of seven (7) consecutive hours, inclusive of meal periods.

(6)    No principal performer (as defined in par. 2.B.(1)) or member of a specialty act shall be considered as a member of a dancers' group in determining the appropriate group rate.

(7)    Any member of a dancing group who steps out and performs as a soloist or as part of a duo for eight (8) or more consecutive bars shall be paid additional compensation (a step out fee) at the following rates:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/15 |
|---|---|---|---|---|
| 30 Minute Program | 85 | 87 | 90 | 93 |
| 60 Minutes or Longer Program | 162 | 166 | 171 | 176 |

except that any such dancer who steps out and so performs for sixteen (16) or more consecutive bars shall be paid the full principal performer's fee if the amount of such fee is greater than the total of the full group fee including the step out fee as provided above; and any member of a dancing group who steps out and performs as a member of a smaller group for sixteen (16) or more consecutive bars shall be paid the smaller group rate. Such reclassifications shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

(8)    In no event shall any dancer be asked or assigned to rehearse on unsafe floors, or concrete, cement, stone or similar surfaces unless the surface is covered in such a manner as to result in a resilient dancing surface except on "camera day" when the requirements of other broadcasting equipment make use of such non-resilient surfaces unavoidable.

Dancing on wet or oily surfaces will be considered hazardous for purposes of Paragraph 5.A.(12).

(9)    Dancers doing knee work, including rolling, spinning, falling, balancing, hinging, walking, turning, and/or performing a choreographed routine on the knees, will be permitted to wear knee pads where practicable in rehearsal and performance.

(10)    During the 1982 and 1985 negotiations, AFTRA claimed that hazards would be created for dancers who are required to wear masks during dance routines or are required to dance under conditions which may impair sight or breathing (*e.g.*, fog, smoke, fire). The Producers acknowledged that the wearing of a mask may impair visibility, and that there could be situations in which the nature of the mask combined with the requirements of particular choreography would entitle a dancer to the hazard pay required by Paragraph 5.A.(12) of the TV Network Code. The Producers further acknowledged that, under certain circumstances, dancing under conditions which impair sight or breathing (*e.g.*, fog, smoke, fire), when combined with the requirements of particular choreography also shall entitle a dancer to such hazard pay. This provision will be brought to the attention of the SAG-AFTRA-Producers Special Committee provided in Paragraph 5.A.(12) and may be cited in any special arbitration proceeding brought under that paragraph.

13

(11)    Compensation for group dancers who are required by the Producer to sing or lip sync (*i.e.*, synchronization of lip movements with lyrics) shall be computed in accordance with the applicable rules stated in Paragraph 46 (Doubling).  The applicable basic dancers minimum program fee shall be utilized as the base in computing any replay payments and any payments for telecasts in foreign areas which may be due such group dancers.

(12)    For performing a hazardous dance routine or other hazardous activity (such as wire flying) in a studio or on location, dancers will be paid $100.00 for each such day, provided that the minimum payment per program shall be not less than $125.00 as provided in Paragraph 39.A.  In recognition of unique problems in determining the entitlement of dancers to such additional compensation for hazardous activity, the following procedures will be applicable.  If a dancer believes that a dance routine or other activity that the dancer is requested to perform should entitle the dancer to such additional compensation, the matter will be discussed promptly between the SAG-AFTRA representative assigned to the program and the Producer or the Producer's designated representative.  If the matter cannot be resolved by that on-the-spot discussion, the SAG-AFTRA representative will prepare a written description of the specific dance routine or other activity, and other facts pertinent to the claim, which will be confirmed and initialed by the Producer and filed with the local SAG-AFTRA Executive Director.

When a number of such claims have been filed, but not less frequently than once each quarter if any claims are on file, the Executive Director will convene a meeting of the SAG-AFTRA-Producers Special Committee.  There shall be two (2) Special Committees, one (1) in New York City and one (1) in Los Angeles, each consisting of two (2) dancer representatives and two (2) representatives of the Producers.

The Committee will review the pending claims and attempt to resolve them.  All such resolutions will be based on the specific circumstances involved and will be on a no-precedent basis.  If a claim is upheld, the Producer will be notified in writing and must make the required payment to the dancer (by check mailed to the SAG-AFTRA Executive Director) within five (5) working days of receipt of the notice to do so.  Two (2) panels of arbitrators, each of which is to consist of ten (10) named arbitrators agreed to by the parties, shall be maintained and filed with the American Arbitration Association, one (1) in New York City and one (1) in Los Angeles.  Names may be added or deleted from time to time by mutual agreement.  Whenever either Special Committee has at least four (4) pending claims which it has been unable to resolve, either SAG-AFTRA or the Producer may submit such claims for arbitration under Paragraph 95, with the following special rules being applicable:

(a)    There will be a single arbitrator selected from the appropriate panel.

(b)    The matter will be presented to the arbitrator by a representative of the Producer and by a representative of SAG-AFTRA.

(c)    The arbitrator will render an award either granting or denying each claim, with no written opinion.

(d)    The arbitrator's award will be on a no-precedent basis and not citable in any subsequent arbitration proceeding.

(13)    Subject to applicable law, if a dancer on whose behalf contributions have been made to the AFTRA Health and Retirement Funds during five (5) of the prior ten (10) years is employed to work on a covered television program as an assistant choreographer, but not as a dancer or in any other category covered by the Code, Producer will contribute to the AFTRA Health and

14

Retirement Funds on such dancer's behalf on the basis of the highest compensation received by any group dancer on the program for services as a group dancer.  If no individual classified as a dancer under this Code appears on the program, the contribution shall be based on the Group Dancer program fee, pursuant to the length of the program.  Such employment shall not be subject to other provisions of the Code.

If a dancer who has qualified for health coverage under the AFTRA Health and Retirement Funds for five (5) years is employed to work on a covered television program as a choreographer, but not as a dancer or in any other category covered by the Code, Producer will contribute to the AFTRA Health and Retirement Funds on such dancer's behalf on the basis of the highest compensation received by any group dancer on the program for services as a group dancer.  If no individual classified as a dancer under this Code appears on the program, the contribution shall be based on the Group Dancer program fee, pursuant to the length of the program.[1]  This paragraph shall not require the application of any other provision of the Code to choreographers.

(14)   For non-syndicated non-prime time programs, Producer shall have the option of employing group dancers in accordance with this Subparagraph (14) in lieu of the provisions of Subparagraphs (1), (2), (3), (4) and (5) above:

(a)   <u>Day Rates</u>:

(i)   <u>Network Programs</u>:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Programs Less Than One (1) Hour (one day rate) | 500 | 513 | 528 | 544 |
| Programs of One (1) Hour or More (two day rate) | 891 | 913 | 940 | 968 |

(ii)   <u>Programs on Multiple Stations Commonly Owned</u>:

| Program Length | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Programs Less Than One (1) Hour (one day rate) | 315 | 323 | 333 | 343 |
| Programs of One (1) Hour or More (two day rate) | 605 | 620 | 639 | 658 |

(b)   A day shall consist of eight (8) hours exclusive of a one (1) hour meal period.

(c)   Hours worked on additional days shall be paid at the overtime rate with an eight (8) hour minimum call.

(d)   Where the rates provided in this Subparagraph (14) are paid, no payment for step-out (Par. 5.A.(7)), lip sync (Par. 5.A.(11)), doubling (Par. 46), stand-in/dance-in (Par. 36) shall be required.

(e)   Producer shall notify the dancer of the basis of employment in advance of the dancer's first performance date.

---

[1] Subject to review by the Funds' attorney that this change will not adversely affect the tax exempt status of the Fund or the deductibility of employer contributions.

(15)   Producer shall notify SAG-AFTRA of the dates and locations of all rehearsals, taping, and time of first rehearsal for dancers one (1) week prior to the first rehearsal, provided such information is known at that time.

(16)   <u>Dancers on Awards Programs (in excess of 60 minutes)</u>

| | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Rehearsal Day | 247 | 253 | 261 | 269 |
| Camera Day | 725 | 743 | 765 | 788 |
| Program Minimum | 970 | 994 | 1,024 | 1,055 |

A Rehearsal Day shall consist of 6 hours excluding the meal period.  The seventh and eighth hours shall be paid at the Extra Rehearsal rate.  A Camera Day shall consist of 8 hours excluding the meal period.  Overtime shall be paid at $45.00 per hour.

B.   <u>Chorus Singers:</u>

(1)   (a)   <u>Program Fees - On-Camera:</u>

| Program Length | Number of Performers in Group | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|---|
| ** 5 minutes or less | 3 to 8 | 167 | 171 | 176 | 181 |
| | 9 or More | 152 | 156 | 161 | 166 |
| over 5 to 15 min. | 3 to 8 | 335 | 343 | 353 | 364 |
| | 9 or More | 302 | 310 | 319 | 329 |
| over 15 to 30 min. | 3 to 8 | 437 | 448 | 461 | 475 |
| | 9 or More | 409 | 419 | 432 | 445 |
| over 30 to 60 min. | 3 to 8 | 541 | 555 | 572 | 589 |
| | 9 or More | 506 | 519 | 535 | 551 |
| over 60 to 90 min. | 3 to 8 | 645 | 661 | 681 | 701 |
| | 9 or More | 611 | 626 | 645 | 664 |
| over 90 to 120 min. | 3 to 8 | 743 | 762 | 785 | 809 |
| | 9 or More | 717 | 735 | 757 | 780 |

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

(b)   <u>Rehearsal Hours & Days:</u>

| Program Length | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session - Hours | Minimum Daily Call - Hours |
|---|---|---|---|---|---|
| ** 5 minutes or less | 1.5 | 1 | 1 | 1 | 1.5 |
| over 5 to 15 min. | 3 | 1 | 1 | 1 | 3 |
| over 15 to 30 min. | 5 | 1 | 2 | 3 | 3 |
| over 30 to 60 min. | 8 | 2 | 3 | 3 | 3 |
| over 60 to 90 min. | 10 | 2 | 5 | 3 | 3*** |
| over 90 to 120 min. | 13 | 3* | 6 | 3 | 3*** |

* On Award Shows, there shall be two (2) Included Days.

** Multiple performance discounts do not apply.

***On Award Programs in excess of one (1) hour and Prime Time Variety Programs, the minimum call shall be four (4) hours.

16

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

(2)    (a)    <u>Program Fees - Off-Camera</u>:

| Performance Category | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Solo/Duo | 692 | 709 | 730 | 752 |
| Groups of 3 to 8 | 404 | 414 | 426 | 439 |
| Groups of 9 or More | 376 | 385 | 397 | 409 |

These rates apply to any program length.

(b)    <u>Off-Camera Singers - Session</u>:

Off-camera singers' fees include a session of up to four (4) hours on any one (1) day for all programs, except on any program where the off-camera singers work with the cast, in which case the length of the program on the air may be added to the allowable hours. Furthermore, on a variety program Special where the singers work with the cast, work on a second day is subject to a four (4) hour minimum call payable at the applicable rehearsal rate. Work on a second day without the cast (or on a third day on a variety program Special where the singers work with or without the cast) shall require the payment of a new session fee for a session of up to four (4) hours.

If a session goes beyond the included hours, the rate of $25.00 per hour shall be paid for each additional hour of work up to and including the sixth (6th) hour worked on the day of the session, and for each additional hour worked in excess of six (6), shall be paid at the rate of $37.50 per hour. Hours in excess of six (6) may be computed in quarter (¼) hour segments. Paragraph 14 (Rehearsal Days) shall not apply to off-camera singers.

(c)    <u>Off-Camera Singers - Meal Period</u>:

In lieu of Paragraph 23, the following shall apply to off-camera singers: If a session exceeds five (5) hours (plus the length of the program when the singers work with the cast) and a meal period has not already been given, the singers shall receive a meal period of at least one (1) hour. A meal period shall not be considered as time worked or counted toward the length of a session. In the event a meal period is not given as herein required, Producer shall be required to pay, in addition to any other fees, a sum of $25.00 to such performer for such meal period missed.

In the event that a Performer is engaged for both on- and off-camera work on a single day, the Performer shall be paid the higher applicable rate.

17

(3)     Special Rates for Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53):

(a)     Program Fees - On-Camera:

| Program Length | Number of Performers in Group | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|---|
| over 15 to 30 min. | 3 to 8 | 312 | 320 | 330 | 340 |
| | 9 or More | 283 | 290 | 299 | 308 |
| over 30 to 60 min. | 3 to 8 | 346 | 355 | 366 | 377 |
| | 9 or More | 320 | 328 | 338 | 348 |
| over 60 to 90 min. | 3 to 8 | 400 | 410 | 422 | 435 |
| | 9 or More | 366 | 375 | 386 | 398 |
| over 90 to 120 min. | 3 to 8 | 449 | 460 | 474 | 488 |
| | 9 or More | 408 | 418 | 431 | 444 |

(b)     Program Fees - Off-Camera:

| Performance Category | Rate Effective 11/17/13 | Rate Effective 11/167/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Groups of 3 to 8 | 261 | 268 | 276 | 284 |
| Groups of 9 or More | 245 | 251 | 259 | 267 |

(c)     Rehearsal Hours:

All other terms and conditions set forth in Paragraphs 5.B. and 5.C. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

Singers on non-serial dramatic programs

Effective November 16, 2008, Singers on non-serial dramatic programs, in lieu of receiving initial compensation based upon program fees as above, shall receive the initial compensation set forth under either the Legacy Exhibit A rates or as applicable, the SAG-AFTRA Television Agreement rates (which are listed below).  All other terms and conditions of employment for such Singers and all conditions regarding re-use of such performances shall be those provided in the SAG-AFTRA "front of the book."

**Legacy Exhibit A Rates**

| Daily Rates – On Camera | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo and Duo | 960 | 984 | 1,014 | 1,044 |
| Groups 3-8 | 843 | 864 | 890 | 917 |
| Groups 9+ | 735 | 753 | 776 | 799 |
| Mouthing 1-16 | 705 | 723 | 745 | 767 |
| Mouthing 17+ | 550 | 564 | 581 | 598 |

| Daily Rates – Off Camera | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo and Duo | 960 | 984 | 1,014 | 1,044 |
| Groups 3-8 | 510 | 523 | 539 | 555 |
| Groups 9+ | 438 | 449 | 462 | 476 |

| 3 Day Rates | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|

18

| | | | | |
|---|---|---|---|---|
| ½ Hour or 1 Hour Show | 2,248 | 2,304 | 2,373 | 2,444 |
| 1½ hour or 2 Hour Show | 2,646 | 2,712 | 2,793 | 2,877 |

| Weekly Rates | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo and Duo | 3,083 | 3,160 | 3,255 | 3,353 |
| Groups 3-8 | 2,827 | 2,898 | 2,985 | 3,075 |
| Groups 9+ | 2,571 | 2,635 | 2,714 | 2,795 |
| "Step Out" (Per day - up to 15 Cumulative bars) | 478 | 490 | 505 | 520 |
| Per day - 16 Cumulative bars or detained 1 Hour | 960 | 984 | 1,014 | 1,044 |
| Contractor 3-8 | 1,412 | 1,447 | 1,490 | 1,535 |
| Contractor 9+ | 2,571 | 2,635 | 2,714 | 2,795 |

**SAG-AFTRA Television Agreement Rates**

| Daily Rates – On Camera | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo and Duo | 929 | 952 | 981 | 1,010 |
| Groups 3-8 | 815 | 835 | 860 | 886 |
| Groups 9+ | 711 | 729 | 751 | 774 |
| Mouthing 1-16 | 681 | 698 | 719 | 741 |
| Mouthing 17+ | 530 | 543 | 559 | 576 |

| Daily Rates – Off Camera | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo and Duo | 929 | 952 | 981 | 1,010 |
| Groups 3-8 | 492 | 504 | 519 | 535 |
| Groups 9+ | 422 | 433 | 446 | 459 |

| 3 Day Rates | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| ½ Hour or 1 Hour Show | 2,173 | 2,227 | 2,294 | 2,363 |
| 1½ hour or 2 Hour Show | 2,556 | 2,620 | 2,699 | 2,780 |

| Weekly Rates | Rate Effective 7/1/13 | Rate Effective 7/1/14 | Rate Effective 7/1/15 | Rate Effective 7/1/16 |
|---|---|---|---|---|
| Solo and Duo | 2,979 | 3,053 | 3,145 | 3,239 |
| Groups 3-8 | 2,732 | 2,800 | 2,884 | 2,971 |
| Groups 9+ | 2,486 | 2,548 | 2,624 | 2,703 |
| "Step Out" (Per day - up to 15 Cumulative bars) | 463 | 475 | 489 | 504 |
| Per day - 16 Cumulative bars or detained 1 Hour | 929 | 952 | 981 | 1,010 |

(4)   When the number of remaining included rehearsal hours is not evenly divisible by the number of hours in the minimum session, the balance may be used as a separate session which may be less than the number of hours in the minimum session, but not less than one (1) hour in length, and must be used consecutively in such separate session.

(5)   For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20.

(6)     No principal performer or any member or members of a specialty act shall be considered as a part of the singers' group in determining the appropriate group rate.

(7)     (a)     On-Camera - Any singer hired at a group rate who performs on camera as a soloist or a duo for over four (4) consecutive bars but not more than sixteen (16) consecutive bars shall be paid an additional fifty percent (50%) of his total original group fee; if in excess of sixteen (16) consecutive bars, the full principal performer's fee shall apply, and, notwithstanding Paragraph 46.D, the singer in such case shall be subject to the rehearsal hours and days set forth in the schedule below.  Any member of a group who performs as a member of a smaller group for over four (4) consecutive bars shall be paid the smaller group fee.  Such re-classification shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

Schedule of rehearsal hours and days for group singer upgraded to principal performer rate in accordance with this Paragraph 5.B.(7)(a):

| Program Length | Included Rehearsal Hours | Included Days | Regular Days | Minimum Session – Hours | Minimum Daily Call – Hours |
|---|---|---|---|---|---|
| 15 minutes or less | 3 | 1 | 1 | 1 | 3 |
| over 15 to 30 min. | 8 | 1 | 2 | 3 | 3 |
| over 30 to 60 min. | 10 | 2 | 3 | 3 | 3 |
| over 60 to 90 min. | 15 | 2 | 5 | 3 | 3 |
| over 90 to 120 min. | 18 | 3 | 6 | 3 | 3 |

(b)     Off-Camera - Any singer hired at a group rate who performs off-camera as a soloist or a duo for over four (4) consecutive bars but not more than sixteen (16) consecutive bars shall be paid an additional fifty percent (50%) of his total original group fee; if in excess of sixteen (16) consecutive bars, the full solo/duo fee shall apply.  Any member of a group who performs as a member of a smaller group for over four (4) consecutive bars shall be paid the smaller group fee.  Such re-classification shall not operate to reduce the size of the overall group with respect to fees payable to the remainder of the group.

(8)     Additional Compensation for Broadcast of Multiple Tracking and Sweetening:

"Multiple tracking" refers to singing the same part two (2) or more times where separate sound tracks are recorded and a composite is made of separate renditions.

"Sweetening" refers to singing different parts or notes recorded at different times where separate sound tracks are made and a composite is made of separate renditions.

For broadcast of multiple tracking and/or sweetening on a program, a group singer shall be entitled to a single payment equal to:

(a)     fifty percent (50%) of the applicable minimum off-camera program fee, which constitutes payment for unlimited multiple tracking, or

(b)     one-hundred percent (100%) of the applicable minimum off-camera program fee, which constitutes payment for unlimited sweetening and unlimited multiple tracking.

20

No such payment shall be required for:

    (i)    mechanical over-dubbing where the broadcast includes no composite of separate renditions by the same singer, or

    (ii)    guide tracks used only for rehearsal and not for broadcast, or

    (iii)    multiple tracking and sweetening for rehearsal only, where there is no broadcast of any composite of separate renditions by the same singer.

For broadcast of multiple tracking and/or sweetening on a primetime entertainment program, a solo/duo singer engaged as a Principal Performer who multi-tracks and/or provides sweetening six (6) or more times in any session shall be entitled to a single per program payment equal to:

a)    Fifty percent (50%) of the applicable off-camera solo/duo program fee, which constitutes payment for unlimited multiple tracking; or

b)    One-hundred percent (100%) of the applicable minimum off-camera solo/duo program fee, which constitutes payment for unlimited sweetening and unlimited multiple tracking.

(9)    If the performance of a singer on an incomplete track of a phonograph recording made under the AFTRA or SAG-AFTRA Sound Recordings Code is heard on the broadcast of a television program, and that singer has not been engaged as a singer or principal performer on such program, the singer shall receive a payment equal to the applicable minimum off-camera program fee under this Code, it being understood that (1) no such payment is required if the singer has been engaged as a singer or principal performer on the program, and (2) this provision deals only with the utilization of incomplete tracks and imposes no payment requirements for the utilization of commercial phonograph records or tapes, *i.e.*, those available to the general public.

C.    Multiple Performances in One (1) Calendar Week, Same Show:

2 performances per week at 1¾ times the single rate
3 performances per week at 2¼ times the single rate
4 performances per week at 2¾ times the single rate
5 performances per week at 3 times the single rate

Included Hours for group dancers on multiple performances in one (1) calendar week shall not exceed forty (40) hours.

## 6.    SPECIALTY ACTS

A.  A specialty act is any performer or group of performers who render and perform a self-contained theatrical performance with material and theatrical routines of their own (as distinguished from material and routines furnished or provided by the Producer) and which performance has been previously rehearsed and/or used by such specialty act prior to its engagement by the Producer. A specialty act is and shall also be known as a "standard act," a "variety act," and a "vaudeville act," and whenever used in connection with television engagements these terms shall be deemed to be synonymous. A "stand-up comedy act" shall be considered a "specialty act" under this paragraph.

B.    Program Fees:

21

|  | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| 1 Performer* | 1,383 | 1,418 | 1,461 | 1,505 |
| 2 Performers | 2,187 | 2,242 | 2,309 | 2,378 |
| 3 Performers | 2,771 | 2,840 | 2,925 | 3,013 |
| For Each Additional | 692 | 709 | 730 | 752 |

Extra rehearsal: $25.00 per hour; $28.00 per hour effective November 16, 2015.

\* A specialty act by a single performer shall be paid the specialty act rate or the applicable principal performer's rate, whichever is the greater.

C.    Above rates include six (6) hours of rehearsal which must be used within two (2) days, one (1) of which shall be the last day of performance.  Such two (2) rehearsal days are not required to be consecutive, but must be within the following span:

Program of:    15 minutes or less, within 2 consecutive days
Over 15 to 30 minutes, within 5 consecutive days
Over 30 to 60 minutes, within 7 consecutive days
Over 60 to 90 minutes, within 9 consecutive days
Over 90 to 120 minutes, within 11 consecutive days

D.    Any rehearsal outside of the span or within the span but outside the two (2) aforesaid rehearsal days shall be paid at the overtime rate.

E.    <u>Special Rates for Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53)</u>:

|  | Rate Effective 11/1/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| 1 Performer* | 816 | 836 | 861 | 887 |
| 2 Performers | 1,327 | 1,360 | 1,401 | 1,443 |
| 3 Performers | 1,675 | 1,717 | 1,769 | 1,822 |
| 4 Performers | 2,099 | 2,151 | 2,216 | 2,282 |
| For Each Additional | 429 | 440 | 453 | 467 |

\* A specialty act by a single performer shall be paid the specialty act rate or the applicable principal performer's rate, whichever is the greater.

Included rehearsal hours: 6

All other terms and conditions set forth in this Paragraph 6 pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

7.    **SPORTSCASTERS**

Sportscasters and Assistant Sportscasters (color persons) shall be paid no less than the following rates:

A.    <u>Sportscasters Fee</u>:

|  | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Per Event | 1,506 | 1,544 | 1,590 | 1,638 |
| Per Week | 3,825 | 3,921 | 4,039 | 4,160 |

B.    <u>Assistant Sportscasters (Color Persons)</u>:

22

|  | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Per Event | 923 | 946 | 974 | 1,003 |
| Per Week | 2,364 | 2,423 | 2,496 | 2,571 |

The per week rate includes up to seven (7) events of the same sport or up to one (1) week's broadcasting of the Olympic Games, Pan American Games, Asian Games, Goodwill Games or World University Games.

C.    Championship Events:

|  | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Sportscaster | 1,609 | 1,649 | 1,698 | 1,749 |
| Assistant Sportscaster | 1,005 | 1,030 | 1,061 | 1,093 |

Championship events are designated as follows:

College Football:

Rose Bowl, Cotton Bowl, Sugar Bowl, Orange Bowl, Gator Bowl, Fiesta Bowl, Senior Bowl, North-South, Blue-Grey and East-West Shrine games.

Professional Football:

National Conference and American Conference playoff games and championship games, Super Bowl, Pro-Bowl and the professional-college All-Star games.

Major League Baseball:

World Series, League Championship Series and All Star Games.

Professional Boxing:

World Championship matches in all weight divisions.

Horseracing:

Kentucky Derby, Belmont Stakes, and the Preakness.

Basketball:

NCAA Final Four, NBA Championship series, NBA Conference Finals.

Professional Hockey:

NHL Stanley Cup Final Series.

Golf:

U.S. Open Golf Tournament, Masters Golf Tournament, PGA, LPGA, and British Open championships.

Tennis:

U.S. Open Tennis Tournament, Wimbledon Tennis.

D.    Major League Baseball Double-Header (other than one scheduled as a result of postponement, which is covered in subparagraphs A. and B. hereof):

23

|  | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| Sportscaster | 1,609 | 1,649 | 1,698 | 1,749 |
| Assistant Sportscaster | 1,005 | 1,030 | 1,061 | 1,093 |

E.   On extended sports programs of the type of the Olympics, and the Pan American Games, performers who appear or whose voices are heard in no more than three (3) self-contained features of no more than fifteen (15) minutes in the aggregate may be paid $423.00 regardless of the day(s) on which the features are aired during such extended sports programs.  In a single day, performers appearing in more than three (3) such features or in features that aggregate more than fifteen (15) minutes shall be entitled to the Assistant Sportscaster's rate.

A week means any seven (7) consecutive days.  An event is whatever the daily ticket of admission buys, except for the events listed in 7.B. above, in which case an event shall be one (1) day of broadcasting.  However, no event covered by subparagraphs C. and D. hereof shall be included as an event for purposes of the weekly rate provided in subparagraphs A. and B.

The included rehearsal period for the commercials shall be one (1) hour which must be scheduled within three (3) hours immediately preceding the time of broadcast.

Whenever the services of a spotter or spotters are required, the Producer shall engage such spotter, as his own employee, and shall pay for his services, and no deduction therefor shall be made from performer's compensation, whether scale or overscale.  If the Producer requires the services of a statistician, the latter shall be engaged and paid by the Producer, and his compensation shall not be deducted from the performer's compensation, whether scale or overscale.

A pre-game show or a post-game show (*i.e.*, a show which has the indicia of a separate program and, in the case of a post-game show, the broadcast or the length of which is not dependent on the length of the remaining time period after the event has ended) shall not be considered part of the event, and shall be paid separately based on the length of such pre-or post-game show.

F.   The Producer shall have, at its option, the ability to hire off-camera announcers for sporting events for exhibition on cable television.  If the Producer so elects, it will pay such off-camera announcer a minimum fee equivalent to the Sportscaster per event fee under Paragraph 7 of the Code.  Such fee shall cover all off-camera announcing services related to that sporting event that are provided during a single recording session, and the use of such material, including any free-standing announcements promoting the cable exhibition of the event.  This understanding shall not constitute a grant of jurisdiction over made for cable announcements, including promotional announcements.

## 8.   BACKGROUND ACTORS

A.   Program Fee - Variety:

| Program Length | Rate Effective 11/18/12 | Rate Effective 11/16/14 | Included Rehearsal Hours | Included Days | Regular Days | Minimum Daily Call – Hours |
|---|---|---|---|---|---|---|
| **5 minutes or less | 41 | 42 | 1.5 | 1 | 0 | 1.5 |
| over 5 to 15 min. | 81 | 83 | 2 | 1 | 0 | 2 |
| over 15 to 30 min. | 122 | 126 | 7.5 | 1 | 0 | 4 |
| over 30 to 45 min. | 141 | 145 | 8 | 2 | 0 | 4 |
| over 45 to 60 min. | 156 | 161 | 8 | 2 | 0 | 4 |
| over 60 to 90 min. | 191 | 197 | 10 | 2 | 0 | 4 |
| over 90 to 120 min. | 224 | 231 | 13 | 2 | 0 | 4 |

Extra rehearsal: $11.00 an hour; $15.00 an hour effective November 16, 2015.

24

For definitions and conditions applicable to rehearsal hours and days, including guaranteed days of employment, see Paragraphs 13-20; for definition of background actor see Paragraph 48.

\*\* Multiple performance discounts do not apply.

B.    Special Rates for Variety Programs on Multiple Stations Commonly Owned (As Specified in Paragraph 53):

| Program Length | Rate Effective 11/18/12 | Rate Effective 11/16/14 | Included Rehearsal Hours |
|---|---|---|---|
| over 15 to 30 min. | 77 | 79 | 7.5 |
| over 30 to 45 min. | 103 | 106 | 8 |
| over 45 to 60 min. | 114 | 117 | 8 |
| over 60 to 90 min. | 143 | 147 | 10 |
| over 90 to 120 min. | 166 | 171 | 13 |

All other terms and conditions set forth in Paragraph 8.A. pertaining to programs of the above lengths are applicable and, except as modified in Paragraph 53, all other provisions of this Code apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's option, either: one-hundred percent (100%) of the program fee for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

Minimum session for all rates above is two (2) hours, except for "5 minutes or less" which is 1.5 hours.

C.    Serials

(1)    Program Fees:

| Program Length | Rate Effective 11/18/12 |
|---|---|
| \*\*5 minutes or less | 39 |
| over 5 to 15 min. | 80 |
| over 15 to 30 min. | 115 |
| over 30 to 45 min. | 134 |
| over 45 to 60 min. | 150 |
| over 60 to 90 min. | 180 |

(2)    A program fee, in accordance with the schedule set forth above, will be paid for each program in which a performer appears.  For each two (2) week reconciliation period, the Producer will compare the number of days worked by a performer against the number of program fees payable to that performer.  If the number of days worked by the performer exceeds the number of program fees payable to the performer for such period, each such excess work day shall be paid for at the rate of $72.00 for performers employed on programs of less than one (1) hour, $96.00 for programs of one (1) hour or longer).

(3)    For definitions and conditions applicable to hours and days, see Paragraphs 15, 16, 43, and 48.

\*\* Multiple performance discounts do not apply.

The program fee for a "5 minutes or less" self-contained program aired on a multiple basis within a twenty-four (24) hour period shall be, at Producer's

option, either: one-hundred percent (100%) of the program for an "over 5 to 15 minutes" program, or the "5 minutes or less" program fee plus all applicable replay fees.

D. (1) <u>Program Fees - Other Than Serials and Variety</u>:

The rate for background actors engaged on programs other than serials and variety will be as follows:

| Performer Category | Rate Effective 11/17/13 | Rate Effective 11/16/14 |
|---|---|---|
| General Background Actor | 112 | 115 |
| Special Ability Background Actor | 122 | 126 |

The above rates include eight (8) hours of work.

Overtime: Time-and-one-half, pro rata, after eight (8) hours.

(2) <u>Preference of Employment for Programs Other Than Serials and Variety</u>:

(a) In recognition of the services performed by professional performers, Producer agrees that in the hiring of background actors preference will be given to qualified professional performers where such performers are readily available through registration services, in-house casting, or alternative arrangements agreed to in the Producers-Background Actors Cooperative Committee.

(b) It is understood and agreed that it would be impossible to fix accurately the actual damages suffered by SAG-AFTRA by reason of a breach by the Producer of the provisions of this Paragraph. It is therefore agreed that, in the absence of any other agreement regarding liquidated damages for such breach, the claim shall be referred to the Producers-Background Actors Cooperative Committee and its decision of such dispute shall be final and binding.

(3) For definitions and conditions applicable to hours and days, see Paragraph 16.

E. <u>Special Rates for Large Groups</u>

(1) <u>Serials</u>:

The program fee, in accordance with the schedule set forth in Paragraph 8.C. above will apply when fewer than twenty (20) background actors are engaged on any program. When twenty (20) or more background actors are engaged on any program per day, all background actors engaged on the program will be paid at twenty percent (20%) less than the existing program fee.

(2) <u>Variety Programs</u>:

The existing program fee will apply when fewer than thirty (30) background actors are engaged on any program. When thirty (30) or more background actors are engaged on any program per day, all background actors engaged on the program will be paid at twenty percent (20%) less than the existing program fee.

26

With respect to this provision it is agreed that "variety programs" refers to a program which consists principally of various entertainment elements, *e.g.,* comic acts, sketches, and musical numbers. Examples of variety programs, both present and past, are *"The Tonight Show," "Saturday Night Live," "Academy Awards," "In Living Color," "Laugh-In," "The Ed Sullivan Show," "Sonny and Cher," "Tim Conway Show," "Dolly Parton Show,"* and *"Star Search."*

(3)   <u>For the Purposes of Paragraph 8.E. (1) and (2) above</u>:

Such twenty percent (20%) reduction shall apply to the program fee only. There shall be no reduction in any other compensation due background actors.

When determining the number of background actors engaged on each program, the Producer will not count any contest winners, or members of the company's production staff who appear as background actors. The Producer is free to count background actors who are upgraded to a higher category (*e.g.,* five (5) lines-or-less or principal).

The background actor must be notified at the time of employment of the rate at which he/she is to be employed.

(4)   SAG-AFTRA will consider granting waivers for background actors in large crowd scenes.

F.   Background actors may perform in multiple roles as background actors on the same programs without additional compensation.

G.   (1)   The Producer of a daytime serial employing ten (10) or more background actors on a single day may use recordings of those background actors made on that day:

(a)   in the studio or on location, in up to six (6) episodes, without payment of any additional fees, provided that any background actor appearing in such multiple episodes is paid twice the applicable minimum for the original employment, or

(b)   on location only, in an unlimited number of episodes over thirteen (13) weeks, without payment of any additional fees, provided that any background actor appearing in such multiple episodes is paid three (3) times the applicable minimum for the original employment.

(2)   The background actor must be notified at the time of employment if these provisions are to be applied.

(3)   The minimum applicable to background actors employed pursuant to subparagraph 8.G.(1) shall be the full rate set out in Subparagraph 8.C., without discount. However, those employed under Subparagraph 8.G.(1) may be counted toward the number required for the discount in Subparagraph 8.E.(1).

H.   Background Actors who are required to furnish the following shall receive the indicated additional payments which shall not be subject to Health and Retirement contributions:

(1)   Pets, Personal Accessories--Allowances per day:

| | | |
|---|---|---|
| Pets | $23.00 | |
| Golf Clubs set with bag | $12.00 | |
| Tennis Racquets | $5.50 | (no additional pay if paid for tennis outfit) |
| Luggage (per piece) | $5.50 | |

27

|  |  |
|---|---|
| Camera | $5.50 |
| Skis and Poles | $12.00 |

(2)     For props not listed above, Background Actors may negotiate a fee at the time of booking.

(3)     Autos and other vehicles—Allowances per day

|  |  |
|---|---|
| Auto | $37.50 |
| Trailer | $19.00 |
| Bicycle | $12.00 |
| Moped | $15.00 |
| Motorcycle | $37.50 |
| Police Motorcycle | $50.00 |
| Skates/Skateboard | $5.50 |

## 9.     LIVE SIGNATURE NUMBERS

Per performer including dress rehearsal: $105.00

Extra rehearsal: $11.00 an hour.

## 9.A.     STANDARD NON-COMMERCIAL OPENINGS AND CLOSINGS AND MUSICAL SIGNATURES

Any performer (other than an announcer) engaged under a term contract for a series, or any serial performer under a term contract who is guaranteed at least $10,000.00 per thirteen (13) weeks, may consent to perform (or permit a portion of a prior performance to be used) without additional compensation, in standard openings and closings, bridging material (lead-ins and lead-outs from commercials or lead-ins and lead-outs from the program) and musical signatures broadcast in conjunction with any or all episodes of the program produced while the performer is under contract to appear on the program; provided that if the performer is required to perform such services on a day when he is not otherwise required to perform on the program, he shall be paid at least $100.00.

Any other performer (other than an announcer) who performs (or permits a portion of a prior performance to be used) in standard openings and closings, bridging material (lead-ins and lead-outs from commercials or lead-ins to and lead-outs from the program) and musical signatures for a program broadcast in conjunction with any episode(s) of a series or serial in which the performer does not otherwise perform may be paid on a per-episode basis or a per thirteen (13) week basis.  The minimum amount payable on the per-episode basis shall be the applicable minimum program fee.

The minimum amount payable on the thirteen (13) week basis shall be the following rate per performer for each thirteen (13) week period during which such broadcasts occur:

| Performer Category | Rate Effective 11/17/13 | Rate Effective 11/16/14 | Rate Effective 11/16/15 | Rate Effective 11/16/16 |
|---|---|---|---|---|
| On-Camera | 1,786 | 1,831 | 1,886 | 1,943 |
| Off-Camera | 1,284 | 1,316 | 1,355 | 1,396 |
| Singers - Solo/Duo | 1,284 | 1,316 | 1,355 | 1,396 |
| Singers - Group 3 to 8 | 1,006 | 1,031 | 1,062 | 1,094 |
| Singers - Group 9 or More | 872 | 894 | 921 | 949 |
| Background Actors | 293 | 300 | 309 | 318 |

As to serial programs, this Paragraph 9.A. may be utilized only on those programs on which an announcer is regularly employed to perform such material and those programs on which, at the time such standard openings and closings are first utilized, an announcer has not been regularly employed since November 15, 1979, to perform such material.

28

10.   **PROMOTIONAL ANNOUNCEMENTS**

A.   (1)   When a performer is engaged to perform services in a promotional announcement (*i.e.*, a non-commercial announcement promoting one (1) or more programs, or series on a network, or on a program service, in syndication or on multiple stations commonly owned; or an announcement promoting the network, program service or station on which the program or series is broadcast) the fee shall be as follows:

On-Camera:        $323.00
Off-Camera:       $240.00

Off-Camera (value added): $410.00
Background Actors:  $97.00 (Such payment shall be in lieu of any additional compensation to the Background Actor pursuant to Paragraph 10).

Different length versions of a promo or network/program service identification constitute separate promotional announcements or identifications.

Said fees shall be for the recording and not more than thirteen (13) weeks of use on a network, on a program service, in syndication, on commonly owned local stations or on network affiliated stations.  Reuse in New Media shall also be included in the initial compensation paid for a promotional announcement.

Use on basic cable within the same thirteen (13) weeks of use shall require the payment of an additional fee as set forth above.

(2)   When a performer is engaged to perform services in a radio promotional announcement (*i.e.*, a non-commercial radio announcement promoting one (1) or more television programs, or series on a network, or on a program service in syndication, or on multiple stations commonly owned, or a radio announcement promoting the television network, program service or station on which the program or series is broadcast) the fee shall be as follows:

Eight (8) days' use:        $270.00
Thirteen (13) weeks' use:   $350.00

(3)   A performer engaged to perform services in stand-alone network and program service identifications (hereinafter "id") or cues shall be entitled to payment of the fee and all other terms specified in subparagraph (1), above.

(4)   A session for on-camera performers shall be eight (8) hours in length; a session for off-camera performers shall be two (2) hours in length.

(5)   Producer may, at its option elect, upon payment of three times the promo fee have an announcer record up to five promos, for an episode of a program being distributed in first run syndication.

B.   Tags:

(1)   A tag is a short change or addition to an existing promotional announcement which may be placed anywhere in the announcement.  Tags may only contain information indicating the day, date, time or show title (*e.g.,* tonight, tomorrow, next, next week, following, or Tuesday), network or program service, but do not change the content of the announcement.

(2)   Required payment for each tag is $93.00 for thirteen (13) weeks of use for each announcement to which such tag is added, whether the tag is separately recorded and mechanically edited or the entire announcement is reread.

29

C.   Customized Station Tags:

(1)   Promos may be customized by appending customized identification containing information which specifies the station call letters, channel, or other means of station identification.  These customized tags must be appended to a promotional announcement recorded by the same announcer.

(2)   Minimum fees for such tags shall be as follows:

Up to 30 tags    -   $50.00 for each tag
31 to 100 tags   -   $35.00 for each tag
over 100 tags    -   $25.00 for each tag

(3)   Said fees shall be for the recording and not more than thirteen (13) weeks of use of such tags, during which period they may be attached to any promo recorded by the same announcer.

D.   A minimum session fee of $250.00 shall be payable for each session at which tags are recorded, based on a two (2) hour session, however, the minimum session fee may be credited against total payments due for such session.

E.   The foregoing provisions applicable to promotional announcements also shall apply to pre-recorded public service announcements; provided such public service announcement is no longer than three (3) minutes in length.

F.   A performer may agree in writing at the time of his/her employment that he/she may record promotional announcements without additional compensation which promote the program or series for which the performer is under current contract as a series regular.

G.   Group singers engaged to record voice tracks for program promotional announcements (*i.e.*, non-commercial announcements not more than three (3) minutes in length promoting one (1) or more network television programs or series) will be employed under the following conditions:

(1)   Session Fee:

Each singer will be paid $175.00 for each final recording of each arrangement actually performed during a session, which fee includes unlimited tracking and/or sweetening.  In the event no final recording of an arrangement is produced, each singer will nevertheless be paid $175.00.  Fees paid pursuant to this subparagraph (1) may be credited against payment of the use fee(s) specified in (2) below.  A session shall be three (3) hours in length.

(2)   Use Fees:

(a)   Before the first use of the promotional announcement(s), Producer shall elect one (1) of the following initial payment alternatives, depending upon the number of different promotional announcements to be made and whether they are made for television use only or for television and radio use.

30

(i)   If the promotional announcements are made for use in TV only:

| No. of Different Promotional Announcements in which Singers' Services are Used | TV Use Only Fee Per Singer | Use Covered By Such Fee | |
|---|---|---|---|
| | | Network TV Weeks of Use | Affiliates TV Weeks of Use |
| Per Announcement | $  185.00 | 13 | 13 |
| 10 | 1,516.00 | 13 | 13 |
| 20 | 2,526.00 | 15 | 26 |
| 50 | 5,054.00 | 15 | 39 |
| Unlimited | 6,950.00 | 52 | 52 |

(ii)   If the promotional announcements are made for use in TV and Radio:

| No. of Different Promotional Announcements in which Singers' Services are Used | TV and Radio Use Fee Per Singer | Use Covered By Such Fee | | |
|---|---|---|---|---|
| | | Network TV Weeks of Use | Affiliates TV Weeks of Use | Radio Weeks of Use |
| Per Announcement | $  212.00 | 13 | 13 | 26 |
| 10 | 1,744.00 | 13 | 13 | 26 |
| 20 | 2,906.00 | 15 | 26 | 26 |
| 50 | 5,811.00 | 15 | 39 | 39 |
| Unlimited | 8,212.00 | 52 | 52 | 52 |

The use of voice tracks recorded in sessions (as provided in B.(1) above) that occur more than thirteen (13) weeks after the initial session requires payment of an additional use fee, which Producer shall elect from the initial payment alternatives.  The foregoing shall not apply to customized individual station tracks recorded pursuant to subparagraph (4) below.

(b)   Soloists and duos shall receive an additional fifteen percent (15%) of the above rates.

(c)   Cycles shall commence with first use.  In connection with payment for additional cycles, Producer may elect any one (1) of the payment alternatives provided above.

(3)   Contractors:

The contractor for the group shall receive a single fee of $53.40 per session.

(4)   Customized Tracks:

Customized tracks produced for individual stations shall be compensated at the rate of $50.00 per track per singer, which shall entitle the station to fifty-two (52) weeks of use.  Producer shall so inform the station in writing.

If a singer is called to make customized tracks on a day on which he is not otherwise engaged on other promotional announcements, Producer shall make not fewer than four (4) tracks or, if fewer are made, the singer shall be paid a minimum of $200.00.

H.   The following shall apply to promotional announcements produced for distribution into syndication (other than first run syndication on a Program Service or Network), including cable.

31

(1)     The off-camera announcer (off-camera singer) shall receive an initial payment for each promotional announcement, in accordance with the provisions of subparagraph 10.A. (10.G.), along with an additional, single aggregate payment of $35.00 ($40.00 for an off-camera group singer) for all promotional announcements created for a given episode of a program. Such initial payment shall entitle the producer to one (1) year of syndicated use of the promotional announcement(s).

(2)     The off-camera announcer (off-camera singer) shall receive a payment of $250.00 per episode per year ($225.00 per episode per year for off-camera group singers) for each one (1) year period that the program for which the promotional announcement(s) was recorded remains in syndication. Such payment shall be made at the beginning of each subsequent one (1) year period, unless the original promotional announcement(s) are no longer in use.

(3)     If a Producer of a promotional announcement produces such announcement for distribution into syndication by another entity, the Producer, in its agreement with such other entity, shall specify the payments that are required by this provision and shall include in its agreement with such other entity the following statement:

[Producer] and [Distributor] hereby agree that the off-camera announcer (off-camera singer) shall be a third-party beneficiary of this agreement to the extent that [Distributor] assumes the obligation to make reuse payments due to the off-camera announcer (off-camera singer) pursuant to Section 10.H. of the SAG-AFTRA Code, subject to the following:

In order to initiate a third-party beneficiary claim against [Distributor] the off-camera announcer (off-camera singer) or SAG-AFTRA must demonstrate 1) that Producer has failed to make a reuse payment when due; and 2) that a demand was made on the Producer to make the residual payment but such payment was not made.

[Distributor] further agrees that any dispute between [Distributor] and SAG-AFTRA or [Distributor] and the off-camera announcer (off-camera singer) shall be resolved according to the Grievance and Arbitration procedures set forth in the National Code of Fair Practice for Network Television Broadcasting.

(4)     For promotional announcements produced for "off-network" syndication, Producer may, at its option elect, instead of utilizing the provisions set forth in subparagraphs (1) and (2), to make an initial payment to the Performer, at the time of the original engagement, of two times the promo fee provided in Paragraph 10A (10G for singers) for up to five promos per episode. An additional payment of $35 per year, for all promos created for a given episode shall cover each year's use during the episode's license period. For second and subsequent sales, the applicable $35 fee shall be $25 per year per episode payable at the time of the second or subsequent sale.

I.     A sweeper is a transition announcement of seven (7) seconds or less used at the end of reformatted credits. The payment for each sweeper which is not part of another announcement is $125.00 for thirteen (13) weeks of use. A minimum session fee of $250.00 shall be payable for each session at which sweepers are recorded, based on a two (2) hour session, however, the minimum session fee may be credited against total payments due for such session.

11.   **SUSTAINING PROGRAMS**

Sustaining rate: eighty percent (80%) of above fees.

12.   **RATES FOR PROGRAMS IN EXCESS OF TWO HOURS AND MORNING NEWS PROGRAMS**

A.   In all programs of more than two (2) hours in length, the fee shall be the applicable two (2) hour rate plus, for each one-half (½) hour or part thereof over and above two (2) hours, a sum equal to the difference between the applicable ninety (90) minute rate and the applicable one hundred-twenty (120) minute rate, provided that in no event shall an announcer's off-camera minimum fee for a sports event (as defined in Paragraph 7) be greater than the minimum fee for a Sportscaster for such sports event.

B.   <u>Rates for Morning News Programs of Two (2) Hours or More</u>:

1.   Performer(s) appearing on a morning news program *(e.g., "The Today Show," "Good Morning America")* of two (2) hours or more may be paid the applicable one half (1/2) hour program fee, subject to the following:

The total time spent being interviewed and actually performing (as distinguished from rehearsing), including any live performance(s), and/or taped performance(s), within the same program episode, shall not exceed thirty (30) minutes. This rate may be used only one (1) time during any thirteen (13) week period, for a given performer(s) on any single program. Time between live performances shall count towards the thirty (30) minute limitation.

2.   Performer(s) appearing on a morning news program *(e.g., "The Today Show,")* of more than two (2) hours may be paid the applicable two (2) hour program fee, if the performer(s) does not qualify for the one (1) hour rate in B.1. above, subject to the following:

For this rate, such performer(s) may appear one (1) time only during any thirteen (13) week period on any single program and the total show segment(s) in which the performer(s) appears, including any interview(s) and the performance(s), shall not exceed thirty (30) minutes in the aggregate.

3.   Specialty Acts, as defined in this Agreement, appearing in a morning news program of two (2) hours or more may be paid 80% of the applicable Specialty Act rate, based upon the number of performers who appear in such Specialty Act.

13.   **PERIODS OF REHEARSAL AND RATES (NOT APPLICABLE TO SERIALS)**

A.   Periods of rehearsal are classified as (1) Included Rehearsal Days, (2) Regular Rehearsal Days, and (3) Additional Rehearsal Days.

B.   Included Rehearsal Days are the period of consecutive days in which the included rehearsal hours must be used or forfeited. The number of included rehearsal hours and the number of Included Rehearsal Days are specified in the fee schedule for each category of performer in Paragraphs 2-8. The last day of the Included Rehearsal Days is the day of broadcast in the case of a live program or the performer's scheduled final performance day in the case of a pre-recorded program. Included rehearsal hours are included in the performance fee. The rate of pay for all other hours of rehearsal on Included Rehearsal Days shall be the applicable extra rehearsal rate except as provided in Paragraphs 14.D., 15 and 16.

C.   Regular Rehearsal Days are the period of consecutive days ending with the day just prior to the Included Rehearsal Days. The last day of the Regular Rehearsal Days

33

is also the last day of the Guarantee Period provided in Paragraph 19.  The number of Regular Rehearsal Days for each category of performer is set forth in Paragraphs 2-8.  The rate of pay for all hours of rehearsal on Regular Rehearsal Days shall be the applicable extra rehearsal rate except as provided in Paragraphs 14.D., 15 and 16.

D.  Additional Rehearsal Days are the days prior to the beginning of the period of a performer's Regular Rehearsal Days or when no Regular Rehearsal Days are provided in Paragraphs 2-8 prior to the period of his Included Rehearsal Days.  The rate of pay for all hours of rehearsal on Additional Rehearsal Days shall be at the rate of time and one-half of the applicable extra rehearsal rate, except as provided in Paragraph 21 for a reading session.

14.  **REHEARSAL DAYS (NOT APPLICABLE TO SERIALS)**

A.  A rehearsal day shall consist of no more than seven (7) out of eight (8) consecutive hours on any day, inclusive of meal periods, except on one (1) day, which day may be only one (1) camera day (*i.e.,* the performer's scheduled final performance day or one (1) of the two (2) days prior thereto).  On a rehearsal day other than the one (1) camera day, there shall be no more than four (4) consecutive hours of rehearsal in any session.

B.  On the camera day described in (a) above, the rehearsal day shall consist of no more than nine (9) out of eleven (11) consecutive hours, and there shall be no rehearsal session of more than five (5) consecutive hours on any such day.

C.  Whenever the limit for consecutive rehearsal hours in a session is reached in (a) and (b) above, there shall be at least a one (1) hour break before the next session, during which break a meal period may be given.  However, a meal period of not more than one (1) hour may be given at normal meal periods (as specified in Paragraph 23) prior to reaching such limit, and such meal period shall not be considered as breaking the session so long as the rehearsal resumes immediately after such a meal period.

D.  If on an Included Rehearsal Day or Regular Rehearsal Day rehearsal exceeds seven (7) hours or more than four (4) consecutive hours, or, in the case of the said one (1) camera day as described in A above, rehearsal hours exceed nine (9) hours or more than five (5) consecutive hours, performers shall be paid overtime at the additional rate of one-half (½) the applicable rehearsal fee.

E.  A rehearsal day starting on one (1) calendar day and continuing into the following calendar day shall be deemed to be one (1) rehearsal day; namely, the rehearsal day on which it started.

15.  **OVERTIME**

A.  Programs Other Than Serials:

In all cases when performers have rehearsed more than forty (40) hours for a program within the period of Included Rehearsal Days plus Regular Rehearsal Days for which they are either credited or paid the straight time rehearsal rates, such performers shall be paid for all hours rehearsed beyond such forty (40) hours at the rate of time and one-half of the applicable rehearsal rate.  However, this shall not require duplicate overtime payment for the same hours.

B.  Serials:

(1)  Hours Per Day: Each day of work shall consist of the hours of work (exclusive of meal periods) specified below.  Overtime at the hourly rates

34

specified below will be paid in minimum increments of one-half (½) hour for all hours worked in any day which exceed the stated hours.

The rates in Column I are applicable to the first two (2) hours of such overtime.  The rates in Column II are applicable to the third and each successive hour of such overtime.

**Principal Performers**

| Program Length | Hours Per Day | Overtime Rate Per Hour | |
|---|---|---|---|
| | | I | II |
| 5 minutes or less | 4 | $36.00 | $47.00 |
| over 5 to 15 min. | 8 | 36.00 | 47.00 |
| over 15 to 30 min. | 8.5 | 51.00 | 67.00 |
| over 30 to 45 min. | 9 | 65.00 | 85.00 |
| over 45 to 60 min. | 9 | 65.00 | 85.00 |
| over 60 to 90 min. | 9 | 65.00 | 85.00 |

**Performers Who Speak Five Lines or Less**

| Program Length | Hours Per Day | Overtime Rate Per Hour | |
|---|---|---|---|
| | | I | II |
| 5 minutes or less | 4 | $22.00 | $29.00 |
| over 5 to 15 min. | 8 | 22.00 | 29.00 |
| over 15 to 30 min. | 8.5 | 26.00 | 34.00 |
| over 30 to 45 min. | 9 | 29.00 | 38.00 |
| over 45 to 60 min. | 9 | 29.00 | 38.00 |
| over 60 to 90 min. | 9 | 29.00 | 38.00 |

**Background Actors**

| Program Length | Hours Per Day | Overtime Rate Per Hour | |
|---|---|---|---|
| | | I | II |
| 5 minutes or less | 4 | $17.00 | $22.00 |
| over 5 to 15 min. | 8 | 17.00 | 22.00 |
| over 15 to 30 min. | 8.5 | 17.00 | 22.00 |
| over 30 to 45 min. | 9 | 17.00 | 22.00 |
| over 45 to 60 min. | 9 | 17.00 | 22.00 |
| over 60 to 90 min. | 9 | 17.00 | 22.00 |

Not applicable to overnight location work.  For hours applicable to overnight location work, see Paragraph 43.E.

(2)    Sixth (6th) or Seventh (7th) Days: With respect to a performer who has worked five (5) days in a given workweek and who is required to work a sixth (6th) or seventh (7th) day in that week, the performer shall be paid for hours worked on such sixth (6th) or seventh (7th) day at the applicable overtime rate from Column I above, with a minimum call of four (4) hours, in addition to any performance fee or excess workday payment due, if any.  Hours worked in excess of those stated in the "Hours Per Day" column above shall be paid at the applicable overtime rate from Column II above.

This provision is not applicable to overnight location work.  For provisions applicable to overnight location work, see Paragraph 43.E.

(3)    The rates specified in Column I above shall be applicable to all overtime hours worked during the first six (6) months of a new serial program one (1) hour or more in length, the first (3) three months of a new serial program less than one (1) hour in length, the first six (6) weeks after the length of a serial program has been increased, or the first six (6) weeks after a serial

35

program has moved to a different studio complex.  The rates specified in Column II above shall not be applicable in those circumstances.

**16.   REST BETWEEN DAYS**

A.   There shall be a rest period of not less than twelve (12) hours between the end of work on one (1) rehearsal day and the beginning of work on the next rehearsal day, provided that if any performer is required by the Producer to report to work within such twelve (12) hour period, he shall be paid $20.00 per hour for the hours between the time he is required to and does report, and the end of such twelve (12) hour period, in addition to the applicable extra rehearsal rate.  Such hours shall not be credited against the hours of rehearsal which are included in the minimum rates hereunder.

B.   Serials:

In recognition of the special problems of serial principal performers who appear in successive daily episodes and who under such circumstances have unique problems in memorizing lines and otherwise preparing for such successive episodes:

(1)   The amounts payable under this Paragraph 16 where applicable shall be multiplied by five (5) for the first two (2) hours and shall be multiplied by six (6) for each additional hour in the case of a serial performer who must memorize lines.  Such amounts shall be paid in minimum increments of one (1) hour.

(2)   In order to address the major concern that continuous invasions of rest period combined with excessive work hours may adversely affect such a performer's health and career, the parties have further agreed to the following special provision:

(a)   In the event it appears that such performer's rest period may be invaded for a second consecutive time in a workweek, he/she may request to be rescheduled so that the invasion of his/her rest period(s) will be eliminated or reduced.

(b)   In considering such request, Producer will take into account such concerns and factors as the human needs of the performer, the prior and upcoming schedule of the performer, the impact on others of granting such request, the availability and viability of alternative production methods (*e.g.,* stand-ins), all in context of the needs and budget of the enterprise.  If in order to grant such request or to otherwise reduce or eliminate rest period invasions Producer reschedules any rehearsal, the provisions of Paragraph 55.A. shall not apply.

(c)   Given the gravity of these matters it is the expectation of the parties that performers will not make such requests lightly nor routinely, and that Producer will give good faith consideration to each request. Producer will record all responses to such requests when made in writing and will make such information available to SAG-AFTRA before any meeting of the Serials Forum.  A claim by either party that these expectations are not being lived up to may be presented for consideration at the next Serials Forum.

(d)   If a performer is required to work for at least one (1) hour of the applicable rest period on two (2) consecutive occasions in a workweek, a penalty of $105.00 per hour shall be paid for those hours worked during the second or any subsequent rest period in lieu of the payments otherwise due under (1) above.  If the total time worked during such rest periods is four (4) hours or more, the

36

Producer shall pay an additional lump sum penalty of $325.00 for the second such rest period invasion.

(e)   Producer may not invade the third consecutive rest period in a workweek of any performer who qualifies for the $105.00 per hour penalty provided for above and whose total time worked during such rest periods is four (4) hours or more, unless Producer pays $105.00 per hour for all hours of rest period invasion for which a $105.00 penalty is not already required by Paragraph B.(2)(d) and a lump sum penalty of $350.00 to performer for such third invasion.

(f)   Producer may not invade the fourth or subsequent consecutive rest period in a workweek of any performer who qualifies for the $105.00 per hour penalty provided for in Paragraph B.(2)(d) above and whose total time worked during such rest periods is four (4) hours or more, unless Producer pays $105.00 per hour for all hours of rest period invasion for which a $105.00 penalty is not already required by Paragraph B.(2)(d) and a lump sum penalty of $400.00 to performer for each such fourth or subsequent invasion.

(g)   For purposes of this Paragraph (2), on overnight remote locations the applicable rest period shall be eleven (11) hours, but all other provisions in this Paragraph 16 B. shall apply.

(h)   For purposes of avoiding disputes over the facts involved in the application of this Paragraph (2) the Producer shall establish a sign in/sign out procedure for the principal performers on each serial.

C.   The Producer agrees to make a good faith attempt to provide adequate rest between work days.

## 17.   MINIMUM DAILY CALL (NOT APPLICABLE TO SERIALS)

A.   A performer shall be given the applicable credit or payment for no less than a minimum call on any rehearsal day on which he works.

B.   A performer shall be given the applicable credit or payment for no less than a minimum call on each day of his Included Rehearsal Days, whether worked or not, which follows his first rehearsal day.

C.   A performer shall be given credit or payment for no less than a minimum call for the number of days guaranteed employment within each unit of the Guarantee Period, as set forth in Paragraph 19, whether worked or not.

D.   When the number of included rehearsal hours is not evenly divisible by the number of hours in the minimum daily call, the balance may be used on any of the performer's Included Rehearsal Days as a separate session, which may be less than the number of hours in the minimum call, but not less than one (1) hour in length. The minimum daily call for each category of performer is specified in Paragraphs 2-8. For special provisions applicable to strip programs (other than serials), see Paragraph 20.

## 18.   MINIMUM SESSION (NOT APPLICABLE TO SERIALS)

The minimum session, as specified in Paragraphs 2-8, applies to any rehearsal day on which the performer works. The minimum session shall be consecutive rehearsal hours. Rehearsal time beyond the minimum session shall be computed in half-hour (½) segments for each half-hour (½) or part thereof. For special provisions applicable to strip programs (other than serials), see Paragraph 20.

19.   **GUARANTEED DAYS OF EMPLOYMENT (NOT APPLICABLE TO SERIALS)**

A.   When a performer's first rehearsal day is scheduled prior to his period of Included Rehearsal Days he shall be entitled to guaranteed days of employment as hereinafter provided in this paragraph.

B.   The Guarantee Period is that period of time beginning with a performer's first scheduled day of rehearsal and ending with the day just prior to his first Included Rehearsal Day.  The Producer guarantees that during the Guaranteed Period the performer shall be given the applicable credit or payment for no less than a minimum daily call, whether worked or not, for the number of days of guaranteed employment within each unit as specified in the following schedule:

| Number of Guaranteed Days of Employment | Number of Consecutive Days in Guarantee Period (Unit) |
|---|---|
| 5 | 7 |
| 4 | 6 |
| 3 | 5 |
| 3 | 4 |
| 2 | 3 |
| 1 | 2 |
| 1 | 1 |

If the Guarantee Period is longer than seven (7) days, the guarantee shall be computed in successive seven (7) day units, commencing with the performer's first scheduled day of rehearsal, except that the last unit (*i.e.*, the one immediately preceding the Included Rehearsal Days) may be fewer than seven (7) days.  If the last unit has fewer than seven (7) days, the guarantee for such unit shall be computed in accordance with the above schedule and based upon the number of days in the last unit.

C.   When a performer's Guarantee Period begins more than fourteen (14) days prior to his scheduled final performance day, Producer shall pay the sum of $50.00 per week as an advance which shall be credited against the performer's total fee, and such payment shall be made not later than Thursday of each week during the period prior to the week in which the final performance day is scheduled.

D.   Where a segment is recorded prior to the principal production of the program and where a performer in the segment is also employed in the principal production of the program, the Producer may, in lieu of the above provisions, pay the performer compensation for the segment at the applicable overtime extra rehearsal rate, with a minimum of four (4) hours (which compensation shall be in addition to the applicable minimum compensation to which he is entitled for other services on the program).  In no event, however, shall payment under this subparagraph D be less than ninety dollars ($90.00) for group singers and dancers, or less than one hundred and eighty dollars ($180.00) for principal performers.  Producer may not require a performer to appear in such segment at a time which conflicts with the *bona fide* prior commitments of the performer.

Except when the segment is done at the time of one show for another in the series, or except where the performer is under a term contract for the series, Producer must inform performer at the time of employment that he will be utilized in segments some time prior to the principal production.  Group Singers and Dancers may not record a segment under this clause except while working on another program in the same series.

38

20.     **REHEARSAL ON STRIP PROGRAMS (OTHER THAN SERIALS)**

The provisions of Paragraphs 13-19 apply to performers in strip programs (other than serials) with the following modifications:

A.     Minimum Daily Call:

No separate minimum call shall be required for rehearsal of a show in the series immediately before or after the broadcast or pre-recording of a different show in the series.

B.     Minimum Session:

Rehearsal (i): Where a rehearsal of a show in a series immediately follows the broadcast or pre-recording of a different show in the series, the minimum rehearsal session shall be one (1) hour for each rehearsal.

Pre-read (ii): Where, on any day, a pre-read of a show in a series immediately follows the broadcast or pre-recording of a different show in the series, the minimum session shall be one (1) hour for any performer who appears on both shows, and shall be two (2) hours for any performer who does not appear in the show which is broadcast or pre-recorded on such day.

C.     Included Rehearsal Days:

The period of Included Rehearsal Days may be split (*i.e.*, such days need not be consecutive) when a Saturday, Sunday or holiday which is not worked intervenes between successive Included Rehearsal Days which are worked, or for which the performer is given the applicable credit or payment, whether for the show of the day worked or for a different show in the series.  When such split occurs, no minimum call shall be applicable to such Saturday, Sunday or holiday which is not worked; but, in such case, a performer shall be given the applicable credit or payment for no less than a minimum call (subject to the exception provided in subparagraph A above) for the day immediately preceding and the day immediately following the intervening day or days not worked.

D.     Guaranteed Days of Employment:

The provisions of Paragraph 19 shall not apply to performers in running parts on strip programs, nor shall the provisions of Paragraph 19 apply to any other performer on a strip program when, in addition to his services on any day on one (1) program, he also pre-records on that day a portion of his performance for use on another program of the same series on which he is otherwise performing; provided, however, that such performer shall be paid for a minimum of four (4) hours at the applicable extra rehearsal rate as a result of such pre-recording of a portion of his performance on such other program, which amount may not be credited towards the applicable minimum compensation for his performance on such other program.  Such provisions shall apply to all other performers, except that the Guarantee Period shall not be commenced when such performer is required to rehearse or to pre-record a portion of a program prior to his scheduled final performance day for that program because of Producer's call to rehearse or record on a day(s) which is outside the normal rehearsal period for that program to meet the convenience or to avoid conflicts or prior commitments of any performer in the cast.

E.     Special Provisions:

On strip programs of over forty-five (45) to sixty (60) minutes, the included rehearsal hours for principal performers are ten (10) hours, except for new programs (including programs increasing program length to over forty-five (45) to sixty (60) minutes).  On new programs, for the first six (6) months only, included hours are eleven (11) hours per program.

21.     **READING SESSION**

    A.    <u>Programs Other Than Serials</u>:

        Performers may be required to attend a reading session which shall not be more than one (1) hour for a fifteen (15) minute or half-hour (½) program and not more than two (2) hours for an hour (1) program. Such reading session shall be considered as rehearsal time. The minimum call shall not apply to such reading session. The performer's reading session shall be held within the period of a Regular or Included Rehearsal Days, as defined in Paragraph 13 of this Code, or within two (2) days prior to the start of his or any other performer's first rehearsal day and such reading session shall be paid for at the applicable rehearsal rate. In no case shall the reading session start the employment Guarantee Period as defined in Paragraph 19 of this Code.

    B.    <u>Serials</u>:

        If a performer otherwise works on a day on which the performer participates in a reading session, the hours of the reading session shall be treated as time worked. If a performer is called in for a reading session on a day on which the performer is not otherwise working, the performer will be paid the excess work day rate, subject to the applicable reconciliation formula contained in Paragraph 2.A.(2) (b),or 3.C.(2), or 8.C.(2).

22.     **REST PERIODS**

    A.    There shall be at least a five (5) minute rest period provided during every hour of rehearsal. If a request by the contractor, deputy or authorized SAG-AFTRA representative to give such rest period to dancers is ignored or denied by Producer, each dancer shall be paid $5.00 for each such violation of the rest-period rule. One notice per rehearsal day per program shall suffice.

    B.    Specialty acts (physical) shall not be required to rehearse their full act more than two (2) times full out in any one (1) day and in no instance shall they be asked to rehearse full out with less than one (1) hour between rehearsals; on programs where only one (1) camera day is scheduled for such programs, specialty acts (physical) may be required to rehearse their full act three (3) times full out on any such camera day, provided that in such event there shall be not less than one (1) hour's rest between the first and second full out and not less than two (2) hours' rest between the second and third full out.

23.     **MEAL PERIODS**

    A.    Performers (including background actors) on all program types shall have no more than 6 hours between first call and first meal, provided that a performer (including background performers) may be provided with a non-deductible meal appropriate to the time of day of fifteen (15) minutes in duration within two (2) hours of the performer's call time, during which performer will be freed of all activity, provided that for Background Actors such non-deductible meal is given for the purpose of synchronizing the performers' meal time with the crew meal time. If the performer is given a non-deductible meal, a notation indicating the start and finish time of that meal shall be made on the production report. The first deductible meal period shall commence within six (6) hours of the end of such non-deductible meal.

    B.    Meal periods of one (1) hour shall be given at a time as close to normal meal periods (namely 11 a.m. to 2 p.m. for lunch, 5:30 p.m. to 8 p.m. for dinner, 11 p.m. to 2 a.m. and 6 a.m. to 8:30 a.m.) as the requirements of other participants in the production will permit, but in no case shall the period between the end of lunch and the beginning of dinner exceed six (6) hours. There shall be a twelve (12) minute grace period, which is not a scheduled grace period, prior to the imposition of any meal penalty. Meal periods shall not be considered as time worked. No work shall

40

be required during a meal period, including, but not limited to, make-up, hairdress, or wardrobe.

(1)     In the event a first meal period is not given to any performer as herein mentioned, Producer shall be required to pay in addition to any other fees a sum of $25.00 to such performer for such first meal period missed.

(2)     In the case of a second or succeeding meal period, Producer has the option of giving a one-half (½) hour meal period, subject to the following additional conditions:

(a)     When such a meal period is given and producer caters a balanced meal, no penalty shall be incurred.

(b)     When such a meal period is given and a balanced meal is not catered, a $27.50 meal period penalty shall be incurred.

(3)     If a second or succeeding meal period is not given, a $35.00 missed meal period penalty shall be incurred.  The Producer shall not continually pay the $35.00 penalty as a subterfuge for a practice of refusing to give meal periods to performers on a program and Producer acknowledges its primary obligation to grant meal periods in accordance with the provisions of this paragraph.

The five (5) minute rest periods required to be given in the hour immediately preceding and the hour immediately following the meal period shall be given cumulatively immediately adjacent to the first meal period so that total elapsed time shall be seventy (70) minutes, and in the case of a half (½) hour subsequent meal period, total elapsed time shall be forty (40) minutes.  Producer shall furnish meals in the 11 p.m. to 2 a.m. or 6 a.m. to 8:30 a.m. meal period when no restaurant facilities are reasonably available.

C.     In lieu of subparagraph B above, for serial programs only, the following shall apply:

(1)     The first meal period shall include the five (5) minute rest periods required to be given in the hour immediately preceding and the hour immediately following the meal period for a total elapsed time of seventy (70) minutes. Succeeding meal periods shall be one (1) hour and the period between the end of a meal period and the beginning of the next meal period shall not exceed six (6) hours.  No work shall be required during a meal period, including, but not limited to make-up, hairdress or wardrobe.  If the Producer does not comply with the foregoing meal period requirements, the penalty set forth in subparagraph C.(2) below shall apply.

(2)     If the Producer does not comply with the provisions of subparagraph C.(1) above with respect to the first meal period, the Producer shall be required to pay a $35.00 penalty to each affected performer.

(3)     In the case of a second or succeeding meal period, Producer has the option of proceeding as described in subparagraph B.(2) through (3), above.

(4)     Except as provided in subparagraph A above, meal periods shall not be counted as work time.

## 24.   **COMMERCIAL**

Commercial copy that must be memorized shall be in the hands of the performer at least twenty-four (24) hours preceding air time.  If any significant changes or additions are made to copy within the twenty-four (24) hours prior to air time, Producer shall be required to supply an acceptable prompting device or legible cue cards.

25. **WARDROBE, HAIRDRESS, MAKE-UP AND INCIDENTAL REHEARSAL**

    A.    <u>Wardrobe, Wigs, and Appurtenances</u>:

Performers, including background actors, shall not be required to furnish any special wardrobe, special wigs or special appurtenances, except specialty acts or units, which may supply their own wardrobe if so contracted by Producer. Evening clothes (except full dress for male performers) and any apparel which may reasonably be expected to be included in the regular wardrobe of a performer are not special wardrobe, provided, however, that the regular wardrobe of a female performer shall not be deemed to include more than one (1) evening gown. If a performer agrees to Producer's request that he furnish special wardrobe (not including wardrobe which he normally furnishes as part of his professional performance) he shall be paid a fee of $12.00.

    B.    <u>Wardrobe Hygiene</u>:

All wardrobe and wigs supplied by the Producer shall be in a sanitary condition.

    C.    <u>Wardrobe Maintenance</u>:

Performers, including background actors, supplying personal wardrobe shall receive a wardrobe maintenance fee of $10.00 per garment, except that the fee for formal evening wear and genuine furs (coats, jackets, capes and stoles) shall be $25.00.

In the event wardrobe furnished by performer is damaged during rehearsal or performance, the Producer will reimburse the performer for the cost of repair provided that notice of such damage is given to a responsible representative of the Producer, such as the Producer, Director, Associate Director, Floor Manager, House Manager, or Facilities' Manager, prior to the performer's leaving the studio, and only upon submission to the Producer of a paid bill covering the cost of such repairs, but in no event more than the value of the garment. In the event a disagreement arises as to whether the damage was caused as a result of rehearsal or performance, the question shall be arbitrable under the arbitration provisions of this agreement.

"Gross compensation" under Paragraph 102 and Paragraph 102.A. of this Code shall be deemed to include wardrobe maintenance fees.

    D.    <u>Dance Shoes</u>:

A new pair of standard dance shoes of good quality, such as Champion or Capezio, and properly fitted shall be made available by Producer to each dancer engaged for a program or program series, if the dress rehearsal and/or broadcast of the program or program series requires the use of standard dance shoes by the dancer. Producer is not required to issue new standard dance shoes for each show in the same program series, but replacement shoes shall be made available as necessary.

    E.    <u>Incidental Rehearsal</u>:

All performers shall receive credit for one (1) hour rehearsal for each time they are required by the Producer to appear for choosing and/or fitting of wardrobe and/or wigs, if such time is not otherwise being credited as rehearsal time provided that such hour shall be paid or credited at the rate of time and one-half (½) of the applicable extra rehearsal rate if such call is not within the period of Regular or Included Rehearsal Days. Make-up and dressing, including any incidental fittings, repairs, and the like, shall be considered rehearsal time. With respect to any costume calls outside the studio, it is understood that in case of a costume call for

any group of performers, such call must be staggered in order to avoid unnecessary waiting at the costume studio.

It is agreed that if actual time used in such costume fittings is regularly in considerable excess of one (1) hour, a SAG-AFTRA deputy will be assigned to keep track of time, and upon certification by such deputy and costumer, Producer will credit the full time spent.  Time spent in posing for publicity photographs designed to give individual publicity (with personal name identification insofar as such publicity is within the control of the Producer) shall be on performer's own time, but such time shall not be deemed to include trailers or promotional spots.

F.   <u>Extraordinary Prosthetic Make-Up</u>:

Where extraordinary prosthetic make-up is applied to a performer, an individual qualified by training and/or experience with respect to the make-up involved shall apply, or supervise the application of, such prosthetic make-up.

G.   Where practicable, at no additional cost to the Producer, complete wardrobe/costumes should be provided to dancers the day before the first dress rehearsal.

26. **ANNOUNCERS AND PERFORMERS WHO APPEAR IN MORE THAN ONE COMMERCIAL ANNOUNCEMENT**

A.   Announcers and performers (except for background actors, group dancers, group singers, hand models and physical demonstrators) engaged to perform in commercial announcements who appear in more than one (1) commercial announcement on a particular program shall receive payment equal to the aggregate of the payments applicable to all such commercial announcements or the applicable principal performer's program rate, whichever is the lesser.

B.   Group dancers, group singers, background actors, hand models and physical demonstrators engaged to perform in commercial announcements who appear in more than one (1) commercial announcement on a particular program shall receive payment equal to the aggregate of the payments applicable to all such commercial announcements or their applicable program rate, whichever is the lesser.  (For purposes of this paragraph, the applicable program rate for hand models and physical demonstrators shall be the rate applicable to performers who speak five (5) lines or less as set forth in Paragraph 3.)

27. **CLASSIFICATION OF BACKGROUND ACTORS IN COMMERCIAL ANNOUNCEMENT**

A performer, without lines, in a commercial announcement whose face is not shown on camera and who is not otherwise identified, shall be paid the background actor's rate.  When a performer whose face is shown is required to demonstrate or illustrate a product or service, as distinguished from merely touching or looking at a product, such performer shall be paid the applicable performer's rate.

28. **LIVE REPEAT PROGRAM**

A live repeat program is a repeat performance of a live broadcast transmitted also as a live broadcast to supplement the network as a delayed broadcast, and if such live repeat broadcast is performed within twenty-four (24) hours after the first broadcast, performer shall receive not less than one-half (½) the applicable minimum fee plus payment for any rehearsal required.  In all other cases full fee shall be required.

29.     **RETAKES & RECORDING AFTER SCHEDULED FINAL PERFORMANCE DAY**

A.      A pre-recorded program or a recording of a live program or a portion thereof may be re-recorded in order to make adjustments necessitated by mechanical failures, or adjustments or corrections in performance after the date of the performance, provided that such re-recording is done not later than sixty (60) days after the broadcast in the case of a live program or sixty (60) days after the performer's final performance day in the case of a pre-recorded program, and subject to the availability of the performer involved in such re-recording.  If only a portion of the program is thus re-recorded, the performers involved shall be entitled to compensation in half-hour (½) segments for the time for which they are called for such re-recording (but in no event for less than one (1) hour) at an hourly rate of pay equal to three times the extra rehearsal rate applicable to their category of employment.  If the entire program is thus re-recorded, the performers involved shall be entitled to one-half (½) the applicable minimum program fee and if they are required to rehearse preparatory to the making of such re-recording, they shall be entitled, in addition, to compensation in half-hour (½) segments for the time spent in rehearsing at the extra rehearsal rate applicable to their category of employment.

B.      In any case where the performer is needed to record beyond his scheduled final performance day (except for re-recording as provided in (A) above) the performer shall be paid for such recording at the rate of time and one-half of the applicable rehearsal rate and the minimum daily call and session shall be no less than six (6) hours; provided that such recording may not be done later than seven (7) days after the performer's scheduled final performance day and at a time which does not conflict with the *bona fide* prior commitments of the performer, and further provided that such recording may not be for more than two (2) days (not necessarily consecutive) within such seven (7) day period.

30.     **PREVIEWS**

Previews are performances of scheduled broadcasts which are performed before a studio audience prior to broadcast.  Previews shall be considered as rehearsal time.

31.     **WARM-UPS**

A.      A warm-up is planned entertainment for one (1) studio audience of one (1) program (or episode of an episodic program) preceding and during the broadcast or dress rehearsal.  The total length of such planned entertainment for each such program will constitute the length of the warm-up.  However, no warm-up performer may be required to perform more than forty-five (45) minutes in any sixty (60) minute period.

B.      Participants in warm-ups who are not members of the cast shall receive not less than one-half (½) of the applicable fifteen (15) minute fee if the warm-up is fifteen (15) minutes or less, one-half (½) of the applicable half-hour (½) fee if the warm-up is more than fifteen (15) minutes but thirty (30) minutes or less.  Warm-up performance time in excess of thirty (30) minutes shall be paid at a rate not less than one-half (½) the applicable fifteen (15) minute fee for each fifteen (15) minutes, or part thereof, performed.  The included hours shall be two (2) hours for a fifteen (15) minute warm-up and four (4) hours for a thirty (30) minute warm-up and two (2) additional hours for each additional fifteen (15) minutes of warm-up.  Time worked in excess of the included hours or eight (8) hours in one (1) day (including time when the warm-up performer is required by Producer to be present at the studio) shall be paid for at the extra rehearsal rate.  Where multiple programs are being taped in a day (such as with game shows) and individual warm-ups are done for each program, the applicable warm-up fee shall be paid for each program for which a warm-up is performed.  Where a single program is being taped in a day but separate warm-ups are performed for different audiences (such as with "dress"

44

and "air"), the applicable warm-up fee shall be paid for each warm-up.  When more than one (1) warm-up fee is paid, the total number of included hours shall be commensurate with the length of the warm-ups for which fees are paid.

C.      Performers in warm-ups who are members of the regular cast shall receive $50.00 per performer (including announcers), excepting specialty acts who shall not perform a specialty act in the warm-up.  Where multiple programs are being taped in a day (such as with game shows) and individual warm-ups are done for each program, the $50.00 shall be paid for each program for which a warm-up is performed.

## 32.    AFTER-SHOWS

After-shows are planned entertainments for the studio audience immediately following the broadcast.  No after-show may be more than thirty (30) minutes in length.  All performers appearing in such after-show, whether in cast or not in cast, shall receive not less than one-half (½) the applicable fifteen (15) minute fee if after-show is fifteen (15) minutes, and one-half (½) the applicable half-hour fee if after-show is thirty (30) minutes.

## 33.    MODELS

When a model is required to do special business or is engaged to display or use his or her services as a model, such model shall be paid the applicable fee for the five (5) lines or less category.

## 34.    CONTRACTOR FOR GROUP SINGERS OR GROUP DANCERS

A.      When any member of a dancing group of three (3) or more is requested to give any additional services, such as contacting dancers, arranging choreography for the same program, arranging for auditions, arranging rehearsals, or any other similar or supervisory duties, such person shall be paid at least twice the full applicable minimum fee.

B.      For every singing group of three (3) or more there shall be a contractor who shall perform any service commonly associated with the services of a contractor or leader, such as but not limited to contacting singers, pre-rehearsal, coaching or conducting singers, re-arranging or correcting vocal parts, arranging auditions or rehearsals or other similar or supervisory duties.  The member of the singing group assigned as contractor shall be paid at least one hundred-fifty percent (150%) of the full applicable minimum fee, except that the payment shall be two hundred percent (200%) of the full applicable minimum fee if there are sixteen (16) or more members in the singing group.  It shall be the responsibility of the contractor to request a five (5) minute rest period during each hour of work.

The contractor of a singing group on any show shall file with the Producer's representative a contractor's time sheet, prepared by the contractor and initialed by the members of the singing group and the Producer's representative; and in addition, the contractor shall deliver to SAG-AFTRA promptly upon conclusion of the final performance, but in no event more than twenty-four (24) hours after the broadcast of the show, copies of all such contractor's time sheets for the show.

C.      One member of the dancing group shall be deputized by the dancers within the first hour of rehearsal to act as their deputy.  All requests from the Producer relating to any matters under this Code shall be made through the deputy.  It shall be the responsibility of the deputy to request a five (5) minute rest period during each hour of work, and to file with the Producer's representative a daily time sheet, initialed by the deputy and the Producer's representative; and in addition the deputy shall deliver copies of all deputy's time sheets for the show to SAG-AFTRA promptly upon conclusion of the final performance.

45

D.      For purposes of this Paragraph 34, "full applicable minimum fee" shall include compensation for extra rehearsal, overtime, multi-tracking and/or sweetening.

## 35.     UNDERSTUDIES

A.      Anyone performing solely as an understudy shall be paid not less than the minimum program fee applicable to the category of the performer being understudied.  Any rehearsal by such an understudy in excess of the number of rehearsal hours included in said program fee shall be paid at the extra rehearsal rate applicable to the category of the performer being understudied.  The number of extra rehearsal hours for which such an understudy shall be paid shall be determined by the extra rehearsal hours worked by the understudy and not by the extra rehearsal hours worked by the performer being understudied.

B.      A performer engaged by the company to act as an understudy in addition to acting a part shall receive not less than the minimum fee for understudying, in addition to not less than the minimum fee for the part which he is to perform.  For such combined fees, the company may require the performer to rehearse the combined number of rehearsal hours included in both fees.  Any rehearsal in excess thereof shall be paid once at the higher applicable extra rehearsal rate.

## 36.     STAND-INS AND DANCE-INS

Stand-ins and/or dance-ins are defined as those performers who are engaged by the company to substitute for members of the cast during rehearsal.

A.      Stand-ins and/or dance-ins shall not be required to memorize any material or supply any specific wardrobe.

B.(1)   Stand-ins and/or dance-ins on non-dramatic programs and daytime serials shall receive $25.00 ($26.00 effective November 16, 2016) per hour for the period for which they are called; with a minimum call of one (1) hour per session; provided that the minimum call shall be two (2) consecutive hours per session: (i) for a person who is engaged solely as a stand-in or dance-in and who is not a member of the cast; or (ii) for a member of the cast engaged as a stand-in or dance-in on a day on which he does not otherwise perform or rehearse.  On Award Programs in excess of one (1) hour, the minimum call shall be five (5) hours and on prime time entertainment programs sixty (60) minutes or longer, the minimum call shall be three (3) hours, except prime time variety programs sixty (60) minutes or longer, for which the minimum call shall be five (5) hours.  In lieu of the above, Producer shall have the option of paying stand-ins and/or dance-ins as understudies provided that he obtains such option at the time he engages the performer, and further provided that he notifies the performer prior to the time the performer starts work on such engagement as dance-in or stand-in that the performer will be classified and paid as an understudy.

B.(2)   Stand-ins on dramatic programs shall receive $169 per day ($173 effective July 1, 2014, $178 effective July 1, 2015 and $183 effective July 1, 2016) subject to the applicable SAG-AFTRA Television Agreement rules regarding length of the day.

Producer shall pay Stand-Ins covered under either Paragraph 36B.(1) or (2) overtime at one and a half times the regular hourly rate [$25.00 ($26.00 effective November 16, 2016) under 36B.(1) and 1/8 the then current daily rate under 36B.(2)] for all work in excess of 8 hours, excluding meals, per day.

C.      If stand-ins and/or dance-ins are required to memorize or learn any material (such as dialogue, choreography, pantomime, or other performing routines), they shall be classified as understudies.

46

D.      No performer during rehearsal shall be permitted to read any part other than his own, unless he is paid the applicable fee set forth in B. above, but persons other than performers may cue.

E.      Paragraph 23 (Meal Periods) shall apply to Stand-Ins who work in excess of six (6) hours in a day.

## 37.     **MULTIPLE PROGRAMS WHICH ARE PART SUSTAINING AND PART COMMERCIAL**

If a program is broadcast on a multiple basis (*i.e.*, more than one (1) time a week) the compensation payable to any performer appearing on two (2) or more of such programs shall be the compensation applicable to the commercial program multiple rate if any one of such programs on which the performer appears is commercial.

If a performer is engaged on only one (1) program during the week of a program broadcast on a multiple basis and such program is broadcast as a sustaining program, the performer shall receive the applicable sustaining rate for such program.

## 38.     **NOTICE ON MULTIPLE PERFORMANCES**

A.      On all regularly scheduled programs such as serials, strip programs and the like, performers having running parts shall be given not less than two (2) weeks' notice of the engagement prior to the first broadcast in the weeks for which the performer is engaged for the multiple performance rates to be applicable.  In the event such notice is not given, the performers shall be paid on the single performance basis.

B.      In the event performer (who has performed the same role for five (5) consecutive programs on which the role was written in immediately preceding the day for which he was called on less than two (2) weeks' notice) accepts another engagement and the Producer engages a substitute to perform in such role because of the unavailability of the original performer to perform, then in such case the performer originally performing such role may not be replaced in the role for the next ensuing consecutive four (4) weeks during which the role is written in the script.

C.      In the case of pre-recordings, the performer shall be notified in advance of his first scheduled call of the intended broadcast use of the program(s) to be recorded and payment shall be made accordingly pursuant to the provisions of Paragraph 61.A of this Code.  The applicability of the discounted rates for multiple performances in one (1) calendar week shall be determined by the broadcast use of the recording(s) or the use as cited at the time of the engagement, whichever is greater.

D.      Call Board (Serial Performers Only) - All communications which refer to the cast in general shall be posted on the Call Board.  A Call Board shall be supplied in the studio, and the wishes of the performers shall be considered in determining its location.  The Call Board shall include a copy of the rundown sheet.  Where the information is customarily provided by the Producer in writing, it shall also be posted on the Call Board: video tape recording line-up of the day, call sheets, dressing room assignments, instructions for day players and background actors (*e.g.,* person to whom they report, daily schedule, location of dressing rooms, make-up and hairdressing schedule), and any other general notices to the cast.  All items posted on the Call Board are for general information purposes only and shall in no way obligate the Producer, nor shall the posting constitute official notice to the performer.

## 38.A.  **VACATIONS**

On regularly scheduled programs such as serials, performers having running parts or who are required to hold themselves available for such programs shall be entitled during each

consecutive fifty-two (52) weeks' period of such commitments to a vacation of two (2) consecutive weeks if employed less than five (5) years on the program or three (3) weeks if employed for five (5) years or more on the program.  For each such week of vacation taken by a performer, the performer shall be paid or credited with vacation pay at the performer's individual performance rate times the average number of performances per week guaranteed.

If the performer performs the number of episodes per year guaranteed in his contract, such vacation pay shall be in addition to the amount guaranteed for that number of episodes.  If the performer performs fewer than the number of episodes guaranteed in his contract, the amount allocable to the unperformed episodes may be credited towards such vacation pay, but only if provisions for such crediting are set forth in the performer's individual contract.

Subject to production requirements, producers shall consider the wishes of the performers on a program in scheduling vacation periods, and shall give the performers reasonable advance notice of such vacation period.  If the performer gives the Producer at least eight (8) weeks' notice of the dates of his intended vacation, within one (1) week the Producer shall advise the performer whether the requested vacation can be accommodated, consistent with the story line and production requirements.  If Producer denies performer's request for vacation, Producer shall, within one (1) week of such denial, supply performer with alternate vacation dates.  If such alternate vacation dates are not agreeable to the performer, performer and Producer, will, within ninety (90) days, meet and arrange mutually agreeable vacation dates.  However, if the program shuts down for a vacation period applicable to all the performers on the program, this paragraph shall not be construed to require scheduling of a performer's vacation at the different time.

If, at the request of the Producer, a performer agrees to change or postpone a vacation period which has been approved by the Producer, the performer shall be reimbursed for any vacation expenditures reasonably attributable to the change in his/her vacation.

## 38.B.  HOLIDAYS

Any serial performer who works on Christmas Day (December 25), Thanksgiving Day, New Year's Day (January 1), or the fourth holiday as determined below shall be paid, in addition to any other compensation due the performer for such day's work, a further payment equal to the applicable minimum program fee set forth above in this Code.  No later than December 15 of every year, each serial Producer shall designate a fourth holiday for the following year from the following list: Martin Luther King's Birthday, Memorial Day, (fourth Monday in May), July 4, Labor Day, Friday after Thanksgiving Day.

## 39.  HAZARDOUS PERFORMANCES

A.    No performer shall be required without his consent to take part in hazardous action or work under hazardous conditions.  A performer taking part in hazardous action or working under hazardous conditions shall be paid additional compensation of $100.00 per program.  The parties to this Code agree as a matter of policy that performers employed hereunder shall, to the extent possible, not be placed in circumstances hazardous, or dangerous to the individual.  This Paragraph A. shall not apply to specialty acts in the performance of their specialty where the nature of such act is hazardous, or to stunt persons.

B.    The performer's consent shall be a requisite precondition to performing stunts or other hazardous activity, and shall be limited to the stunt or activity described to the performer at the time consent is given.  In particular:

(1)    Where script or non-script stunts or stunt-related activity is required of a performer by a Producer, an individual qualified by training and/or experience in the planning, setting up and performance of the type of stunt involved, shall be engaged and present on the set.  No performer shall be

48

requested to perform a stunt or stunt-related activity without the opportunity for prior consultation by the performer with such individual.

(2)     No performer shall be requested to work with an animal which a reasonable person would regard as dangerous in the circumstances, unless an animal handler or trainer qualified by training and/or experience is present. The performer shall be given an opportunity to familiarize himself/herself with the animal, with the trainer present, in advance of being required to perform with the animal.

(3)     No performer shall be rigged with any type of explosive charge of any nature whatsoever without the use of a qualified special effects person.

(4)     Equipment provided by the Producer shall be in suitable repair for safe and proper performance of the stunt. Producer shall exercise care, including prior testing of equipment (breakaway props, etc.) during rehearsal, to avoid injury to the performer. Any Producer who has a studio and is responsible for production facilities (for himself or other producers hereunder) shall post at the main switchboard or reception desk and in each studio in use, a panel of qualified physicians (where state law permits) with their names, addresses and telephone numbers who are readily available and on call in case of accident.

Persons involved in the planning and execution of a stunt shall be entitled to inspect any vehicle, mechanical device and/or equipment to be used in the stunt on the day prior to its use, provided it is available. No additional payment shall be due for any such inspection.

C.     Producer shall grant all performers engaging in scripted or non-scripted stunts adequate training time in the use of dangerous props and instruct performers in the use of props where necessary. Time spent in training in the use of props shall be treated as rehearsal time. At no time shall Producer attempt to coerce the performer to engage in a hazardous stunt or action; and Producer shall discourage the performer from taking unreasonable risks.

D.     A person qualified under the circumstances to administer medical assistance on an emergency basis shall be present or readily available at all rehearsals and all performances during which hazardous actions or work under hazardous conditions is planned. In the event Producer does not have such qualified person present or readily available, the performer(s) concerned or SAG-AFTRA may request that such a person be present or readily available, which request may not be unreasonably denied. SAG-AFTRA or the performer(s) may likewise request in certain situations that said qualified person be present and not merely readily available. Any such person will have visible identification.

E.     In any instance in which fire is to be used in special effects, adequate fire safety precautions will be taken and, where warranted, an individual(s) qualified in fire control techniques will be present in order to provide for the safety of the performers.

F.     Transportation to the nearest medical facility providing emergency services shall be readily available. When hazardous activity involving stunts is planned on location, the nearest emergency medical facility (including capabilities thereof and communications therewith) will be pre-determined in order to assure that transportation to such facility is readily available at all times during the performances of such work. If warranted by the nature of the stunt activity, the transportation should be capable of accommodating a stretcher and first aid equipment, but need not necessarily be an ambulance.

G.     The Producers of entertainment programs and SAG-AFTRA agree to cooperate in the distribution of copies of all safety guidelines issued by the Industry-Wide Labor/Management Safety Committee.

**39.A.  WORK IN SMOKE & HAZARDOUS SUBSTANCES**

    A.    All performers shall be given prior notice if work in smoke or hazardous substances is involved.  If a performer is not notified, the performer may refuse to perform in smoke or hazardous substances and will nevertheless be paid a program fee or his/her guarantee, whichever is greater.  However, the above sentence shall not be construed to give the performer the right to refuse other work that day which does not involve smoke or hazardous substances, nor to mean that a performer is entitled to more than one (1) program fee or guarantee for any one (1) day's work.  (Paragraph 39, section A. may also apply.)

    B.    Producer shall comply with all Federal and State laws and regulations applicable to the use of substances utilized for the creation of smoke and other effects and the Industry shall cooperate with SAG-AFTRA to the end that information concerning such Federal and State laws and regulations is disseminated.

    C.    The Industry and SAG-AFTRA shall meet and, within six (6) months, shall attempt to reach agreement on a list of any substances which shall not be used for the creation of smoke and other effects.  The Committee shall also attempt to agree upon the procedures to be followed in the use of permitted substances and guidelines for the maximum exposure time in smoke during any workday, taking into consideration all pertinent factors.  The Committee shall meet periodically thereafter, on reasonable notice from either party, to review and update the list of any prohibited substances, the procedures to be used and guidelines to be followed.

**40.  PAYMENT FOR MULTIPLE SPONSORSHIP OF PROGRAMS**

    A.    If a program is sponsored by more than one (1) sponsor, the compensation payable to the performer shall be based on the overall length of the program.  As soon as any commercial message is incorporated into the program, the performer shall be paid at least the minimum commercial scale applicable to the entire program and no additional payment shall be due when additional commercial messages are incorporated.

    B.    If any station broadcasts a commercial announcement during any network program or if any network program is offered or made available for sale to sponsors on a local or regional basis; *i.e.*, co-op, participating, or any other similar program which includes cued, or timed, allocations of public service or other announcements, which makes them available to local stations in such a manner as to enable local stations to broadcast local commercial announcements, such a program shall be considered a commercial program subject to all the terms and conditions of this Code.

**41.  COMMERCIALS ON SEGMENTED PROGRAMS**

With respect to programs sold in segments, persons rendering services only in the commercial portions of a segment shall be entitled to compensation based on the length of the segment during which they rendered services; in the case of persons rendering such services on two (2) or more segments, for the same employer, the overall length of the program shall govern the minimums which are applicable.

**42.  REMOTES**

There shall be no telecast pickups from any theatres, nightclubs, circuses, hotels, studios on location for pictures being made for theatrical use, and other places where such performances may take place, without the consent of the individual performers involved.

Such performers shall be entitled to such additional amounts for such telecast as may be provided in their individual contract of employment or the applicable SAG-AFTRA scale, whichever is the higher.

**43.**   **COMPENSATION FOR TRAVELING AND LOCATION WORK**

A.   Location Work:

(1)   Location Definitions:

Location work means any work requiring transportation to a location away from the Producer's regular broadcast studios.

Base refers to a broadcast studio building or the place where the performer normally works (home base), or the out-of-town hotel or headquarters to which the performer is assigned by the Producer for the duration of his assignment (out-of-town base).

(2)   Daily Location Work:

Daily location work means location work on an assignment which does not require performer to stay away from home overnight.

When a performer is scheduled by the Producer to travel from his home on a daily location work assignment, he shall be credited with the time normally required to travel from his home base to such assignment. If such performer is not scheduled to return to his home base from such assignment, he shall be credited with a like amount of time for the return to his home.

(3)   Overnight Location Work:

Overnight location work means work on an assignment at a location requiring performer to stay away from home overnight.

On any day in which a performer travels to or from an overnight location and performs work on the same day, the time spent in such travel, less any meal period, shall be added to the performer's rehearsal hours.

Any time in excess of thirty (30) minutes required to get from the performer's out-of-town base to the location or from the location back to the performer's out-of-town base shall be added to the rehearsal time.

On any non-work day in which a performer travels to or from an overnight location, performer shall be paid $75.00.  On any non-work, non-travel day on an overnight location, the Producer will pay $75.00 (this is not applicable to serials).

Single hotel rooms, if available, will be provided to principal performers. Single hotel rooms, if available, will be provided to dancers if there are six (6) or fewer dancers.

B.   Rehearsal on Location (Not applicable to serials):

Regular rehearsal fee and conditions shall apply for all time spent in rehearsal on location.

C.   Compensation for Traveling:

(1)   Performer shall be paid $30.00 for each day or part thereof when performer is required to travel more than twenty (20) miles from the broadcast center

51

of New York, Chicago, Los Angeles or Washington D.C.  This provision is not applicable to serials.

(2)   This payment shall be in addition to first-class transportation and living expenses.

(3)   First class transportation shall be provided in all cases.  Coach or economy class on jet or turbo prop airplanes or regularly scheduled airlines shall be considered first-class transportation, provided no employee of the Producer represented by any other craft, guild, or union is furnished a higher class of air transportation on the same assignment.  However, the provision of the preceding sentence shall be inapplicable in those cases in which the employee was furnished such higher class transportation by virtue of an existing collective bargaining agreement which has not expired or been renegotiated by the Producer subsequent to the negotiation of this Code.

(4)   If the performer furnishes his own automobile he shall be paid in accordance with company policy, if the company has an established policy, but in no event less than $3.00 per day.  If the Company has no established policy, the performer shall be paid thirty cents (30¢) per mile, but in no event less than $3.00 per day.

(5)   When a performer is required to travel from home to an assignment on location, or vice versa, if transportation is not provided by Producer, the performer will be reimbursed for the reasonable expense of performer's travel between home and airport (or rail terminal) and hotel (or other destination designated by Producer).  This sub-section does not apply to travel by commuter train or subway.

D.   <u>Travel Insurance:</u>

When a performer travels at the request of the Producer in connection with an assignment to perform services for Producer on a program (including tours and personal appearances for purposes of program promotion), anywhere inside or outside the continental limits of the United States, the Producer shall provide (at Producer's own cost) a $200,000.00 accidental death and dismemberment insurance policy covering the performer for such travel for the benefit of the performer or such beneficiary as the performer may designate.

E.   <u>Serial Performers:</u>

All the provisions of this Paragraph 43 apply to serial performers except B. and C.(1).  In addition, the following rules shall apply on overnight locations:

(1)   Each day of work shall consist of ten (10) hours of work (exclusive of meal periods).  Overtime at the applicable rate specified in Paragraph 15.B.(1) Column I will be paid for the first two (2) hours which exceed ten (10) and at the applicable rate specified in Column II for the third and each successive hour of overtime on the first six (6) days in a given workweek. Hours worked on a seventh (7th) day in a given workweek shall be paid at the applicable overtime rate from Column I, except that those which exceed ten (10) shall be paid at the applicable overtime rate from Column II.  These payments shall be in addition to any performance fee or excess workday payment due, if any.  There shall be a minimum call of four (4) hours for work on a seventh (7th) day.

(2)   Non-work days on overnight location shall be compensated at the rate of $130.00 per day for all principal performers, $105.00 per day for all five-line-or-less performers and $80.00 per day for all background actors.

(3)   Travel time on a travel-and-work day shall be considered, and included with, work time for purposes of computing overtime for overnight location

52

work.  Travel time on a travel-only day shall not be considered work time; however, a travel-only day shall be considered a work day for purposes only of calculating the number of excess work days, if any, to be paid for at the rates set forth respectively in Paragraph 2.A.(2)(b)(ii), Paragraph 3.C.(2) or Paragraph 8.C.(2).

44. **PROGRAM AUDITIONS**

Program auditions are performances of programs which are used to determine whether the program shall be broadcast at a future date or time; such auditions may not be shown to the public generally but may be performed before a studio audience.  Program auditions, whether for sustaining or commercial purposes, shall be paid at one-half (½) of the applicable commercial fees for programs of similar length.  Rehearsal time beyond the included rehearsal hours shall be paid for at the full applicable rate specified for regular broadcasts.

45. **TALENT AUDITIONS, INDIVIDUAL VIDEO TESTS, AND INDIVIDUAL VOICE TESTS; CALLS FOR GROUP DANCERS**

A. Talent auditions, individual video tests, and individual voice tests are those try-out periods wherein a performer or a package act, or group of performers, is tested for ability, talent, physical attributes and/or suitability for inclusion in a broadcast and for which none of said performers shall be required to learn special material or spoken lines or special business, except that (i) in a talent audition for commercials, when the field has been narrowed down to not more than three (3) contestants, each of such contestants is permitted memorization of not more than ten (10) lines, or use of cue cards or familiarization with material, without compensation, for the final selection of the audition winner, and (ii) in a talent audition for actors on dramatic programs, when the field for leads or running parts has been narrowed down to not more than three (3) performers, each of such performers is permitted memorization of material or familiarization with material or use of cue cards of up to three (3) minutes, without compensation, for the final selection of the audition winner.  There shall be no fee required for this category provided that if the performer shall be required to learn special material or spoken lines or special business other than as permitted in exceptions (i) and (ii) of this subparagraph A., the program audition rate set forth in Paragraph 44 of this Code shall be paid, measured in fifteen (15) minute units or the overall length of the program, whichever is less.  It is the intention of this clause to afford the opportunity for performers to display their individual talents.  This provision shall not be used by Producer to evade the terms of this collective bargaining agreement and the Producer agrees that this provision shall not be unreasonably exercised.  If a general notice concerning an audition(s) is sent to talent agents, the same notice will be sent to the local SAG-AFTRA office nearest the location where the audition will be held.  A joint Industry SAG-AFTRA committee will be established to review matters relating to auditions.

B. Calls for background actors for all types of programs shall be limited to one (1) hour per person.  In the event a background actor is called to a second audition or interview for the same show within Los Angeles County he shall be paid $3.00 as transportation expense.

C. With specific reference to group dancers, the producer agrees to give SAG-AFTRA timely notice of any audition call, so that SAG-AFTRA may notify its members of such call in time to respond to the audition call.  In addition, with respect to spectaculars, specials or other programs in excess of one (1) hour in length, auditions for group dancers shall be called within twelve (12) weeks prior to the first scheduled rehearsal day.  If, after an audition, a dancer is called back for a further audition for a period in excess of two (2) hours, such dancer shall be entitled to the extra rehearsal rate ($25.00 per hour), measured in half-hour (½) increments, for the excess.

53

D. On dramatic shows only, calls for performers (except background actors) shall be staggered and each performer shall be limited to a call of one (1) hour. If the Producer requires the performer to remain on a call in excess of one (1) hour, the performer shall be entitled to $25.00 per hour, measured in half-hour (½) increments.

E. Professional performers shall be auditioned or tested first in any tryouts for performances covered by this Code.

F. The following provisions are applicable to serial performers in running parts requested to participate in an audition:

(1) If a performer in a running part is requested to participate in an audition(s) on a day on which the performer otherwise works, the hours of the audition shall be treated as time worked.

(2) If a performer in a running part is requested to participate in an audition(s) on a day on which the performer is not otherwise working, the performer shall be paid:

| Length of Call | Program 30 Minutes or Less | Program 60 Minutes or More |
|---|---|---|
| 4 Hours | $150.00 | $200.00 |
| Over 4 Hours | 300.00 | 400.00 |

Such day shall not be treated as a day worked for purposes of Paragraph 2.A.(2)(b)(ii).

## 46. DOUBLING

A. No doubling will be permitted on or off-camera in the entertainment portion of any dramatic program except upon payment of the full additional applicable fee to any performer who doubles; this sentence shall not be applicable to puppet shows and as set forth in Paragraph J. below.

B. Multiple doubles are permitted on variety shows or when the program consists of a series of short different episodes such as but not limited to dramatized news broadcasts or historical sequences.

(1) Chorus singers also performing as actors on any variety show shall receive in addition to their fees as chorus singers fifty percent (50%) of the applicable performer's program fee plus the performer's full extra rehearsal rate for any time spent in rehearsing their parts as actors.

(2) Group dancers also performing as actors or chorus singers (including lip sync required by Producer as defined in Paragraph 5.A.(11)), shall be paid the higher of the following two (2) amounts:

(a) To the amount computed in accordance with group dancer rates and conditions add fifty percent (50%) of either the applicable performer (principal performer or five-line-or-less) or chorus singer program fee; provided that (1) if only the five-line-or-less rate is applicable the dancer shall receive in addition to the group dancer rate and conditions fifty percent (50%) of the five-line-or-less program fee plus the full extra rehearsal rate for the five-line-or-less category for any time spent in rehearsing that part: or (2) if both the five-line-or-less and chorus singer rates would be applicable the dancer shall receive in addition to the group dancer rate and conditions fifty percent (50%) of the principal performers' program fee.

54

        (b)     The amount computed in accordance with the rates and conditions of the highest applicable category in which the group dancer performs.

    (3)     Group dancers and chorus singers may perform as background actors without additional compensation.

C.    Producer may have the option of classifying chorus singers as principal performers in which event, such performer automatically comes within all of the working conditions of that particular category.

D.    Participation in group noises shall not be considered a double and is permissible without additional compensation.

E.    When a performer renders services in more than one (1) category on any program he shall receive not less than the highest applicable fee for any such category.

F.    The minimum fee for performers on a program (whether in character or not) who participate in commercial announcements by reading lines shall be the applicable minimum fee for the performance plus for each such commercial announcement a fee equal to fifty percent (50%) of the fee applicable to one (1) commercial announcement, but in no event more than one (1) full commercial announcement fee for all commercial announcements.  Performers on the program who participate in character in commercial announcements but who do not read any lines shall not receive any compensation in addition to the applicable fee for the performance.  The mere mention of the product advertised in the course of the performance shall not be considered participation in a commercial announcement.

G.    If group dancers or chorus singers who are in the body of the program also perform in commercial announcements as singers or dancers, they shall receive for each commercial announcement an additional fee of not less than fifty percent (50%) of the commercial announcement fee applicable to group dancers and group singers, but for all such commercial announcements they shall not be entitled to more than the full fee applicable to group dancers or chorus singers engaged only for participation in commercial announcements.

H.    If background actors who are in the body of the program also perform in commercial announcements as background actors, they shall receive for each such commercial announcement a fee equal to fifty percent (50%) of the fee for one (1) commercial announcement applicable to background actors, but in no event more than one (1) such full commercial announcement fee for all commercial announcements.

I.    A background actor may perform as a stand-in provided he/she is compensated at not less than the highest applicable fee for either the background actor or stand-in category.

**47.**    **DEFINITION OF A LINE**

A line shall consist of not more than ten (10) words, and part of a line shall be considered a line.  It is the intention of the five-line-or-less category to include only those performers who have very minor parts to perform.

**48.**    **DEFINITION OF BACKGROUND ACTORS**

Background actors are those performers who do not speak any lines whatsoever as individuals but who may be heard, singly or in concert, as part of a group or crowd.

The background actor rate shall be applicable for the performance, singly or in concert, of ordinary business including actions, gestures, and facial expressions portraying the background actor's assignment.

A background actor shall be upgraded to the five-lines-or-less category if he or she meets any one of the following three (3) conditions in a scene:

A.      is addressed individually by a principal performer;
B.      is alone in the scene;
C.      speaks individually as part of a group or crowd;

and provided that such background actor receives more than minimal individual direction and portrays a point essential to the story.

A performer engaged as a background actor who is subsequently directed to speak at least one (1) line not as part of a group or crowd shall be paid the applicable principal or five-lines-or-less rate.

Performers who speak no lines but who nevertheless portray a major part in the program shall be paid the applicable principal performer rate.

**49.    CAST CREDITS**

All persons classified as performers who speak more than five (5) lines, announcers at their option, and specialty acts, shall receive cast credit, individual and unit respectively, provided that in no event shall the Producer be required to give more than fifteen (15) (or, in the case of serials, twenty (20)) cast credits on any program and provided further that on programs broadcast more than once a week the Producer shall not be required to give any such performer or act credit more than once during a week.  In the case of serials, the Producer shall make a good faith effort to give credits on either Monday or Friday, but if instead the credits are given on another day on which the serial is broadcast, it shall not be a violation of this Agreement.  The Producer agrees to properly administer the requirements of this Code with respect to cast credits.  Visual credits shall be legible and shall not be superimposed over commercial slides.  Such individual cast credits shall provide character identification in addition to the performer's name.  No character identification shall be required when the performer plays himself or when he plays several roles.  The Producer shall not be deemed to have breached this provision if cast credit is omitted due to unavoidable contingencies in connection with the broadcast of the program as distinguished from the recording of the program.  Cast credit need be given as herein required only for appearances in the entertainment portion of the program (this last sentence is not intended to exclude credit to commercial announcers).

Cast credits required hereunder, if not given before the entertainment portion of the program, shall be given prior to all other personal credits (including personal credits to individuals acting on behalf of a company) except for Producer, Director, Writer and those outstanding personalities whose celebrated status is such that they are able to make contractual arrangements for billing that put their credits ahead of those of the performers.

On a serial, in the case where any individual(s) other than performers and key production and creative personnel (as defined below), receives an air credit more often than once in a week, the cast credit will be given in that same week as often as that individual(s) is given credit.  For the purpose of this paragraph, "key production and creative personnel" shall mean Executive Producers, Producers, Associate Producers, Writers, Directors, and individuals responsible for the creative or continued development of the series.  This will not be applicable in a situation where an individual (other than one exempted above) receives credit more than once a week as a result of an unanticipated change in the programs to be aired in a particular week.

**50.    COSMETIC ALTERATIONS AND NUDITY**

If a performer is required to grow a beard or mustache, or to shave his head, the performer shall be paid additional compensation of $35.00. No performer shall be expected to appear nude, except with the performer's consent after the performer has had an opportunity to read the script.

## 51. <u>DRESSING ROOMS</u>

A.   Adequate, clean and accessible dressing rooms and toilet facilities shall be provided. Dressing rooms with adequate locks or facilities for locking or checking valuables shall be provided, or in their absence, adequate insurance against loss must be provided. Private or semi-private dressing rooms shall be provided to principal performers where such dressing rooms are available in the studio facility. A quiet area in which to study lines shall be available to performers who are not provided with private or semi-private dressing rooms.

B.   Seats shall be available for all performers in the dressing rooms and, during rehearsal, on the stage or in the studio or theatre. Such seats shall be marked "for cast use only" except in rehearsal halls, theatres and studios having readily accessible audience seating facilities.

C.   Adequate space affording complete privacy shall be provided whenever a performer is required to make a complete change in connection with any performance.

D.   Facilities for repair of wardrobe used in the performance shall be provided.

E.   When dramatic and variety programs go on location, Producer has the obligation to provide and shall provide adequate sanitary facilities. Dressing rooms adequate for comfort, cleanliness, privacy and accessibility shall be provided, taking into consideration the number of performers and the legal and/or logistical difficulties involved; such dressing rooms shall be separate for each gender. Heaters or fans and appropriate protection from the sun shall be provided as needed. The Producer's obligation shall receive full consideration in the Producer's survey of any location site.

At the time the Producer plans to have performers in a dramatic or variety program work on location, the Producer will notify those of the cast concerned and SAG-AFTRA of the date, time and whereabouts of the location and at the request of SAG-AFTRA, the Producer will review with the designated representative of SAG-AFTRA elements of the location survey with respect to facilities such as dressing rooms, sanitary facilities and facilities for securing valuables. Producer agrees to provide such information as is available at the time the request is made, and to consider SAG-AFTRA's recommendations, consistent with the logistics of the location and economic constraints.

## 52. <u>MINIMUM SCALES</u>

Producer agrees that he will make no contract with any performer at terms less favorable to such performer than those contained in this agreement and make no changes or alterations of those provisions without the written consent of SAG-AFTRA.

## 53. <u>PROGRAMS ON MULTIPLE STATIONS COMMONLY OWNED</u>

A.   Producer may pay the special program rates set forth in this Code on any program which is produced for broadcast on multiple stations commonly owned, provided that such program:

(1)     utilizes the services of two (2) or more actors, comedians, singers, dancers, performers in specialty acts, background actors or puppeteers, and

(2)     satisfies the conditions set forth in subparagraph B. below.

Such special program rates may be paid to all persons covered by this Code who perform in such program.  However, the applicable network program rates shall apply to any program covered by this Code which does not satisfy all of the conditions set forth in subdivisions (1) and (2) above.

B.      The special program rates referred to in subparagraph A., are applicable to programs whether sustaining or commercial which are broadcast only on stations owned by the same person, firm or corporation, provided that such special rates are limited to programs produced after March 1, 1964.  However if a program produced after that date is part of an existing program series, such special rates shall not be applicable to performers who have previously been engaged for programs in such series.

C.      Paragraph 11 (Sustaining Programs) of this Code is not applicable to the special program rates referred to in subparagraph A.

D.      In the event Producer broadcasts a program covered by subparagraph A. and B. above, on a television network as defined in Paragraph 71 of this Code rather than on multiple stations commonly owned, each performer shall be paid the difference, if any, between the special program rate and the applicable commercial or sustaining network program rate.  The aforesaid payment shall also be made and the program shall be considered a network program for purposes of this Paragraph 53 if such program is broadcast by any television station other than one under the same ownership as the station or stations for which the program was originally produced or broadcast.

E.      The replay fee applicable to programs covered by subparagraphs A. and B. above on which the performers were paid at the special rates referred to therein shall be determined by applying the applicable replay percentage in Paragraph 73.B. against the applicable basic minimum program fee as set forth in the Paragraphs referred to in subparagraph A. above.  However, replays of such programs which were broadcast on a television network as described in subparagraph D. above shall carry a replay fee based upon the applicable network rates as set forth in Paragraph 73.B.

## 54.   **EXCLUSIVITY**

With respect to term engagements for dramatic and variety shows and serials, Producer is prohibited from requiring the performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period of the programs covered by such engagement; provided, however, that this prohibition shall not apply if the artist's guaranteed compensation for a thirteen (13) week period is at least $8,500 (or in the case of a serial performer, at least $10,500 for programs of under one (1) hour, $15,000 for programs of one (1) hour or more) or a proportional sum for any longer period of time.  This Paragraph is not applicable to multiple performances within one (1) calendar week, except on serials.

## 54.A.  **TERM CONTRACTS - SERIALS**

The length of term contracts between the Producer and an actor on a serial program shall be subject to the following limitations upon renewal and cancellation:

A.      If the contract is an original agreement for a term of two (2) years or more, any portion of the term extending beyond the initial twelve (12) months must, if cyclical, be in cycles of at least twenty-six (26) weeks; provided that either the first or second cycle of any such contract may be adjusted in order to synchronize the performer's contract cycles with those of other performers on the same program.  If

this adjusted cycle is less than eight (8) weeks in length, it shall not count for the purpose of determining the period after which new cycles must be at least twenty-six (26) weeks; if such adjusted cycle is eight (8) or more weeks in length, it shall be counted for such purpose.

The Producer must specify in the original agreement which cycle, if any, will be adjusted and the specific time period of such adjusted cycle.

B.  If the contract is a renewal agreement (*i.e.*, for a term beginning at the end of an earlier term which was not subject to extension or renewal except by mutual agreement) for a term of eighteen (18) months or longer, it must, if cyclical, be in cycles of at least twenty-six (26) weeks, irrespective of the length of the original agreement; provided that the initial cycle of any such contract may be made shorter than twenty-six (26) weeks in order to synchronize the performer's contract cycles with those of other performers on the same program.

C.  All serial contracts must provide a per episode fee and a guaranteed minimum number of episodes.

With respect to all term contracts divided into cycles of twenty-six (26) weeks or less, in order for a Producer to average a performer's guarantee over a period of up to one year, a performer's personal service contract must so specify.  If such personal service contract does not so specify, the guarantee cannot be averaged over any period of time in excess of the performer's then current cycle, except that if the cycles provided in the first year of the performer's employment contract are less than twenty-six (26) weeks, the first and second cycles may be combined for purposes of averaging the guarantee and the third and fourth cycles may be combined for purposes of averaging the guarantee, but in no event shall the combined period be more than twenty-six (26) weeks.  It is understood that a performer's guarantee may, in any event, be averaged over a cycle (or other guaranteed term) which is in excess of twenty-six (26) weeks.  This provision shall be applicable to all contracts entered into or renewed thirty (30) or more days after March 12, 1993.

D.  Cancellation of the contract shall require at least four (4) weeks' notice of the cancellation before the end of any cycle (except where cycles of at least twenty-six (26) weeks are required pursuant to A. or B. above, in which case six (6) weeks' notice of cancellation before the end of any such cycle shall be required).

E.  Where a performer on a serial program has been employed for more than fifty-two (52) weeks under any one contract or extension or renewal thereof, his individual contract of employment may not be cancelled because of unavoidable absence for a period not in excess of four (4) weeks where such absence is due to illness (including disability due to pregnancy); provided, however, that if such illness occurs at a period when Producer has the right to cancel such contract, this provision shall not in any way affect such right.

Except as otherwise provided in subparagraph D. above, the foregoing limitations shall not preclude the Producer from canceling an actor's term contract by reason of breach of contract, failure or inability to perform, non-performance and the like, program termination, or cessation of production because the program goes off the air.

Where notice is required under this Code of cancellation of a term employment contract, such notice shall be given in writing to the party(s) designated in such term contract to receive such notice, with a copy to SAG-AFTRA; provided that failure to give a copy to SAG-AFTRA shall not be deemed a failure to effectuate such notice.

F.  An employment contract (or deal memo reflecting the essentials of the agreement reached) will be delivered to the performer or performer's agent not later than the commencement of the performer's first performance day, except where the

circumstances do not allow sufficient time to provide such contract or deal memo. The performer, or performer's agent, will be given a reasonable opportunity to review such contract or deal memo before being required to sign.

At the time of scheduling the first performance under a performer's individual contract, the Producer shall inform the performer of the date of the beginning and of the end of each cycle of such contract, subject to adjustment as permitted by cycle adjustment provisions set forth in such contract.

G.  The Producer shall use either the first day of the workweek of the performer's first air date or production date, as the case may be, as the basis for determining cycles for purposes of calculating performers' guarantees, and except as otherwise specified in the performer's individual contract, the guarantee of each performer on a particular serial shall be calculated on a basis consistent with the policy, practice or procedure established by the Producer with respect to performers on that serial.

No individual contract under this Code shall permit the Producer to change at will the date used as the basis for calculating a performer's guarantee pursuant to the preceding sentence. Nothing in this paragraph shall be construed to affect any obligation with respect to time of payment, (or any existing waivers specifically agreed to by AFTRA and Producer prior to November 16, 1991).

H.  If a performer is signed to a term agreement of one (1) year or longer in duration and performer relocates his/her residence to accept the employment, performer must be provided with a one (1) way coach airline ticket back to the point from which the performer relocated or, at the option of the performer, the cash equivalent of such ticket, if performer's employment is terminated before the end of his/her first year of employment.

## 55.  <u>ENGAGEMENTS</u>

A.  Each performer shall have specific notice of the part to be played, place of rehearsal, number of guaranteed days of employment, if any, and not later than the first reading session (or in the event of no reading session, not later than twenty-four (24) hours in advance of the first rehearsal session), the rehearsal schedule (times and dates) contracted for, and on serials, performers having running parts or who are required to hold themselves available for such programs shall be given schedules showing days off and place of reporting to work at least seven (7) days in advance. In addition, in the case of a live broadcast, each performer shall have specific notice of the date of broadcast (scheduled final performance day), time and place of broadcast, and time of live re-broadcast, if any. In the case of a pre-recorded program, each performer shall have specific notice of his scheduled final performance day.

On Serials, the Producer recognizes the importance of providing the cast with scripts sufficiently in advance to allow the performers to memorize their lines; prompting devices will be provided where scripts are not made available to performers at least seventy-two (72) hours prior to their call.

The total number of hours and the total number of days of work, as shown on the rehearsal schedule, shall not be reduced. However, the time of any rehearsal may be changed to another time if the performer is given twenty-four (24) hours' notice of such change in time or day, and any place of rehearsal may be changed to another place in the same city on reasonable notice; provided that any such change in time, day or place does not conflict with any *bona fide* engagement contracted for by the performer prior to the giving of such notice.

B.  A performer engaged as a principal performer in a running part may not be downgraded.

C.  Producer agrees that he has notice of SAG-AFTRA's rule declaring unfair any employer guilty of an abuse with respect to "hold" and "availability" calls.

D.  Producer agrees that he has notice of SAG-AFTRA's rule concerning abuse of "ready to go" calls.

## 56.  <u>OVERSCALE CONTRACTS</u>

A.  Any artist who is engaged to perform services at a scale, or under terms or conditions over and above the minimum scales, terms or conditions provided for in this agreement shall nevertheless have the protection and benefit of all other provisions and conditions set forth in this agreement.  If the compensation of the artist for any engagement is above the minimums specified herein, additional services at applicable minimum fees for such engagement may, except as otherwise specified in this Code, be credited by the Producer up to the full amount of the compensation paid to such artist if there is a specific provision to such effect in the artist's written contract, or if in the case of a verbal engagement, it is specifically agreed at the time the verbal engagement is entered into that the sponsor or Producer is entitled to such credit provided however, that late payment penalties may not be credited against overscale compensation; further provided, that wardrobe fees may be credited only against that portion of paid or guaranteed overscale compensation which exceeds one hundred-twenty percent (120%) of scale.

Notwithstanding the foregoing, for performers, except those under contract as series or program regulars, engaged to perform services at less than $2,200.00 per program, the sponsor or Producer shall specify in the performer's written contract the particular items of compensation that will be credited against the performer's overscale compensation.  The preceding sentence shall be applicable to contracts entered into after June 10, 1993, and shall not apply to serials.

B.  With respect to overscale artists who are engaged for $1,500.00 or less per program, the Producer agrees that the maximum number of rehearsal hours that the Producer may require for the contract price shall be specified by the Producer at the time the engagement is confirmed; and any rehearsal hours used in excess thereof shall be paid for at the applicable rehearsal rate, and such payment shall be in addition to the contract price, and may not be credited under subparagraph A. against the artist's overscale compensation.  In the event the Producer fails to use all the rehearsal hours so specified by him at the time the engagement was originally confirmed, the artist shall nevertheless be entitled to his full contract price, and in that event any credit the Producer may be entitled to under subparagraph A. shall be calculated on the basis of the rehearsal hours actually used.  This subparagraph B. shall not apply to contracts having a non-cancellable term of thirteen (13) weeks or more.

C.  With respect to serial performers under an individual contract which may be over and above the minimum terms and conditions specified herein, payments under this Code for the following specified items may not be credited against any portion of a performer's compensation: wardrobe fees, meal period penalties, overtime (including sixth and seventh day payments), short turnaround payments, travel payments, cosmetic alteration fees, hazardous performance payments, and doubling fees.

## 57.  <u>ADDITIONAL SERVICES</u>

No service of the performer is contracted for except as specified herein.  This paragraph is not intended to prevent the performer from contracting for services of a kind not covered by the agreement by individual contract at such rates of pay and under such conditions as the Producer and the performer shall agree, subject only to the fact that it shall not be in conflict with this agreement.

58.    **CANCELLED INDIVIDUAL ENGAGEMENTS**

In the event the performer's engagement for the program is cancelled, Producer agrees, nevertheless, to pay the performer in full for all contracted time, as herein specified, except where cancellation is for gross insubordination or misconduct.  Producer agrees that after the engagement is made, the risk of performer's incompetence is assumed by him.

59.    **CANCELLED PROGRAMS**

A.    If the recording of a program, or broadcast in the case of a live program is prevented by governmental regulation or order, or by a strike, or by the failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of said broadcasting facilities due to causes beyond the reasonable control of the Producer (such as the collapse of the transmitter due to structural defects), the Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented; provided that in such case the Producer shall reimburse the performer for all out of pocket costs necessarily incurred in connection with such program.  In addition, the performer shall be paid the full applicable rehearsal rate for all hours rehearsed prior to notice of cancellation.

B.    The same consequences shall ensue if the program time is preempted by a Presidential broadcast, a news emergency or the telecast of a special news event and notice of cancellation for such purpose is given the performer promptly upon such notice having been received by the Producer.

C.    If a substantial portion of a program or an element essential to the program is not shown because a program is interrupted for any of the reasons cited in subparagraph A. and B. above, the network or station(s) whose broadcast of such program was interrupted shall be entitled to rebroadcast the interrupted program in its entirety within a thirty (30) day period following the interrupted broadcast without incurring any additional payment to any performers in that program.

D.    If a lawful strike should prevent or interrupt the production of a program covered by this Code, any performer on the program (other than a star performer) who is bound to Producer by an exclusive term agreement may accept other work during such strike; provided that such performer shall be and remain subject to immediate recall by the Producer.

E.    The following provision is not applicable to serials:
When the production of a program is prevented, suspended or postponed by reason of the illness or injury of a series regular, the Producer shall have the right to suspend the services of all series regulars and series non-regulars, for the duration of the illness or injury; provided, however, such suspension shall not exceed five (5) consecutive production days.

The series regulars shall be paid a day's salary for each day or part thereof the performer is required and actually reports to work prior to such suspension if production which commences upon the conclusion of the suspension is on a program other than the one for which the suspension was called.   Such compensation, if any, shall be calculated at the performer's pro-rata salary.  If production which commences upon the conclusion of the suspension is on the same program for which the suspension was called, the days the series regular is required and actually reports to work prior to such suspension shall be added to the days worked after production is recommenced for purposes of calculating the series regulars' work time on that program.

The series non-regulars shall be paid a day's salary for each day or part thereof the performer is required and actually reports to work prior to such suspension provided that production which commences upon the conclusion of the suspension is on the same program for which the performer was engaged and the series non-regular does

62

not have a *bona fide* professional commitment which would conflict with resumption of his/her services.  If production of the same program does not commence upon the conclusion of the suspension or if a series non-regular has a *bona fide* professional commitment which conflicts with resumption of his/her services on the program, the series non-regular shall be deemed terminated and shall be compensated for a cancelled individual engagement as provided in Paragraph 58.

Any guaranteed employment for a series regular under his/her personal services agreement may be extended by the period of such suspension by giving written notice to such effect not later than the date of resumption of production following such suspension, unless the performer has a *bona fide* prior professional commitment which would conflict with such extension.

Producer agrees that a specific reference to Paragraph 59, "Force Majeure, Suspended or Cancelled Programs," shall be included in all contract performer personal service agreements entered into after April 11, 1993.

F.   Where the program is cancelled or prevented for any reason other than those stated in subparagraphs A. or B. or E. above, or where insufficient advance notice has been given under subparagraphs A. or B. above, the Producer shall pay the performer his/her full contract price for the program so cancelled or prevented.

**60.   POSTPONED PROGRAMS**

A.   Applicable to Non-Serials:

If a postponed recording of a program or broadcast in the case of a live program involves a change in the call of the performer to another day, the producer of such program shall not be required to pay a performer for such postponement provided: (1) the performer has been given notice of the postponement at least forty-eight (48) hours prior to the time of the performer's scheduled call; and (2) the performer is notified within fourteen (14) business days from the notice of the postponement of the date to which the performance is to be rescheduled.  In the event that a recording of a program or broadcast in the case of a live program is postponed to a later hour of the same broadcast day (such change not having been made known to the performer twenty-four (24) hours in advance), then the hours intervening between the originally scheduled time for the performance and the time of the actual performance shall be considered rehearsal time.  In the event that the postponed call conflicts with performers' *bona fide* prior professional commitments, the original call shall be considered as a cancelled individual engagement for which he/she shall be paid pursuant to Paragraph 58.  However, in the event that the performer declines to perform on the rescheduled date for reasons other than a *bona fide* prior professional individual engagement, the producer shall be relieved of an obligation to pay the performer for the postponed recording of the program or broadcast.  The performer must notify the Producer of his/her decision not to perform on the rescheduled date or his/her *bona fide* prior professional engagement at the time he/she is notified of the rescheduled performance date.  Subject to the above provisions, the change of a performance from a live to a pre-recorded basis shall not be deemed to be a cancelled program.  If a program is postponed more than once, payment to the performer must be made pursuant to Paragraph 58.

B.   Applicable To Serials:

Where the recording of a program or broadcast or portion of a program or broadcast for which a performer is engaged is postponed, the postponed engagement shall be counted as an additional day.

**61.   PAYMENT**

A.    Except as otherwise provided in this Paragraph A. and in the advance payment provisions of Paragraph 19.C., payment to all performers shall be made not later than Thursday after the week during which such performance shall have taken place or in the case of a pre-recorded program, after time of final rendition of physical services. For this purpose, the workweek shall end at the close of broadcasting on Saturday. The minimum fees shall be net to the performer and no deductions whatever may be made therefrom (except for such taxes and withholdings as are required or authorized by law). Payment shall be made directly to the performer unless written authorization has been received by the employer from the performer authorizing payment to some other person, with a copy of such authorization to be delivered to SAG-AFTRA by performer. Not later than the date of first rehearsal, the Producer shall furnish a W-4 form (and, at the performer's request, a non-resident state income tax form if such forms are issued and available to the Producer) to each performer who has not previously filed such form with the Producer. The performer shall complete and return said form promptly to the Producer. If a performer under a term contract of thirteen (13) weeks or longer so requests, Producer shall pay such performer one-thirteenth $(1/13^{th})$ of the performer's thirteen (13) week guarantee each week, and make any adjustments or additional payments that may be necessary at the end of the cycle. Payment to term contract performers in accordance with the preceding sentence shall constitute timely payment.

B.    Penalty for Late Payment: In the event Producer fails to make timely payment, as provided in the preceding subparagraph A., the following cumulative penalty payments shall be added to the compensation due and payable to the performer for each day (beginning with the day following the date of default) on which payment remains not made or received:

<div align="center">$5.00 for each day</div>

up to a maximum penalty payment of $150.00 (30 days); thereafter the penalty payment shall cease, unless SAG-AFTRA or the performer serves or has served upon the designated representative of the Producer (if no specific representative is designated, the management official of the Producer who is SAG-AFTRA's regular contact) by certified mail, return receipt requested, a notice that the default continues. If the penalty had ceased, it shall resume on receipt of such notice and shall continue until payment is made; provided, further however, that Saturdays, Sundays and legal holidays which Producer observes shall not be computed as penalty days, and further provided that the penalty shall not be invoked or payable when the performer fails to furnish his completed W-4 form promptly or when the performer, having been furnished an engagement contract on or before show day, fails to return the signed contract promptly, or when there is a *bona fide* dispute as to compensation.

C.    All required payments of additional compensation for replays and foreign uses, unless included with or in the payment made pursuant to subparagraph A. above, shall be made by check delivered to SAG-AFTRA, payable to the order of the performer entitled thereto or to a person designated in accordance with subparagraph A. Compliance herewith shall constitute payment to the performer. SAG-AFTRA shall promptly forward each such check to the performer entitled thereto or to a person designated in accordance with subparagraph A. If Producer fails to make payment for replays within thirty (30) days after the time specified in Paragraph 73.B., or for foreign use within the time specified in Paragraph 73.F.(2)(e) but thereafter makes payment within thirty (30) days after such payment became due, Producer shall be liable for a penalty of five percent (5%) of the overdue amount which sum shall be added to the compensation due and payable to the performer. If payment is not made within such thirty (30) day period Producer shall remain liable for such five percent (5%) penalty, but shall not be liable for any further penalty unless and until he receives written notice that a payment is more than thirty (30) days overdue, in which event he shall be liable for an additional penalty each month of five percent (5%) (based on the amount of the compensation which first became overdue) up to a maximum penalty of one-hundred percent

<div align="center">64</div>

(100%) of the compensation originally due and payable to the performer. The penalties set forth in this subparagraph shall not be invoked or payable when the performer has failed to furnish his completed W-4 form promptly or when the performer, having been furnished an engagement contract on or before show day, fails to return the signed contract promptly, or when there is a *bona fide* dispute as to compensation.

An inadvertent failure on the part of the Producer to comply with the provisions of this subparagraph C. shall in no event constitute a default by the Producer or a breach of this Code, provided such failure is cured promptly after notice thereof from SAG-AFTRA.

D.   To the extent practicable, payments to performers shall be accompanied by a breakdown of the earnings included in the payment. With regard to earnings for which a breakdown is not provided, for a reasonable period of time the Producer shall make earnings breakdown information available to the individual performers upon request.

For unemployment insurance purposes, the Producer will supply performers with the employer of record's name, address, state identification number (if any) and, upon request, dates worked and whether the payment is for residuals.

## 62.   DEDUCTIONS FOR SOCIAL SECURITY AND WITHHOLDING TAXES

Social Security and withholding taxes shall be deducted from all employees covered by this Code regardless of whether they are part-time or full time, staff or freelance employees.

## 63.   DISABILITY INSURANCE

In states which have state disability insurance laws requiring deductions, such deductions shall be noted on the checks or statements given to the performer. The check or statement should also include the employer's name or registration number in those states where unemployment insurance laws require that such information be given to the employee by the employer.

## 64.   NON-WAIVER OF RIGHTS

The acceptance by a member of SAG-AFTRA, for any work or services under this Agreement, of payment or other consideration in money, by check, or in any other form, shall not be deemed a waiver by such SAG-AFTRA member, nor constitute a release or discharge by him, of such SAG-AFTRA member's rights either under this Agreement or under any Agreement subject to this Agreement, for additional compensation or of his contractual rights. Releases, discharges, notations on checks, cancellations, etc., and similar devices which may operate as waivers or releases shall be null and void to the extent provided for above unless SAG-AFTRA's prior written approval is first had and obtained.

## 65.   NOTICE ON GROUP SINGERS, GROUP DANCERS AND ANNOUNCERS

Any individual member (not under contract) of a singing or dancing group, or an announcer, who has appeared on six (6) or more consecutive programs shall receive at least two (2) weeks' written notice of discharge except for cause. However, any member who auditions for a program, as a member of a group, shall, in the event that said group is accepted for the program, be considered to be a member of said group and may not be discharged without justifiable cause without SAG-AFTRA's consent as long as the group remains on the program or for a period of thirteen (13) weeks, whichever is less.

## 66.   INDIVIDUAL CONTRACTS

Notice of this agreement will be given to SAG-AFTRA members, and they will contract subject thereto, and as to such Producers who either sign this agreement or signify their intention to abide thereby, the member will sign contracts subject to the fulfillment of all obligations of such Producer hereunder.  In the event that the SAG-AFTRA National Office requests a copy of the personal contract of a performer, the Company will supply such contract to the SAG-AFTRA National Office when requested on a selective basis provided that it receives assurances from the SAG-AFTRA National Office that it has a *bona fide* need for such contract on a particular program in connection with a potential grievance, for this purpose.

## 67.  STANDARD CLAUSE FOR INDIVIDUAL CONTRACT

Every contract (whether written or oral) between Producers under this Code and any Artist must contain and shall be deemed to contain the following clause:

"Notwithstanding any provision in this contract to the contrary, it is specifically understood and agreed by all parties hereto:

1.  That they are bound by all the terms and provisions of the applicable SAG-AFTRA Code of Fair Practice for Network Television Broadcasting, including payment of Supplemental Market fees.  Should there be any inconsistency between this contract and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation or conditions provided for in this agreement which are more favorable to members of SAG-AFTRA than the terms, compensation and conditions provided for in said Code of Fair Practice.

2.  That the performer is covered by the provisions of Paragraph 102 of said Code entitled 'AFTRA Health and Retirement Funds' and Paragraph 102.A. entitled 'AFTRA Industry Cooperative Fund.'

3.  That the performer is or will become a member of SCREEN ACTORS GUILD-AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS in good standing, subject to and in accordance with Paragraph 84 of said Code of Fair Practice.

4.  All disputes and controversies of every kind and nature arising out of or in connection with this contract shall be determined by arbitration in accordance with the procedure and provisions of the SAG-AFTRA Code of Fair Practice for Network Television Broadcasting.

## 68.  STANDARD SAG-AFTRA ENGAGEMENT CONTRACT FOR SINGLE TELEVISION BROADCAST AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK

Every engagement for a single television broadcast or for multiple television broadcasts within one (1) calendar week shall, if in writing, be on the following standard form of contract, and, if oral, shall be deemed to be on such standard form.  Additions to the standard form must be more favorable to the performer than, or not inconsistent with, the express provisions of the said standard form contract, and in no event may such additions violate the SAG-AFTRA Code.

## STANDARD TERMS AND CONDITIONS

1.  Performer shall render Performer's services in connection with this engagement to the best of Performer's ability, and subject to Producer's direction and control.  Performer will abide by all reasonable rules and regulations of Producer, the broadcaster, the sponsor(s) and their advertising agencies, and Performer will refrain from any offensive or distasteful remarks or conduct in connection with this engagement.  Performer shall, if and as required by this written contract, be

66

available to participate in commercial inserts and leads into and out of such commercial inserts.

The Producer, broadcaster(s), and the sponsor(s) and their advertising agencies, may open and answer mail addressed to Performer relating to the program, provided that all such mail relating to Performer and intended for him or copies thereof shall be turned over to Performer within a reasonable length of time.

2.    (a)    Performer shall indemnify Producer, the sponsors and their advertising agencies, the network, and all stations broadcasting the program against any and all claims, damages, liabilities, costs and expenses (including reasonable attorney's fees) arising out of the use of any materials, ideas, creations, and properties (herein called "materials") whether or not required of Performer, furnished by Performer in connection with this engagement, and any ad libs spoken or unauthorized acts done by Performer in connection therewith, Producer shall similarly indemnify Performer in respect to "materials" furnished by Producer, and acts done or words spoken by Performer at Producer's request.  The fact that a program is pre-recorded and subject to editing shall in no way alter the respective indemnities set forth herein or in any way alter the respective responsibilities of Performer or Producer for anything said or done in connection with any program.  Each party will give the other prompt notice of any such claims and/or legal proceedings (and shall send a copy of such notice to SAG-AFTRA) and shall cooperate with each other on all matters covered by this paragraph.

    (b)    If this Agreement requires, as an express additional provision, that Performer furnish materials (herein called "required materials") in connection with his performance hereunder, Performer shall submit such required materials to Producer at such time prior to performance thereof as may be reasonably designated by Producer, and such required materials shall, as between Producer and Performer, unless otherwise expressly provided in this Agreement under the heading "Additions," be and remain the property of the Performer.

3.    In full payment for Performer's services and the rights and privileges granted to Producer hereunder, Producer shall pay Performer the compensation hereinbefore specified not later than Thursday after the week during which Performer's services shall have been rendered, subject to the deduction of such taxes and withholdings as are authorized or required by law.  There shall be no obligation on Producer's part to produce or broadcast the program or to use Performer's services or materials, if any.

4.    The program hereunder may be originally broadcast either live or by recording over the facilities arranged by or for Producer.  The term "recordings," as used herein, shall mean and include any recording or recordings made whether before or during a broadcast transmission, by electrical transcription, tape recording, wire recording, film or any other similar or dissimilar method of recording television programs, whether now known or hereinafter developed.  All recordings as between Producer and Performer shall be Producer's sole property, but shall be subject to the restrictions contained in the SAG-AFTRA Code in effect at the time such recording is made, except as SAG-AFTRA may otherwise permit in writing.  Performer will, if required by Producer, re-enact the performance, in whole or in part, in connection with any recording of all or any portion of the program (which Producer may deem desirable) in order to make adjustments necessitated by mechanical failures, or adjustments or corrections in performances after the date of performance, provided that such re-recording is done not later than seven (7) days after the broadcast in the case of a live program or seven (7) days after the Performer's final performance day in the case of a pre-recorded program, and at a time which does not conflict with Performer's other *bona fide* commitments, and provided, further that Producer shall pay for Performer's services in connection with such re-recording such additional compensation as may be required by the said SAG-AFTRA Code.

5.    If the recording of a program, or broadcast in the case of a live program hereunder is prevented by government regulation or order, or by a strike, or by failure of broadcasting facilities because of war or other calamity such as fire, earthquake, hurricane, or similar acts of God, or because of the breakdown of such broadcasting facilities due to causes beyond the reasonable control of the Producer (such as the collapse of the transmitter due to structural defects), the Producer shall be relieved of any responsibility for the payment of compensation for the program so prevented; provided that in such case the Producer shall reimburse Performer for all out of pocket costs necessarily incurred in connection with such program.  In addition Performer shall be paid the full applicable rehearsal rate for all hours rehearsed prior to notice of cancellation.  The same consequences shall ensue if the program time is preempted by a Presidential broadcast, a news emergency or the telecast of a special news event and notice of cancellation for such purpose is given Performer promptly upon such notice having been received by Producer.  Where the program is cancelled or prevented for any reason other than those stated above, or where insufficient advance notice has been given under the preceding sentence, Producer shall pay Performer his full contract price for the program so cancelled or prevented.

6.    Producer is prohibited from requiring Performer to refrain from rendering his services in connection with any other television or radio services for any period other than the actual rehearsal and broadcast period involved in this engagement; provided, however, that this prohibition shall not apply if Performer's compensation for this engagement shall be $1,500.00 or more.

7.    Notwithstanding any provision in this agreement to the contrary it is specifically understood and agreed by all parties hereto:

(a) That they are bound by all the terms and provisions of the applicable SAG-AFTRA Code of Fair Practice for Television Broadcasting, including payment of Supplemental Market fees.  Should there be any inconsistency between this Agreement and the said Code of Fair Practice, the said Code shall prevail; but nothing in this provision shall affect terms, compensation, or conditions provided for in this Agreement which are more favorable to members of SAG-AFTRA than the terms, compensation or conditions provided for in said Code of Fair Practice.

(b)    That Performer is covered by the provisions of Paragraph 102 of said Code entitled "AFTRA Health and Retirement Funds" and Paragraph 102.A. entitled "AFTRA Industry Cooperative Fund."

(c)    That Performer is or will become a member of SAG-AFTRA in good standing, subject to and in accordance with the Union Shop provision of said Code of Fair Practice.

(d)    All disputes and controversies of every kind and nature arising out of or in connection with this agreement shall be determined by arbitration with the procedure and provisions of the said SAG-AFTRA Code of Fair Practice.

(e)    Producers will recognize that it is SAG-AFTRA's intent to assure that its members receive from Producer or any of its agents or retainers, treatment befitting the professional character and nature of its members.

8.    This Agreement, when executed by Performer and Producer, shall constitute the entire understanding between them, and shall be construed according to the laws of the State of _____ , applicable to contracts fully performed therein.

**ADDITIONS WHICH HAVE NOT BEEN APPROVED BY SAG-AFTRA AND ARE NOT PART OF STANDARD FORM**

68

**STANDARD SAG-AFTRA ENGAGEMENT CONTRACT FOR SINGLE TELEVISION BROADCAST AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK**

Dated: _____

Between_____ hereinafter called "Performer,"

and, _____ hereinafter called "Producer."

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the part or parts to be played:

TITLE OF PROGRAM_____

TYPE OF PROGRAM: Sustaining ( )        Commercial ( )        Closed Circuit ( )

SPONSOR (if commercial): _____

NUMBER of GUARANTEED DAYS OF EMPLOYMENT: _____
(if Par. 19 of the SAG-AFTRA Code is applicable)

PLACE OF PERFORMANCE*: _____

SCHEDULED FINAL PERFORMANCE DAY:_____

SAG-AFTRA CLASSIFICATION: _____

PART TO BE PLAYED: _____

COMPENSATION: _____

MAXIMUM REHEARSAL HOURS INCLUDED IN ABOVE COMPENSATION: _____
(if Par. 56.B of the AFTRA Code is applicable)

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any.

(PRODUCER)

_____            By  _____

Performer

_____

Telephone Number

_____

Social Security Number

Note: Attach rehearsal schedule or deliver to Performer not later than the first reading session, (or in the event of no reading session, not later than twenty-four (24) hours in advance of the first rehearsal session).

* Subject to change in accordance with SAG-AFTRA Code.

69

**STANDARD SAG-AFTRA ENGAGEMENT CONTRACT FOR STUNT PERFORMERS FOR SINGLE TELEVISION BROADCAST AND FOR MULTIPLE TELEVISION BROADCASTS WITHIN ONE CALENDAR WEEK**

Dated: _____

_____

Between (Name and Address) _____ hereinafter called "Stunt Performer," and, _____ hereinafter called "Producer."

Performer shall render artistic services in connection with the rehearsal and broadcast of the program(s) designated below and preparation in connection with the stunt(s) to be performed:

TITLE OF PROGRAM: _____EPISODE #:_____

TYPE OF PROGRAM: _____

DATES: _____

LOCATION: _____
_____
STUNT(S) TO BE PERFORMED: _____

SAG-AFTRA CLASSIFICATION: PRINCIPAL PERFORMER _____

COMPENSATION: _____

STUNT ADJUSTMENT(S) (if applicable):_____

ADDITIONAL TERMS AND CONDITIONS (*e.g.*, equipment):_____

Execution of this agreement signifies acceptance by Producer and Performer of all of the above terms and conditions and those on the reverse hereof and attached hereto, if any, except for stunt adjustment(s) (if applicable), payment for which is agreed upon after the stunt is performed.

(PRODUCER)

_____          By _____
    Stunt Performer


_____
    Telephone Number


_____
    Social Security Number
  Corporate Tax ID Number, if any

**68.A.  STUNT PERFORMERS**

A.  <u>Additional Stunt Work</u>:

In the event stunt work is required by Producer beyond that which was agreed to by the stunt performer, the stunt performer shall have the right to negotiate additional compensation for the additional work required.

(1)  Changes required prior to performance.  If such required change occurs prior to the taping or televising of the stunt, the stunt performer shall advise the Producer before the stunt in question is taped or televised if the performer wishes to negotiate additional compensation for the additional work required.  Such negotiation may occur either before or after the performance of the stunt; however it is expressly agreed that the production shall not be delayed for the purpose of first determining the compensation for the stunt.

(2)  Changes required during performance.  If the Producer requires such a change during the taping or televising of a stunt, the stunt performer shall advise the Producer at the earliest reasonable time after completion of such stunt that he wishes to negotiate additional compensation for the additional work and shall have the right to so negotiate such additional compensation after the stunt is taped or televised.

B.  <u>Stunt Performers - Sanitary Wardrobe</u>:

Stunt performers shall not be required to wear wardrobe that has not been properly cleaned after prior use by another person.

C.  <u>Protecting of Stunt Performer Safety</u>:

(1)  All reasonable requests and requirements for safety equipment in connection with performance of stunts shall be complied with by Producer or Producer's representative on the set or location.

(2)  Equipment provided by Producer, for example, autos, cycles, wagons, etc. shall be in suitable repair for the safe and proper performance of the stunt.

(3)  If there is a change in a planned stunt which makes it substantially more dangerous, the stunt performer may refuse to perform the stunt as changed.

**68.B.  STUNT COORDINATORS**

(1) Dramatic Programs (other than serials).   The terms and conditions of employment for stunt coordinators employed on dramatic programs other than serials shall be those applicable to stunt coordinators employed under "flat deal contracts" as set forth in the SAG-AFTRA Television Agreement.

(2) Serial Programs.  A Producer shall make contributions to the AFTRA Health and Retirement Funds pursuant to Paragraph 102 based on the stunt coordinator's individually negotiated salary for such work.  This paragraph shall not require the application of any other provision of the Code to stunt coordinators.

(3) Other Programs.  A Producer may at it its option, but is not required to, engage a stunt coordinator. Should the Producer so elect, it shall make contributions to the AFTRA Health and Retirement Funds pursuant to Paragraph 102 based on the stunt coordinator's individually negotiated salary for such work.  This paragraph shall not require the application of any other provision of the Code to stunt coordinators.

## 69. SUPPLEMENTAL MARKETS; PAY TELEVISION; BASIC CABLE

A.   Supplemental Markets:

The rights of Producer in television programs produced under this Code shall include the right to exhibit such programs in Supplemental Markets, subject to the provisions of the SAG-AFTRA Supplemental Markets Agreement, Exhibit D.

B.   Pay Television:

The provisions applicable to the engagement of performers by Producer to perform on programs produced under this Code for initial release on Pay Television are set forth in Exhibit E (Pay Television, Video Disc/Videocassette provisions).

"Pay Television" (also known as Pay Cable), as used in this Code, means exhibition on a home-type television screen by means of telecast, cable, closed circuit or CATV where substantially all systems to which the program is licensed meet the following tests:

(1)   Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

(2)   Where the subscriber pays for each program he selects (except that a program he selects for which only a token charge is made shall not be considered a Pay Television program); and/or

(3)   Where the subscriber pays a fee for an encoded telecast or telecast which fee is a major charge relative to other fees paid for encoded telecasts.

It is expressly understood that "Pay Television" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

C.   Basic Cable:

Paragraph 69(c) of the 1979-82 Agreement contained the following provision:

"If Producer desires to engage performers to perform on any program produced primarily for release on more than one Basic Cable system (as distinguished from a program produced for Pay Television, as defined in subparagraph (b) of this Paragraph 69), Producer will give AFTRA notice of such desire not later than sixty (60) days prior to the date upon which it intends to engage such performers. AFTRA and Producer shall thereafter meet and bargain in good faith for the purpose of agreeing upon terms and conditions of employment and compensation for performers engaged by the Company to perform on such programs, and if no agreement is reached between Producer and AFTRA with respect thereto within sixty (60) days after commencement of negotiations, and if Producer then reaffirms its intention to produce such a program, then AFTRA may, upon sixty (60) days written notice to Producer, instruct its members to refuse to perform services on such programs."

Pursuant to the requirements of that provision, Producer and AFTRA met. The negotiations are continuing. Pending agreement, all rights expressed therein remain in effect.

It is expressly understood that "Basic Cable" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

70.   **PROGRAMS COVERED BY COLLECTIVE BARGAINING AGREEMENT**

A.   This Agreement covers live network television programs originating in New York, Chicago, Los Angeles and Washington, D.C.; recorded programs used to supplement live broadcasts, film sequences made especially for the entertainment portion of a live program, and any other program produced or recorded as provided in Paragraph 72 hereof.

B.   This Code shall apply to Traveling Shows, as the term is generally understood in the Industry, which normally originate at one of the production centers covered by this Code, regardless of the point of origination of the broadcast.  This Code also shall apply to all persons covered by this Code on sports broadcasts produced by a signatory to this Code or to the letters of adherence and broadcast on the network regardless of the point of origination of the broadcast.

C.   When a program is produced or co-produced by a signatory to this Code or to the letters of adherence for broadcast to the network but said program originates at a point other than New York, Chicago, Los Angeles or Washington, D.C., the terms and conditions of this Code (except the provisions of Paragraph 84 hereof when inapplicable under the Labor Management Relations Act, 1947, as amended) shall nevertheless apply to such network program.  Excluded from the coverage of the preceding sentence are programs (but not cut-ins or feeds to other programs other than news inserts which are governed by the provisions of Paragraph 75 of this Code) in the field of news and public affairs, except to the extent that participation in such programs may be covered by the network staff newsperson's agreement: "remote" originations of events (such as a rodeo or sportscar races) which by their nature feature persons who are not performers within the meaning of this Code and which as a matter of course occur in the locality from which the broadcast originates; religious programs broadcast in connection with observance of particular religious holidays.

SAG-AFTRA agrees to consider and grant (when warranted) waivers of the provisions of this subparagraph C. for network program originations in special circumstances.

71.   **DEFINITION OF NETWORK PROGRAM**

A network television program is one which is broadcast over two (2) or more television stations in the United States, its territories and possessions and Canada except programs broadcast on regional networks now existing in radio as provided in the SAG-AFTRA Code of Fair Practice.  "Network" within the meaning of the preceding sentence shall be deemed to include the regularly affiliated station, if any, of each network in Mexico City, Tijuana and/or Bermuda.

72.   **RECORDED PROGRAMS COVERED BY COLLECTIVE BARGAINING AGREEMENT**

The parties hereto hereby confirm the terms and provisions of the "Clarification of 1954-56 AFTRA Code" (herein called "Clarification Agreement") which provides that said Clarification Agreement is also applicable to this Code, and that all of the terms and provisions of this Code are applicable to network television programs originating in New York, Chicago and Los Angeles which are produced or recorded by means of any electronic video equipment (including a combination electronic and motion picture or "slave" camera) used either in connection with live broadcasting or in connection with electronic video recording, whether by means of disc, wire, tape, kinescope, audio tape recorders, video tape recorders, wire recorders, disc recorders and any other apparatus now or hereafter developed which is used to transmit, transfer or record light or sound for immediate or eventual conversion into electrical energy.  (Excluded from the foregoing are programs recorded solely by motion picture camera not in connection with a radio broadcast or a live telecast.)  The foregoing provisions of this paragraph shall not limit or restrict, or be limited or restricted by anything contained in Paragraph 70 of this Code.

73

73.     **REPLAY OF RECORDED PROGRAMS**

A.      With respect to programs produced prior to March 1, 1956, the terms and conditions of Paragraph 72 of the 1954-56 AFTRA Code of Fair Practice for Network Television Broadcasting shall apply, and said Paragraph 72 shall remain in full force and effect with respect to such programs.

B.      With respect to programs produced on and after March 1, 1956, the parties hereto hereby confirm the terms and provisions of said Clarification Agreement as follows:

Recordings: Producer shall have the right, within sixty (60) days of the original telecast, whether live or prerecorded, to supplement the network (as "network" is defined in Paragraph 71 of this Code) by means of recordings in any area where the program has not been previously broadcast, without additional payment to the performers.  A program shall be deemed to be replayed if broadcast more than sixty (60) days after the original telecast, except as otherwise expressly permitted for syndication pursuant to subparagraph C. hereof.  A program shall be deemed to be replayed if broadcast within said sixty (60) days in any area where the original telecast was shown.

Each additional broadcast in any area where the program has previously been broadcast shall be considered an additional replay.  Compensation for replays shall be not less than the amounts set forth below:

(1)     First and Second Network Replays (*i.e.*, Replays Over a National Television Network Whether or Not in Prime Time):

    (a)     For the first network replay, performer shall be paid seventy-five percent (75%) of the applicable basic minimum program fee plus the percentage set forth below of the performer's additional rehearsal and doubling fees for the program:

        programs originally telecast between 11/16/73 and 11/15/75: 10%
        programs originally telecast between 11/16/75 and 11/15/76: 12½%
        programs originally telecast on or after 11/16/76: 20%

    (b)     For the second network replay, performer shall be paid on the same basis as set forth under (a) above for the first network replay of such program.

(2)     First Run Syndicated Programs

Residual payments shall be governed by the following formula for all first run syndication programs, including new episodes of existing programs, produced after February 27, 2012:

| Run | Residual payment |
| --- | --- |
| Second | 40% |
| Third | 30% |
| Fourth | 25% |
| Fifth | 25% |
| Sixth | 25% |
| Seventh-Tenth | 15% |
| Eleventh-Twelfth | 10% |
| Each subsequent | 5% |

74

(3)   <u>All Other Replays</u>:

For all replays not covered in (1)(a) and (b) and (2) above, performer shall be paid the percentage set forth below of the applicable basic minimum program fee:

| | |
|---|---|
| First replay | 75% |
| Second replay | 75% |
| Third replay | 50% |
| Fourth replay | 50% |
| Fifth replay | 50% |
| Sixth replay | 10% |
| Seventh and each additional replay | 5% each |

(4)   <u>Reality Based Programs</u>:

With respect to programs with reality based formats utilizing reenactments, the producer may: (1) recombine previously telecast segments from programs in the same series; (2) create from such previously telecast segments either an edited-down program or a recombined and edited program of not less than thirty (30) minutes duration; and/or (3) combine previously telecast segments with new segments for the same series.

Performers who appear in program segments which are replayed (whether as part of new, recombined, or edited-down programs, or in programs replayed as originally broadcast) shall be paid the following percentages of the applicable minimum program fee for the length of the program in which the segment appears, based upon the program fee in effect as of the date of such program's first telecast:

| | |
|---|---|
| First & Second replay | 50% |
| Third replay | 40% |
| Fourth replay | 30% |
| Fifth, Sixth & Seventh replay | 25% |
| Eighth, Ninth, Tenth & Eleventh replay | 15% |
| Twelfth & Thirteenth replay | 10% |
| Each subsequent replay | 5% |

(5)   "Applicable basic minimum program fee," as used in (1), (2) (3) and (4) above, means the basic minimum commercial program fees (or the following percentages of the basic minimum sustaining program fees, in the case of a sustaining replay of a sustaining program) as contained in the AFTRA or SAG-AFTRA Code of Fair Practice for Network Television Broadcasting existing at the time of the performance.

Payment of replay fees (either the minimum fees set forth herein or the replay fees set forth in the performer's individual contract, whichever are higher) shall be made by the Producer to performers not later than thirty (30) days after any network broadcast or for any replay on FBC or the CW, or one hundred-twenty (120) days after any non-network broadcast, whichever is applicable.

Payment of the applicable fee for a replay shall entitle the Producer to telecast the program once in each area for each run.

Producer shall not be required to make payment of any replay fees to performers engaged to perform solely as walk-ons or background actors as defined herein.

The Producer may, subject to the consent of the performer at the time the original engagement is made, credit overscale payments in excess of twice the full SAG-AFTRA minimum fee including all extra payments for additional rehearsal and doubling, towards monies due the performer for replays of any recordings under the above schedule, except when a daytime serial program produced hereunder is replayed in network prime time, in which event such crediting shall be limited to the amount of overscale compensation in excess of $2,000.00 per program for a performer on a serial of one (1) hour or more, or $1,500.00 per program for a performer on a serial of less than one (1) hour.

In the case of contracts with performers which were executed prior to March 1, 1956, for services to be rendered after said date, the Producer shall be required to secure the performer's agreement, notwithstanding any contractual provisions to the contrary, concerning the fees to be paid for the replay of recordings, provided that no such agreement may be for less than the schedule of replay fees set forth above.

The schedule of replay fees set forth above is a schedule of minimum fees, and nothing herein shall be deemed:

(a)     to prevent the performer from bargaining for better terms for the performer than those provided herein, or

(b)     to change or modify contracts containing better replay terms for performers.

Producer agrees to furnish SAG-AFTRA with a production memorandum signed by an authorized agent of the Producer for each replay of a recording. The production memorandum shall give full and specific information sufficient to permit computation of proper replay fees for all performers concerned.  Each production memorandum shall be filed with SAG-AFTRA within fifteen (15) days after the first broadcast constituting the first or any additional replay.

Upon the sale, transfer, assignment, license, lease, agreement to distribute or other disposition by Producer of its television rights in any recorded program produced by it under this Code entered into or renewed after ratification of this Agreement, Producer shall not be responsible to SAG-AFTRA or to any performers for any payments thereafter due with respect to replays, Supplemental Markets use, or foreign telecasting or for a breach or violation of this Code by such transferee (including distributor), if SAG-AFTRA approves the financial responsibility of such transferee in writing (which approval shall not be unreasonably withheld), and if Producer in its agreement with such transferee has included a provision substantially in the form of agreement set forth in the Transfer of Rights provisions of this Code, which are attached hereto as Exhibit B.

(6)     Domestic Replay in a Foreign Language - Producer shall have the option of applying the payment provisions in subparagraphs (a), (b) and (c), below to the second and any subsequent broadcast in any domestic area of a network television program in a language other than English in lieu of the foregoing provisions of subparagraph 73.B. governing domestic replays in which case such broadcasts shall not be treated as domestic replays:

(a)     The Producer will pay for the benefit of the performers on such a program two percent (2%) of the "Distributor's gross receipts" (as defined in Exhibit D) from such broadcast(s) of such program in a language other than English, provided, however, the scale payment due each performer shall not exceed one and one-half percent (1½%) per performer and the scale payment due each off-camera announcer shall not exceed one-half percent (½%) per announcer.

76

Health and Retirement contribution shall be paid in addition to such payments.

(b) This two percent (2%) payment shall be for the benefit of all performers on the program, except for background actors. The two percent (2%) payment shall be distributed pro rata to the performers on the basis of a two-to-one ratio for principal performers against other performers. Performers on non-serial dramatic programs production of which commences on or after November 16, 2014, shall share in distributor's gross receipts on a pro rata basis of 3-2-1 rather than 2 to 1. The parties agree that performers engaged under the Five Lines or Less category shall be regarded as a "1". In the event any performer has individually negotiated with the Producer an individual payment formula for such distribution, his pro rata share shall be credited against the payment provided for in his individual contract. Distribution of the pro rata payments shall be made either directly to the performers by the Producer or to SAG-AFTRA for distribution to the performers as the parties may mutually determine. Additionally, a contribution based upon a percentage of the fees payable under this subparagraph shall be made to the AFTRA Health and Retirement Funds. The applicable percentage shall be the same as the percentage of gross compensation payable to the AFTRA Health and Retirement Funds under the AFTRA or SAG-AFTRA Code under which the program was produced.

(c) If any agreement for broadcasts in a language other than English includes more than one (1) program, or includes both rights to telecast in a language other than English and other rights, the Producer shall make a reasonable allocation for the purpose of determining payments due hereunder.

Unless the dubbing is performed outside of the United States, the foregoing option shall only apply if the persons performing the dubbing are paid a rate not less than the applicable minimum session fee in the AFTRA Spanish International Network 1985-1988 Spanish Language Agreement for Television Commercials. The persons who perform the dubbing shall not be entitled to any other payment for use of the program.

(7) Release to Public Television - When a television program produced under this Code is released for broadcast on public broadcasting station(s), Producer shall have the option of applying the replay provisions of this Paragraph 73.B. or of paying the performers who are entitled to payments for replays, either:

(a) the first replay fee, which payment shall entitle the Producer to the initial releases provided in the National SAG-AFTRA Public Television Agreement, but not the extended broadcast releases provided in that Agreement, or

(b) the applicable program rate under the National SAG-AFTRA Public Television Agreement which rate shall entitle the Producer to the initial uses provided therein. Further uses shall be subject to the applicable payment provisions of such Agreement.

No use paid for under options (a) or (b) above shall be considered a domestic replay under this Code.

C. Syndicated Programs shall be governed by all the terms, conditions and provisions of Paragraphs 72 and 73 of this Code, except as otherwise expressly provided in this subparagraph C. to wit:

77

(1)    A recorded program which is not broadcast as a network program but has been pre-recorded for syndication on local stations may be played on local non-interconnected stations provided that payment in advance for pre-recording such program shall be made to each performer at not less than the rates, terms and conditions provided in this Code for a network broadcast. Such advance payment shall cover the first play on not more than one (1) local station in each area. All subsequent replays shall be paid for at the rates and under the conditions provided in subparagraph B. of this Paragraph 73.

(2)    With respect to a recorded program which is originally broadcast as a network program, whether live or pre-recorded, such program shall not be deemed to be a replay when first broadcast on local non-interconnected stations in any area where the original telecast was not shown, and only in such areas, provided that such first broadcast occurs within three (3) years after the end of the sixty (60) day period (permitted to supplement the network) after the date of the original telecast. All other plays shall be deemed to be replays, and such replays and all subsequent replays shall be paid for at the rates under the conditions provided in subparagraph B. of this Paragraph 73.

D.    The provisions of this Paragraph shall apply to recordings described in Paragraph 72 and to recordings as defined in Paragraph 68 (Standard Terms and Conditions, Paragraph 4) of this Code as follows:

(1)    Producer shall have the right to utilize, without additional compensation, excerpts from programs, whether produced under this or any previous AFTRA or SAG-AFTRA TV Network Code:

(a)    For promotional purposes as provided in Paragraph 88.

(b)    Where news excerpts from news programs are utilized in other news programs in accordance with the conditions set forth in Paragraph 75.C. Furthermore, SAG-AFTRA will not claim a breach of this or any previous AFTRA or SAG-AFTRA Code if Producer without payment of additional compensation uses an excerpt of no more than two (2) minutes in length from any program in a news program or, in a basic news context in a public affairs type program.

(c)    As flashbacks (brief scenes from one episode in a series used as part of a story in another episode in a series) provided that a performer in the flashback who is not otherwise engaged to perform services on the program in which the flashback is utilized shall be entitled to one-hundred percent (100%) of the applicable minimum program fee, or if not under contract at the time of such broadcast, one-hundred percent (100%) of his performance fee for the episode used in the flashback.

(d)    Where excerpts from different programs are utilized in any program devoted to annual television awards produced under this or any other AFTRA or SAG-AFTRA Code, without compensation to the star performers, provided that consent from the star performer is obtained (which consent may be obtained in the performer's individual contract) and further provided that performers other than star performers appearing in such excerpt(s) shall be paid an amount equal to the first replay fee based on the minimum program fee of the program from which the excerpt(s) is taken; however, where excerpts from programs are utilized on the annual Emmy Awards (daytime or nighttime), such excerpts may be utilized without compensation to or consent from the performer(s). Further, where excerpt(s) from programs featuring a portion of a current nominated

78

performance, or in connection with a lifetime achievement award or the like, are utilized in the Grammy Awards, Academy Awards, or Tony Awards, such excerpt(s) may be utilized without compensation to the performer(s), provided that in both cases consent from the star performer(s) is obtained (which consent may be obtained in the performer's individual contract).

(e)     Where the performance of a star performer(s) is utilized in an excerpt which contains no non-star performers, provided that consent from the star performer is specifically obtained at the time of such contemplated use, it being understood that consent may not be obtained by a general clause in the performer's individual contract prior to such contemplated use. This right is limited to programs where the excerpts run not more than ten (10%) of the program time or, in the case of anniversary shows or personality retrospectives, fifty percent (50%) of the program time.

(f)     When used for purposes of recapping the story to date in the context of a serial, multi-part program, episodic series, unit series or anthology; provided, however, that if such recap shall exceed ninety (90) seconds in length when used on a program less than sixty (60) minutes in total length, or exceed one hundred-eighty (180) seconds in length when used on a program of sixty (60) minutes or more in total length, Producer shall pay the performers appearing in the excerpts used in the recap in accordance with subparagraph (2) below. When used in a recap in a serial, an excerpt can be used only once under the provisions of this subparagraph (1)(f) and any subsequent use of such excerpt in a serial shall require payment in accordance with subparagraph (1)(c) above. A recap consists of brief scenes from past episodes in a series or multi-part program used at the beginning of an episode to bring the story up-to-date.

(2)     For any use of excerpts, after February 28, 1995, from an entertainment program that is not provided for in subparagraph (1) above, Producer shall pay the performers appearing in such excerpts as follows:

(a)     If the excerpt(s) is used in a program other than a local program, Producer shall pay to each performer appearing in three (3) minutes or less of such excerpt(s) from a given program the minimum program fee of the program from which the excerpt(s) is taken or the minimum program fee of the program in which the excerpt(s) is used, whichever is higher. If such excerpt(s) is longer than three (3) minutes, Producer shall negotiate the payment for such use with each performer appearing in such excerpt(s) with a minimum payment of the minimum program fee of the program in which the excerpt(s) is used. For subsequent broadcasts of the program in which the excerpt(s) is used, the performer shall receive replay fee(s) based on the minimum program fee paid for the use of the excerpts(s). None of the above payments may be credited against the performer's overscale compensation or individual guarantee. Only excerpts from a single episode are aggregated to measure whether the excerpt(s) is longer than three (3) minutes for purposes of determining whether the Producer is required to negotiate the payment for such use with the performer(s) appearing in the excerpt(s).

(b)     If the excerpt(s) is used on a local program, Producer shall pay each performer appearing in such excerpt(s) fifty percent (50%) of the payments provided in subparagraph (2)(a) above.

(3)     Use of excerpts in accordance with this Paragraph 73.D. shall not be deemed replays of the program(s) from which the excerpt(s) is taken.

(4)    Nothing herein shall require additional payment to a performer in an excerpt(s), if such performer is otherwise engaged to perform services on the program in which the excerpt is utilized.

(5)    The provisions of this Paragraph 73.D. shall apply to compilation programs.

(6)    No compensation shall be payable pursuant to this Paragraph 73.D. to a background actor.

(7)    The production company which actually produces the program containing excerpts requiring payment shall be obligated to make such payment, but if such Producer is not a signatory to this Code, Producer shall remain liable for payments due hereunder.

(8)    (a)    In the event that more than seventy-five percent (75%) of a program (except a program produced for pay television or video discs/videocassettes, which is covered by Paragraph 73.D.(10)), consists of excerpts, all performers appearing in the excerpts shall be paid not less than two (2) times the minimum program fee of the program from which the excerpt(s) is taken or two (2) times the minimum program fee of the program in which the excerpt(s) is used, whichever is higher, based upon the performers' original performance category. No excerpts from a program may be used under this subparagraph (8), except as set forth below in the second paragraph of this paragraph (8)(a), without the consent of the performers appearing in the excerpts, which consent must be obtained at the time of contemplated use hereunder unless the performer has given prior written consent specifically referring to this subparagraph (8). However, if the Producer has made a *bona fide* attempt to locate the performer and is unable to find the performer, the Producer shall notify SAG-AFTRA, and if SAG-AFTRA is unable to find the performer within a reasonable time, the Producer may use such excerpt(s) without consent. In the event a performer(s) and the Producer negotiate for such excerpt use and performer(s) refuses to grant consent for the use of such excerpt(s), Producer may appeal the reasonableness of such refusal to a committee established by SAG-AFTRA's National Board of Directors, and both Producer and performer shall be bound by the determination of such Committee. None of the above payments may be credited against the performer's overscale compensation or individual guarantee.

Notwithstanding the foregoing, no consent is required for the use of excerpts from episodes of a single series (including a daytime serial) in a program, which consists of seventy-five percent (75%) or more excerpts, produced for telecast as: i) a regular or special episode or retrospective program of that series, or ii) a retrospective program related to a series that is no longer on the air, provided that consent shall be required of specialty acts in variety program excerpts.

(b)    If the excerpts are used on a local program, the Producer shall pay each performer appearing in such excerpts fifty percent (50%) of the payments provided in subparagraph (8)(a) above.

(c)    As an alternative to obtaining consent as permitted in subparagraph (a) above, the Producer may use the following procedure to obtain the consent of any performer whose appearance is incidental to the compilation program and to the excerpt(s) in which he or she appears:

80

(i)    The Producer will send a written consent request by certified mail, return receipt requested, or other means whereby delivery to the performer can be verified, to the performer's last known address on file with the local SAG-AFTRA office, or to an address known to the Producer to be more recent. A postage pre-paid, addressed envelope will be enclosed for the performer's response. The Producer will make a good faith effort to send a copy of this consent request to a known agent of the performer, but failure to do so shall not affect the validity of this request.

(ii)    The consent request shall include the following notice to the performer:

"If you fail to respond to this request within fifteen (15) business days of its delivery, the Producer will be deemed to have obtained your consent to use the excerpts for the compilation program(s), as described in the request."

(iii)    If neither the performer nor an agent acting on behalf of the performer responds within fifteen (15) business days of the request's delivery, the Producer will be deemed to have obtained the performer's consent to use the excerpts for the compilation program(s) as described in the request.

(9)    Nothing herein shall affect Producer's right to replay an edited-down program, where editing is required by program time exigencies, provided that all performers who appear in the original program shall be paid their applicable replay fee.

(10)    If an excerpt from a program produced for free television under this or any previous Network Television Code is used in a program produced for pay television, video discs/videocassettes or basic cable, the provisions of this subparagraph 73.D. shall apply.

(a)    In the event more than seventy-five percent (75%) of such a program produced for pay television consists of excerpts, Producer shall pay each performer, irrespective of the number of excerpts in which he/she appears, a single payment of twice the highest minimum program fee applicable to his/her performance in any program from which an excerpt is being taken or two (2) times the minimum program fee of the program in which the excerpt(s) is used were it produced for free television, whichever is higher. In the event such compilation program is produced solely for video disc/videocassette release, Producer shall pay each performer a single payment of the highest minimum program fee applicable to his/her performance in any program from which an excerpt is being taken, or the minimum program fee of the program in which the excerpt(s) is used were it produced for free television, whichever is higher. Such initial payment shall entitle the Producer to the use set forth in Paragraph 2.B. of Exhibit E of this Code. Additional compensation shall be paid pursuant to the provisions of Paragraphs 3, 5 and 7 of Exhibit E of this Code. None of the above payments may be credited against the performer's overscale compensation or individual guarantee.

No excerpts from a program may be used under this subparagraph (10) without the current consent of the performers appearing in the excerpts unless the performer has given prior written consent specifically referring to subparagraph 8 in the 1985-1988 Network TV Code or subparagraph 10 in a subsequent Network TV Code, or combination thereof. Where the Producer has been unable to locate

81

the performer in order to obtain his/her consent, SAG-AFTRA agrees to assist the Producer in locating the performer.

(b)     <u>Additional Option for Serials</u>:

As an additional option, serial producers may release compilation programs to the videocassette market with the payment of $150.00 per performer per videocassette compilation program, as an advance against future Supplemental Market payments, if any, as provided in Exhibit D: *i.e.*, 4.5% for the first $1,000,000.00 of distributor's gross and 5.4% thereafter. Under such option the producer is prohibited from obtaining the performer's consent at the time of initial employment and must do so at the time of contemplated use. For this Paragraph (10)(b) only, a performer may consent to the incorporation of one (1) or more excerpts into one (1) or more videocassette compilation programs at any time other than during initial employment or subsequent contract negotiations provided the material to be used as an excerpt(s) was produced and broadcast prior to the date of consent and provided that the consent agreement shall specify the time period over which such performances were made, the name of the program(s) from which the excerpt(s) are taken, and the number of videocassette compilation programs to be produced. Further, such consent agreement must specifically set forth the above-referenced payment of $150.00 per videocassette compilation program and that such payment is an advance against future Supplemental Market payments, if any, as provided in Exhibit D. None of the above payments may be credited against the performer's overscale compensation or individual guarantee.

If SAG-AFTRA believes the industry has abused the practices of free distribution of cassettes for promotional purposes the issue may be referred to the Joint Committee.

(c)     (i)     If the Producer has made a *bona fide* attempt to locate the performer and is unable to do so, the Producer must notify SAG-AFTRA, and if SAG-AFTRA is unable to locate the performer within a reasonable time, the Producer may use such excerpts without consent.

            (ii)     In the event a performer and the Producer negotiate for the use of an excerpt and the performer refuses to grant consent for the use of such excerpt, the Producer may appeal the reasonableness of such refusal to a committee established by SAG-AFTRA's National Board of Directors, and both the Producer and performer shall be bound by the determination of the Committee.

            (iii)     As an alternative to obtaining consent as permitted in subparagraphs (10)(a) and (b) above, the Producer may use the following procedure to obtain the consent of any performer whose appearance is incidental to the compilation program and to the excerpt(s) in which he or she appears:

                        A.     The Producer will send a written consent request by certified mail, return receipt requested, or other means whereby delivery to the performer can be verified, to the performer's last known address on file with the local SAG-AFTRA office, or to an address known to the Producer to be more recent. A postage pre-paid, addressed envelope will be enclosed for the performer's response. The Producer will make a good faith effort to send a copy of this consent

82

request to a known agent of the performer, but failure to do so shall not affect the validity of this request.

B. The consent request shall include the following notice to the performer:

If you fail to respond to this request within fifteen (15) business days of its delivery, the Producer will be deemed to have obtained your consent to use the excerpts for the compilation program(s), as described in the request.

C. If neither the performer nor an agent acting on behalf of the performer responds within fifteen (15) business days of the request's delivery, the Producer will be deemed to have obtained the performer's consent to use the excerpts for the compilation program(s) as described in the request.

(iv) Payment for use of the excerpts described herein shall be made in accordance with the applicable provisions set forth in subparagraph (10)(a) and (b) above.

(v) Excerpts of not more than an aggregate of one (1) minute in length from a single compilation videocassette may be used to promote the sale of that videocassette without additional compensation, provided that where multiple videocassettes are being promoted together, each excerpt used is from at least one of the videocassettes being promoted for sale, and provided further that the promotional announcement may not exceed three (3) minutes in length.

E. The provisions of subparagraph B. of this Paragraph 73 shall not apply to recordings of commercial inserts, cut-ins, hitch-hikes and cow-catchers, or other services covered by Paragraph 4 of this Code, and the following shall apply:

When a performer is engaged pursuant to this Code, whether the performance is actually done "live" or is pre-recorded from an audition or rehearsal or in any other manner (so long as the artist's engagement is for a "live" performance), payment for commercials (announcements, cut-ins, hitch-hikes, cow-catchers, or otherwise) shall be made pursuant to the provisions of Paragraphs 2, 4, 26, 27 and 46 of this Code, as applicable.  When such "live" announcement is replayed as part of the program in which it was originally included payment shall be: (1) for performers and chorus singers and dancers paid pursuant to Paragraph 46.G. and H. for the original "live" performance - the applicable payment provided in Paragraph 46.G. and H. will be made for the commercial announcement services in addition to the payment pursuant to subparagraph B. of this Paragraph 73 for replay of the program; (2) for performers, including announcers, in performances other than in (1) above - the full applicable payment made for the commercial announcement services, or the program rate if originally paid, but in no event more than the full applicable program rate pursuant to Paragraph 2 or Paragraph 4, as applicable.

In the event such "live" announcement is replayed as a separate announcement, or as part of a program other than that in which it was originally included, payment shall be made pursuant to the provisions of the SAG-AFTRA Television Recorded Commercials Contract.

In no event shall the provisions of the SAG-AFTRA Television Recorded Commercials Contract be construed as applicable to any announcement referred to in this paragraph unless the individual contract of the performer contains a specific provision so authorizing the additional broadcast use of his services in the

announcement and a copy of such contract shall be filed and approved by SAG-AFTRA prior to any use under the said Recorded Commercials Contract.

Approval by SAG-AFTRA shall be presumed unless notice to the contrary is given to Producer within forty-eight (48) hours after receipt of the contract by SAG-AFTRA.

F.   <u>International Television</u>:

(1)   Producer recognizes the jurisdiction of SAG-AFTRA over the programs, broadcasts and persons set forth in subparagraphs (a), (b), and (c) below to the extent provided therein.

(a)   Subparagraph (2) below shall be applicable to network programs as set forth in Paragraphs 70, 71 and 72 of this Code, which employ talent covered by this Code, when such programs are broadcast on any station located in the "foreign areas" herein described in subparagraph (2)(b) below if one (1) or more of the conditions set forth in (i), (ii) or (iii) below are met:

(i)   The foreign broadcast by satellite, cable or other means now or hereafter developed is simultaneous with a broadcast in the United States, its territories or possessions, or Canada, or the affiliates named in Paragraph 71 (hereinafter referred to as the "domestic area");

(ii)   The program is broadcast and recorded in the domestic area and the recording is delivered to, and broadcast in, the "foreign area;"

(iii)   The program is broadcast in the domestic area, transmitted by satellite, cable or other means now or hereafter developed to the "foreign areas," and recorded and broadcast in the "foreign areas."

(b)   This subparagraph (1)(b) shall be applicable to programs produced in the United States but not broadcast in the domestic area, by signatories to this Code for telecast in the "foreign areas" if such programs meet all the conditions for coverage under Paragraph 70 or 72 of this Code other than the requirement of being a network program as defined in Paragraph 71.  This subparagraph (1)(b) is intended to be applicable to such programs if (i) the foreign broadcast takes place simultaneously with the live production in the United States, (ii) the foreign broadcast takes place after recording in the United States but simultaneously with the transmission from the United States to a "foreign area," or (iii) the foreign broadcast takes place subsequent to live production in the United States and the program is recorded either in the domestic area or a "foreign area" for foreign broadcast.  Persons performing services of the type covered by Paragraph 75 of this Code in programs covered by this subparagraph (1)(b) shall receive a minimum of seventy-five percent (75%) of the otherwise applicable minimum network program fees which shall cover all broadcasts and replays in the "foreign area."  If such program is subsequently broadcast as a network television program in the domestic area, each such person shall be paid the same fees for domestic and foreign broadcast as would have been applicable if the program had been covered originally by subparagraph (1)(a) above, and Producer may credit towards such payment the amount paid to such person pursuant to this subparagraph (1)(b).

84

(c)     This subparagraph (1)(c) shall be applicable to persons covered by Paragraph 75 of this Code who are engaged in the United States by a signatory to the Code and are sent from the United States to a "foreign area" to perform services for a program covered by Paragraph 70 of this Code which is intended for broadcast as a network television program in the domestic area.  Such persons shall be covered by the rates and conditions of this Code, including the rates set forth in subparagraph (2) hereof, if such program is also broadcast in any of the "foreign areas."  SAG-AFTRA agrees to give waivers in proper cases upon application by the Producer with respect to working conditions on such programs.

(2)     (a)     This subparagraph (2) shall be applicable to:

(i)     programs as set forth in subparagraph (1)(a) above;

(ii)    talent covered by the Code who appear in the broadcast of a network program as described in (i) above who receive compensation for the original telecast in the United States at the full SAG-AFTRA minimum fee, or in excess of the full SAG-AFTRA minimum fee up to, but not over, 1) twice the full SAG-AFTRA minimum fee including all payments for additional rehearsal and doubling in the case of news, sports or public affairs programs, or 2) $1,600.00 for a thirty (30) minute serial program, or 3) $2,000.00 for a sixty (60) minute serial program, or 4) 2.68 times the applicable minimum program fee in effect on November 16, 1982 for all entertainment programs other than as set forth in 2) and 3) above;

(iii)   talent covered by the Code who appear in the broadcast of a network program as described in (i) above who receive compensation for the original telecast in the United States in excess of 1) twice the full SAG-AFTRA minimum fee including all payments for additional rehearsal and doubling in the case of news, sports or public affairs programs, or 2) $1,600.00 for a thirty (30) minute serial program, or 3) $2,000.00 for a sixty (60) minute serial program, or 4) 2.68 times the applicable minimum program fee in effect on November 16, 1982 for all entertainment programs other than set forth in 2) and 3) above;

(iv)    Producer shall not be required to make payment of any additional fees for broadcasts in "foreign areas" to performers engaged to perform solely as background actors as defined herein.

(b)     The "foreign areas" involved in this Paragraph 73.F. are:

(i)     "The British Isles and Cyprus" (hereinafter referred to as Area 1).

(ii)    "Europe" (hereinafter referred to as Area 2).

(iii)   "Africa" (hereinafter referred to as Area 3).

(iv)    "Asia and Australia" (hereinafter referred to as Area 4).

(v)     "The Americas" (hereinafter referred to as Area 5).
        For the Purposes of this Paragraph 73.F.:

Area 1 includes:    England, Scotland, Wales, Ireland and the Island of Cyprus.

Area 2 includes:    All European countries including Iceland, but excluding those countries in Area 1.

Area 3 includes:    The entire continent of Africa and adjacent islands including the Island of Madagascar.

Area 4 includes:    The continents of Asia and Australia, New Zealand, Japan, the East Indies and all the islands in the Pacific and Indian Oceans (except those adjacent to the continents of Africa, North America and South America).

Area 5 includes:    Central America, Mexico, South America, Greenland, the Caribbean Islands and all other islands adjacent to the American continents.

(c)    Producer shall have the right to license, authorize, permit, or cause network programs (as described in subparagraph (a)(i) above) to be broadcast by each station located in each of the "foreign areas," subject to the following payments to the talent described in subparagraph (a)(ii) and (iii) above:

(i)    1.    for broadcasts by one (1) or more stations in Area 1, twenty-five percent (25%) of the basic minimum appropriate program fee contained in the Code;

    2.    for serial programs only, sold on or after March 12, 1993, for broadcast by one (1) or more stations in Area 1, ten percent (10%) of the basic minimum appropriate program fee contained in the Code;

(ii)    for broadcasts by one (1) or more stations in Area 2, ten percent (10%) of the basic minimum appropriate program fee contained in the Code;

(iii)    for broadcasts by one (1) or more stations in Area 3, five percent (5%) of the basic minimum appropriate program fee contained in the Code;

(iv)    for broadcasts by one (1) or more stations in Area 4, five percent (5%) of the basic minimum appropriate program fee contained in the Code;

(v)    for broadcasts by one (1) or more stations in Area 5, five percent (5%) of the basic minimum appropriate program fee contained in the Code;

(vi)    upon payment of fifty percent (50%) (thirty-five percent (35%) for serial programs only sold on or after March 12, 1993) of the basic minimum appropriate program fee contained in the Code, Producer shall have the right to broadcast network programs in accordance with the provisions of this Paragraph 73.F. in all of the "foreign areas."

(vii)    for dramatic programs, other than daytime serials, after performer has received the percentage of the basic minimum appropriate program fee for any Area(s) as provided in (i)

86

through (vi) above, performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of:

1.  $365,000 in Distributor's Foreign Gross for one-half (½) hour programs;

2.  $730,000 in Distributor's Foreign Gross for one (1) hour programs;

3.  $1,860,000 in Distributor's Foreign Gross for programs more than one (1) hour in length but not more than two (2) hours in length;

4.  $3,120,000 in Distributor's Foreign Gross for programs more than two (2) hours in length but not more than three (3) hours in length;

5.  $4,170,000 in Distributor's Foreign Gross for programs more than three (3) hours in length but not more than four (4) hours length;

6.  $5,210,000 in Distributor's Foreign Gross for programs more than four (4) hours in length but not more than five (5) hours in length;

7.  $6,250,000 in Distributor's Foreign Gross for programs more than five (5) hours in length but not more than six (6) hours in length; and

8.  for programs in excess of six (6) hours, the above applicable thresholds will increase proportionately.

(viii)  for any non-dramatic program or daytime serial program, after performer has received the percentage of the basic minimum appropriate program fee for any Area(s) as provided in (i) through (vi) above, all performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of:

1.  $182,500 in Distributor's Foreign Gross for one-half (½) hour programs;

2.  $365,000 in Distributor's Foreign Gross for one (1) hour programs;

3.  $930,000 in Distributor's Foreign Gross for programs more than one (1) hour in length but not more than two (2) hours in length;

4.  $1,560,000 in Distributor's Foreign Gross for programs more than two (2) hours in length but not more than three (3) hours in length;

5.  $2,083,000 in Distributor's Foreign Gross for programs more than three (3) hours in length but not more than four (4) hours in length;

6.  $2,605,000 in Distributor's Foreign Gross for programs more than four (4) hours in length but not more than five (5) hours in length;

7.      $3,125,000 in Distributor's Foreign Gross for programs more than five (5) hours in length but not more than six (6) hours in length; and

8.      for programs in excess of six (6) hours, the above applicable thresholds will increase proportionately.

(ix)    payment of an amount equal to thirty-five percent (35%) of the basic minimum appropriate program fee (including any payments for foreign basic cable and/or any foreign area payments in (i) - (vi) above) constitutes payment for foreign basic cable; provided, however, that foreign basic cable receipts shall apply to "Distributor's Foreign Gross" for purposes of reaching the thresholds in and determining the amount the performers shall be paid pursuant to subparagraphs 1. through 8. of (vii) and (viii) above. Notwithstanding the foregoing, both parties reserve their respective positions regarding the payment of foreign cable residuals under the Area formula under Codes prior to the effective date of the 2001 Code.

(x)     provided that Producer shall have given written notice to SAG-AFTRA of such election prior to the first broadcast in any "foreign area;" and further provided that such election by Producer shall be irrevocable as to that program or series of programs after receipt by SAG-AFTRA of such notice as an alternative to the method of payment pursuant to the provisions of this subparagraph 73.F.(2)(c)(i) through (ix) above, Producer may elect to make payments for foreign use of a particular program or programs in accordance with Section 18(c) of the SAG-AFTRA Television Agreement. However, in lieu of Section 18(c)(4) of the SAG-AFTRA Television Agreement, the following provisions shall apply:

1.      For dramatic programs, other than daytime serials, after performer has received a total of thirty-five percent (35%) of the basic minimum appropriate program fee, all performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of the amounts set forth in Subparagraphs 73.F(2)(c)(vii)1. through 8. above.

2.      For any non-dramatic or daytime serial program, after performer has received a total of thirty-five percent (35%) of the applicable minimum program fee, all performers in the aggregate shall be paid three and six-tenths percent (3.6%) of the Distributor's Foreign Gross in excess of the amounts set forth in Subparagraphs 73.F(2)(c)(viii)1. through 8. above.

3.      In order to preserve the status quo in Section 18 of the SAG-AFTRA Television Agreement and Paragraph 73.F. of the SAG-AFTRA Code, payment of the thirty-five percent (35%) of applicable minimum under the foreign telecasting formula continues to constitute payment for foreign basic cable; provided, however, that foreign basic cable receipts shall apply to "Distributor's Foreign Gross" for purposes of reaching the thresholds in and determining the amount the performers shall be paid

88

pursuant to subparagraphs 1. through 8. in (vii) and (viii) above.

(xi)    For programs that are originally exhibited in more than one (1) part, the applicable threshold levels referred to in subparagraph 1. through 8. of (vii) and (viii) above shall be applied to each part of the program as originally exhibited, irrespective of the manner in which the program is exhibited on foreign television.

(xii)    The performers shall receive such additional monies, as provided in (vii), (viii), (x)1. and (x)2. above, pursuant to the payment provisions of Exhibit D, Sections 3 and 5 of the SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting, except that payment and reporting shall be due every six (6) months or at such other time as may be agreed upon in writing by the parties.

(d)    Producer's right under subparagraph 73F.(2)(c) shall be subject to the securing of such specific right in writing from the talent described in subparagraph 73F.(2)(a)(ii) above, and notifying SAG-AFTRA promptly thereof.  SAG-AFTRA agrees that it will not influence such talent to obtain additional payments for such right, but nothing herein contained shall be deemed to prohibit such talent from negotiations for additional compensation for such right. Nothing herein contained shall be deemed to prohibit Producer and such talent from agreement to apply overscale payments in excess of 1) twice the full SAG-AFTRA minimum fee including all payments for additional rehearsal and doubling in the case of news, sports or public affairs programs, or 2) $1,600.00 for a thirty (30) minute serial program, or 3) $2,000.00 for a sixty (60) minute serial, or 4) 2.68 times the applicable minimum program fee in effect on November 16, 1982 for all entertainment programs other than set forth in 2) and 3), above as compensation for such right.  Provided that for serial programs produced after February 28, 1995, Producer shall not have the right to credit foreign residual payments against performer's overscale compensation.

(e)    Applicable payments shall be made only upon actual broadcast of a network program by a station or stations located in a "foreign area," and shall be made within ninety (90) days following such broadcast. Producer agrees to furnish SAG-AFTRA immediately after the execution of this Code with a current list of network programs played in each of the "foreign areas" and on what stations, and to furnish further reports to the same effect every ninety (90) days.

(f)    SAG-AFTRA agrees that it will not enter into any agreement with any signatory to the SAG-AFTRA Code (in good standing) using Producer's facilities which would invalidate the operation of this Agreement.

(g)    Producer agrees that for all recordings (as described in Paragraph (a)(i) above) of shows broadcast in the "foreign areas," from June 18, 1957 until September 1, 1958, payments will be paid to each performer described in Paragraph (a)(ii) above on the same basis as provided in Article 73(f) B.3 of the 1960-63 National Code of Fair Practice for Network Television Broadcasting, provided such performer executes an appropriate release approved by SAG-AFTRA.

89

(h)    Payments made hereunder shall be subject to the additional payments required by Paragraph 102 and Paragraph 102.A. of the Code.

(i)    Producer agrees that it will not for the purpose of evading any of its obligations under this Paragraph 73.F. sublet or transfer responsibility hereunder to any third person, firm or corporation. In the event that any person, firm or corporation licensed, authorized or permitted by Producer to broadcast network programs on any stations in the "foreign areas" engages in any conduct which contravenes any provisions of this Paragraph 73.F., Producer agrees to assume responsibility therefor and, further, to take prompt action, including legal measures, if necessary, to prevent such conduct by any such person, firm or corporation, and to keep SAG-AFTRA fully apprised of all steps it has undertaken.

(j)    Producer agrees for the purposes of this Paragraph 73.F. only that the stations located in the "foreign areas" are not affiliates of the network regardless of any agreement between the network and said stations, and further that for the purposes of this Paragraph 73.F. only network programs broadcast on said stations do not supplement the network within the meaning of the Code.

(k)    Any dubbing with respect to any of the recordings of network programs covered by this Paragraph 73.F. which is done in the United States shall be within SAG-AFTRA's jurisdiction, and shall be paid for at the applicable Code rates.

(l)    It is the intent of the descriptions of Areas 1 to 5 in this Paragraph 73.F. to include the entire world, except as specified below, and where an area is not explicitly covered by the descriptions of Areas 1 to 5 it shall be considered a part of the most appropriate Area. Anything to the contrary in this Paragraph 73.F. notwithstanding, the foreign areas (Areas 1 to 5) do not include the countries, territories, possessions and affiliated stations referred to in Paragraph 71 of this Code.

G.    In no event shall program openings or closings, or lead-ins or lead-outs, be broadcast except as an integral part of the program in which the original "live" performance was rendered.

H.    It is agreed that Producer may (1) use or authorize others to use recordings of programs for direct projection exhibition in film festivals and competitions, and/or (2) authorize the Armed Forces, clubs or religious, educational or charitable organizations (as distinguished from the general public) to use a recording of a public affairs program for direct projection purposes within one (1) year from the date of broadcast of the program or term of this Code, whichever is greater. The rights granted in (1) and (2) above shall obtain so long as Producer does not derive profit from such uses and so long as such recordings are not, except with the prior consent of SAG-AFTRA, used for direct projection exhibition in any theatre, auditorium or other place if a separate admission fee is charged for such exhibition.

## 74.   CLOSED CIRCUIT PROGRAMS

A.    When a closed circuit program is produced in New York, Chicago, Los Angeles, or Washington, D.C. and is shown in one (1) of the aforesaid cities and in one (1) or more other cities, or is not shown in one (1) such city but is shown in two (2) or more other cities, each person who performs therein as talent (within the coverage of Paragraph 75) shall be paid the applicable network sustaining rates. Producer shall make payments to the AFTRA Health and Retirement Funds in accordance with Paragraph 102 and Paragraph 102.A. of this Code with respect to such

performers on such closed circuit programs and, except as otherwise specifically provided in this Paragraph 74, all terms and conditions of employment (including rehearsal provisions) in this Code which are applicable to the production of network television programs shall apply to such closed circuit programs.

B.    Excluded from this Paragraph 74 are (i) star performers who appear in a closed circuit program which includes promotion of a program or program series in which they are or will be starred, and (ii) executives of the producer or co-producer of the program or executives of the sponsor of the program.

C.    The provisions of Paragraph 73 of this Code shall apply to closed circuit programs hereunder, except that supplemental closed circuit use in an area where the program has not previously been shown, for which no additional payment is required, shall be limited to a period within thirty (30) days after the original closed circuit showing.  In no event shall a closed circuit program be deemed a syndicated program for any purpose.

D.    Producer may release or exhibit a closed circuit program hereunder for direct projection purposes before non-paying audiences, upon payment of additional compensation to the performers involved in the amount of forty percent (40%) of the applicable closed circuit minimum for each year of direct projection use commencing with the first such use.

E.    When a closed circuit program is produced in New York, Chicago, Los Angeles, or Washington, D.C., and is shown in such producing city only, or is not shown in such city but is shown in only one (1) other city, an appropriate rate, less than the network sustaining rate, for the talent on such program may be negotiated by the Producer and the SAG-AFTRA Local.

F.    This Paragraph 74 shall not apply to the closed circuiting of industrial or trade shows.

G.    Nothing contained in this Paragraph 74 shall be deemed to prohibit closed circuit showing of recordings of network television programs, or excerpts therefrom, produced under this Code or its predecessor Codes.  Nothing in this Paragraph 74 shall apply to film television programs, or excerpts therefrom, used in connection with closed circuit programs.  Excerpts shall not include film sequences made especially for the entertainment portion of a closed circuit program.

## 75.   <u>PEOPLE COVERED</u>

A.    All persons who perform as talent, *e.g.*, actors; comedians; masters-of-ceremonies; quiz masters; disc jockeys; singers; dancers; announcers (other than staff duties of staff announcers); sportscasters; specialty acts; stunt persons; background actors; puppeteers; reporters and analysts (with the exception of government employees and persons who are engaged occasionally on a single program basis because they are specialists whose regular employment or activity is in the field in which they report, such as college professors and scientists) in the fields of home economics, fashion, farm and rural subjects, and market reports; models; moderators; members of panel where format of program requires such persons to participate generally in entertainment.  Excluded from the provisions of this agreement are members of panel who take part in discussion of news, education, or public affairs programs, or persons who act only as judges of contests; provided that services of staff newspersons on such panel programs shall be subject to their respective staff agreements.

This Code also applies to all persons other than staff newspersons rendering services in the field of news including but not limited to commentators and analysts and persons who criticize, review and/or comment on the following: books, the fine arts, music, sports, the theatre, movies, dance, radio, television, society, and travel; and including persons who perform in live, film, or recorded news inserts in

network television programs.   However, management personnel delivering editorials are excluded from the coverage of this Code.

Services in the field of news covered by this Code under the preceding subparagraph shall be paid for under the terms, conditions and rates applicable to announcers; provided, however, that

(1)   with respect to news or public special events programs, if the program is two (2) hours or less in length, payment shall be made at the rates provided in this Code for the category of the person performing such services; but if the program is more than two (2) hours in length:

(a)   payment for services on such program shall be made at the two (2) hour rate plus an additional amount which shall be the subject of individual negotiation, provided that in the case of special events such as political conventions and the like, the Local Executive Director of the appropriate SAG-AFTRA Local, or such person as may be designated by the National Executive Director of SAG-AFTRA may, at his discretion, undertake the said individual negotiation on behalf of the SAG-AFTRA member involved;

(b)   payment for services in one (1) or more separate portions of the program shall be made for each separate portion as if it were a complete program, or instead, payment shall be in accordance with subdivision (i) above;

(c)   payment for services on such program by staff newspersons and staff announcers shall be governed by the provisions of their respective staff agreements.

(2)   live, film or recorded news inserts originating from New York, Chicago, San Francisco, Los Angeles, or Washington, D.C., of five (5) minutes or less in length broadcast on network news programs of any length shall be paid for at the rate of $164 ($167 effective November 16, 2015 and $170 effective November 16, 2016) per person for each such insert; and the foregoing shall be applicable to such news inserts by those persons who criticize, review and/or comment as set forth in the first sentence of the second paragraph of this Paragraph 75.A., whether such insert originates inside or outside the studio from which the program originates.   For such payment any news insert covered by this subparagraph (2) may be used for an unlimited number of broadcasts within twenty-four (24) hours of the original broadcast and for a further payment of $107.00 it may be used for an unlimited number of broadcasts for an additional seven (7) days; and

(3)   the program rate, rather than the news insert rate set forth in subparagraph (2) above, shall apply when a program is made up solely of news inserts.   If a news or public special event is simultaneously broadcast on two (2) or more networks on a program of two (2) hours or less in length as a result of one (1) network making its origination available to other networks, persons covered under this Paragraph 75 who are assigned by the originating network to appear and do so simultaneously on two (2) or more such networks shall be paid an additional twenty-five percent (25%) of the applicable minimum program fee for each additional network carrying said program; provided, however, that nothing herein shall apply to any such broadcast from political conventions.   For the purposes of this subparagraph, a program shall be deemed to be simultaneously broadcast if a broadcast on an additional network is within three (3) hours of the broadcast on the originating network.

B.   If a person covered under this Paragraph 75 assigned to perform services in the field of news by the originating network obtains a news story (but excluding general news conferences and open interviews) on which his voice is heard and/or his image

92

appears and that story is made available by the originating network to another network or to an independent station, such person shall be paid the following amounts when that story is telecast (provided no other newsperson's identifiable voice or image occurs or appears in such story) with his voice and/or image by such other network or such independent station:

Fifty percent (50%) of the applicable minimum fee for each such other network;

Twenty-five percent (25%) of the applicable minimum fee for each such other independent station, unless made available pursuant to the provisions of Paragraph 76 below; provided, however, that no more than one-hundred percent (100%) of the original applicable minimum fee shall be payable under this Paragraph to any person for a single story. A person who is paid for such story pursuant to the final paragraph of Paragraph 75.A. shall not be entitled also to be paid under this paragraph.

C.     Except as otherwise provided in Paragraph 75.B. and Paragraph 76, nothing in this Code shall be construed as requiring the payment of additional compensation to any person rendering services in the field of news for using an excerpt of five (5) minutes or less from a news program in any other news programs; provided, however, that if any other such news program is made up entirely of such excerpts the replay percentages set forth in Paragraph 73.B. shall be applicable. When an entire news program (whether or not re-edited) or an excerpt from a news program of more than five (5) minutes in length is replayed and such replay contains the voice and/or image of a person performing services in the field of news, the replay percentages set forth in Paragraph 73.B. shall be applicable to such person.

D.     The Producer shall have the right to use *bona fide* amateurs on *bona fide* amateur programs from time to time, provided that such programs shall not be grouped so as to constitute a series, and provided further that such amateur gives the Producer a written statement that he has not previously appeared as an amateur more than once in the then current calendar year.

SAG-AFTRA agrees to give a waiver for persons employed for not more than one (1) performance each year during the term of this Agreement, because of reputation acquired in fields other than the amusement field.

Choirs and choruses of denominational religious organizations on programs of a religious nature which are not sponsored by any advertiser shall be excluded from the provisions of this Agreement.

Participants from the audience in audience participation programs and interviewees from the audience on any program are excluded from this Agreement.

E.     This Code also applies to professional performers appearing as interviewees on entertainment programs (except as set forth in the following Paragraph) and to physical demonstrators on entertainment programs unless the demonstration is incidental to an appearance in an interview capacity. A professional athlete interviewed primarily in connection with his athletic reputation or endeavors is not a professional performer for purposes of this provision. In any event, sports programs, including programs of the type of Wide World of Sports as that program was formatted during the 1979-1980 broadcast season, are not entertainment programs for the purpose of this provision.
This Code shall not apply to a professional performer who appears only as an interviewee or as a participant in a panel discussion on an entertainment program, provided that the following conditions are satisfied: 1) such professional performer is not widely known as a professional performer in the entertainment field; 2) the performer's appearance is not scripted and is not a planned performance; 3) there is no exploitation of the performer's name as a performer in the entertainment industry; and 4) the performer does not appear on the same program on a regular basis.

93

Additionally, Section 75(e) does not apply to star performers who appear as interviewees on talk shows, if their interview concerns a humanitarian cause or topic of special concern to the star performer, and the performer is notified at the time of the engagement that there is no fee for the appearance.

In the case of a star performer appearing as an interviewee on a non-dramatic entertainment program, the applicable minimum payment shall be fifty percent (50%) of the 30-minute principal performer program fee provided such interview:

(1)     does not involve significantly more time than is reasonable and customary for an engagement of this type (which is usually not more than four (4) hours, exclusive of travel time) and

(2)     is primarily in a "Q&A" format.

## 76.   NEWS SERVICE

A.    Any person rendering services on behalf of Producer in the field of news of the type covered by this Code under Paragraph 75.A. who performs in live, film or recorded news stories not exceeding five (5) minutes in length which originate within the continental limits of the United States and which are made available by Producer for telecast on a non-interconnected basis by two (2) or more stations as part of their local news programs shall be paid by Producer one (1) single payment of $99 ($101 effective November 16, 2015 and $103 effective November 16, 2016 or each such news story in which such person is seen or heard, up to a maximum of per day of $193 ($197 effective November 16, 2015  and $201 effective November 16, 2016 for all news stories made available by Producer on any day, provided:

    (1)     such person is employed by Producer in New York, Los Angeles, Chicago, San Francisco or Washington, D.C., and said news story originates from such city or originates from another city within the continental limits of the United States when such person is sent to such other city for the purpose of making such origination; or,

    (2)     such person's employment is otherwise covered under a SAG-AFTRA contract with a station if such contract covers services in the field of news.

        For the payment made pursuant to this Paragraph 76, Producer may allow each local station either or both of the following: (a) an unlimited number of such telecasts within forty-eight (48) hours after the news story has first been made available by Producer hereunder; (b) one (1) such telecast after such forty-eight (48) hour period but within seven (7) days after the news story has first been made available by Producer.

B.    If a news story covered by this Paragraph 76 is broadcast by Producer on a network television program, payments made for such network broadcast may be credited against any payments due under this Paragraph.

C.    If Producer assigns an announcer to perform introductions, lead-ins, lead-outs and the like for news stories made available for telecast by local stations, Producer shall not permit any such local station to telecast under the terms of this Paragraph 76.B. the voice or image of such announcer, as distinguished from the voices or images of the persons appearing or heard in such news stories.

D.    Producer's total obligation for work which is covered only by this Paragraph 76 shall be to make the payments specified in this Paragraph, the payment to the AFTRA Health and Retirement Funds as specified in Paragraph 102, and the payment to the AFTRA Industry Cooperative Fund as specified in paragraph 102.A.

## 77.   CHILDREN'S PROGRAMS

For purposes of this Code, persons sixteen (16) years of age or under are children, and a program is a children's program if seventy-five percent (75%) of the performers on the program are children.

On children's programs, children may be engaged on terms mutually satisfactory to the Producer and the individuals concerned, subject to applicable law; provided that professional children, as that term is understood in the industry, shall be entitled to the applicable minimum fee for adults.  SAG-AFTRA reserves the right, if children's programs become a problem, to request the Producer to enter into negotiations relative thereto.

Children on adult programs shall receive the minimum applicable fee for adults.

### 78.   WAIVERS

SAG-AFTRA will give waivers in proper cases upon application by the Producer to meet any program requirements with respect to working conditions.  Minimum fees are not working conditions.

The wages and working conditions set forth herein are the minimum wages and working conditions for the employment of television artists in the categories mentioned above and no waiver of any such wages or working conditions by any artist shall be effective unless the written consent of SAG-AFTRA to such waiver is first had and obtained.

### 79.   RETROACTIVITY

Because the Producers received notification from SAG-AFTRA by January 15, 2015 that the SAG-AFTRA Code had been ratified, the monetary terms of the Code shall be retroactive to November 16, 2014, unless a later date is specified.

### 80.   MODIFICATION OF PRESENT CONTRACT

The Producer agrees, for the benefit of SAG-AFTRA and all performers employed by the Producer, that existing contracts (whether oral or written), with all performers are hereby modified in accordance herewith, but no terms, wages, or hours now had by any such performers which are more favorable to such performers than the terms, wages, or hours herein specified shall be deemed so modified except that every existing contract shall be deemed to contain Paragraph 102 of this Code entitled, "AFTRA Health and Retirement Funds" and Paragraph 102.A. entitled, "AFTRA Industry Cooperative Fund," with the same force and effect as though set forth word for word, and this provision may not be waived or changed and cannot be used as a credit under Paragraph 56.  If there are any other contracts between or among signatories to this agreement or those who signify their intention of abiding thereby, which require performers to work under terms, wages or conditions less favorable to such performers than this agreement, then, notwithstanding such contracts, it is agreed that this agreement shall, nevertheless, apply for the benefit of all such performers and of SAG-AFTRA.

### 81.   WAIVER OF CAUSE OF ACTION

For the benefit of all members of SAG-AFTRA, and of SAG-AFTRA, and of all other persons and organizations, we hereby waive, relinquish and release any and all claims, rights, actions or causes of action, whether at law, equity, arbitration or otherwise, growing out of the failure of any SAG-AFTRA member or any other person to render services prior to the execution of this Agreement where such failure was occasioned by the SAG-AFTRA members', or other persons', obedience to a strike call (or picketing in connection therewith) heretofore issued by SAG-AFTRA, irrespective of whether the SAG-AFTRA member, at the time of such failure, was under contract to render services, or growing out of the issuance of such strike call or the direction of such picketing by SAG-AFTRA.  The provisions of this paragraph shall survive the expiration (or termination) of this Agreement,

and shall have the same effect as if addressed and delivered personally to every member of SAG-AFTRA and every other person who so failed to render services.

## 82.  INDIVIDUAL CONTRACTS BEYOND TERM OF CODE

We agree that every contract (now or hereafter made) between the undersigned Company and every SAG-AFTRA member shall contain and shall be deemed to contain the following clause:

In the event a performer's individual contract is of longer duration than the said SAG-AFTRA Code, then, for such period of duration and until a new Code is agreed to, we covenant not to bring or maintain any action or proceedings against you, because you refrain from rendering your services under this contract by reason of any strike or work stoppage (whether partial or complete) called or ordered by SAG-AFTRA.  In such event we covenant (a) that neither SAG-AFTRA nor any of its representatives shall be deemed to have induced you to breach this contract, and (b) that for the direct benefit of SAG-AFTRA and its representatives, we will not bring or maintain any action or proceedings against them, or any of them, based upon or arising either out of the existence of this contract or out of your failure to render services under this contract.  Upon the resumption of work after such strike or stoppage, all the terms and conditions of this contract shall be reinstated for the balance of the term hereof; provided, however, that if a collective bargaining agreement covering work of the type provided for herein is signed by us, you will, from and after the effective date provided for in such Agreement, receive the benefit of any applicable provisions of such agreement which may be more favorable to you than the terms of this contract.  We further agree that your obligations hereunder shall be subject and subordinate to your primary obligation to SAG-AFTRA to obey its rules and orders.

The provisions of this Paragraph 82 shall survive the expiration or cancellation of this Agreement as to all such contracts with SAG-AFTRA members in existence while this Agreement is in effect.

## 83.  DEFINITIONS

Wherever in this Code, the first person (such as we, our, us) is used, it means the Producer. Similarly, the second person (you) means SAG-AFTRA.  The terms "Producer" and "Company" are used interchangeably.

## 84.  UNION SHOP

Until and unless the union security provisions of the Labor Management Relations Act, 1947, as amended, are repealed or amended so as to permit a stricter union security clause the following provisions shall apply:

"It is agreed that during the term of this Agreement, we will employ and maintain in our employment only such persons covered by this Agreement as are members of SAG-AFTRA in good standing or as shall make application for membership on the thirtieth (30th) day following the beginning of employment hereunder or the date of execution of this Agreement whichever is the later, and thereafter maintain such membership in good standing as a condition of employment."

In the event that said Act is repealed or amended so as to permit a stricter union security clause the above provision shall be deemed amended accordingly.  The provisions of this paragraph are subject to said Act.

SAG-AFTRA agrees not to impose unreasonable entrance fees or dues upon its members and wherever necessary for the Producer's program purposes to qualify members within twenty-four (24) hours after notice from the Producer.

Producer shall notify the SAG-AFTRA office no later than the time of hiring or seventy-two (72) hours in advance of the first rehearsal session, whichever is later, of the names of the performers to be used on dramatic and variety programs, except where the circumstances do not allow sufficient time to give such notice.  It shall be the duty of the Producer to ascertain if each performer is a member of SAG-AFTRA in good standing, subject to the foregoing, by examining the SAG-AFTRA membership card of each member of the cast at the first rehearsal session of each performer, and to notify the local SAG-AFTRA office of the name of any person failing to present a paid-up membership card. Such notice shall be given to SAG-AFTRA immediately following the first rehearsal session, or if the SAG-AFTRA office is closed at that time, such notice shall be given to the SAG-AFTRA office as soon as feasible on the following work day.

Producer shall send SAG-AFTRA on a monthly basis a list of all persons (including their addresses and social security numbers) performing Sportscaster services covered by the SAG-AFTRA Network TV Code for such Producer pursuant to a personal services contract.  Producer shall also indicate on this monthly list performers (including their addresses and social security numbers) who signed new personal services contracts during that month and those whose personal services contracts expired during that month.  For the sole purpose of notification under this paragraph, Producer shall be the agent for any F/S/O supplying the covered services of a Sportscaster to such Producer.

85.   **SAG-AFTRA RULES**

Producer agrees that he has notice that the performer, if a member of SAG-AFTRA, must obey its rules.  Producer admits specifically notice of the rule which requires the SAG-AFTRA member to render services only upon a program where all the performers within SAG-AFTRA's jurisdiction are members in good standing of SAG-AFTRA, except as otherwise provided by law.  SAG-AFTRA agrees that it has no present rules and will make no future rule in derogation of this Agreement.

86.   **ADMISSION TO PREMISES**

Any representative of SAG-AFTRA shall be admitted to the premises of the Producer or where the rehearsal or broadcast takes place, at any reasonable time, to check the performance by the Producer of this Agreement, but such checking shall be done so as not to interfere with the conduct of the Producer's business.  Producer agrees upon SAG-AFTRA's request to furnish a list of all artists appearing on any program.

87.   **PRODUCTION MEMORANDUM & REMITTANCE REPORT**

Producer agrees to furnish SAG-AFTRA with a production memorandum and remittance report for each individual program signed by an authorized agent of the Producer.  The production memorandum and remittance report shall include the date when the check was issued to the performer and shall give full and specific information, sufficient to permit computation of performer's fee, with respect to the services rendered by the performer and the gross fees paid.  Such information shall be furnished when timely in standard-form reports which will be promulgated by SAG-AFTRA by agreement with representatives of the Broadcasting Industry.  Said memorandum shall be filed with SAG-AFTRA within five (5) days after the time required for payment to the performer and no later.

88.   **USE OF RECORDINGS FOR REFERENCE, FILE, AUDITION, TRAILER OR PROMOTIONAL PURPOSES**

Recordings may be used for reference, file and private audition for prospective sponsors and their agencies.

97

An excerpt from a recording of not more than five (5) minutes in length for television programs less than ninety (90) minutes in length and not more than ten (10) minutes for television programs ninety (90) minutes or more in length, may be used only in television for trailer and promotional purposes for a program, provided that such excerpt may be used at any time before and not more than three (3) years beyond the scheduled broadcast on a particular station or network of the program from which the excerpt was taken, except that:

A.    With the consent of any star performer appearing in the excerpt (which consent may be obtained by a general clause in the performer's contract)

    (1)    the time limitation specified above shall be a three (3) year period following the broadcast season in which the program from which the excerpt was taken was broadcast, and/or

    (2)    excerpts from prior specials or awards programs may be used to promote a current special or awards program.

B.    The three (3) year limit shall not apply to the use of such excerpt for any performer performing in a continuing role in a series under a series or term contract.

Such uses shall not be subject to the provisions of Paragraph 73 of the Code.

## 89.   LETTERS OF ADHERENCE

Paragraph 89, Letters of Adherence, was deleted from the 1998-2001 and succeeding Codes.  Remaining Paragraphs will retain their existing numbers.

## 90.   PRODUCER BOUND BY OTHER AFTRA AND SAG-AFTRA CODES

To be bound by this Code, the Producer must sign a Letter of Adherence to the Code.  The Producer may elect to agree to be bound by the terms of other Codes as provided in the Letter of Adherence, only if it expressly agrees to do so in writing and not by default.

## 91.   BOND OR CERTIFIED CHECK

SAG-AFTRA reserves the right, in its sole discretion, to require the posting in advance of an adequate bond, cash, or other security.  SAG-AFTRA also reserves the right to require a Producer to make payment by certified check to the performers, delivered to the SAG-AFTRA office at least twenty-four (24) hours in advance of the first call, to be held in escrow until due and payable under applicable provisions of this Code.

## 92.   UNFAIR PRODUCER

Producer agrees that he has notice that this Code represents the minimum terms and working conditions of performers in live network television broadcasting.  Any Producer who engages bargaining unit performers and who breaches any material term or condition of this Code may be regarded as unfair and performers may be instructed not to work for anyone who is unfair.  This paragraph is a statement by the Producer that he has notice of the facts stated in this paragraph, and goes no further.

Any Producer who engages bargaining unit performers and who is declared to be unfair by any branch of the Associated Actors and Artistes of America upon action taken by the Associated Actors and Artistes of America by reason of a primary dispute between such branch and such Producer may be declared unfair by SAG-AFTRA and artists may be instructed not to work for any such person.  Artists may not be required to take direction from anyone who has been declared unfair under this provision.

Producer shall notify SAG-AFTRA of the names of all employers who use the Producer's recording facilities for the purpose of making recordings at least twenty-four (24) hours in advance of each recording session.

**93.  <u>NO-STRIKE CLAUSE</u>**

So long as the Producer performs this Code, SAG-AFTRA will not strike against the Producer as to the performers covered by this Code in the field covered by this Code.  To the extent SAG-AFTRA has agreed not to strike, it will order its members to perform their contracts with the Producer.

**94.  <u>PRODUCTION PROSECUTED</u>**

In the event that the program for which the performer is engaged is complained of and any prosecution, civil or criminal, private or governmental, shall follow, Producer agrees at his expense to defend the performer and to pay all charges and judgments so incurred.  This paragraph does not apply to a case where the prosecution is in respect of material furnished by the performer or acts done by the performer without the authorization of the Producer. There shall be no distinction made between live and pre-recorded programs for the purposes of the application of this paragraph.

**95.  <u>GRIEVANCE AND ARBITRATION</u>**

All disputes and controversies of every kind and nature whatsoever between any Producer and SAG-AFTRA or between any Producer and any member of SAG-AFTRA, arising out of or in connection with this Code, and any contract or engagement (whether overscale or not, and whether at the minimum terms and conditions of this Code or better) in the field covered by this Code as to the existence, validity, construction, meaning, interpretation, performance, non-performance, enforcement, operation, breach, continuance, or termination of this Code and/or such contract or engagement, shall be submitted for resolution in accordance with the following grievance and arbitration procedures.

A.  <u>Time Limits</u>:

Proceedings for grievance and/or arbitration of a claim must be commenced on or before the earlier of:

(1)  twelve (12) months following the date on which the party bringing the grievance or arbitration proceeding knew or should have known of the facts upon which the claim is based; or

(2)  two (2) years following the date on which the event in dispute occurred.

B.  <u>Grievance Procedure</u>:

Within ten (10) working days after the filing of a grievance, authorized representatives of the Producer and SAG-AFTRA or (with the written consent of SAG-AFTRA) the artist concerned shall discuss and attempt to settle the dispute.

C.  <u>Arbitration</u>:

A dispute may be submitted to arbitration at any time twenty (20) or more working days following the filing of a grievance, whether or not a discussion of the grievance under the grievance procedure has occurred, or earlier if it appears that the demand for arbitration would otherwise be untimely under the time limits specified in subparagraph A.  Such arbitration shall be conducted under the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association except as otherwise provided herein:

(1)    SAG-AFTRA, the Producer concerned, or (with the written consent of SAG-AFTRA endorsed upon the demand for arbitration) the artist concerned, may demand such arbitration in writing. The hearing shall be held and the award made by a single SAG-AFTRA-Industry Arbitrator, who shall be named in accordance with the provisions of this Paragraph 95.

(2)    In the demand for arbitration, the party seeking arbitration may specify that the arbitration shall be conducted under either of the following procedures:

(a)    The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within seven (7) days after the close of the submission of evidence.

- or -

(b)    The hearing shall be held on not less than thirty (30) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within thirty (30) days after the close of the submission of evidence.

If the party seeking arbitration does not specify which of the above procedures shall be followed, the arbitration shall be conducted under the procedure specified in subparagraph C.(2)(b) of Paragraph 95.

The award of the Arbitrator shall be final and binding upon all parties to the proceeding during the period of this agreement, and judgment upon such award may be entered by any party in the highest court of the forum, state or federal having jurisdiction.

(3)    The parties agree that the provisions of this Paragraph shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court or before any administrative tribunal with respect to any controversy or dispute which arises during the period of this Agreement and which is therefore arbitrable as set forth above. The arbitration provisions of this Agreement shall, with respect to such controversy or dispute, survive the termination or expiration of this Agreement.

(4)    SAG-AFTRA shall be an ex officio party to all arbitration proceedings hereunder in which any artist is involved, and SAG-AFTRA may do anything which an artist named in such proceeding might do. Copies of all notices, demands, and other papers filed by any party in arbitration proceedings, and copies of all motions, actions or proceedings in court following the award shall be promptly filed with SAG-AFTRA.

(5)    Nothing herein contained shall be deemed to give the Arbitrator the authority, power or right to alter, amend, change, modify, add to or subtract from any of the provisions of this Code.

(6)    The three Network Broadcasting Companies (CBS, NBC and ABC) signatory hereto acting in behalf of all present and future Signatories to this Code and letters of adherence thereto shall:

(a)    Make every effort to agree mutually upon (and so designate in writing to the American Arbitration Association) the single SAG-AFTRA-Industry Arbitrator referred to in subparagraph (1) above (it being understood and agreed that there shall be a different "single SAG-AFTRA-Industry Arbitrator" designated in each network center who shall serve as arbitrator in any arbitrable matters arising under this Code), or in the alternative,

100

(b)     Make every effort to agree mutually upon (and so designate in writing to the American Arbitration Association) a Panel of Arbitrators for each network center from which there shall be elected (in accordance with the selection procedure set forth below) a single SAG-AFTRA-Industry Arbitrator to serve as arbitrator in the network centers in any arbitrable matters arising under this Code.

Whichever method of selecting an Arbitrator is first utilized (*i.e.*, either (6)(a) or (6)(b) above) shall be determinative hereunder.

In the event an Arbitrator (selected pursuant to (6)(a)) is unable to perform his duties for any reason whatsoever the said Broadcasting Companies and SAG-AFTRA shall mutually agree upon a successor immediately and if they are unable to so agree then the procedure set forth in Paragraph 95.C.(7) hereof shall become applicable.

Immediately upon serving a demand for arbitration, a copy of the demand shall be filed with the American Arbitration Association, which shall select the single Arbitrator for the hearing in accordance with whether SAG-AFTRA and the said Broadcasting Companies have utilized either method (6)(a) or (6)(b) for the designation of the arbitrator.

If the method (6)(b) has been utilized and therefore a Panel of Arbitrators has been selected for each network center then the Arbitrator shall be selected from the Panel named for the network center in which the demand is filed.  In any case, both parties shall be notified by the American Arbitration Association of the Arbitrator assigned to their case immediately upon his appointment.

In making selections from the Panel, the American Arbitration Association shall do so in numerical order, and shall appoint the first arbitrator on the Panel who is available.  The Arbitrator for the next arbitration shall again be processed in numerical order, omitting only those arbitrators who have been previously appointed, it being the intention that no arbitrator will be appointed more often than any other (except by virtue of his numerical position on the Panel) unless all those on the Panel who have not served as many times are unavailable for the arbitration in question.  Should none of the Arbitrators on the Panel be available for any particular arbitration, such arbitration shall be determined by a single neutral arbitrator selected in accordance with the procedure set forth in subparagraph (7) following, which for this purpose is made a part of this paragraph with the same force and effect as though fully set forth herein.

(7)     All of the foregoing provisions of this paragraph 95 shall be effective immediately upon the execution of this Code, but pending only the utilization of either method (6)(a) or (6)(b) for the designation of the arbitrator, and the designation in writing to the American Arbitration Association of the name of the single SAG-AFTRA-Industry Arbitrator or the Panel of Arbitrators, the following arbitration provisions shall apply:

(a)     SAG-AFTRA, the Producer concerned, or (with the written consent of AFTRA endorsed upon the demand for arbitration) the artist concerned, may demand such arbitration in writing.  A single neutral arbitrator shall be selected to resolve the dispute, pursuant to the Voluntary Labor Arbitration Rules then obtaining of the American Arbitration Association.

(b)     In the demand for arbitration, the party seeking arbitration may specify that the arbitration shall be conducted under either of the following procedures:

101

(i)     The hearing shall be held on two (2) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator(s). The award of the Arbitrator(s) shall be made within seven (7) days after the close of the submission of evidence.

- or -

(ii)     The hearing shall be held on not less than thirty (30) days' notice and shall be concluded within fourteen (14) days unless otherwise ordered by the Arbitrator. The award of the Arbitrator shall be made within thirty (30) days after the close of the submission of evidence.

If the party seeking arbitration does not specify which of the above procedures shall be followed, the arbitration shall be conducted under the procedure specified in subparagraph C.(7)(b)(ii) of Paragraph 95.

The award of the arbitrator shall be final and binding upon all parties to the proceedings during the period of this agreement, and judgment upon such award may be entered by any party in the highest court of the forum, state or federal, having jurisdiction.

(c)     The parties agree that the provisions of this Paragraph shall be a complete defense to any suit, action or proceeding instituted in any Federal, State or local court or before any administrative tribunal with respect to any controversy or dispute which arises during the period of this Agreement and which is therefore arbitrable as set forth above. The arbitration provisions of this agreement shall, with respect to such controversy or dispute, survive the termination or expiration of this Agreement.

(d)     SAG-AFTRA shall be an ex officio party to all arbitration proceedings hereunder in which any artist is involved, and SAG-AFTRA may do anything which an artist named in such proceeding might do. Copies of all notices, demands, and other papers filed by any party in arbitration proceedings, and copies of all motions, actions or proceedings in court following the award, shall be promptly filed with SAG-AFTRA.

(e)     Nothing herein contained shall be deemed to give the Arbitrators the authority, power or right to alter, amend, change, modify, add to or subtract from any of the provisions of this Code.

(8)     The Arbitrator(s) in making an award with respect to any claim hereunder may, in the light of all the facts and circumstances involved in connection with such claim, in his or her discretion: (a) make his or her award effective as of the date when payments were first due, but in no event more than two (2) years prior to the date when the written demand for arbitration was served, or (b) make his or her award effective as of the date of the award, or (c) make his or her award effective as of any intermediate date.

## 96.    <u>CHECK-OFF</u>

The Producer agrees that, on thirty (30) days written notice from SAG-AFTRA, he will deduct for and on account of union membership dues, that percentage or amount requested in the SAG-AFTRA notice, of all compensation earned and to be earned by each employee covered under this Agreement for whom there shall be filed with the Producer a written

assignment in accordance with Section 302(c) of the Labor Management Relations Act, 1947. The Producer shall commence making such deductions with the first wage payment to be made to each such employee following the date of the filing of his said written assignment, and such deductions shall continue thereafter with respect to each and every subsequent wage payment to be made to each such employee during the effective term of his said written assignment.

Within ten (10) days after the end of each month, the Producer shall remit to the Union, by check drawn to the order of SAG-AFTRA, the total amount of all deductions made during the said month for all such employees. At the time of such remittance, and together therewith the Producer shall also furnish to the Union, a record certifying the names of the employees on whose account such deductions were made, their respective earnings during said month, and the amount of deductions for each such employee during said month.

The Producer agrees that he will cooperate with the Union in order to expedite the procurement by the Union of the written assignments of the employees, as herein required.

## 97.   **NO DISCRIMINATION/AFFIRMATIVE ACTION**

A.   Policy:

Producer agrees not to discriminate against any performer because of race, creed, color, national origin, sex, age, sexual orientation, gender identity or disability, in accordance with applicable state and federal law. In accordance with this policy, Producer shall cast performers belonging to all groups in all types of roles, including continuing roles, having due regard for the requirements of and suitability for the role.

In accordance with the above, SAG-AFTRA reaffirms its policy of non-discrimination with respect to admission to membership, and rights of membership and Producer agrees to participate in the Joint Industry-SAG-AFTRA Committee established to administer the policies and procedures set forth in the 1963 Joint Statement of Policy. That Policy, as updated to conform to the first paragraph hereof, designed to continue and strengthen the implementation of the long-standing policy against discrimination in the employment of talent, reads as follows:

SAG-AFTRA, the employers, producers, networks, stations, advertising agencies, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios and others, are in agreement that the following policies and procedures will be continued and strengthened in the future:

(1)   Discrimination shall not be practiced against any performer, or any applicant for employment as a performer, because of race, creed, color, national origin, sex, age, sexual orientation, gender identity or disability; (a) in admission to membership to SAG-AFTRA together with all the rights and privileges of full membership in SAG-AFTRA as established in the SAG-AFTRA constitution; (b) in the publicizing of auditions and interviews; (c) in calling or requesting the appearance of performers for auditions or interviews; (d) in the hiring of performers, in the discharge or replacement of performers; (e) in the staging of a production; or (f) in any other dealings with or treatment of performers.

(2)   To word casting notices in such a way as not to discourage minority group members from inquiring, applying or auditioning. Casting notices shall state that Producer is an Equal Opportunity Employer.

(3)   When a role being cast depicts a person with a specific disability, the Producer agrees to include that fact in the casting specifications so as to enhance the opportunity for performers with similar disabilities to audition for the role.

(4)     When conducting interviews or auditions for casting purposes, representation by an agent or other performers' representatives shall not be a requirement for an audition.

(5)     To the extent that any producer keeps files of performers' names, pictures, resumes, etc., there will be no discrimination in keeping of such files on account of race, color, creed, national origin, age, sexual orientation, gender identity or disability.

(6)     To instruct all casting agents and performers' representatives to refer performers without regard to race, creed, color, national origin, age, sexual orientation, gender identity or disability.

(7)     To select applicants for audition, interview and employment, and employ performers on the basis of ability in all roles without regard to race, color, creed, national origin, sex, age, sexual orientation, gender identity or disability, subject to *bona fide* job qualifications and requirements.

(8)     Producer shall cast performers in accordance with the above policy in all types of roles, having due regard for the requirements of, and suitability for, the role, so that, for example, the American Scene may be portrayed realistically.  To that end, due regard shall be given to women, minorities, performers with disabilities and seniors in all aspects of society.  The parties agree that the producer shall retain its exclusive creative prerogatives.  In furtherance of the foregoing, the producer shall make good faith efforts to provide audition opportunities for women, minorities, individuals with physical disabilities and seniors.

(9)     Producer shall not use any information contained on INS Form I-9 to discriminate against any performer on the basis of sex, race, age or national origin and the I-9 form will be used for the purpose for which it is intended, *i.e.*, verifying that an employee may be employed pursuant to applicable Immigration Law and will not be made available for any other purpose.

The signatories to this Statement of Policy are SAG-AFTRA, employers, producers, networks, stations, independent packagers, transcription companies, phonograph recording companies, agents, managers, impresarios and others.  Furthermore, the Policy Statement has been reviewed and agreed to by a committee representing advertisers and agencies employing and using talent in television and radio.

(10)    Each signatory Producer agrees to comply with the substantive provision of Title I of the Americans with Disabilities Act of 1990, including applicable conforming amendments found within the ADA Amendments Act of 2008, with respect to performers employed under this Code, notwithstanding the fact that the ADA by its own terms may not otherwise apply to any such Producer.

(11)    The practice known as "painting down" is presumptively improper; the Producers will continue their dialogue with SAG-AFTRA and the stunt community on this issue.

B.      <u>Data</u>:

(1)     Within twenty (20) days after the end of each quarter, Producer will submit to the SAG-AFTRA National Office a report on the sex, ethnicity, obvious physical disability, and age of performers employed by Producer under this Agreement on all dramatic programs which have completed production during such quarter.  The report will be submitted on the form attached hereto as Exhibit H, it being understood that a report produced by Producer's data processing system which furnishes the same information as required in

104

the form shall be acceptable.  With respect to the information furnished on age, obvious physical disability, and ethnicity, it is recognized that, while Producer shall make reasonable efforts to ascertain such information, subject to any legal restrictions applicable thereto, there may be circumstances where Producer will be unable to secure the data or vouch for its accuracy.

(2)     The first report to be submitted shall be for the first complete quarter following execution of this Code.

(3)     The data which is furnished by Producer in accordance with this subparagraph B shall be for the purpose of facilitating any meeting which may be requested pursuant to subparagraph C, and is in no way intended to abridge the Producer's creative rights in the production of the program. SAG-AFTRA shall notify all Producers of the specific department at the SAG-AFTRA National Office to which the reports shall be addressed.

(4)     In the event that Producer fails to submit the report within the time specified above, SAG-AFTRA may send a written notice of delinquency to the Producer requesting submission of the report within ten (10) working days of receipt of the notice.

The reports may be released only to appropriate SAG-AFTRA staff and to SAG-AFTRA members who will be participating with the Producer pursuant to subparagraph C and shall not be released to others without the express written consent of the Producer except that SAG-AFTRA may release aggregated industry-wide information that does not identify individual Producer(s).

If there is a substantial breach of this subparagraph (4) with respect to any individual quarterly report, or in the event there is a dispute as to whether or not a substantial breach has occurred, the matter may be referred to arbitration.

C.     Meetings with Producer Representatives:

(1)     If the Union or Producer has information which is the basis for a genuine concern that the policies expressed in this Paragraph are being violated, either party may request, on ten (10) days' notice, a meeting to discuss any matter relating to discrimination, fair employment, the policy expressed herein, its further implementation, the data submitted or any other matter relevant to equal employment opportunity for performers.

(2)     If the Producer has an official with responsibilities for matters involving equal opportunity, the Union's request for a meeting shall be referred to such person who shall then be responsible for arranging the meeting with the appropriate Producer representatives.  If the Producer has no such person on staff, the Producer will designate such a person for the purpose of arranging the requested meeting, and the Union will be notified in writing of the person so designated.

(3)     Representatives at the Network meetings will include the Company's senior labor relations and programming officials and persons responsible for developing story lines and casting, typically including executive producers, head writers and, where applicable, casting directors.

(4)     The ten (10) day notice may be given at any time but may not be given more often than once each quarter.

(5)    A party's alleged failure or refusal to participate in a meeting, as required by this subparagraph 97.C., shall be subject to the grievance and arbitration procedure.

D.    The parties agree that in order to promote the casting of performers belonging to all groups in all types of roles in daytime television, the three Networks (ABC, NBC and CBS) shall meet separately with SAG-AFTRA at least once per year for the purpose of discussing additional employment of minorities and disabled persons, progress in that area since the last meeting, new opportunities that may be arising, and any other issues relevant to this paragraph of the Code.  Additionally, at the request of any independent Producer or SAG-AFTRA such Producer and SAG-AFTRA shall meet.  A party's alleged failure or refusal to participate in a meeting, as required by this subparagraph 97.D., shall be subject to the grievance and arbitration procedure.

E.    <u>Arbitration</u>:

Except as provided in subparagraphs B, C, and D, above, the matters covered in this Paragraph are not subject to the provisions of Paragraph 95.

F.    <u>Stunt Performers</u>:

When applicable, and with due regard to the safety of cast, crew and other persons, women and minorities shall be considered for stunt doubling roles and for scripted stunts on a functional nondiscriminatory basis.

Producer shall endeavor to cast performers with disabilities for scripted stunts for which they are qualified and with due regard for safety, in roles portraying their particular disability such as wheelchair stunts or stunts involving the use of other adaptive devices, *e.g.,* crutches, prostheses, etc.  The SAG-AFTRA Liaison to the Performers with Disability Committee is among the resources that can be utilized in ascertaining the availability of such performers.

Where the stunt performer doubles for a role which is identifiable as female and/or Black/African American, Latino/Hispanic, Asian/Pacific Islander or Native American and the race and/or sex of the double are also identifiable, Producer shall endeavor to cast qualified persons of the same sex and/or race involved.  The Producer shall endeavor to identify and recruit qualified minority and female stunt performers prior to the commencement of production.

G.    <u>Producer Meeting-Mediation</u>:

Either Producer or SAG-AFTRA may submit a request, which shall be in writing, that a dispute under Paragraph 97.A. needs to be discussed.  The Producer and Union shall meet within sixty (60) days after receipt by the non-moving party of such written notice, except that the parties may, by mutual agreement, extend such sixty (60) day period.  If the meeting is not held due to the failure of the non-moving party to attend such meeting, the moving party may refer the matter to a non-binding mediation with an independent mediator.

Producer and SAG-AFTRA agree to seek funding for the mediation program from the AFTRA Industry Cooperative Fund.

**97.A.  <u>ALCOHOLISM AND DRUG ABUSE</u>**

The signatories to this Code hereby adopt and approve the Statement of Objectives and Principles of AIPADA, the SAG-AFTRA-Industry Program for Alcoholism and Drug Abuse, as set forth in Exhibit G, and agree to cooperate with SAG-AFTRA and AIPADA in furtherance of such objectives.

**98.  <u>REVIEW BOARD</u>**

The signatories to this Code agree to discuss with SAG-AFTRA the formation of a fact-finding impartial review board.

**99.** **SEPARABILITY**

The parties hereto recognize that from time to time during the course of their bargaining new laws have been enacted with provisions that have remained unclear, and several provisions of this Code declaring established past practices have been readopted in the absence of any known problem or legal question.  It has always been and is the intention of the parties to interpret and apply all provisions of this Code in accordance with the requirements of law.  To that end we declare that if any provision of this Code is found to be in violation of law, this Code shall be deemed modified or amended accordingly.  All terms and conditions of this Code are separable.

**100.** **GUIDELINES – EMPLOYMENT OF MINORS**

The parties hereto, recognizing the special situation that arises when minors are employed, have formulated the following guidelines with respect to minors employed under this Code, to ensure that: 1) The performance environment is proper for the minor; and 2) the conditions of employment are not detrimental to the health, education, safety and morals of the minor.

It is the intent of this provision that the best interests of the minor be the primary consideration of the parent/guardian and the adults in charge of production, with due regard to the age of the minor.

The term "minor," as used herein, means any performer under the age of eighteen (18) years, except that it shall not include any such performer if (1) the performer has satisfied the compulsory education laws of the state governing the performer's employment; (2) the performer is married; (3) the performer is a member of the Armed Forces; or (4) the performer is legally emancipated, in which case it is agreed that both the Producer and the minor shall comply fully with the legal terms of the minor's emancipation.

A.    Interviews and Tests:

Calls for interviews and individual voice and photographic tests, fittings, wardrobe tests, make-up tests, production conferences, publicity and the like for children of school age shall be after school hours, provided such calls are completed prior to 8:00 p.m.  Producer shall use its best efforts to assure that calls for such interviews and tests normally shall be limited to one (1) hour.  Two (2) adults must be present at and during any such call involving a minor.  Calls for actual production shall not be so limited.

B.    Engagement:

(1)    Producer shall advise the parent/guardian of the minor of the terms and conditions of the employment (studio, location, estimated hours, hazardous work, special abilities required, etc.), to the extent they are known, at the time of the hiring.

(2)    Prior to the first date of the engagement, parent/guardian shall obtain, complete and submit to the Producer or his representative the appropriate documents required by state and local law related to the employment of the minor.  Producer agrees to cooperate with SAG-AFTRA in an effort to secure a more efficient handling of the issuance of working permits for children from the N.Y. Society for the Prevention of Cruelty to Children, and the Mayor's Office of the City of New York.

C.    Work Hours:

(1)     The workday for a minor shall begin no earlier than 5:00 a.m. and shall end no later than 10:00 p.m. on evenings preceding school days. On evenings preceding non-school days the minor's workday shall end no later than 1:00 a.m. on the morning of the non-school day(s).

    (a)     <u>Exceptions to "work hours"</u>:

        (i)     Where the Producer has obtained a waiver of the minor's work hours from the applicable state agency, SAG-AFTRA will be deemed to have granted an automatic waiver of this provision, in accordance with such state waiver.

        (ii)    SAG-AFTRA agrees to grant Producer's reasonable requests for waivers of the work hours provision.

(2)     Producer shall set the first call at the beginning of the minor's employment and dismissal on the last day of the minor's employment so as to ensure that the minor will have a twelve (12) hour rest period prior to and at the end of the employment. For example, if a minor's last day of employment is Wednesday, and the minor will be attending school at 8:30 a.m. on Thursday, the minor must be dismissed by 8:30 p.m. on Wednesday.

D.     <u>Supervision</u>:

(1)     The parent/guardian must be present at all times while a minor is working, and shall have the right, subject to production requirements, to be within sight and sound of the minor. The presence of the parent/guardian will not interfere with the production. The parent/guardian will not bring other minors not engaged by Producer to the studio or location.

(2)     The parent/guardian will accompany the minor to wardrobe, make-up, hairdressing and dressing room facilities. No dressing room shall be occupied simultaneously by a minor and an adult performer. This restriction shall not apply to minors under three (3) years old.

(3)     Producer will provide a safe and secure place for minors to rest and play. The Producer agrees to supply cots during rehearsal for minor performers.

(4)     No minor shall be required to work in a situation which places the child in clear and present danger to life or limb. If a minor believes he or she to be in such a dangerous situation after having discussed the matter with his or her guardian or the stunt coordinator, if one is present, then the minor shall not be required to perform in such situation regardless of the validity of his or her belief.

(5)     When a Producer engages a minor, Producer must designate one (1) individual on each set to coordinate all matters relating to the welfare of the minor and shall notify the minor's parent/guardian of the name of such individual.

(6)     If a minor is at location, the minor must leave the location as soon as reasonably possible following the end of his or her working day.

(7)     Guardian, as that term is used in this Section, must be at least eighteen (18) years of age and be the minor's legal guardian or have the written permission of the minor's parent(s) to act as guardian.

(8)     Producer will comply with all applicable child labor laws governing the employment of the minor in broadcasting, and will keep a summary of said laws in the production office, if such summary is readily available.

E.     <u>Education</u>:

Producer shall use its best efforts to ensure that the minor's education will not be neglected or hampered by the performer's employment and will comply with all applicable education laws.

If a minor is scheduled to work in the studio two (2) or more weekdays in a given week and on these days his or her work schedule is at least eight (8) hours each day and interferes with the performer's attendance at his/her regular school in a manner that precludes the performer from attending school for at least three (3) hours, then Producer shall provide the performer with sufficient study time, in periods of no less than twenty (20) minutes at any one time, so that performers will have had the opportunity to be in school and/or study for a total combined period of three (3) hours on each such day.

Any provision of this Paragraph which is inconsistent and less restrictive than any child labor law or regulation in applicable state or other jurisdiction shall be deemed modified to comply with such laws or regulations.

The provisions of this Paragraph shall prevail over any inconsistent and less restrictive terms contained in any other Paragraphs of this Code which would otherwise be applicable to the employment of the minor, but such terms shall be ineffective only to the extent of such inconsistency without invalidating the remainder of such Paragraphs.

Teachers shall have proper teaching credentials appropriate to the level of education required (i.e., primary or secondary level) from Washington D.C. or any state within the United States, but need not be credentialed by or a resident of the state wherein the minor's employment occurs unless otherwise required by law.

Producer agrees to provide a school facility, such as a schoolhouse, classroom, trailer schoolhouse or other schooling area, which closely approximates the basic requirements for classrooms, especially with respect to adequate lighting, heating, desks and chairs. Stationary buses or cars are not adequate school facilities unless used exclusively for the minors during instruction. A moving car or bus shall never be used as school facility; minors must not be taught while being transported to or from local locations.

## 101. <u>COST OF LIVING</u>

Paragraph 101. Cost of Living, was deleted from the 1991-1994 Code. Remaining Paragraphs will retain their existing numbers.

## 102. <u>AFTRA HEALTH AND RETIREMENT FUNDS</u>

Section 1.

A.    With respect to services performed under this Code on and after February 27, 2012 (including all services such as rehearsal theretofore performed in connection therewith), and with respect to "recordings" produced under this Code and broadcast on and after February 27, 2012, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to sixteen and one-half percent (16.5%) (seventeen percent (17%) effective January 1, 2015) of the gross compensation due each performer for such services and/or the use of such "recordings." As used in the preceding sentence, the term "recordings" shall have the meaning given in Paragraphs 70 and 72 of this Code. The Producer's obligation to pay such sum shall apply to the performer's gross compensation, including talent agent's commission (it being understood that nothing in this Code shall be construed as requiring Producer to pay a talent agent's commission), without any deductions whatsoever, whether pursuant to oral or written contracts entered into prior to, on or after

109

November 16, 1954.  (However, this shall not be construed as requiring any duplication of payment made under any previous AFTRA or SAG-AFTRA Code.)

The bargaining parties hereby delegate to the Board of Trustees of the Health and Retirement Funds the authority to establish, acting in a settlor capacity and as delegates of the bargaining parties, the allocation of such contributions as between the Health Fund and the Retirement Fund.

Producer's obligation to make health and retirement contributions on gross compensation shall be limited to a maximum gross compensation of $200,000 for half hour serials; $230,000 for one-hour serials; $240,000 for sports; and $250,000 for all other programs per performer / per employer / per calendar year, for every program and performance category contained in the Code except for dramatic programs, SAG-AFTRA Television Agreement programs, and dramatic serials as set forth below in sections (1), (2) and (3).

(1)   Dramatic Programs (Including Situation Comedies) Other Than SAG-AFTRA Television Agreement and Serials:

With respect to services performed under this Code on and after February 27, 2012 (including all services such as rehearsal theretofore performed in connection therewith), and with respect to "recordings" produced under this Code and broadcast on and after February 27, 2012, on dramatic programs, except SAG-AFTRA Television Agreement programs covered in subparagraph (2), below, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal sixteen and one-half percent (16.5%) (seventeen percent (17%) effective January 1, 2015) of the gross compensation due each performer for such services and/or the use of such recordings.   The allocations shall be as set forth in unnumbered subparagraphs two and three above.

Producer's obligation to make health and retirement contributions on gross compensation shall be limited to the following maximum amounts of compensation per performer per program episode on which contributions are due:

|  |  |
| --- | --- |
| 30 minute program episode | $15,000 |
| 60 minute program episode | $24,500 |
| 90 minute program episode | $33,000 |
| 120 minute program episode | $40,000 |
| Exclusivity payments | $40,000 |

(2)   SAG-AFTRA Television Agreement Programs:

With respect to services performed under this Code (including all services such as rehearsal theretofore performed in connection therewith) on SAG-AFTRA Television Agreement programs on and after July 1, 2011 and with respect to recordings produced under this Code and broadcast on and after July 1, 2011, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to sixteen and one-half percent (16.5%) (seventeen percent (17%) effective July 1, 2015) of the gross compensation due each performer for such services and/or the use of such recordings.

Producer's obligation to make health and retirement contributions on gross compensation shall be limited to the following maximum amounts of compensation per performer per program episode on which contributions are due:

|  |  |
| --- | --- |
| 30 minute program episode | $15,000 |
| 60 minute program episode | $24,500 |
| 90 minute program episode | $33,000 |
| 120 minute program episode | $40,000 |

|  | Exclusivity payments | $40,000 |

(3)    <u>Dramatic Serials</u>:

> With respect to services performed under this Code (including all services such as rehearsal theretofore performed in connection therewith) by performers on dramatic serials on or after February 27, 2012, and with respect to recordings produced under this Code and broadcast on and after February 27, 2012, the Producer shall pay to the AFTRA Health and Retirement Funds a sum equal to fifteen percent (16.5%) (seventeen percent (17%) effective January 1, 2015) of the gross compensation due each performer for such services and/or the use of such recordings.

B.    In the event the gross compensation paid, due or to become due to a "star performer," or, on his behalf, to any other person, firm or corporation, directly or indirectly, for an engagement under this Code on or after November 16, 2004, is more than twenty-five percent (25%) below the performer's reasonable or customary compensation as measured by the average gross compensation paid, due or to become due to the performer or on his behalf, to any other person, firm or corporation, directly or indirectly, by other Producers, with which performer had no relationship, for his last four (4) comparable appearances (excluding "exchanges"), then Producer shall be obligated to pay to the AFTRA Health and Retirement Funds a sum equal to the applicable percentage set forth in Paragraph 102 A of such reasonable or customary compensation, as measured by such last four (4) comparable appearances, for the instant engagement: provided, however, that the foregoing criterion of the average reasonable or customary compensation for the last four (4) comparable appearances shall in no event apply where (i) the engagement is for a type of program on which it has been customary to pay star performers minimum compensation or compensation not substantially in excess of minimum, or (ii) there has been a substantial loss in the "marquee value" of the star performer, or (iii) no last four (4) comparable appearances have occurred during the eighteen (18) month period immediately prior to the instant engagement of the performer, or (iv) the performer's engagement is only for a "flash" appearance. Upon request of Producer, SAG-AFTRA shall furnish to Producer such records as can be obtained by SAG-AFTRA as are necessary to ascertain the average gross compensation for performer's last four (4) comparable appearances.

C.    As used in the preceding paragraph, a "star performer" is a performer whose average gross compensation, for an appearance under this Code, as measured by his last four (4) comparable appearances (excluding "exchanges"), is more than $1,500.00. A "comparable appearance" is an appearance under this Code or a prior AFTRA or SAG-AFTRA Network Television Code on a comparable program. "Exchanges" are those situations where star performers exchange appearances on each other's programs.

D.    The aforementioned sums shall be used solely (1) for the purpose of providing retirement benefits for eligible employees under this Code including, in the discretion of the Trustees, death benefits for beneficiaries of deceased eligible employees, (2) for the purpose of providing health benefits for eligible employees under this Code and, at the discretion of the Trustees, for eligible performers within SAG-AFTRA's jurisdiction and, at the further discretion of the Trustees, for their families, and (3) for the incidental expenses connected with the establishment and administration of the AFTRA Health and Retirement Funds.

E.    Nothing in this Code shall be construed as suspending or modifying the prior AFTRA Code Health and Retirement provisions applicable to services performed or recordings broadcast from November 16, 1956 to and including November 15, 2007 nor shall this Code be construed as requiring any duplication of payment made under such prior AFTRA Code Health and Retirement provisions.

F.    With respect to any agreement for the services of a performer (f/s/o agreement), including services covered by the SAG-AFTRA National Code of Fair Practice for

111

Network Television Broadcasting, to be furnished by a "loan-out company" (*i.e.*, a corporation which is controlled by the performer and which furnishes performer's services to others under an f/s/o agreement), payments into the AFTRA Health and Retirement Fund (hereinafter "contributions") shall be governed by the following:

(1)    In its f/s/o agreement with the loan-out company, the Producer shall separately state the compensation applicable to services covered by the SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting.

(2)    If other than SAG-AFTRA covered services are involved and an amount is allocated to such other services, the Producer shall notify SAG-AFTRA of the amount allocated to the SAG-AFTRA covered services. If SAG-AFTRA disputes the amount allocated to the SAG-AFTRA covered services, the parties will discuss what the appropriate allocation of such compensation shall be, giving substantial consideration in resolving the dispute to the performer's "customary salary." If, after such discussions, SAG-AFTRA does not agree on the appropriate allocation, then either party may submit the matter, as it relates to health and retirement contributions only, to arbitration in accordance with the provisions of this Code.

(3)    Contributions shall be based on the amount the Producer pays the loan-out company for furnishing the performer's SAG-AFTRA covered services.

(4)    (a)    Agreements with loan-out companies for covered services of the loaned-out performer which are entered into, on or after December 25, 1989, shall provide that Producer shall make health and retirement contributions directly to the Plan as agent for this purpose for the loan-out company.

            (b)    Until such time as the Producer implements the direct payment system described in subparagraph (4)(a) above, the loan-out company shall have the obligation to make the contributions; provided, however, that the Producer and the loan-out company may enter into an agreement which provides that the Producer shall pay such contributions directly, to the AFTRA Health and Retirement Fund and notify the SAG-AFTRA National Executive Director of such agreement and such payment shall be made by Producer without notice from SAG-AFTRA or the Fund. If the loan-out company does not pay contributions within ten (10) business days following the date they become due, SAG-AFTRA or the Plan shall give written notice to the Producer within a reasonable period thereafter and the Producer, as agent for this purpose for the loan-out company, shall pay the contributions within ten (10) business days after receiving such notice.

Section 2.

The AFTRA Health and Retirement Funds shall be Trust Funds and shall be administered under the AFTRA Health and Retirement Funds Agreement and Declaration of Trust, dated November 16, 1954, as amended to date (the "Trust Agreement") which Trust Agreement is hereby ratified and confirmed, and is made a part of this Code with the same force and effect as though fully set forth herein. The said Trust Agreement shall provide, among other things:

A.    That the AFTRA Health and Retirement Funds be administered by ten (10) Producer Trustees designated by the Producers and ten (10) SAG-AFTRA Trustees designated by SAG-AFTRA.

B.    That SAG-AFTRA may, at any time in its discretion on written notice to all the Trustees then in office, appoint a successor or successors for any one (1) or more of the SAG-AFTRA Trustees. The written notice shall contain the names of the

new Trustees and the names of the Trustees whom they replace.  Successors for Producer Trustees may be appointed as provided in the Trust Agreement.

C.    That the Trustees shall determine the form, nature, and amount of retirement and health benefits and the rules of eligibility for such benefits, except as otherwise provided in this Agreement.  The health benefits shall include in the discretion of the Trustees any one or more of the following benefits (but none other): death, accidental death, dismemberment, hospitalization, surgical expense, medical expense, temporary disability, dental, wellness, prescription drug, loss of voice.

D.    That the employers having other collective bargaining agreements with SAG-AFTRA or AFTRA may, with the approval of the Trustees, become contributing Producers and parties to the Trust Agreement; and by agreeing to be bound by the Trust Agreement, such other Producers thereby appoint as their representatives in the administration of the AFTRA Health and Retirement Funds the Producer Trustees.

E.    That the plan of retirement benefits adopted thereunder shall be subject to the approval of the Internal Revenue Service as a qualified plan.  If any part of the plan is not approved by the Internal Revenue Service, the plan shall be modified by the Trustees, but subject to the limitations set forth in this agreement, to such form as is approved by the Internal Revenue Service.

F.    That no portion of the contribution may be paid or revert to any Producer.

Section 3.

Each Producer shall furnish the Trustees the information pertaining to the names, job classifications, social security numbers and compensation information for all performers covered by this Agreement, together with such other information as may be reasonably required for the proper, low cost and efficient administration of the AFTRA Health and Retirement Funds.  Producer agrees to furnish a remittance report containing such information and to pay to the appropriate AFTRA Health and Retirement Fund office the contribution specified in Section 1 not later than fifteen (15) days following the Thursday (a) after the week during which the performance shall have taken place, or (b) in the case of a prerecorded program after the final rendition of physical services.

Section 4.

These provisions for the AFTRA Health and Retirement Funds are in addition to (and not in substitution in whole or in part for) any existing health and/or retirement funds covering any of the performers under this Agreement; and no performer shall lose, in whole or in part, any of his rights or privileges under such other health and/or retirement funds by virtue of receiving or being entitled to receive benefits under the AFTRA Health and Retirement Funds; nor may any payments, rights or privileges available to a performer under the AFTRA Health and Retirement Funds be credited to any payments, rights, or privileges under any other health and/or retirement funds and vice versa.  Nothing in this Paragraph 102 shall preclude the AFTRA Health Fund from applying coordination of benefits and/or subrogation provisions.  Nothing in this Paragraph 102 shall preclude actions to comply with the provisions of the Internal Revenue Code applicable to qualified retirement plans.

Section 5.

No part of the Producer's contributions or the performer's benefits from the Health and Retirement Plans (a) may be credited against the performer's overscale compensation or against any other benefits or emoluments whatsoever that the performer may be entitled to, no matter what form such other benefits or emoluments may take, or (b) are subject to any talent agency commission, or other deduction, except to the extent that the payment or benefits may be subject to a qualified domestic relations order or other offset or deduction required by law.

113

## 102.A. **AFTRA INDUSTRY COOPERATIVE FUND**

The AFTRA Industry Cooperative Fund proceeds are earmarked for the administration of programs intended to benefit performers and to increase awareness of the provisions of the Code.

Funding shall be provided by an employer contribution of one-tenth (1/10) of one percent (.1%) of "gross compensation," as defined in Paragraph 102, Section 1, of this Agreement and subject to the ceilings set forth in Paragraph 102, paid to performers covered under this Agreement.

## 103. **EXCESS FEEDS TO STRUCK STATIONS**

Producer agrees that in the event SAG-AFTRA performers performing on a station or stations other than the originating stations of New York, Chicago and Los Angeles are on strike, the Producer will not (without the consent of SAG-AFTRA) require performers to render services on programs originating at the producer's station or facilities in excess of the number of programs originating at such points which are normally made available to such stations where such excess broadcasting is designed to replace or supplement broadcasts which would, in the absence of such strike, be of local origination at the station where such strike exists. The Producer further agrees that he will not require SAG-AFTRA members to perform services for any broadcast station and/or network for the purpose of discharging the functions of persons employed by such broadcast stations and/or network during a labor-management dispute involving such persons.

## 104. **SIMULCASTS**

Radio simulcasts for all programs other than sporting events shall be included under Exhibit D of the Code, pursuant to which the Producer shall pay the performers on a dramatic program simulcast on radio 6%, and on all other programs 3.6% (1.5% where the off-camera announcer is the only covered performer) of Distributor's gross receipts in lieu of any other fees.

This provision will not be utilized in connection with the simulcast of sporting events, for which the following shall apply: Performers whose performance is simulcast shall receive no less than the applicable minimum television scale under this Code plus the applicable minimum radio scale (including one (1) hour of rehearsal if required under the Radio Code) under the applicable AFTRA or SAG-AFTRA National Code of Fair Practice for Commercial Radio Broadcasting, where the radio broadcast is commercial, or the applicable minimum radio scale set forth in Paragraph 76 of the applicable AFTRA or SAG-AFTRA National Sustaining Radio Agreement, where the radio broadcast is sustaining. The hours of rehearsal referred to herein shall be available to the Producer for use. It may be used without reference to the television minimum call if it is used for radio purposes only. A broadcast shall be deemed to be a simulcast if one (1) performance of that broadcast is used for both radio and television broadcasts, whether or not the radio and television broadcasts of that performance are actually simultaneous. Except as otherwise specified herein, all provisions of the said AFTRA or SAG-AFTRA Codes shall be applicable to simulcasts.

## 105. **TITLE OF CODE**

This Code shall be referred to as the 2014-2018 SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING.

SCREEN ACTORS GUILD- AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____   Date _____
David P. White

114

National Executive Director

ACCEPTED AND AGREED TO:


By _____         Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.


By _____         Date _____
   Steve Eisenhardt
   NBC, Inc.


By _____         Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.


By _____         Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.


By _____         Date _____
   Helayne Antler
   CPT Holdings, Inc.

# EXHIBIT A

## Exhibit attached to and made a part of the
## SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting

A producer who signs the 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting or a Letter of Adherence thereto agrees to the special terms and conditions set forth in Exhibit A in the employment of performers (as specified herein below) in network dramatic television programs produced for prime time, as defined or permitted by the FCC, as well as programs produced for the CW, which series commenced production produced prior to July 1, 2014.  For all new series whose initial production commenced on or after July 1, 2014, the provisions of the SAG-AFTRA Television Agreement and Basic Codified Agreement shall apply, as set forth in such Agreements.

It is understood that this Exhibit A applies only to  network prime time dramatic programs (including situation comedies) produced prior to July 1, 2014 and to programs produced for the CW and not to variety or other programs and not to "book musicals" which have a primary music emphasis.   It applies to actors, background actors, singers, dancers, stuntpersons, stunt coordinators, puppeteers and airplane pilots performing on such dramatic programs, including actors who, incidental to their dramatic performance, also sing or dance.  Except as specifically noted, this Exhibit A does not apply to announcers; the SAG-AFTRA Code of Fair Practice for Network Television Broadcasting in its entirety shall apply to all such persons employed on such prime time dramatic programs.  The five-line-or-less rate shall not be used on dramatic programs produced under this Exhibit A. Except as otherwise provided in the background actors' provisions of this Exhibit A, actors who speak any lines are paid the full actor rates.  Off-camera singers performing in standard non-commercial billboards, and standard non-commercial openings, closings, lead-ins to and lead-outs from commercials, bridging lines and musical signatures (theme songs) intended for use with three (3) or more episodes of a designated series of dramatic programs shall be paid pursuant to Exhibit A.

See Separate Exhibit A / CW Supplement Agreement for applicable rates, terms and conditions.  Such Supplement shall be deemed incorporated herein and is otherwise part of this SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting.

# EXHIBIT B

## 2014-2018 AFTRA National Code of Fair Practice for Network Television Broadcasting

### TRANSFER OF RIGHTS

Upon the sale, transfer, assignment, license, lease, agreement to distribute or other disposition by Producer of its television rights in any recorded program produced by it under this Code entered into or renewed after November 16, 2011 Producer shall not be responsible to SAG-AFTRA or to any performers for any payments thereafter due with respect to replays, reruns, Supplemental Markets Use or foreign telecasting or for a breach or violation of this Code by such transferee, (including distributor), if SAG-AFTRA approves the financial responsibility of such transferee in writing, and if Producer in its agreement with such transferee has included a provision (hereinafter referred to as an "assumption agreement") substantially in the following form:

" _____
(insert name of transferee)

hereby agrees with _____
(insert name of Producer)

that all recorded programs covered by this agreement are subject to the 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting. Transferee hereby agrees for the benefit of SAG-AFTRA as representative of the performers affected thereby to make the additional compensation payments subsequently incurred and required by said Code for replays, reruns, Supplemental Markets Use, or foreign telecasting, and all Social Security withholding, unemployment insurance and disability insurance payments and any other payments required of employers by law with respect to such additional compensation, and all appropriate contributions to the AFTRA Health and Retirement Funds required under the provisions of said Code with respect to such additional compensation, and to comply with the provisions of said Code with respect to the use of such recorded programs and required records and reports. It is expressly understood and agreed that the rights of transferee to telecast such recorded programs shall be subject to and conditioned upon the prompt payment to the performers involved of additional compensation as provided in said Code, and SAG-AFTRA shall be entitled to injunctive relief, in the event such payments are not made. It is also expressly understood and agreed that any dispute between the transferee and SAG-AFTRA or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code."

Producer agrees to give written notice to SAG-AFTRA within thirty (30) days of each sale, transfer or assignment, license or other disposition of any recorded programs which are subject to this Code, and such notice shall specify the name and address of the purchaser, licensee, transferee or assignee, and to deliver to SAG-AFTRA a copy of the above referred to assumption agreement.

An inadvertent failure on the part of Producer to comply with any of the provisions of this Exhibit B shall in no event constitute a default by Producer or a breach of the 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting provided that such failure is cured promptly after notice thereof from SAG-AFTRA.

Upon delivery of such assumption agreement and on condition that SAG-AFTRA approves in writing the financial responsibility of the purchaser, assignee, licensee, or transferee, Producer shall not be further liable for the keeping of any such records or for the payment of such additional compensation for replays, reruns, Supplemental Markets Use, or foreign telecasting, or for contributions to the AFTRA Health and Retirement Funds which are required in connection therewith, it being agreed that the purchaser, assignee, licensee, or transferee, shall solely be liable therefor.

SAG-AFTRA agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee, licensee or transferee, it being further agreed that if SAG-AFTRA, within twenty-one (21) days of receipt of notice of any such sale, assignment, license or transfer, has not advised Producer that it disapproves the financial responsibility of such

purchaser, assignee, licensee or transferee, SAG-AFTRA will be deemed to have approved the financial responsibility thereof.  In the event SAG-AFTRA advises Producer within such twenty-one (21) day period that it disapproves the financial responsibility of any such purchaser, assignee, licensee, or transferee and Producer disputes such disapproval, Producer shall have the right, at its election, to cause to be immediately submitted to arbitration, pursuant to the provisions of Paragraph 95 of such Code, the issue of whether SAG-AFTRA has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee, licensee or transferee.

The provisions of this Exhibit B shall not apply with respect to any performer in connection with a replay, rerun, Supplemental Markets Use, or foreign telecast of a recorded program if no part of the performer's performance is used in the replay, rerun, or foreign telecast.

**EXHIBIT C**

Exhibit C, Cost of Living Adjustment, was deleted from the 1991-1994 Code.

Remaining Exhibits will retain their existing letters.

## EXHIBIT D

As of November 16, 2001

Screen Actors Guild - American Federation of Television
  and Radio Artists

Gentlemen:

The following sets forth our understanding and agreement with respect to television programs produced under the SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting (the SAG-AFTRA Network Television Broadcasting Code) or a local AFTRA or SAG-AFTRA Television Broadcasting Code, which are released in Supplemental Markets.

1.   <u>Scope of Agreement</u>

This agreement shall apply to television programs produced under this or any previous AFTRA or SAG-AFTRA Network Television Broadcasting Code or a local AFTRA or SAG-AFTRA Television Broadcasting Code (hereinafter sometimes referred to as "programs") which are released in Supplemental Markets.  The rights of Producer in television programs produced under such Codes shall include the right to exhibit such programs in Supplemental Markets (as hereinafter defined) without the Performer's consent subject to any restrictions contained in individual employment contracts of performers in such television programs.  However, in the case of a television program(s) produced on or after November 16, 1973, Producer must obtain performer's consent for release of programs to supplemental markets if the performer, as of December 1994, was:

A.   involved in active negotiations regarding consent for such use, and/or

B.   the Performer has subsequent to November 15, 1993 and prior to December 19, 1994 specifically denied consent to such Supplemental Market use.  Such negotiation and denial of consent must be substantiated by the submission of evidentiary material, and, in any event, all restrictions (other than those contained in individual employment contracts) on post-1973 Supplemental Market use expire on November 15, 1995.

2.   <u>Definition of Supplemental Markets</u>

The term "Supplemental Markets," as used in this Agreement, means only: The exhibition of television programs by means of cassettes (to the limited extent provided in subparagraph A. of this paragraph), Pay Television, or Basic Cable as those terms are hereafter defined in this paragraph, the exhibition of television programs on any commercial or common carrier such as but not limited to, commercial airlines, trains, ships and buses (referred to herein as "In-Flight") and Radio simulcasts as defined in Paragraph 104 herein.  As used in this Agreement, Supplemental Markets does not include: (i) Distribution of such programs for direct projection or closed circuit exhibition before non-paying audiences (but excluding any form of CATV) under arrangements which are covered by the existing Letter Agreement between Producer and SAG-AFTRA, or (ii) distribution of the type described in Paragraph 73.H. of the SAG-AFTRA Network Television Broadcasting Code, or of any corresponding provision in a local AFTRA or SAG-AFTRA Television Broadcasting Code.

A.   <u>Cassettes</u>:

For the purpose of this Agreement, a cassette is any audio-visual device, including without limitation, cassette, cartridge, disc, phonogram or any other similar or dissimilar audio-visual device now known or hereafter devised, containing a program (recorded on film, disc, tapes or other material) which may be used for exhibition on a home-type television screen.  The sale or rental of cassettes for exhibition on a home-type screen in the home or in other closed circuit use such as in hotel rooms constitutes the "Supplemental Market" for the purpose of this

agreement. The foregoing definition does not include the exhibition of a television program by cassette over a television broadcast station or in theatrical exhibition, and no rights to so use are granted to Producer by reason of such exclusion.

B.    Pay Television:

"Pay Television" (also known as Pay Cable), as used in this Agreement, means exhibition on a home-type television screen by means of telecast, cable, closed circuit or CATV where substantially all systems to which the program is licensed meet the following tests:

(1)    Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

(2)    Where the subscriber pays for each program he selects (except that a program he selects for which only a token charge is made shall not be considered a Pay Television program); and/or

(3)    Where the subscriber pays a fee for an encoded telecast or telecast which fee is a major charge relative to other fees paid for encoded telecasts.

It is expressly understood that "Pay Television" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

C.    Basic Cable:

"Basic Cable," as used in this Agreement, means one (1) or more basic cable systems which do not meet the definition of Pay Television (as set forth in Paragraph 2.B. of this Exhibit D) and wherein the release on Basic Cable is a separate release and not part of a free television broadcast.

It is expressly understood that "Basic Cable" does not include theatrical exhibition and does not include methods such as community antennas and community television systems when used to supplement free television transmission.

3.    Supplemental Market Fees

A.    (1)    As to each television program within the scope of Paragraph 1 above which was released in Supplemental Markets prior to November 16, 1988, except for network prime time dramatic programs, Producer will pay for the benefit of the performers on such program two percent (2%) (3.6% with respect to programs for which an agreement to release the program to basic cable was entered into on or after February 28, 1995) of the Distributor's gross receipts in perpetuity (as hereinafter defined). With respect to programs released on cassette on or after November 16, 1985 the payment shall be two and five-tenths percent (2.5%) of the first one million dollars ($1,000,000.00) of such Distributor's gross receipts and three percent (3%) of such receipts thereafter. Both the two and five-tenths percent (2.5%) and three percent (3%) will increase to 3.6% with respect to cassettes for which an agreement to release a program to cassette was entered into on or after February 28, 1995. With respect to any other Supplemental Markets release on or after November 16, 1985, except in-flight which will remain at two percent (2%), the payment shall be two percent (2%) (3.6% with respect to programs for which an agreement to release the program to Supplemental Markets was entered into on or after February 28, 1995.) As to each television program produced prior to November 16, 1973 and released in Supplemental Markets on or after November 16, 1988, except for those released on cassettes or subject to subdivision (2) below, Producer will pay for the benefit of the performers on such program an amount equal to 3.6% of the

121

Distributor's gross receipts in perpetuity (as hereinafter defined) which amount shall include Health and Retirement contributions. With respect to Distributor's gross receipts from the release to basic cable of free television programs produced on or after November 16, 1998, pursuant to license agreements entered into on or after November 16, 2001, said percentage shall be 3.6% plus applicable Health and Retirement contributions, in accordance with the provisions of Paragraph 102A. No ICF contributions shall be due in connection with such payments. With respect to programs produced prior to November 16, 1973, which are released on cassette on or after November 16, 1988, the payment shall be four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000.00) of such Distributor's gross receipts and five and four-tenths percent (5.4%) thereafter which amounts shall include Health and Retirement contributions.

Such payments shall be for the benefit of all performers on the program, except for background actors. Such payments shall be distributed pro rata to the performers on the basis of a two-to-one ratio for principal performers against other performers, however from the period of March 12, 1993 through February 28, 1995 the scale payment due each performer shall not exceed one and five-tenths percent (1.5%) per performer and the scale payment due each off-camera announcer shall not exceed five-tenths of one percent (.5%) per announcer. Performers on non-serial dramatic programs production of which commences on or after November 16, 2014, shall share in distributor's gross receipts on a pro rata basis of 3-2-1 rather than 2 to 1. The parties agree that performers engaged under the Five Lines or Less category shall be regarded as a "1".

For programs released after February 28, 1995, the above per performer limitations shall not apply. Notwithstanding the above, on news and public affairs programs, the five-tenths of one percent (.5%) limitation shall apply to off-camera announcers only where such announcer is the only performer covered by this Code. The five-tenths of one percent (.5%) limitation shall also apply to ten-lines-or-less, off-camera announcers on other type programs where the announcer is the only performer covered by this Code. In all other circumstances where the off-camera announcer is the only covered performer, a one and five-tenths percent (1.5%) limitation shall apply.

Health and Retirement contributions shall be paid in addition to such payments. In the event any performer has individually negotiated with Producer an individual payment formula for such distribution, his pro-rata share shall be credited against the payment provided for in his individual contract. Distribution of the pro rata payments shall be made either directly to the performers by the Producer or to SAG-AFTRA for distribution to the performers as the parties may mutually determine.

Additionally, except as expressly provided otherwise above, a contribution based upon a percentage of the Supplemental Markets fee payable under this Paragraph 3.A.(1) shall be made to the AFTRA Health and Retirement Funds. The applicable percentage shall be the same as the percentage of gross compensation payable to the AFTRA Health and Retirement Funds under the AFTRA or SAG-AFTRA Code under which the program was produced.

(2)     As to a network prime time dramatic program produced on or after July 1, 1983 which was released in Supplemental Markets prior to July 1, 1986, Producer will pay for the benefit of the performers on such program an amount equal to three and sixth-tenths percent (3.6%) of the Distributor's gross receipts in perpetuity (as hereinafter defined) which amount shall include health and retirement contributions. With respect to programs produced prior to July 1, 1984 released to basic cable on or after July 1, 1989, the payment shall be 7.5% of the Distributor's gross receipts in

perpetuity which amount shall include health and retirement contributions. With respect to programs produced on or after July 1, 1984, released to basic cable on or after July 1, 1989, the payment shall be six percent (6%) of the Distributor's gross receipts in perpetuity which amount shall include health and retirement contributions.  With respect to Distributor's gross receipts from the release to basic cable of free television programs produced on or after July 1, 1998, pursuant to license agreements entered into on or after July 1, 2001, said percentage shall be six percent (6%) plus applicable health and retirement contributions in accordance with provisions of Paragraph 102 of this Agreement.  No AICF contributions shall be due in connection with such payments.  With respect to prime time dramatic programs produced on or after November 16, 1973, released on cassette on or after July 1, 1986 the payment shall be four and five-tenths percent (4.5%) of the first one million dollars ($1,000,000) of such Distributor's gross receipts and five and four-tenths percent (5.4%) thereafter.  With respect to any other Supplemental Markets release of such prime time dramatic programs on or after July 1, 1986, the payment shall be 3.6% of such Distributor's gross receipts.  Such payments shall be for the benefit of all performers on the program, except for walk-ons and background actors. That portion of the payments which is not allocated to health and retirement contributions shall be distributed to the performers in accordance with the distribution formula set forth in subparagraph (1) above.

B.     Upon the sale, transfer, assignment, license, lease, agreement to distribute or other disposition by Producer of its right to exhibit a television program in Supplemental Markets, Producer shall not be responsible to SAG-AFTRA or to any performers for any payments thereafter due with respect to Supplemental Market use or for a breach or violation of this Agreement by such transferee, if Producer in its agreement with such transferee has included a provision (hereinafter referred to as an "assumption agreement") substantially in the following form:

"_____

(insert name of transferee)

hereby agrees with _____ that all recorded

(insert name of Producer)

programs covered by this agreement are subject to the 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting, including Exhibit D thereof, the SAG-AFTRA Supplemental Markets Agreement. Transferee hereby agrees expressly for the benefit of SAG-AFTRA as representative of the performers affected thereby to make the additional compensation payments for Supplemental Markets use subsequently incurred and required by said Agreement and all Social Security, withholding, unemployment insurance and disability insurance payments and other payments required of employers by law with respect to such additional compensation, and all appropriate contributions to the AFTRA Health and Retirement Funds required under the provisions of said Agreement with respect to such additional compensation, and to comply with the provisions of said Agreement with respect to the use of such recorded programs and required records and reports.  It is expressly understood and agreed that the rights of transferee to exhibit such recorded programs in Supplemental Markets shall be subject to and conditioned upon the prompt payment to the performers involved of additional compensation as provided in said Agreement, and SAG-AFTRA shall be entitled to injunctive relief in the event such payments are not made.  It is also expressly understood and agreed that any dispute between the transferee and SAG-AFTRA or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code."

4.     <u>Definition of Distributor's Gross Receipts</u>

123

A.   With respect to network prime time dramatic programs released on cassette on or after July 1, 1986 and all other programs released on cassette on or after November 16, 1985, the "Distributor's gross receipts" is defined as follows:

    (1)   If the Producer is the Distributor or the Distributor is owned by or affiliated with the Producer, the "Distributor's gross receipts" derived from the distribution of such program by "cassettes" shall be twenty percent (20%) of the worldwide wholesale receipts derived by the Distributor.  In such cases, if the Distributor is also the retailer, a reasonable allocation of the retail gross receipts shall be made as between the Distributor as distributor and the Distributor as retailer, and twenty percent (20%) of the former only shall be deemed to be "Distributor's gross receipts."  The reasonableness of such allocation shall be subject to arbitration, and in such arbitration, generally prevailing trade practices in the cassette industry with respect to dealings between non-related companies shall be relevant evidence.

    (2)   If the Distributor is not the Producer and is not owned by or affiliated with the Producer, the "Distributor's gross receipts" shall be one hundred percent (100%) of the fees received by the Producer from licensing the right to distribute such program by cassette.

B.   For all other purposes the term "Distributor's gross receipts" shall mean the worldwide total gross receipts derived by the distributor (who may be the Producer or a distributor licensed by the Producer) from licensing the right to exhibit such program in Supplemental Markets, as defined above.

If the distributor of such program does not distribute such program directly in Supplemental Markets, but employs a sub-distributor to so distribute such program, then the "Distributor's gross receipts" shall be the worldwide total gross receipts derived by such sub-distributor from licensing the right to exhibit such picture in Supplemental Markets.  In case of an outright sale of Supplemental Markets distribution rights, for the entire world, or any territory or country, the income derived by the seller from such sale, but not the income realized by the purchaser or licensee of such rights, shall be the "Distributor's gross receipts."  If any such outright sale shall include Supplemental Market exhibition rights and other rights, then (but only for the purpose of the computation required hereunder) the Producer shall allocate to the Supplemental Markets exhibition rights a fair and reasonable portion of the sales price which shall, for the purpose hereof, be the "Distributor's gross receipts."  In reaching this determination, Producer may consider the current market value of Supplemental Markets exhibition rights in comparable programs.

If SAG-AFTRA shall contend that the amount so allocated was not fair and reasonable, such claim may be determined by submission to arbitration as herein provided; and in the event the Arbitrator shall find that such allocation was not reasonable and fair, he or she shall determine the fair and reasonable amount to be allocated.  If the outright sale includes Supplemental Markets distribution rights to more than one (1) program, Producer shall likewise allocate to each such program a fair and reasonable portion of the sales price of the Supplemental Market rights; and if SAG-AFTRA contends that such allocation is not fair and reasonable, the question may be determined by submission to arbitration as provided herein.  If the Arbitrator shall find that such allocation was not fair and reasonable, the Arbitrator shall determine the fair and reasonable amount to be so allocated to each such program.  Nothing with respect to the price received on the outright sale of only Supplemental Markets distribution rights in a single such program shall be subject to arbitration except that, in the event of a dispute, there may be arbitrated the question of whether the price reported by the Producer to SAG-AFTRA as having been received by the Producer on such outright sale is less than the amount actually received by the Producer on such outright sale.

C.   <u>The Distributor's gross receipts shall not include:</u>

(1)     Sums realized or held by way of deposit as security, until and unless earned, other than such sums as are non-returnable;

(2)     Rebates, credits or repayments for cassettes returned (and in this connection Producer shall have the right to set up a reasonable reserve for returns);

(3)     Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of such programs or on any monies to be remitted to or by Producer or such other distributor; but there shall not be excluded from Distributor's gross receipts any net income tax, franchise tax or excess profit tax or similar tax payable by Producer or such Distributor on its net income or for the privilege of doing business;

(4)     Frozen foreign currency until Producer shall either have the right to freely use such foreign currency, or Producer or Distributor has the right to transmit to the United States to Producer or Distributor such foreign currency from the country or territory where it is frozen.  If such currency may be utilized or transmitted as aforesaid, it shall be deemed to have been converted to United States dollars at the rate of exchange at which such currency was actually transmitted to the United States as aforesaid, or if not actually transmitted, then at the prevailing free market rate of exchange at the time such right to use or to transmit occurs.  Frozen foreign currency shall be deemed to be unblocked on the basis of "first in, first out" unless otherwise allocated by local foreign fiscal authorities.  Allocation of such unblocked funds as between revenue which serves as the basis of determining payments hereunder and other revenue, shall be on a proportional basis, subject to different earmarking by local foreign fiscal authorities.

D.    <u>Allocation of Gross Receipts</u>:

If any agreement for distribution in the Supplemental Market includes more than one program, or includes both Supplemental Market rights and other rights, Producer shall make a reasonable allocation for the purpose of determining payments due hereunder.  If SAG-AFTRA contends that such allocation is not reasonable, then such claim may be submitted to arbitration in accordance with the Voluntary Labor Arbitration Rules of the American Arbitration Association.

5.    <u>Time of Payment and Reports</u>

Payments of any Supplemental Market fees due under this agreement shall be made quarterly on the basis of quarterly statements.  Payments shall continue as long as gross receipts are realized from the distribution.  Producer shall furnish to SAG-AFTRA written quarterly reports showing Producer's gross receipts, in accordance with the foregoing, from distribution of programs in Supplemental Markets.  SAG-AFTRA shall have the right, at reasonable times, to examine the books and records of Producer insofar as they relate to Producer's gross receipts from distribution in Supplemental Markets.

Producer shall furnish to SAG-AFTRA, promptly upon the release of any program to Supplemental Markets, information including the name, length and date of production of the program and a complete program cast list of performers covered by this Agreement, their social security numbers and a description of the services rendered by each.

Within a reasonable time after the expiration of each calendar quarter but not exceeding sixty (60) days, Producer will furnish or cause to be furnished to SAG-AFTRA, a written report showing the gross receipts during the preceding quarter, from the distribution of each such television program by Producer in Supplemental Markets with respect to which Producer is required to make payments hereunder (whether distributed by the Producer or through another Distributor), showing the date of first exhibition in any Supplemental Market, and concurrently with the furnishing of such written report, Producer shall make the payment thereby shown to be due.  If the Producer shall fail to pay such additional

125

compensation when and as the same becomes due and payable, the Producer shall pay a late payment penalty of one and one-half percent (1½%) per month on the unpaid balance commencing to accrue from the date of the delinquency.

No such reports need be furnished with respect to any periods during which there were no such gross receipts. An inadvertent failure to comply with the reporting provisions of this subsection shall not constitute a default by the Producer hereunder, provided such failure is cured promptly after notice thereof is received by the Producer from SAG-AFTRA.

6.   Assignment of Rights

It is agreed that the rights of performers to compensation for the Supplemental Markets use of a program in accordance with the terms of this Agreement shall not be affected by any sale, assignment, pledge, hypothecation, or other transfer of the recording of the program, or by any attachment, garnishment, bankruptcy, assignments for the benefit of creditors, probate, or any other legal proceeding involving the Producer or his successors in interest. Accordingly, it is expressly agreed that the right of any Producer hereunder to use a recording of any program pursuant to this Agreement is subject to the condition precedent of the payment of all fees required by this Agreement and that:

A.   Any person acquiring all or part of the property rights of said Producer in such recording by voluntary assignment shall do so subject to the same conditions precedent; and

B.   In the event of any involuntary assignment, whether by operation of law or otherwise, the Producer's rights in such recording shall be deemed personal and non-assignable, and no assignee thereof shall acquire any right to use such recording; provided, however, that SAG-AFTRA agrees to permit the assignee in the event of an involuntary assignment, whether by operation of law or otherwise, to exercise all rights hereunder upon payment to the SAG-AFTRA performers in the program of all fees that may be due or become due to them hereunder; and further, that the assignee shall be deemed to have full title to said recording upon his executing an agreement with SAG-AFTRA whereby said assignee assumes the obligation of the debtor to the SAG-AFTRA performers.  Producer agrees to incorporate the terms of this paragraph in any transfer of his interest in a recording and to require the same undertaking on behalf of his successors and assigns in interest.

C.   The performer shall have the right to apply for and secure an injunction against any Supplemental Market use of a program containing the performer's services in the event the requirements of this agreement are not satisfied, and more particularly in the event all payments provided for herein (or in the performer's agreement with the Producer) are not made.

7.   Prior AFTRA Codes and Agreements

Except to the extent that prior Codes have been modified by this Code, nothing in this Agreement shall be construed to vary the terms, provisions, and conditions of any agreement in force as of June 18, 1989 and which concerns the release of a program(s) produced prior to November 16, 1973 in Supplemental Markets.

8.   Availability of Agreement

This Agreement shall be available to any Producer which produces television programs within the scope of agreement set forth in Paragraph 1 which are released in Supplemental Markets, and except as set forth herein no Producer has any rights whatsoever to use in Supplemental Markets any program heretofore produced under an AFTRA or SAG-AFTRA Network Television Code or Local Television Contract.

9.   Term of Agreement

126

This Agreement shall be effective on the date of execution hereof and shall be coterminous with the 2014-2018 SAG-AFTRA Network Television Broadcasting Code.

ACCEPTED AND AGREED TO:


By _____          Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.


By _____          Date _____
   Steve Eisenhardt
   NBC, Inc.


By _____          Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.


By _____          Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.


By _____          Date _____
   Helayne Antler
   CPT Holdings, Inc.


SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS


By _____          Date _____
   David P. White
   National Executive Director

127

**Exhibit E**
**(2014-2018 SAG-AFTRA Network Television Code)**

**ORIGINAL EMPLOYMENT FOR THE PAY TELEVISION, VIDEO DISC/ VIDEOCASSETTE MARKETS**

1.   <u>Introduction and Scope</u>

    A.   These provisions shall apply to the employment of performers on or after July 1, 1986 on entertainment programs of the type historically produced under the SAG-AFTRA Code of Fair Practice for Network Television Broadcasting (hereinafter referred to as the " SAG-AFTRA Code") when produced primarily for the Pay Television and/or the video disc/videocassette markets.

    B.   The term "video disc/videocassette" as used in this Exhibit E means program material produced primarily for disc, cassette, cartridge, and the like, which is sold or rented for play on home-type television screens in the home.

    C.   The term "Pay Television" as used in this Exhibit E shall mean exhibition on a television screen in the home by means of telecast, cable, closed circuit or CATV where substantially all services to which the program is licensed meet the following tests:

        (1)   Where a separate channel is provided for which the subscriber pays a separate fee (which fee is a major charge relative to other charges made to the subscriber) for that channel; and/or

        (2)   Where the subscriber pays for each program he selects (except that a program he selects, for which only a token charge is made, shall not be considered a Pay Television program); and/or

        (3)   Where the subscriber pays a fee for an encoded telecast, which fee is a major charge relative to other fees paid for encoded telecasts.

2.   <u>Initial Compensation and Working Conditions</u>

    A.   The minimum initial compensation and working conditions applicable to entertainment programs of the type historically produced under the SAG-AFTRA Code when produced primarily for the Pay Television and/or video disc/videocassette market shall be the same as:

        (1)   The minimum applicable rates and working conditions (including the provisions for use of excerpts) contained in Exhibit A of the 2014-2018 SAG-AFTRA Code for programs of the following types:

            (a)   Drama (including situation comedy) of the type produced for prime time television;

            (b)   Drama of the type produced for theatrical motion pictures; and

            (c)   Book musicals.

        (2)   The minimum applicable rates and working conditions (including the provisions for use of excerpts) contained in the 2014-2018 SAG-AFTRA Code shall be utilized by the Producer for programs of the type listed below:

            (a)   Variety programs in the format historically produced for network prime time television; *e.g., "The Carol Burnett Show," "The Ed Sullivan Show;"*
            (b)   Television game shows; and
            (c)   Television quiz shows.

(3)    The minimum rates and working conditions (including the provisions for use of excerpts) applicable to serials contained in the 2014-2018 SAG-AFTRA Code shall apply to multiple times per week television dramatic programs of the type normally done for non-prime time television.

(4)    Producer agrees that prior to the employment of any performer in an entertainment program of the type historically produced under the SAG-AFTRA Code intended primarily for exhibition on Pay Television which is not described in subparagraphs (1) through (3) above, Producer will give at least sixty (60) days' advance notice to SAG-AFTRA of such proposed employment.  Producer and SAG-AFTRA agree to meet within thirty (30) days from receipt of such notice for the purpose of negotiating with respect to the terms and conditions for such employment.  If no agreement is reached with respect thereto within such sixty (60) day period, SAG-AFTRA may, upon a thirty (30) day written notice to Producer, instruct its members to withhold services with respect to the production of such program.  Any dispute between SAG-AFTRA and the Producer as to whether such program is included in one of the categories described in subparagraphs (1) through (3) above shall be subject to arbitration under the provisions of this Exhibit E.

B.    The initial compensation set forth in this Paragraph 2 shall constitute payment in full for ten (10) exhibition days for a program (with no limit on the number of broadcasts commenced in any calendar day) over a single United States national pay television subscription service to which the program is licensed in the Pay Television Market within a period of one (1) year from the initial exhibition on each such service and for ten (10) exhibition days for a program (with no limit on the number of broadcasts commenced in any calendar day) over all other services in the United States and Canada to which the program is licensed in the Pay Television market within a period of one (1) year from the initial exhibition on such service.  For this purpose, commonly-owned pay television services, such as HBO/Cinemax/Festival and Showtime/The Movie Channel, shall each be considered a single service.  However, with respect to programs produced primarily for play specifically relating to the holidays set forth in subparagraph (1) of this Paragraph B, the period shall be ten (10) exhibition days in three (3) consecutive holiday seasons:

(1)    New Year's Day, Valentine's Day, St. Patrick's Day, Easter, Passover, Independence Day (July 4th), Halloween, Thanksgiving, Hanukah, Christmas.

(2)    If a performer is engaged for a holiday program, it shall be so stated in his booking slip, if applicable, and in his contract.

The initial compensation shall also include payment for the first 100,000 net unit sales in the aggregate, in the video disc/videocassette worldwide market.

An exhibition day shall commence at one second after midnight and end at midnight, unless any exhibition of a program shall commence prior to midnight and continue past midnight, in which case the exhibition day shall be deemed to begin when the program commenced.

C.    The parties recognize that the March 25, 1982 Supplement to the 1980-1983 AFTRA Code of Fair Practice for Phonograph Recordings and its successors may cover categories of programs not described in Paragraph 2.A. above and that nothing herein shall preclude any signatory hereof from producing such programs pursuant to such Codes.

3. <u>Additional Compensation</u>

    A. <u>Pay Television - For covered programs released in the Pay Television Market</u>:

        (1) For exhibition days on a single United States national pay television subscription service or any other service in the United States and Canada, either in excess of ten (10) or subsequent to one (1) year from the date of the initial exhibition on such service, or for exhibitions on foreign (*i.e.*, other than the United States and Canada) pay television, or for exhibitions on a second or subsequent United States national pay television subscription service, Producer shall pay:

                Six percent (6%) (plus Health and Retirement payments in accordance with the 2014-2018 SAG-AFTRA Code) of the Distributor's gross receipts as defined in Exhibit D of the 2001-2004 AFTRA Code from such excess exhibition days on such service, except that in the case of covered programs the cast of which (exclusive of those members of the cast who would not be entitled to residuals if the program had been produced for free television) is four (4) performers or less, the total percentage shall be computed on the basis of one and one-half percent (1½%) per performer. The computation of the number of performers in the cast, for purposes of determining the percentage payable, shall exclude off-camera announcers, provided however, that where the only performer(s) on a program is an off-camera announcer(s), the percentage shall be one-half (½) of one percent (1%) plus pension and welfare. However, off-camera announcers shall not be excluded for purposes of determining the rateable distribution provided in Exhibit E, Paragraph 5 hereof.

        (2) If any license, whether an initial or subsequent license, for a program on any service covers exhibition days in excess of ten (10), each such day shall be given equal monetary weight in determining the sums subject to the payment described in subparagraph (1) hereof. As an example, if the initial license encompasses seventeen (17) exhibition days, 7/17th of the sums actually received from such license shall be subject to the appropriate payment under this Paragraph 3. For further example, if a second or subsequent license is for ten (10) days and covers the ninth (9th) through eighteenth (18th) day, 8/10th of the sum actually received from such licenses shall be subject to the appropriate payment under this Paragraph 3.

        (3) Where a license covers exhibition days both within and outside the one (1) year limitation set forth in Paragraph 2.B. above, all days shall be given equal monetary weight. For example, if a license is for fourteen (14) days use in eighteen (18) months, and five (5) exhibition days occur after the one (1) year period, each day of exhibition which actually occurs after the one (1) year period shall be given equal monetary weight, and 5/14ths of the license fee shall be subject to the appropriate payment under this Exhibit E, Paragraph 3.

        (4) The Producer's right to apply contingent compensation against the payments required to be paid to any performer under the 2014-2018 SAG-AFTRA Code shall also apply to any payments required herein.

        (5) Payment shall be made quarterly.

    B.    <u>Video Disc/Videocassette Market</u>

        (1)    For sales of a covered program in the video disc/videocassette market, the Producer shall pay:

               Six percent (6%) (plus Health and Retirement payments in accordance with the 2014-2018 SAG-AFTRA Network Television Code) of the fee or other payment actually received by the Producer from net unit sales in excess of 100,000 units in the aggregate, except that in the case of covered programs the cast of which (exclusive of those members of the cast who would not be entitled to residuals if the program had been produced for network television) is four (4) performers or less, the total percentage shall be computed on the basis of one and one-half percent (1½%) per performer. The computation of the number of performers in the cast, for purposes of this paragraph only (but not for the purpose of determining rateable distribution provided in Paragraph 5 hereof), shall exclude off-camera announcer(s), provided however, that where the only performer(s) on a program is an off-camera announcer(s), the percentage shall be one-half (½) of one percent (.5%) plus pension and welfare.

        (2)    The term "disc" as used in this paragraph shall refer to both video discs and videocassettes. The term "unit" shall refer to the disc or aggregate discs in each package released by the Producer for sale or rental. "Net Unit Sales" shall mean sales of units which are released by the Producer or its distributor for sale and are not returned, or are released by the Producer or its distributor for rental purposes.

        (3)    It is recognized that some companies hereunder may act both as producers and as distributors of disc units in covered sales. In such a case, the payments set forth above shall be based on either (i) the fee or other payment received by the subsidiary, division or other department of the company which serves as the production branch from the subsidiary, division or other department of the company which serves as the distribution branch, or (ii) where no separate subsidiary, division, or other department serves as the production branch, a reasonable allocation of the gross receipts of the company from covered sales attributable solely to fees or other payments which would be made to a production subsidiary, division or other department of the company if one existed, or would be made to an outside producer. The reasonableness of such allocation in (ii) above, or of the fee or other payment received by the production subsidiary, division or other department in (i) above, shall be determined in its license fee payments to outside producers for comparable disc units, or in the absence of such practice, by generally prevailing trade practice in the video disc industry.

        (4)    The Producer's right to apply contingent compensation against the payments required to be paid to any performer under the 2014-2018 SAG-AFTRA Code shall also apply to any payments required herein.

4.    <u>Release in Other Media</u>

    A.    If and when a program produced hereunder, for which the minimum initial compensation is governed by Paragraph 2.A.(1) hereof, is broadcast in free television, Producer shall be obligated to pay to the performers the applicable additional compensation for reruns (*e.g.*, if network prime time, network non-prime time, or syndication, as the case may be) provided under Exhibit A of the 2014-2018 SAG-AFTRA Code.

    B.    If and when a program produced hereunder, for which the minimum initial compensation is governed by Paragraph 2.A.(2) or 2.A.(3) of this Exhibit E, is broadcast in free television, Producer shall be obligated to pay to the performers, for the first such broadcast, the applicable first replay fee set forth in the 2014-2018

SAG-AFTRA Code for such broadcast, and any subsequent broadcast of such program shall comply with such replay formula.

C.     If a program produced hereunder is released in theatrical exhibition, Producer shall be obligated to pay to the performers an additional minimum fee equal to the applicable minimum fee payable under the 2014-2018 SAG-AFTRA Code had such program been first exhibited in free television.

D.     If a program hereunder is licensed for exhibition on domestic basic cable (other than as a relay for a domestic free television broadcast) the Producer shall pay to SAG-AFTRA for rateable distribution to the performers in the cast six percent (6%) (plus health and retirement contributions in accordance with the 2014-2018 SAG-AFTRA Network Television Code) of Distributor's gross receipts from such exhibition, subject to the one and one-half percent (1½%) limitation where four (4) or fewer performers are involved, and subject to the compensation limits set forth in the last two (2) sentences of Paragraph 3.A.(1) hereof.

E.     If a program produced hereunder is licensed for exhibition in other Supplemental Markets (such as "in-flight"), the Producer shall pay for such Supplemental Markets use in accordance with the Supplemental Markets formula provided in the 2014-2018 SAG-AFTRA Code which would have been applicable to such program had it been produced for free television.

5.     <u>Distribution Formula</u>

Sums received by SAG-AFTRA hereunder shall be distributed as follows:

Units will be assigned to performers entitled to participate as follows:

A.     <u>Time Units</u>

With respect to each performer, units for time worked shall be computed as follows:

Each day = 1/5 unit
Each week = 1 unit

No more than five (5) time units may be credited to any performer.

B.     <u>Salary Units</u>

(1)     With respect to programs covered by Paragraph 2.A.(1) above:

With respect to each performer, units for total compensation received from the program shall be computed as follows:

(a)     <u>Day Performer</u>

Each multiple of daily scale equals one-fifth (1/5) unit. A fraction of daily scale when more than one-half (½) shall be credited as another one-fifth (1/5) unit.

(b)     <u>All Other Performers</u>

Each multiple of weekly scale equals one (1) unit. A fraction of a multiple when more than one-half (½) of weekly scale shall be credited as another weekly unit.

(c)     No more than ten (10) salary units may be credited to any performer.

132

(2)    With respect to programs covered by Paragraphs 2.A.(2) and (3) above:

With respect to each performer, units for total compensation received from the program shall be computed as follows:

(a)    "Daily scale" shall be determined by dividing the applicable minimum program fee by the applicable number of included days. The multiples of daily scale shall be determined by dividing the total initial compensation received by the performer by the "daily scale." Each multiple of daily scale equals one-fifth (1/5) unit. A fraction of daily scale when more than one-half (½) shall be credited as another one-fifth (1/5) unit.

(b)    No more than ten (10) salary units may be credited to any performer.

C.    <u>Computation</u>

Each performer shall be credited with the sum of time and salary units as computed above. All performers' salary units shall be totaled and each performer will receive that rateable proportion of the monies as the performers' number of units bears to the total number of units for the entire cast.

D.    <u>Allocation</u>

With respect to such programs made outside of the United States, where part of the cast is composed of performers subject to this Exhibit E and part of the cast is not subject to this Exhibit E, then sums payable hereunder shall be prorated based on the proportion which the salaries payable to the performers subject to this Exhibit E bears to the total performers' salaries for the program.

6.    <u>Single Contract</u>

A committee, comprising representatives of SAG-AFTRA and the Producers, shall be established to discuss the formulation of a single contract for product covered hereunder.

7.    <u>Late Payment</u>

In the event Producer fails to pay additional compensation as required under Paragraph 3, within ten (10) days from the date of a notice in writing to Producer from SAG-AFTRA, a late payment penalty shall accrue at the rate of one percent (1%) per month from the date of such notice.

The foregoing shall not preclude the Producer from recovering an erroneous payment. If there is a dispute over the amount due the performer, and Producer pays the undisputed amount on time, or if there is a dispute as to the Producer's liability therefor, there will be no late payment charge.

**EXHIBIT F**

**Stunt Driving Guidelines**

1. When a person appears on camera in a program while driving a vehicle and the following conditions are anticipated, such person shall be treated as a stunt performer:

   (a) When any or all wheels will leave the driving surface.

   (b) When tire traction will be broken, *e.g.*, skids, slides, etc.

   (c) Impaired Vision - when the driver's vision will be substantially impaired by:

      (i) Dust

      (ii) Spray (when driving through water, mud, etc.)

      (iii) Blinding lights

      (iv) Restrictive covering of the windshield

      (v) Smoke

      (vi) Any other conditions which will substantially restrict the driver's normal vision.

   (d) If the speed of the vehicle will be greater than normally safe for the conditions of the driving surface, or when other conditions such as obstacles or difficulty of terrain will exist or off-road driving other than normal low-speed driving for which the vehicle was designed will occur.

   (e) When any aircraft, fixed-wing or helicopter, will be flown in close proximity to the vehicle creating hazardous driving conditions.

   (f) When the driver is required to drive in a position substantially different from a normal driving position (for example, when the driver must drive while lying across the seat, or from the back seat).

2. When, for safety reasons, a principal performer is doubled on-camera as a driver or a passenger in a vehicle, the double shall be treated as a stunt performer.

3. Whenever it is anticipated that high speed or close proximity of two (2) or more vehicles will create conditions dangerous to an on-camera performer, such on-camera performer shall be treated as a stunt performer.

134

**EXHIBIT G**

## STATEMENT OF OBJECTIVES AND PRINCIPLES

### SAG-AFTRA-INDUSTRY PROGRAM FOR ALCOHOLISM AND DRUG ABUSE

1. Alcoholism and drug abuse are diseases for which there is effective treatment and rehabilitation.

2. If an individual with an alcoholism or drug abuse problem submits to modern treatment and rehabilitation techniques, the problem can be arrested in most instances.

3. It is the objective of the Council to further and assist in all efforts to provide direction and assistance to performers in securing effective treatment for alcoholism and drug abuse.  To that end, the Council

   (a) Will work with and guide the office which has been established by the AFTRA Health and Retirement Funds to provide assistance and direction to performers who are in need of treatment for alcoholism or drug abuse.

   (b) Will work within the entertainment community to direct appropriate cases to such office.

   (c) Will publicize the efforts of SAG-AFTRA and the Industry to make an alcohol and drug abuse treatment and rehabilitation program available to performers and will endeavor to secure the cooperation of the entire entertainment community in this project.

**EXHIBIT H**

**SAG-AFTRA - PARAGRAPH 97 REPORT**

PRODUCER_____

ADDRESS_____

E-MAIL ADDRESS_____

TELEPHONE NUMBER_____

PERIOD COVERED (Quarter, Year)_____

PROGRAMS OR PROGRAM SERIES COVERED _____

Titles   _____

Number of Episodes   _____

|  | Principal*    Principals** | Under 5's | Background Actors | AGE | | |
|---|---|---|---|---|---|---|
|  |  |  |  | Under 40 | 40 or Over | Unknown |
| Male |  |  |  |  |  |  |
| Female |  |  |  |  |  |  |

|  | Principals* | Principals** | Under 5's | Background Actors |
|---|---|---|---|---|
| Asian/Pacific Islander |  |  |  |  |
| Black/African American |  |  |  |  |
| Caucasian |  |  |  |  |
| Latino/Hispanic |  |  |  |  |
| Native American |  |  |  |  |
| Other or Unknown |  |  |  |  |

\* Principals in running parts
\*\* Other Principals

SAG-AFTRA
E-mail: diversity@sagaftra.org
Fax: 323-549-6647
Mail: 5757 Wilshire Blvd, 7th Floor
Loa Angeles, CA 90036-3600

136

EXHIBIT I

**PROMOTIONAL ANNOUNCER SESSION REPORT - NEW YORK**
**SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS**
5757 Wilshire Blvd. 7th Floor, Los Angeles, CA (323) 634-8163 FAX (323) 634-8194

# PROMO SESSION REPORT
### Off-Camera Announcer
(One copy of this form must be filled out and filed with **SAG-**AFTRA within 48 hours of engagement)

Announcer (print):_____   Signatory Producer _____

Session Date:_____   Recording Studio:_____   Address:_____

Network/Distributor:_____   Program/Series_____
Promo Use: *(check all that apply)*   Television:   Network ☐   Local ☐   Basic Cable ☐   Radio ☐

| | Promo Title (include episode, series, program service, or station) | No. of TV Promos | No. of Tags | No. of Customized Tags | No. of Sweepers | Additional use on Basic Cable? (If Yes, indicate no.) | | Syndication 1-year License Fee | | No. of Radio Promos |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Yes | No | Yes | No | |
| Promo #1 | | | | | | | | | | |
| Promo #2 | | | | | | | | | | |
| Promo #3 | | | | | | | | | | |
| Promo #4 | | | | | | | | | | |
| Promo #5 | | | | | | | | | | |
| Promo #6 | | | | | | | | | | |
| Promo #7 | | | | | | | | | | |
| Promo #8 | | | | | | | | | | |
| Promo #9 | | | | | | | | | | |
| Promo #10 | | | | | | | | | | |
| Promo #11 | | | | | | | | | | |
| Promo #12 | | | | | | | | | | |
| **Totals** | | | | | | | | | | |

Will an Agent's Commission be paid on this session?  Yes ☐   No ☐

Name of Talent Agency: _____

Hours worked: From: _____   To: _____   Announcer's Social Security no.:
_____

Producer's signature: _____   Announcer's signature:
_____

_____   Announcer's phone no.

137

# EXHIBIT J

## 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting

## TRANSFER OF RIGHTS

Upon the sale, transfer, assignment, license, lease, agreement to distribute or other disposition by Producer of its television rights in any recorded promotional announcement produced by it under this Code entered into or renewed after November 16, 2011 Producer shall not be responsible to SAG-AFTRA or to any performers for any payments thereafter due with respect to use of said promotional announcements or for a breach or violation of this Code by such transferee, (including distributor), if SAG-AFTRA approves the financial responsibility of such transferee in writing, and if Producer in its agreement with such transferee has included a provision (hereinafter referred to as an "assumption agreement") substantially in the following form:

"_____

(insert name of transferee)

hereby agrees with  _____

(insert name of Producer)

that all recorded promotional announcements covered by this agreement are subject to the 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting. Transferee hereby agrees for the benefit of SAG-AFTRA as representative of the performers affected thereby to make the compensation payments incurred and required by said Code for use of said promotional announcements, and all Social Security withholding, unemployment insurance and disability insurance payments and any other payments required of employers by law with respect to such compensation, and all appropriate contributions to the AFTRA Health and Retirement Funds required under the provisions of said Code with respect to such compensation, and to comply with the provisions of said Code with respect to the use of such recorded programs and required records and reports.  It is expressly understood and agreed that the rights of transferee to telecast such recorded promotional announcements shall be subject to and conditioned upon the prompt payment to the performers involved of compensation as provided in said Code, and SAG-AFTRA shall be entitled to injunctive relief, in the event such payments are not made.  It is also expressly understood and agreed that any dispute between the transferee and SAG-AFTRA or between the transferee and any performer whose services are covered by this assumption agreement, involving the performance or interpretation of this assumption agreement, shall be submitted to arbitration in accordance with the provisions of Paragraph 95 of said Code."

Producer agrees to give written notice to SAG-AFTRA within thirty (30) days of each sale, transfer or assignment, license or other disposition of any recorded promotional announcements which are subject to this Code, and such notice shall specify the name and address of the purchaser, licensee, transferee or assignee, and to deliver to SAG-AFTRA a copy of the above referred to assumption agreement.

An inadvertent failure on the part of Producer to comply with any of the provisions of this Exhibit J shall in no event constitute a default by Producer or a breach of the 2014-2018 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting provided that such failure is cured promptly after notice thereof from SAG-AFTRA.

Upon delivery of such assumption agreement and on condition that SAG-AFTRA approves in writing the financial responsibility of the purchaser, assignee, licensee, or transferee, Producer shall not be further liable for the keeping of any such records or for the payment of such compensation or for contributions to the AFTRA Health and Retirement Funds which are required in connection therewith, it being agreed that the purchaser, assignee, licensee, or transferee, shall solely be liable therefor.

SAG-AFTRA agrees that it will not unreasonably withhold its approval of the financial responsibility of any such purchaser, assignee, licensee or transferee, it being further agreed that if SAG-AFTRA, within twenty-one (21) days of receipt of notice of any such sale, assignment, license or transfer, has not advised Producer that it disapproves the financial responsibility of such

purchaser, assignee, licensee or transferee, SAG-AFTRA will be deemed to have approved the financial responsibility thereof.  In the event SAG-AFTRA advises Producer within such twenty-one (21) day period that it disapproves the financial responsibility of any such purchaser, assignee, licensee, or transferee and Producer disputes such disapproval, Producer shall have the right, at its election, to cause to be immediately submitted to arbitration, pursuant to the provisions of Paragraph 95 of such Code, the issue of whether SAG-AFTRA has unreasonably withheld the approval of the financial responsibility of such purchaser, assignee, licensee or transferee.

The provisions of this Exhibit J shall not apply with respect to any performer in connection with use of a recorded promotional announcement if no part of the performer's performance is used.

SIDELETTER 1

As of November 16, 1994

PRODUCER

Gentlemen:

An individual engaged on a serial in a lesser category may occasionally be upgraded to the principal performer category for a particular episode.  Paragraph 55.B. of the SAG-AFTRA Network Television Code is not intended to prohibit the reversion of such performer to a lesser category in subsequent episodes of the series; provided that such upgrading and downgrading of the performer occurs only occasionally or infrequently and not as a regular or ordinary practice.

Very truly yours,

SCREEN ACTORS GUILD- AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

140

SIDELETTER 2

As of November 16, 1994

Screen Actors Guild - American Federation of Television
 and Radio Artists

Attention National Executive Director

Gentlemen:

This is to confirm our agreement for payment to covered persons who perform in programs covered by the 2014-2018 SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING, or programs covered by the 2001-2004 AFTRA LOCAL TELEVISION CODES in New York, Chicago, and Los Angeles, when recordings of such programs are leased or licensed for direct projection or closed circuit exhibition before non-paying audiences (but excluding any form of CATV) under arrangements other than those covered by the Code.

This will confirm the results of our negotiation as follows:

(1)     Each such performer upon the first such lease or license will receive twenty percent (20%) of the applicable network minimum program fee, whether such program is a network program or a local program.  Such payment shall permit leases or licenses to be made only for the purposes hereinabove set forth during the seven (7) year period following such payment.  If the Company desires a renewal of said seven (7) year period, an additional payment of ten percent (10%) of the applicable network minimum program fee shall be paid for such period, and similar payments shall be made for any subsequent seven (7) year period.

(2)     We will notify you in writing when a lease or license covered by this agreement is executed.  Each such lease or license will contain appropriate prohibitions against misuse, which will cover in substance the following:

Licensee will not (i) exhibit the print to a paying audience for such exhibition; (ii) broadcast the print on radio or television, other than closed circuit broadcast to a non-paying audience; (iii) use the print in any manner which may be in violation of federal, state or local law.

(3)     We agree to pay a sum equal to fifteen percent (15%) (fifteen and one-half percent (15.5%) effective January 1, 2011, and sixteen and one-half percent (16.5%) effective February 27, 2012) of all the compensation paid to the performers hereunder to the AFTRA Health and Retirement Fund.

(4)     This agreement, unless extended, shall be applicable only to programs made between November 16, 2011 and November 15, 2014 inclusive.

If the above is in accordance with your understanding of our agreement, please sign in the space indicated below.

Very truly yours,

PRODUCER

By _____

ACCEPTED AND AGREED:

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

141

SIDELETTER 3

As of November 16, 1994

PRODUCER

Gentlemen:

It is understood and agreed that the second unnumbered paragraph of Paragraph 75.A. of the 2014-2018 SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING does not apply to persons who perform in film news inserts in network television programs, or in film news stories subject to Paragraph 76 of the Code, when this work is covered by a valid union contract provision which was in effect prior to November 16, 1966, and there is no waiver or release of such coverage by such other union.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

SIDELETTER 4

As of November 16, 1994

PRODUCER

Gentlemen:

In connection with the portion of Paragraph 91 of the 2014-2018 SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING and Paragraph 67 of the 2003-2007 AFTRA NATIONAL CODE OF FAIR PRACTICE FOR COMMERCIAL RADIO BROADCASTING and any successor agreements and SAG-AFTRA agreements thereto, which provides "AFTRA also reserves the right to require a Producer to make payment by certified check to the performers, delivered to the AFTRA office at least twenty-four (24) hours in advance of the first call, to be held in escrow until due and payable under the applicable provisions of this Code," it is agreed that this is not intended to apply to the Networks, the AMPTP Companies or Affiliated Companies.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____

National Executive Director

ACCEPTED AND AGREED TO:

PRODUCER

By _____

143

SIDELETTER 5

As of November 16, 1994

PRODUCER

Gentlemen:

Paragraph 92 of the 2014-2018 SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING contains a provision that SAG-AFTRA be given twenty-four (24) hours' advance notice of certain recording sessions.

This will confirm our agreement that the foregoing notice provision does not apply to the Networks, the AMPTP Companies or Affiliated Companies.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS


_____
National Executive Director


ACCEPTED AND AGREED TO:

PRODUCER

By _____

144

SIDELETTER 6

As of November 16, 1994

Screen actors Guild - American Federation of Television
  and Radio Artists

Gentlemen:

The following is an agreement between the Screen Actors Guild - American Federation of Television and Radio Artists and the Producer (hereafter individually designated as "company") with respect to recorded excerpts from legitimate stage productions on network television news or public affairs type programs.

1.    It is agreed that if the company records a portion of the performance and/or rehearsal (including dress rehearsal) of a play during its regular rehearsal hours a maximum of three (3) times during the rehearsal period or during the actual performance for use on network television news or public affairs type programs only, no claim will be made under the SAG-AFTRA 2014-2018 Code of Fair Practice for Network Television Broadcasting ("Code") in respect thereto so long as the following conditions are met:

A.    At least twenty-four (24) hours' advance notice of the recording session is given to the cast, and SAG-AFTRA is notified not later than forty-eight (48) hours after such session;

B.    The recorded material does not exceed one-half (½) hour of the rehearsal or performance time;

C.    No more than two (2) minutes of such recorded material is shown on the television broadcast provided that such two (2) minutes must not contain an entire self-contained number or scene;

D.    No payments are made by the company to any other personnel employed in the theatrical production; and

E.    The recorded material is utilized only in connection with reviews, news and feature stories about current theatrical productions, theaters, the theatrical industry and personalities associated with the same.

2.    This agreement is without prejudice to the position of any party and shall be binding only for the term of the current Code.

Very truly yours,

PRODUCER

By _____

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

145

SIDELETTER 7


As of November 16, 1994


PRODUCER


Gentlemen:

    With respect to Section 4 of Paragraph 102, Section 3, of the 2014-2018 SAG-AFTRA
NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING,
and the applicable Health and Retirement provisions of AFTRA or SAG-AFTRA NATIONAL
CODE OF FAIR PRACTICE FOR COMMERCIAL RADIO BROADCASTING AND
TRANSCRIBED RADIO PROGRAMS, of the AFTRA RADIO RECORDED COMMERCIALS
CONTRACT, the SAG-AFTRA TV RECORDED COMMERCIALS CONTRACT, and the
AFTRA or SAG-AFTRA NATIONAL SUSTAINING RADIO AGREEMENT FOR ACTORS
AND SINGERS, this is to confirm our agreement that the Networks, the AMPTP Companies or
Affiliated Companies may continue to furnish remittance reports and pay contributions in
accordance with current practice.



                                    Very truly yours,


                                    SCREEN ACTORS GUILD - AMERICAN
                                    FEDERATION OF TELEVISION AND
                                    RADIO ARTISTS


                                    _____
                                    National Executive Director

146

SIDELETTER 8

Sideletter 8 regarding hazard pay for dancers has been incorporated into Paragraph 5.A. of the Code.

SIDELETTER 9

As of November 16, 1994

Screen Actors Guild - American Federation of Television
and Radio Artists

Gentlemen:

It is recognized that the terms and conditions for the use of still photographs of performers on dramatic programs are often included in individual contracts.  However, where there is no individual contract or where the individual contract does not contain a provision specifically providing for use of still photographs, SAG-AFTRA has been informed that it is the Producer's intention to pay a performer engaged on a dramatic program $25.00 for each episode in which a still photograph(s) is used to portray a point essential to the story, provided the performer does not otherwise appear in the episode.  Such payment and use are not covered by any provisions of the Network TV Code.

Very truly yours,

PRODUCER

By _____

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

148

SIDELETTER 10

As of November 16, 1994

Screen Actors Guild - American Federation of Television
   and Radio Artists

Gentlemen:

   In recognition of singers' concerns about the impact that computerized equipment such as
Emulator, Synclavier, Fairlight, Kurzweil may have on employment of singers, the Producers
agree to participate in a joint SAG-AFTRA-Industry committee formed to discuss those concerns.

                                   Very truly yours,


                                   PRODUCER

                                   By _____


SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS


   By _____

149

SIDELETTER 11


As of November 16, 1994


Screen Actors Guild - American Federation of Television
  and Radio Artists


Gentlemen:

This letter will confirm that in the 1991 negotiations, the Producers agreed to AFTRA's proposal to change the term "physical disability" to "disability" based on AFTRA's representation that the former term has become objectionable to part of its membership.  It is understood that this change is not substantive and the term "disability" is not intended to have any broader meaning than the term "physical disability" as used in the prior Agreement.


Very truly yours,


PRODUCER

By _____


SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS


By _____

SIDELETTER 12

As of November 16, 1994

Screen Actors Guild - American Federation of Television
 and Radio Artists

Gentlemen:

It is recognized that computer payroll systems are by nature highly varied in their sophistication and capacity, and the demands to which the systems are subject vary greatly from Producer to Producer.  Producer has agreed to analyze the capabilities of, and demands upon, its payroll system, and if Producer's system is reasonably capable of providing more information regarding payment to the performer than Producer is currently providing, Producer shall discuss with SAG-AFTRA priorities concerning which information performers may find most useful.

Very truly yours,

PRODUCER

By _____

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____

SIDELETTER 13

As of November 16, 1994

Screen Actors Guild - American Federation of Television
  and Radio Artists

Gentlemen:

SAG-AFTRA brought to the attention of the serial producers a number of serious concerns involving certain terms and conditions of employment of performers engaged in daytime serial production in both the studio and on remotes. Cited were such items as overtime, short turnaround, hazardous assignment, vacation schedules, and employment of minors. The producers acknowledge that these are matters of concern for them as well.

Since all of these concerns differ in their degree of applicability with respect to each producer and each serial, and because of competitive reasons, SAG-AFTRA and the Companies believe that these mutual concerns should continue to be addressed in a different forum, during the term of the contract, on a producer-by-producer basis.

Therefore, in an effort to nurture an ongoing dialogue with respect to these important matters in the period between negotiations, the parties have agreed to hold semi-annual meetings between SAG-AFTRA and each producer on a show-by-show basis. Among the broad range of topics to be addressed at each meeting are the issues referred to above in the first paragraph of this sideletter, plus any other issue of mutual concern that may arise during the period of this contract. The meetings will be held at a mutually convenient time, taking into consideration the production requirements of each program. Attending these meetings for each producer will be not only the senior production representatives for each program but also senior programming, business and labor relations executives. Attending for SAG-AFTRA will be its senior representatives at each location, and representative performers at SAG-AFTRA's discretion, provided that program requirements permit.

A meeting pursuant to this Sideletter 13 shall be scheduled not later than 120 days from the date of ratification of the new Agreement to discuss the problems of vacation scheduling.

Very truly yours,

PRODUCER

By _____

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS

By _____

SIDELETTER 14


As of November 16, 1994


Screen Actors Guild - American Federation of Television
 and Radio Artists


Gentlemen:

Producer agrees to notify its licensee(s) producing promotional announcements for affiliates of
SAG-AFTRA's interest in being competitive in this area of production. Therefore, Producer agrees
to send the following letter to its licensee, provided that in consideration of the above commitment
SAG-AFTRA will not request from the producer the name of said licensee or any of its
subcontractors, or to request a copy of said letter.

Dear (licensee):

You have been licensed by (network) to utilize its graphics, music, etc. in the production
of promotional announcements for affiliates. SAG-AFTRA has expressed a desire to make
available to you its national pool of professional singers and to negotiate terms and
conditions which it believes to be competitive with those you have been using. We would
appreciate your notifying anyone to whom you contract out this work of these facts. If you
or your contractor are interested, you may contact SAG-AFTRA at


Very truly yours,


PRODUCER


By _____


SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION
AND RADIO ARTISTS


By _____

153

SIDELETTER 15

As of November 16, 1994

PRODUCER

Gentlemen:

     With respect to Paragraph 31, "Warm-Ups," producers, directors or writers who are members of the regular production staff of the program shall receive a $50.00 fee for performing a warm-up.  Where multiple programs are being taped in a day (such as with game shows) and individual warm-ups are done for each program, the $50.00 shall be paid for each program for which a warm-up is performed.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____
National Executive Director

SIDELETTER 16

As of November 16, 2004

PRODUCER

Gentlemen:

With respect to other edited down programs which are not composed of segments from programs with reality based formats, we have agreed to formulate a joint SAG-AFTRA Industry Contract Committee which may extend Paragraph 73.B (3). Replay of Reality Based Programs, to programs which do not have reality based formats or do not utilize re-enactments, but which are composed of stand-alone, self contained segments.  The committee also has the authority to consider and decide upon Producer proposals regarding conditions to be applied to other edited down programs.  The Committee will not unreasonably deny such proposals.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS

_____
National Executive Director

SIDELETTER 17


As of November 16, 1994


PRODUCER


Ladies and Gentlemen:

Many of the rules and working conditions of the Code of Fair Practice for Network Television Broadcasting were first formulated at a time when most programs were produced live.  SAG-AFTRA and the Producers agree that, as a result of subsequent changes in the methods of production, the structure of the Code is now overly complicated.

In recognition of their mutual desire to simplify and streamline certain rules and working conditions of the Code, the parties have agreed to establish a Contract Adjustment Committee. This Committee, consisting of SAG-AFTRA representatives and Producer (including Network) representatives will meet during the term of the Agreement to discuss and consider such changes in the structure of the Code as it deems necessary to achieve these objectives including, for example, changes in provisions concerning overtime, included hours and days, additional rehearsal, guaranteed days, sessions, calls, etc.

The Contract Adjustment Committee shall have the authority to agree upon changes of this nature and to recommend changes to the Producers (including Networks) and SAG-AFTRA.  If mutually approved, such changes may be implemented during the term of the Agreement.


Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS


_____

National Executive Director

SIDELETTER 18

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

It is understood and agreed that the parties shall meet within thirty (30) days of February 28, 1995 to promulgate guidelines for consistence in reporting of obvious disabilities.  If necessary, the parties agree to obtain the services of a mutually acceptable expert to assist in the promulgation of said guidelines.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____
National Executive Director

ACCEPTED AND AGREED:

PRODUCER

By _____

157

SIDELETTER 19

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

This letter will set forth our understanding and agreement that, during the period November 16, 1994, through February 28, 1995, the use of excerpts subject to Paragraph 73(d)2, shall be governed by the provisions of Paragraph 73(d)2(a) and (b) of the 1991-1994 AFTRA Television Code.

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____

National Executive Director

ACCEPTED AND AGREED:

PRODUCER

By _____

158

SIDELETTER 20

As of November 16, 1994

PRODUCER

Ladies and Gentlemen:

In response to your question during the 1994 negotiations, this is to confirm that AFTRA has interpreted Paragraph 88 to encompass cable exhibition and will continue to do so.

<div align="right">

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS

_____

National Executive Director

</div>

ACCEPTED AND AGREED:

PRODUCER

By _____

SIDELETTER 21

Sideletter 21 was deleted from the 2011-2014 Code.  Remaining Sideletters will retain their existing numbers.

SIDELETTER 22

Sideletter 22 was deleted from the 2011-2014 Code.  Remaining Sideletters will retain their
existing numbers.

SIDELETTER 23

As of November 16, 1998

PRODUCER

Ladies and Gentlemen:

During the 1998 negotiations, AFTRA proposed to include "knee work" in the definition of "hazardous performance" in Paragraph 5.A.(9) of the Network TV Code.  The Parties agree that, under certain circumstances, knee work including rolling, spinning, falling, balancing, hinging, walking, turning, and/or performing a choreographed routine on the knees, could meet the definition of "hazardous performance."

Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

_____
National Executive Director

SIDELETTER 24


As of November 16, 1998


PRODUCER


Ladies and Gentlemen:

During the 1998 negotiations of the AFTRA Network TV Code, AFTRA brought to the attention of the Producers its concerns about the reporting of production by announcers of promotional announcements in New York City.

Accordingly, AFTRA and the Producers have agreed that they will meet on a company-by-company basis and, within ninety (90) days of ratification, will develop and implement a method for providing AFTRA with a record of announcer promotional announcements produced under this Code in New York (Exhibit I of the Code).  With respect to Producers that produce promotional announcements in Los Angeles, such information shall be reported on a basis comparable to the information currently being provided by such company in Los Angeles.


Very truly yours,

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS


_____

National Executive Director

SIDELETTER 25

Sideletter 25 was deleted from the 2011-2014 Code.  Remaining Sideletters will retain their existing numbers.

SIDELETTER 26

Sideletter 26 was deleted from the 2011-2014 Code.  Remaining Sideletters will retain their existing numbers.

SIDELETTER 27

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

The language in Paragraph 23.A., *Meal Periods*, regarding the twelve (12) minute grace period prior to the imposition of any meal penalty, shall be subject to the same interpretation as applies to programs produced under Exhibit A.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____      Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____      Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____      Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____      Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____      Date _____
    Helayne Antler
    CPT Holdings, Inc.

166

SIDELETTER 28

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

The AMPTP, on behalf of AMPTP Companies signatory to the SAG-AFTRA Code, agrees to direct Breakdown Services to furnish SAG-AFTRA any breakdown in which one (1) or more of the roles being cast depicts a person with a specific disability.

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF
TELEVISION AND RADIO ARTISTS


By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:


By _____    Date _____
    Carol Lombardini
    On behalf of AMPTP Companies
    that are signatories to the 2014 SAG-AFTRA Code

167

SIDELETTER 29

**SIDELETTER ON SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE
FOR NETWORK TELEVISION BROADCASTING PROGRAMS
MADE FOR NEW MEDIA**

As of November 16, 2014

Screen Actors Guild - American Federation of Television
  and Radio Artists

Re:     Programs Made for New Media

This Sideletter confirms the understanding of the Screen Actors Guild - American Federation of Television and Radio Artists ("SAG-AFTRA") and the Producers (collectively "the parties") concerning the application of the 2014 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting ("SAG-AFTRA Network TV Code"), to audio-visual entertainment programs that are made for the Internet, mobile devices or any other "new media" known as of March 8, 2008 (hereinafter "New Media"). With respect to programs intended for initial use on New Media, the parties agree as follows:

The parties recognize that the economics of New Media production are presently uncertain and greater flexibility in terms and conditions of employment is therefore beneficial. If one or more business models develops such that New Media production becomes an economically viable medium, then the parties recognize that future agreements should reflect that fact.

**A.      Jurisdiction**

Jurisdiction over people covered and geographic scope shall be governed by the SAG-AFTRA Network TV Code. Jurisdiction over program types shall include those traditionally covered by the SAG-AFTRA Network TV Code, excluding news, public affairs, documentary and sports. "New Media Promotional Announcements," as that term is defined herein, shall be covered under the terms of Paragraph D. below.

A "New Media Promotional Announcement" is a promotional announcement of the type traditionally produced under the Network Code intended for initial use in New Media which is (1) for a program or programs made for broadcast television; or (2) to promote a Derivative or Original New Media Production which is covered under this Sideletter. All other promotional announcements intended for initial use in New Media may be covered under the terms of Paragraph D. at the Producer's option.

**B.      Derivative New Media Productions**

A "Derivative New Media Production" ("DNMP") is a production for New Media based on an existing television program that was produced for "traditional" media - e.g., a free television, basic cable, or pay television program (the "Original Production").

**1.      Compensation**

All terms and conditions of employment, including initial compensation and deferred compensation, if any, will be subject to negotiation between the Producer and the individual Performer, except for those provisions of the SAG-AFTRA Network TV Code incorporated herein by reference below. It is understood that Producer and Performer may have negotiated about such terms and conditions in contracts of employment entered into prior to March 8, 2008; if so, the terms and conditions of such contract shall control. SAG-AFTRA agrees that it will not interfere in any such negotiations between the Performer and the Producer.

168

2.      **Applicable Provisions of the Network Code**

Only the following specific provisions of the SAG-AFTRA Network TV Code are incorporated herein. To the extent the provisions herein are inconsistent with the Code, the provisions of this sideletter control.

**Paragraph 61.  Payment**

**Paragraph 62.  Deductions for Social Security and Withholding Taxes**

**Paragraph 63.  Disability Insurance**

**Paragraph 66.  Individual Contracts**

**Paragraph 83.  Definitions**

**Paragraph 84.  Union Shop**

**Paragraph 86.  Admission to Premises**

**Paragraph 93.  No-Strike Clause**

**Paragraph 94.  Production Prosecuted**

**Paragraph 95.  Grievance and Arbitration**

**Paragraph 97.  Subsections A. and E. only.  No Discrimination/Affirmative Action**
**Paragraph 99.  Separability**

**Paragraph 102.  AFTRA Health and Retirement Funds**

3.      **Reuse**

Reuse shall be governed by the New Media Re-Use Sideletter.

4.      **Credit**

Principal performers shall be accorded credit if any other person receives credit on the New Media Production. Credits may appear in the corner of the screen. "Click-through" credits may be used.

5.      As soon as practicable for each production made for New Media, Producer shall furnish a notice containing the following information to a designated representative of the Union:

-the name, address and telephone number of the production company;
-the working title of the production; and
-the principal location at which photography is scheduled to occur.

Both the Union and the Producer shall designate a representative for the other party to contact in the event of questions concerning the foregoing.

6.      Overwithholding

1.      The "Part-Year Employment Method" of withholding, as currently set forth in Section 31.3402(h)(4)-1(c) of the Internal Revenue Code Regulations, or any applicable successor regulations, shall be utilized for any performer upon request of the performer and the form of declaration for each such use shall be attached to the performer's employment contract.

2.      The withholding of taxes on a weekly basis rather than on a daily basis for day performers as currently set forth in Internal Revenue Code Regulation

169

Section 31.3402(c)-(1)(d)(2), or any applicable successor regulations, shall be utilized on the request of the day performer and the form of declaration for such use shall be attached to employment contracts of day performers.

3.    The obligation of the Producer to permit the election of the foregoing alternative withholding formulae shall be effective during such time as the Internal Revenue Code Regulations permit such alternatives.

7.    Payroll and Unemployment Insurance Information

Producer shall, upon request of the performer, supply the following information, in writing, to the performer:  (1) the name, address and state identification number of the employer of record; and (2) the state in which unemployment insurance is filed.

8.    Nudity

No performer shall be expected to appear nude, except with the performer's consent after the performer has had an opportunity to read the script.

## C.    "Experimental New Media Productions" (Original Productions Only)

Coverage shall be at the Producer's option with respect to "Experimental New Media Productions."  An "Experimental New Media Production" ("ENMP") is defined as any Original New Media Production (1) for which the actual cost of production is either:  (a) $15,000 or less per minute of program material as exhibited, or (b) $300,000 or less per single production as exhibited, or (c) $500,000 or less per series of programs produced for a single order; and (2) does not utilize a "covered" performer.

For definition of a "covered performer" for purposes of this provision, see Sideletter 47 hereto.

The actual cost of the ENMP shall consist of all direct costs actually incurred in connection with the Production.  The only costs excluded in determining the actual cost of production shall be development costs, overhead charges, financing costs (i.e., loan origination fees, gaps fees, legal fees, and interest), contingency of up to ten percent (10%), essential elements insurance costs, the cost of the completion bond, marketing expenses, contingent payments to talent or other parties which are based on the proceeds derived from the exploitation of the Production and received after recoupment of the negative cost, and delivery items required by sales agents, distributors or sub-distributors (i.e., delivery materials beyond the answer print, NTSC Video Master if the Production is delivered on videotape, or the digital equivalent if the Production is delivered in a digital format).

The terms of Paragraph D. shall apply to any "Experimental New Media Production" which the Producer elects to cover.

## D.    Original Serial Dramatic and Non-Dramatic Programs Made for New Media and "New Media Promotional Announcements"

### 1.    Compensation

All terms and conditions of employment, including initial compensation and deferred compensation, if any, for original serial dramatic and non-dramatic programs made for New Media or New Media Promotional Announcements will be subject to negotiation between the Producer and the individual performer, except for those provisions of the SAG-AFTRA Network TV Code incorporated herein by reference below.  SAG-AFTRA agrees that it will not interfere in any such negotiations between the Performer and the Producer.

Terms and conditions for original non-serial dramatic New Media Productions are not covered hereunder, and will instead be negotiated as part of Exhibit A.

170

### 2.     Applicable Provisions of the Network Code

Only the following specific provisions of the SAG-AFTRA Network TV Code are incorporated herein.  To the extent the provisions herein are inconsistent with the Code, the provisions of this sideletter control.

**Paragraph 61.  Payment**

**Paragraph 62.  Deductions for Social Security and Withholding Taxes**

**Paragraph 63.  Disability Insurance**

**Paragraph 66.  Individual Contracts**

**Paragraph 83.  Definitions**

**Paragraph 84.  Union Shop**

**Paragraph 86.  Admission to Premises**

**Paragraph 93.  No-Strike Clause**

**Paragraph 94.  Production Prosecuted**

**Paragraph 95.  Grievance and Arbitration**

**Paragraph 97.  Subsections A. and E. only.  No discrimination/Affirmative Action**

**Paragraph 99.  Separability**

**Paragraph 102.  AFTRA Health and Retirement Funds**

### 3.     Reuse

Reuse shall be governed by the New Media Re-Use Sideletter.

### 4.     Credit

Principal performers shall be accorded credit if any other person receives credit on the New Media Production.  Credits may appear in the corner of the screen.  "Click-through" credits may be used.

5.     As soon as practicable for each production made for New Media, Producer shall furnish a notice containing the following information to a designated representative of the Union:

-the name, address and telephone number of the production company;
-the working title of the production; and
-the principal location at which photography is scheduled to occur.

Both the Union and the Producer shall designate a representative for the other party to contact in the event of questions concerning the foregoing.

6.     Overwithholding

1.     The "Part-Year Employment Method" of withholding, as currently set forth in Section 31.3402(h)(4)-1(c) of the Internal Revenue Code Regulations, or any applicable successor regulations, shall be utilized for any performer upon request of the performer and the form of declaration for each such use shall be attached to the performer's employment contract.

171

2.    The withholding of taxes on a weekly basis rather than on a daily basis for day performers as currently set forth in Internal Revenue Code Regulation Section 31.3402(c)-(1)(d)(2), or any applicable successor regulations, shall be utilized on the request of the day performer and the form of declaration for such use shall be attached to employment contracts of day performers.

3.    The obligation of the Producer to permit the election of the foregoing alternative withholding formulae shall be effective during such time as the Internal Revenue Code Regulations permit such alternatives.

7.    Payroll and Unemployment Insurance Information

Producer shall, upon request of the performer, supply the following information, in writing, to the performer:  (1) the name, address and state identification number of the employer of record; and (2) the state in which unemployment insurance is filed.

8.    Nudity

No performer shall be expected to appear nude, except with the performer's consent after the performer has had an opportunity to read the script.

**E.    <u>SUNSET CLAUSE</u>**

The parties recognize that this Sideletter is being negotiated at a time when the business models and patterns of usage of programs and other productions in new media are in the process of exploration, experimentation and innovation. Therefore, all provisions of this Sideletter expire on the termination date of the 2014 SAG-AFTRA Network TV Code and will be of no force and effect thereafter.  No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for reuse of Made for New Media Productions and of television programs in new media to be in effect thereafter.

By _____      Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____      Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____      Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____      Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____      Date _____
    Helayne Antler
    CPT Holdings, Inc.

ACCEPTED AND AGREED TO:

172

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS


By _____          Date _____
    David P. White
    National Executive Director

SIDELETTER 30

November 16, 2014

**SIDELETTER ON EXHIBITION OF SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE FOR NETWORK TELEVISION BROADCASTING PROGRAMS REUSED IN NEW MEDIA**

This Sideletter confirms the understanding of the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") and the Producers (collectively "the parties") concerning the application of the 2014 SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting ("SAG-AFTRA Code") to the exhibition of covered entertainment television programs of the type that have traditionally been produced under this or any previous AFTRA or SAG-AFTRA Code on or by means of "New Media", as that term is defined in the Sideletter on Programs made for New Media.

1.    **If the Consumer Pays.**

    A.    <u>License for Limited Period or Fixed Number of Exhibitions</u>

        When the subscriber pays for the program either on a subscription or per-picture basis, and when the payment is in exchange for the right to view the television program for a fixed and limited period of time or a fixed number of exhibitions, the Producer shall pay to the performer(s) an aggregate sum equal to three and six-tenths percent (3.6%) of the license fee paid by the licensee for the right to exhibit such television program in New Media.[1]

    B.    <u>Paid Permanent Downloads (aka "Download-to-Own" or "Electronic Sell Through" ("EST"))</u>

        The following shall apply to programs first exhibited on or after March 8, 2008:

        When the consumer pays for an EST copy of a television program, the Producer shall pay residuals at the rate of 5.4% of 20% of "Distributor's gross," as defined in Paragraph 5 below, on the first 100,000 units and, thereafter, at 10.5% of 20% of "Distributor's gross," as defined in Paragraph 5 below.

        Such payments shall be for the benefit of all performers on the program, except for background actors. Such payments shall be distributed pro rata to the performers on the basis of a two-to-one ratio for principal performers against other performers; the scale payment due each performer shall not exceed one and five-tenths percent (1.5%) per performer; and the scale payment due each off-camera announcer shall not exceed five-tenths of one percent (.5%) per announcer. Performers on non-serial dramatic programs production of which commences on or after November 16, 2014, shall share in distributor's gross receipts on a pro rata basis of 3-2-1 rather than 2 to 1. The parties agree that performers engaged under the Five Lines or Less category shall be regarded as a "1".

2.    **Advertiser-Supported Streaming**

    The following shall apply to the streaming of television programs on a free to the consumer basis on advertiser-supported services transmitted via New Media.

    A.    With respect to television programs, the production of which commences on or after **November 16, 2014**:

---

[1] As bargaining history, this language is based upon the following model: studio licenses to Moviefly the right to transmit the motion picture on the Internet to the viewer who pays Moviefly on a subscription or per-picture basis. Such payment would enable the viewer to view the motion picture for a fixed and limited period of time or limited number of exhibitions. For example, if Columbia Pictures, through Columbia-TriStar Home Entertainment, licenses to Moviefly the right to exhibit a Columbia Pictures film, the residuals shall be based upon 100% of the license fee paid by Moviefly to Columbia-TriStar Home Entertainment for such picture.

(1)      The Producer shall be entitled to a "streaming window" for a seven (7) consecutive day period, except it shall be twenty-four (24) consecutive days for the first seven (7) episodes of a new series and any one time program; and seventeen (17) consecutive days for children's programming and daytime serials.

**B.**      There shall also be a seven (7) consecutive day free streaming window surrounding each rerun on broadcast television of a program made for initial exhibition on broadcast television, whether produced under the 2014 Code or any prior Code, for which free television residuals are payable.  The seven (7) consecutive day period shall be measured separately for each city in the United States and Canada.  If the program is rerun more than once in any seven (7) consecutive day period, the free streaming window shall nevertheless be limited to a single seven (7) consecutive day period surrounding one of the runs, which shall be determined by the Producer. During the streaming window, the Producer may make a television program available for streaming without payment for such use.  The streaming window may be divided between the period immediately prior to and immediately following the initial exhibition of the program on television in any ratio determined by the Producer, except that for each episode of a series in its first year, the streaming window may commence up to thirty (30) days before the initial exhibition on television of the episode.

No payment is due, if during the free streaming period windows provided above, the Producer makes available a television program, production of which commences on or after November 16, 2014, for exhibition on a free-to-the-consumer, advertiser-supported service transmitted via the internet or mobile or other device or on the advertiser-supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") or any similar service that currently exists or may hereafter be developed.

(1)      If outside the streaming window, but within one (1) year of the expiration of the streaming window, the Producer makes available a television program, production of which commences on or after November 16, 2014, for exhibition on a free-to-the-consumer, advertiser-supported service transmitted via the internet or mobile or other device or on the advertiser-supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") or any similar service that currently exists or may hereafter be developed, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period beginning on the first day that the television program is made available as described above following the expiration of the streaming window:

(i)      In the case of dramatic programs, four percent (4%) effective November 16, 2014, four and one-half percent (4.5%) effective November 16, 2015, and five percent (5%) effective November 16, 2016, of the first replay fee applicable to the television program; and

(ii)      In the case of non-dramatic programs, four percent (4%) effective November 16, 2014, four and one-half percent (4.5%) effective November 16, 2015, and five percent (5%) effective November 16, 2016, of the program fee applicable to the television program.

**(2)**      If the Producer desires to make the television program available as described above for all or any part of the twenty-six (26) consecutive week period immediately following the twenty-six (26) consecutive week period described in the preceding paragraph, but within one (1) year of the expiration of the streaming window, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period beginning on the first day that the television

175

program is made available during such twenty-six (26) consecutive week period:

    (i)    In the case of dramatic programs, four percent (4%) effective November 16, 2014, four and one-half percent (4.5%) effective November 16, 2015, and five percent (5%) effective November 16, 2016, of the first replay fee applicable to the television program; and

    (ii)    In the case of non-dramatic programs, four percent (4%) effective November 16, 2014, four and one-half percent (4.5%) effective November 16, 2015, and five percent (5%) effective November 16, 2016, of the program fee applicable to the television program.

    (3)    Neither of the aforementioned twenty-six (26) week periods shall cover a period that is more than one (1) year after the expiration of the streaming window. In the event that a television program is made available as described above on a date that does not allow for the full twenty-six (26) consecutive week period of use within one (1) year of the expiration of the streaming window, then the payment for that period shall be prorated in weekly units to cover the shorter use period.

    For example, suppose that the Producer streams a television program during the window and then does not stream the program again until thirty-nine (39) weeks after the expiration of the window period. Since only thirteen (13) weeks remain within the one (1) year period, a payment of one-half of the payment that would otherwise be due for the twenty-six (26) week streaming period would be payable for streaming during the thirteen (13) week period.

    (4)    During the streaming window, or during either of the twenty-six (26) consecutive week periods described in Paragraph 2.A.(2) above, the Producer may allow excerpts of those television programs that are being made available to be used on free to the consumer, advertiser-supported services transmitted via New Media without any additional payment therefor.

    (5)    Upon expiration of the one (1) year period following expiration of the streaming window, if the Producer desires to make available a television program, production of which commences on or after November 16, 2014, for streaming on a free-to-the-consumer, advertiser-supported service transmitted via the internet or mobile or other device or on the advertiser-supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") or any similar service that currently exists or may hereafter be developed, then it shall pay residuals at the rate of six percent (6%) of "Distributor's gross," as that term is defined in Paragraph 5 below.

B.    If the Producer should desire to stream any television program, the production of which commenced prior to March 8, 2008, as to which free television residuals are still payable, then the Producer shall pay residuals at the rate of six percent (6%) of "Distributor's gross," as that term is defined in Paragraph 5 below.

C.    Revenues derived from foreign streaming shall be included in "Distributor's Foreign Gross," as provided in Paragraph 73.F. of the SAG-AFTRA Network TV Code.

D.    During the 2014 negotiations, the parties confirmed that no residuals or other payments are due when a Producer makes available on an advertiser-supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") a program produced under an agreement with SAG, AFTRA or SAG-AFTRA entered into prior to November 16, 2014.

**3.**   **Use of Excerpts in New Media**

A.   In addition to the use of excerpts permitted in Paragraph 2 above, Company may use an excerpt or excerpts from a television program (other than a television program ninety (90) minutes or more in length) in new media for the purpose of promoting the television program, provided that such excerpt(s) does not exceed five (5) minutes in length.  Company may use an excerpt or excerpts from a television program ninety (90) minutes or more in length or from a program made for the home video market in new media for the purpose of promoting the program, provided that such excerpt(s) does not exceed ten (10) minutes in length.

B.   The following uses of an excerpt or excerpts in new media shall be considered "promotional" and shall require no payment, whether or not the Company receives revenue in connection therewith:

(1)   For promotion of the exhibition of a television program on free television, basic cable or pay television, the use of an excerpt shall not require compensation if the excerpt promotes the exhibition and includes "tune in" information.  "Tune-in" information for promotional purposes is sufficient when it informs the consumer where he or she can view the program or series from which the excerpt is taken.  The "tune-in" information may appear on-screen or in a "click-through" format – i.e., accessible through links.  It is agreed that the network channel or station "bug" alone does not suffice.  It is also understood that the Company is not required to provide the same level of "tune-in" information as is commonly provided in traditional network television promotional announcements.

(2)   For promotion of the traditional home video release or any "special edition" home video release of a television program, the use of an excerpt shall not require compensation if the excerpt promotes the home video release and references the availability of the program in home video.

(3)   For promotion of a new media exhibition of a television program, the use of an excerpt shall not require compensation if the excerpt promotes the new media exhibition and includes instructions for renting, purchasing, or streaming an electronic copy of the program from the website or other new media platform on which the excerpt appears or a direct link to another website or new media platform where an electronic copy of the program can be rented, purchased, or streamed, and occurs in conjunction with the availability of an electronic copy of the program for rental, purchase, or ad-supported streaming via the Internet or other new media platform.

(4)   For "viral" promotion on new media of any use or exhibition of a television program, no payment is required if the excerpt is circulated non-commercially to multiple websites or made available for individuals to circulate.  The fact that the viral excerpt is exhibited on a revenue-generating site owned by or affiliated with the Company shall not render this exception inapplicable, provided that the excerpt is released without payment to other sites.

C.   The use of excerpts shall not be considered "promotional" within the meaning of subparagraph B. above if the excerpts are used on a new media site which archives the contents of several prior seasons of the series and is designed to enable the viewer to search the archives using a sophisticated search engine, as distinguished from a new media site which offers excerpts from several prior seasons of a series that are intended as a recap of the events that transpired during those prior seasons or that are intended to promote the exhibition or sale of full episodes of the series from which the excerpts are taken.

D.    If the use of an excerpt or excerpts in new media is not within one of the promotional provisions in subparagraph B. above, or if the excerpt(s) used exceed the length limitations set forth in subparagraph A. above:

    (1)    If the excerpt is from a television program and is used on a free to the consumer platform outside the streaming window, but within one year following expiration of the streaming window, and the use is not otherwise permitted or paid for under subparagraph 2.A. above, the Producer shall pay for such use as follows:

        (i)    For an excerpt up to two (2) minutes in length, the lesser of $25 or the applicable "new media program fee;"

        (ii)    For an excerpt in excess of two (2) minutes in length but not more than four (4) minutes in length, the lesser of $75 or the applicable "new media program fee;"

        (iii)    For an excerpt in excess of four (4) minutes in length, the applicable "new media program fee."

The "new media program fee" for use of excerpts on free to the consumer platforms is the applicable residual for the use of the entire program in new media as provided in Paragraph 2.A. of this Sideletter.

    (2)    For any other use of an excerpt from a television program on a free to the consumer platform, including the use of excerpts from a television program produced prior to March 8, 2008, the Producer shall pay six percent (6%) of "Distributor's gross," as defined in Paragraph 5 below, for such use.

    (3)    If an excerpt from a television program is used on a "consumer pay" platform, the producer shall pay 3.6% of "Distributor's gross," as defined in Paragraph 5 of this Sideletter, for such use, except when the excerpt is used for one of the promotional purposes set forth in Paragraphs 3.B.(1) through (4) above and meets the length limitations in Paragraph 3.A. above. This formula shall apply to a "hybrid" use where the consumer pays for the excerpt and advertising revenues are also derived by the Producer from such use. Such revenues shall be incorporated in "Distributor's gross."

E.    Notwithstanding the foregoing:

    (1)    If excerpts from the current season of a series and excerpts from past seasons of the series are used together on an ad-supported free to the consumer basis, then the percentage of "Distributor's gross" payment set forth in Paragraph 2.B. of this Sideletter shall apply to all such excerpts.

    (2)    No payment shall be required for the free to the consumer "non-commercial" promotional use of excerpts more than five (5) minutes for programs less than ninety (90) minutes in length or more than ten (10) minutes for programs ninety (90) minutes or more in length containing one (1) or more scenes. A "non-commercial" use is a use from which the Company and its related and affiliated entities, including, but not limited to, distributors and exhibitors, receive no revenues, including, but not limited to, advertising revenues.

    (3)    No payment shall be required for free to consumer use of excerpts during the streaming window. If the Company pays the "new media program fee" pursuant to Paragraph 2.A. of this Sideletter, the payment for the use of the entire program in new media shall also constitute payment for the free to the consumer use of any portion thereof in new media during the corresponding time period.

178

(4)     It is understood that the use of an excerpt from a television program or a made-for-home video program shall not require any payment hereunder if the use would not require a payment under the television excerpt provisions of the SAG-AFTRA TV Code.

F.     All obligations of the Producer with respect to the use of an excerpt or excerpts under this Paragraph 3 shall be fully satisfied so long as the excerpt(s) meets the promotional requirements set forth herein or the Producer pays the applicable amount set forth herein.

G.     **New Media Excerpt Use Committee: Moratorium on Grievances and Arbitration Claims**

Given the novelty and complexity of the issues regarding the promotional versus non-promotional and commercial versus non-commercial use of excerpts in New Media, the parties agree to establish a Committee to review, discuss and categorize instances of such use in New Media to assist them in refining their mutual understanding of such uses and SAG-AFTRA agrees not to file any grievances or arbitration claims arising out of or relating to a dispute over the use of excerpts in New Media that occurs during the first six months of the 2008 Agreement, provided that all payments as to which there is no bona fide dispute are timely made.

## 4.     REUSE OF MADE FOR NEW MEDIA PRODUCTIONS

### A.     Derivative New Media Productions

(1)     Initial compensation for a Derivative New Media Production shall constitute payment for thirteen (13) weeks of use on all free to the consumer advertiser-supported platforms transmitted via New Media (hereinafter "advertiser-supported platforms"), commencing with the first day that the Derivative New Media Production is available for exhibition on any advertiser-supported platform, and for a separate twenty-six (26) week period of use on any consumer pay new media platform (hereinafter "consumer pay platform"), commencing with the first day that the Derivative New Media Production is available for exhibition on any consumer pay platform.

(2)     **Use on Advertiser-Supported Platforms Within One Year Following Expiration of the Thirteen Week Period**

a.     If the Producer desires to use the Derivative New Media Production on advertiser-supported platforms beyond the thirteen (13) week period, but within one (1) year of the expiration of the thirteen (13) week period, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period of use, commencing with the first day that the Derivative New Media Production is available for use on any advertiser-supported platform following the expiration of the thirteen (13) week period:

(i)     In the case of dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the first replay fee applicable to a television program of the same length as the derivative program; and

(ii)     In the case of non-dramatic programs, three percent (3%) (three and one-half percent (3.5%) effective March 8, 2010) of the program fee applicable to a television program of the same length as the derivative program.

179

b.    If the Producer desires to use the Derivative New Media Production on advertiser-supported platforms for all or any part of the twenty-six (26) consecutive week period immediately following the twenty-six (26) consecutive week period described in  Paragraph 4.A(2) above, but within one (1) year after expiration of the thirteen (13) week period, then the Producer shall make a residual payment equal to the applicable amount payable under Paragraph 4.A(2) above, as consideration for a twenty-six (26) consecutive week period of use, commencing with the first day that the Derivative New Media Production is available for use during such twenty-six (26) consecutive week period.

c.    Neither of the aforementioned twenty-six (26) consecutive week periods shall cover a period that is more than one (1) year after the expiration of the thirteen (13) consecutive week period.  In the event that use of the television program on advertiser-supported platforms is commenced on a date that does not allow for the full twenty-six (26) consecutive week period of use within one (1) year of the expiration of the thirteen (13) consecutive week period, then the payment for that period shall be prorated in weekly units to cover the shorter use period.

For example, suppose that the Producer uses a television program on advertiser-supported platforms during the thirteen (13) consecutive week period and then does not use the program on advertiser-supported platforms again until thirty-nine (39) weeks after the expiration of the thirteen (13) consecutive week period. Since only thirteen (13) weeks remain within the one (1) year period, a payment of one-half of the payment that would otherwise be due for the twenty-six (26) consecutive week use period would be payable for use during the remaining thirteen (13) week period.

**(3)    Use on Advertiser-Supported Platforms More Than One Year Following Expiration of the Thirteen Week Period**

Upon expiration of the one (1) year period following expiration of the thirteen (13) week period, if the Producer desires to use the Derivative New Media Production on advertiser-supported platforms, then it shall pay residuals at the rate of six percent (6%) of "Distributor's gross," as that term is defined in Paragraph 5 below.

**(4)    Use on Consumer Pay Platforms**

For use of a Derivative New Media Production on new media platforms for which the consumer pays (e.g., download-to-own, download-to-rent, paid streaming), the Producer shall pay a residual equal to 3.6% of the "Distributor's gross," as that term is defined in Paragraph 5 below, attributable to the period beyond the twenty-six (26) week period of use.

**(5)    Use in Traditional Media**

The Producer shall pay residuals for the use of a Derivative New Media Production in "traditional media" (e.g., free television, basic cable, pay television, home video) as a use under existing SAG-AFTRA Network TV Code formulas.

a.    Free Television Exhibition

(i)    Except with respect to exhibition of dramatic Derivative New Media Productions that exceed fifteen (15) minutes in length in network prime time, residual payments for free

180

television exhibition of Derivative New Media Productions shall be computed as follows:

The new media exhibition of the Derivative New Media Production shall constitute the first run for purposes of calculating residual payments in free television. The residual payment shall be the product of the program fee for a free television program of the same category and length as the Derivative New Media Production multiplied by the percentage applicable to the replay in question.

As an example, suppose that a five (5) minute non-dramatic Derivative New Media Production is exhibited for the first time in network prime time. The applicable residual is the program fee used for a non-dramatic program five (5) minutes and under in length exhibited in syndication ($253 as of February 27, 2012). That figure will be multiplied by 75%, the percentage applicable to a second run on a network, for a total residual payment of $189.

(ii)  The formula for reruns in network prime time of dramatic Derivative New Media Productions that exceed fifteen (15) minutes in length is as follows: The new media exhibition of the Derivative New Media Production shall constitute the first run for purposes of calculating residual payments for use on free television. The residual payment shall be the applicable residual under the SAG-AFTRA Network TV Code for a rerun in network prime time of a free television program of the same type and length as the Derivative New Media Production.

b.  Exhibition on Pay Television, on Home Video and on Basic Cable

For exhibition on pay television, the Producer shall pay residuals equal to 3.6% of "Distributor's gross" pursuant to Exhibit D., Section 4.B. of the SAG-AFTRA Network TV Code. For home video exploitation, the Producer shall pay residuals pursuant to Exhibit D of the SAG-AFTRA Network TV Code. For exhibition on basic cable, Producer shall pay pursuant to Exhibit D of the SAG-AFTRA Network TV Code.

**B.  Original New Media Productions**

The following shall apply to Original New Media Productions other than non-serial dramatic productions:

(1)  What Initial Compensation Covers

Initial compensation for an Original New Media Production shall constitute payment for a twenty-six (26) week period of use on any consumer pay new media platform (hereinafter "consumer pay platform"), commencing with the first day that the Original New Media Production is available on any consumer pay platform, and all uses on free to the consumer advertiser-supported platforms transmitted via New Media (hereinafter "advertiser-supported platforms").

(2)  Use on Consumer Pay Platforms

a.  No payment shall be due for any use on consumer pay platforms for an Original New Media Production budgeted below $25,000 per minute of actual program material as exhibited.

181

b.  For all uses of an Original New Media Production budgeted at or above $25,000 per minute of actual program material as exhibited on consumer pay platforms (e.g., download-to-own, download-to-rent, paid streaming) beyond the twenty-six (26) week period, the Producer shall pay a residual equal to 3.6% of the "Distributor's gross," as that term is defined in Paragraph 5 below, attributable to the period beyond the twenty-six (26) week use period.

c.  Paragraph 1 above shall apply to an Original New Media Production initially released on a consumer pay platform which is subsequently released on an advertiser-supported platform or vice versa.

(3)  <u>Use in Traditional Media</u>

The Producer shall pay residuals for the use of an Original New Media Production in "traditional media" (e.g., free television, basic cable, pay television, home video) as a use under existing SAG-AFTRA TV Code formulas.

**a.  Free Television Exhibition**

(i)  Except with respect to exhibition of serial-type dramatic Original New Media Productions that exceed fifteen (15) minutes in length in network prime time, residual payments for free television exhibition of Original New Media Productions shall be computed as follows:

The new media exhibition of the Original New Media Production shall constitute the first run for purposes of calculating residual payments in free television.  The residual payment shall be the product of the program fee for a free television program of the same category and length as the original New Media Production `multiplied by the percentage applicable to the replay in question.

(ii)  The formula for reruns in network prime time of serial-type dramatic Original New Media Productions that exceed fifteen (15) minutes in length is as follows:  The new media exhibition of the Original New Media Production shall constitute the first run for purposes of calculating residual payments for use on free television.  The residual payment shall be the amount payable for a rerun in network prime time of a free television program of the same length as the Original New Media Production.

b.  For exhibition on pay television, the Producer shall pay residuals equal to 3.6% of "Distributor's gross" pursuant to Exhibit D of the SAG-AFTRA Network TV Code.  For home video exploitation, the Producer shall pay residuals pursuant to Exhibit D of the SAG-AFTRA Network TV Code.  For exhibition on basic cable, Producer shall pay pursuant to Exhibit D of the SAG-AFTRA Network TV Code.

**5.   "DISTRIBUTOR'S GROSS"**

**A.   Definition**

The term "Distributor's gross," for purposes of all re-uses in new media of television programs made for traditional media and of Original and Derivative New

182

Media Productions (each hereinafter referred to as "such Program"), as defined in Exhibit D of the SAG-AFTRA Network TV Code.[1]

When the "Distributor's gross" derived from new media exploitation is received from a related or affiliated entity that acts as the exhibitor/retailer of such Program, then the "Distributor's gross" received by the Producer from the licensing of such rights shall be measured by the exhibitor/retailer's payments to unrelated and unaffiliated entities in arms' length transactions for comparable programs, or, if none, then the amounts received by the Producer from unrelated and unaffiliated exhibitors/retailers in arms' length transactions for comparable programs, or, if none, a comparable exhibitor/retailer's payments to comparable unrelated and unaffiliated entities in arms' length transactions for comparable programs.

**B.  Agreements and Data**

On a semi-annual basis, within ten (10) business days after such request, the Producer shall provide for inspection by SAG-AFTRA's designated employee or auditor, at Producer's premises where such data is kept, full access[2] to all unredacted license, distribution, and other agreements pertaining to new media exploitation of covered programs that were entered into during the immediately preceding six months.[3]  In any subsequent semi-annual inspection, SAG-AFTRA's designated employee or auditor may re-inspect any agreements previously inspected and inspect any agreements not previously inspected.

Upon request, in a manner to be mutually agreed upon in good faith, the Producer shall expeditiously provide, or make available, to SAG-AFTRA data in its possession or control, or the possession or control of its related distribution entities, regarding the new media exploitation of covered programs, such as number of downloads or streams by source and ad rates.

**C.  Recordkeeping and Reporting**

Payment for exploitation of covered pictures in new media shall be due sixty (60) days after the end of the quarter in which the "Distributor's gross" from such exploitation is received.  The Producer shall accompany such payments with reports regarding the "Distributor's gross" derived from such exploitation, which shall be specified by medium and source whenever reasonably possible and will be separated from revenues derived from exploitation of such Programs in traditional media.  Along with such payments, the Producer shall provide SAG-AFTRA with unredacted copies of all corollary distributor's, sub-distributor's, and exhibitor's statements relating to the reported "Distributor's gross."  SAG-AFTRA and each Producer shall discuss and agree upon a method of making this information available to SAG-AFTRA.

Where the Producer allocates revenues between new media rights and other rights in any such Program, among new media rights in multiple such Programs, or otherwise, it shall specify such allocation.

**D.  Confidentiality**

The information provided to SAG-AFTRA by the Producer will be treated as confidential and appropriate arrangements will be made to safeguard the confidentiality of that information.

**E.  Reservation of Rights**

---

[1]  For sake of clarity, "Distributor's gross" specifically includes advertising revenues when the license, distribution, or other agreement provides for sharing in such revenues.

[2]  Full access includes access to all agreements, notwithstanding any confidentiality clause contained therein, and access to all sideletters, exhibits, addenda, and other ancillary documents.

With respect to television programs, the Producer has agreed to a separate payment for this use on the Internet because Internet exhibition is at this time outside the primary market. The Producer reserves the right in future negotiations to contend that the pattern of release has changed so that this use constitutes or is a part of the primary market of distribution of television programs and that, therefore, no additional payment should be made with respect to the exhibition of television programs (including those covered by this Agreement) on the Internet. SAG-AFTRA reserves the right in future negotiations to contend to the contrary, and further to assert that regardless of whether other exhibitions are or have become part of the primary market, residual provisions for television programs so exhibited should be improved.

### F.   Other Terms and Conditions

Except as expressly provided herein, all other terms and conditions of the SAG-AFTRA TV Code, including but not limited to Paragraph 95, shall apply; in the event of a conflict, the terms and condition of this Sideletter shall control.

## 6.   SUNSET CLAUSE

The parties recognize that this Sideletter is being negotiated at a time when the business models and patterns of usage of programs and other productions in new media are in the process of exploration, experimentation and innovation. Therefore, all provisions of this Sideletter expire on the termination date of the 2014 SAG-SAG-AFTRA Network TV Code and will be of no force and effect thereafter. No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for reuse of Made for New Media Productions and television programs in new media to be in effect thereafter.

The parties further acknowledge that conditions in this area are changing rapidly and that the negotiation for the successor agreement will be based on the conditions that exist and reasonably can be forecast at that time. For example, the parties acknowledge that with respect to the formula in Paragraph 1 for the electronic sell-through of programs and television programs, the growth of electronic sell-through could adversely impact traditional home video sales. In future negotiations, the parties agree that the criteria to be considered in good faith in determining whether the electronic sell-through residual should be increased or decreased include patterns of cannibalization of the home video market and changes in the wholesale price.

7.   All payments hereunder made as a percentage of "Distributor's gross" are aggregate payments for all performers who have traditionally been entitled to residuals under the SAG-AFTRA Network TV Code.

ACCEPTED AND AGREED TO:

By _____          Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____          Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____          Date _____

184

Ann Calfas
20th Century FOX and FOX Sports Productions, Inc.


By _____     Date _____
    Helayne Antler
    CPT Holdings, Inc.


SCREEN ACTORS GUILD-AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS


By _____     Date _____
    David P. White
    National Executive Director

SIDELETTER 31

**SIDELETTER TO PARAGRAPH 73 - FREE TELEVISION RERUNS**

As of November 16, 2001

Re:     Experiment in Syndication of Half-Hour Series in Markets Representing 50% or
        Fewer of U.S. Television Households

Reference is made to the provisions of Paragraph 73(B)(2) of the National Code of Fair Practice
for Network Television Broadcasting.  During the 2001 negotiations, the Producers expressed a
concern that if a series could only be syndicated in markets representing fifty percent (50%) or
fewer of the U.S. television households, residuals payable pursuant to Paragraph 73(B)(2) and (3)
would render such syndication fiscally untenable.  The Producers asserted that the payment of any
residuals in such circumstances would benefit both the Producer and the individual performers
since no payments are presently made.

While AFTRA expressed concern that an accommodation might be subject to abuse or otherwise
reduce overall syndication residuals, the parties agreed to an experiment for the term of this
Agreement, to be reviewed by November 14, 2004 to determine its effectiveness and whether or
not it should be extended.  In such regard, the Producers agree to provide SAG-AFTRA with
license fee information at the time of the first payment hereunder together with a detail of markets
covered by the license agreement.  If the series is later syndicated in additional markets, the
Producer shall provide SAG-AFTRA with a detail of the additional markets at the time of the
payment immediately following such later syndication.

When a half-hour series is syndicated in markets representing in the aggregate fifty percent (50%)
or fewer of U.S. television households, residuals for such series shall be payable at thirty-seven
and one-half percent (37.5%) of the applicable minimum program fee, but shall not constitute a
"run" for purposes of Paragraph 73(B)(2) and (3).

If the series is further syndicated and the aggregate of the markets in which the series is syndicated
exceeds fifty percent (50%) of the U.S. television households, the payments required pursuant to
Paragraph 73(B)(2) and (3) shall be due on any subsequent runs.

This experiment will only apply to series that have not yet been placed into syndication as of
November 15, 2001.


ACCEPTED AND AGREED TO:
SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____        Date _____
     David P. White
     National Executive Director


By _____        Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

By _____        Date _____
     Steve Eisenhardt
     NBC, Inc.

By _____        Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.

By _____          Date _____

    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.


By _____          Date _____

    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 32

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

Any performer who signs dialogue on programs using American Sign Language (ASL), International Sign Language, British Sign Language, Finger Spelling, Native American Sign Language or any other sign language recognized by the parties during the term of this Agreement, under circumstances which would qualify said performer as a principal were that performer speaking the dialogue, will be considered a principal performer.

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS


By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____          Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____          Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 33

As of November 16, 2001

PRODUCER

Ladies and Gentlemen:

The parties agree to meet and discuss how the AFTRA Paragraph 97 Report (AFTRA Code Exhibit H) can be revised to provide for reporting information on performers with obvious physical disabilities, as required by Paragraph 97, Section B.1.  The parties agree that such meeting shall include each party's employment counsel, to facilitate meaningful dialogue on this issue.

The parties agree to convene a meeting to discuss this issue by February 15, 2002.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____    Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____    Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____    Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____    Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____    Date _____
    Helayne Antler
    CPT Holdings, Inc.

189

SIDELETTER 34

As of November 16, 2001

Screen Actors Guild - American Federation of Television
  and Radio Artists

Re:     "Background Actors and Sound Recordings Code"

Ladies and Gentlemen:

During the 2001 Code negotiations, the bargaining parties agreed to change references to Extras in the AFTRA Code to "Background Actors" and references to "Phonograph Code" to "Sound Recordings Code."  These changes are non-substantive and result only in a change in nomenclature.

By _____          Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
   Steve Eisenhardt
   NBC, Inc.

By _____          Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.

By _____          Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
   Helayne Antler
   CPT Holdings, Inc.

By _____          Date _____
   Carol Lombardini
   On behalf of AMPTP Companies
   that are signatories to the 2014 SAG-AFTRA Code

ACCEPTED AND AGREED TO:
SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____          Date _____
   David P. White
   National Executive Director

SIDELETTER 35

As of November 16, 2004

**Re:  Serial Contracts**

PRODUCER

Ladies and Gentlemen:

During the 2004-2007 negotiations, AFTRA brought to the attention of the serial Producers the concerns of serial Performers regarding negotiation of new contract terms at the expiration of a cycle during a term contract. The parties had a full discussion on the issue.

As a result of such discussions, the parties have reached an agreement to provide serial Performers a guaranteed minimum period of time for such negotiations. Accordingly, in the event that a Producer wishes to negotiate different terms of employment which could result in a reduction of guaranteed compensation at the beginning of the next cycle within a term contract already in effect (but not at the expiration of a term contract), Producer will provide notice in writing to the party(s) designated in the term contract to receive notice, with a copy to SAG-AFTRA; provided that failure to give a copy to SAG-AFTRA shall not be deemed a failure to effectuate such notice. Such notice shall be given no later than two weeks prior to the date that the cancellation notice is due.

The foregoing provision shall not preclude the parties from mutually agreeing to negotiate after notice of cancellation has been given, or when a Performer or his/her designated representative initiates a request for negotiation of the type set forth above.

The giving of such notice by Producer shall not prejudice any of the rights of the parties under a Performer's term contract or this Code.

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____         Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____         Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____         Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____         Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____         Date _____
    Helayne Antler
    CPT Holdings, Inc.

191

SIDELETTER 36

As of November 16, 2004

**Re: Daytime Drama Committees**

During the 2004-2007 negotiations, the parties agreed to establish Producer / AFTRA-Performer Daytime Drama Committees. The parties agreed that such Committees will meet during the term of the Code, on a Producer by Producer basis in the city where the program(s) is (are) produced.   At such meetings, each Producer will be represented by senior executives and production management.   The Committees will discuss creative and artistic issues affecting daytime drama performers and address ways to improve artistic performances.

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
David P. White
National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
Marc Sandman
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
Steve Eisenhardt
NBC, Inc.

By _____          Date _____
Harry Isaacs
CBS Broadcasting, Inc.

By _____          Date _____
Ann Calfas
20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
Helayne Antler
CPT Holdings, Inc.

192

SIDELETTER 37

As of November 16, 2014

**Re:  Morning News Programs**, Talk Shows, Magazine Shows and Holiday Specials

Ladies and Gentlemen:

SAG-AFTRA recognizes that certain waivers have previously been granted to Producers of morning news programs, where certain non-professional performance groups affiliated with religious, educational, charitable and other non-profit organizations have been excluded from the scope of this Agreement.  SAG-AFTRA will not unreasonably deny a waiver to bona fide morning news programs, talk shows, magazine shows or holiday specials (e.g. *Christmas in Rockefeller Center, New Year's Eve Live, Dick Clark's New Year's Rockin' Eve, Disney Park's Christmas Celebration, A Home for the Holidays, Macy's Fourth of July Spectacular*) subject to the following:

(1)     Members of the performance group shall be performing their own material or act, not material provided or arranged by the Producer.

(2)     The performance group shall not back-up a star performer.

(3)     Groups covered by this waiver shall be limited to one (1) appearance on that program within a calendar year.

(4)     This waiver shall not apply to groups like the Vienna Boys Choir or Harlem Boys Choir, which are deemed to be professional.

(5)     Producer shall notify SAG-AFTRA of the intention to utilize the provisions of this Sideletter prior to the appearance of the group on the program, or in no event later than twenty-four (24) hours after such appearance.

(6)     Other waivers of this nature shall not unreasonably be denied.

(7)     Professional performers who are members of such a group will receive, as a performance fee, payment of the appropriate rate, plus the applicable Health and Retirement contribution.

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____          Date _____
    David P. White
    National Executive Director

ACCEPTED AND AGREED TO:

By _____          Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____          Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____          Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____

Helayne Antler
CPT Holdings, Inc.

SIDELETTER 38

As of November 16, 2004

**Re:  Bona fide Amateur**

During negotiations for the 2004-2007 National Code of Fair Practice for Network Television Broadcasting, the parties reached the following agreement on a standing waiver to the Agreement:

_Bona fide Amateur_ contestants on _bona fide_ amateur talent opportunity programs and all reality programs which involve a competition out of which winners are chosen on each program or cycle of programs shall be excluded from this Agreement provided that any such contestant shall be limited to one (1) such cycle of talent programs within one (1) year.

ACCEPTED AND AGREED TO:

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
David P. White
National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
Marc Sandman
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
Steve Eisenhardt
NBC, Inc.

By _____          Date _____
Harry Isaacs
CBS Broadcasting, Inc.

By _____          Date _____
Ann Calfas
20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
Helayne Antler
CPT Holdings, Inc.

SIDELETTER 39

As of November 16, 2004

**Re:     Sideletter to Paragraph 73 - Promotional Launch Period for Dramatic Programs and Prime Time Variety Programs**

The parties agree to the following for the purpose of encouraging the success of new dramatic and prime time variety free television series produced for a network or The WB.  This shall also apply to Dramatic Programs and Prime Time Variety Programs on MyNetwork and to Prime Time Variety Programs on The CW.  No residual compensation shall be due to series contract or term contract performers under Paragraph 73(B) or under Exhibit D for the second run (which may be either on free television or basic cable) of the first three (3) episodes broadcast (which may include the pilot) during the first production season, provided the second run occurs within a two (2) month period following the initial exhibition of each program. If such second run is on free television, it shall not constitute a "run" for purposes of Paragraph 73(B) or "release" to basic cable for purposes of Exhibit D of this Agreement. Producer shall be obligated to report any such run to SAG-AFTRA as required under this Code notwithstanding the fact that no payment shall be due therefore.

The producer may not utilize this provision at any time after the series has been cancelled.

The parties agree to study the utilization of this provision at the end of eighteen (18) months. Prior to that time, the parties will agree on the information to be exchanged as part of the study.

ACCEPTED AND AGREED TO:

By _____          Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
     Steve Eisenhardt
     NBC, Inc.

By _____          Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.

By _____          Date _____
     Ann Calfas
     20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
     Helayne Antler
     CPT Holdings, Inc.

By _____          Date _____
     Carol Lombardini
     On behalf of AMPTP Companies
     that are signatories to the 2010̶4̶ SAG-AFTRA Code

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____          Date _____
     David P. White
     National Executive Director

196

SIDELETTER 40

As of March 8, 2008

**Re:    Exhibitor / Distributor**

During the negotiation of the 2008 AFTRA Network TV Code, AFTRA and the Producers discussed the nature of distribution via new media.  In particular, the Producers compared new media to basic cable distribution.  The Producers stressed that a new media exhibitor might work with a third party in the same way that a cable network, such as FX, works with MSO's to exhibit programs.  AFTRA acknowledged that it considers new media exhibitors such as hulu.com to be exhibitors, and not distributors, and that situations analogous to the one in basic cable would be treated the same-namely, that the third party would be considered an exhibitor and would not make the initial exhibitor a distributor.

In addition, the parties agree that language in Paragraph 1 of the Sideletter 30, which was changed in the 2008 negotiations, is not a substantive change from the corresponding language that appeared in the same Sideletter in the 2004 TV Code.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____          Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____          Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
    Helayne Antler
    CPT Holdings, Inc.

197

SIDELETTER 41

As of March 8, 2008

**Re:**     **Committee on Alternative Digital Broadcast Channels**

During the negotiation of the 2008 TV Code, the parties discussed their concerns regarding the reuse of programs on alternative digital broadcast and cable channels.  Following negotiations, the parties will establish an Alternative Digital Broadcast and Cable Channel Committee to address issues related to the reuse of programs on alternative digital broadcast and cable channels.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____          Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____          Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 42

As of March 8, 2008

**Re:     Experimental New Media Projects**

During the lengthy discussions during the 2008 negotiations over Made-for New Media Projects, AFTRA expressed the concern of its members that the Producers might use Experimental New Media Projects to circumvent the terms and conditions of the AFTRA TV Code.   The Producers assured AFTRA that they do not intend to use such projects as a subterfuge to allow the production of broadcast television programs outside the terms of the AFTRA or SAG-AFTRA TV Code.

<div style="margin-left:50%">

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF
TELEVISION AND RADIO ARTISTS


By _____
   David P. White
   National Executive Director

Date _____

</div>

ACCEPTED AND AGREED TO:

By _____          Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
   Steve Eisenhardt
   NBC, Inc.

By _____          Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.

By _____          Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
   Helayne Antler
   CPT Holdings, Inc.

SIDELETTER 43

As of March 8, 2008

**Re:    Entertainment Jurisdiction**

This will confirm that during the discussions for the 2007 – 2010 AFTRA Network TV Code the parties discussed the historic past practices concerning AFTRA's jurisdiction over entertainment programs.

The parties confirm that AFTRA has historically covered live or recorded entertainment programs, as discussed in Paragraphs 70 and 72, originating within the continental United States and Alaska and Hawaii.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____        Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____        Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____        Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____        Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____        Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 44

As of March 8, 2008

**Re:    Vacation Requests**

During the 2008 Code negotiations, the Producers reconfirmed their commitment to serial performers to give good faith consideration to requests for vacation. Additionally, during negotiations, performers emphasized the importance of performers' ability to attend significant family-related events such as weddings and graduations and Producers stated that they will use good faith to accommodate such requests.

Upon request from SAG-AFTRA, the serial Producers will meet with SAG-AFTRA on a Producer-by-Producer basis to discuss any problems or concerns about such vacation requests.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____        Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____        Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____        Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____        Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____        Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 45

As of March 8, 2008

**Re:      Use of Personal Vehicles on Serial Locations**


        If a Producer asks a Performer to provide a vehicle to a location to be used in the production (and the Producer and Performer have not otherwise agreed upon a rental fee), the Producer shall pay mileage to and from the location and for related driving on the location.  For this purpose only, the term "location" as used herein is meant to include the primary studio location.


                                        SCREEN ACTORS GUILD - AMERICAN
                                        FEDERATION OF
                                        TELEVISION AND RADIO ARTISTS


                                        By _____
                                             David P. White
                                             National Executive Director


                                        Date _____

ACCEPTED AND AGREED TO:

By _____        Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

By _____        Date _____
     Steve Eisenhardt
     NBC, Inc.

By _____        Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.

By _____        Date _____
     Ann Calfas
     20th Century FOX and FOX Sports Productions, Inc.


By _____        Date _____
     Helayne Antler
     CPT Holdings, Inc.

202

SIDELETTER 46

As of March 8, 2008

Re:     **Stunt Coordinators – Paragraph 94**

The parties shall create a joint committee to study the application of Paragraph 94, "Production Prosecuted," to the engagement of Stunt Coordinators.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
   David P. White
   National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
   Steve Eisenhardt
   NBC, Inc.

By _____          Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.

By _____          Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
   Helayne Antler
   CPT Holdings, Inc.

SIDELETTER 47

As of March 8, 2008

**DEFINITION OF A
COVERED PERFORMER IN THE
SIDELETTER ON PROGRAMS MADE FOR NEW MEDIA**

A "covered performer" is an individual who has been employed pursuant to the terms of a collective bargaining agreement covering his or her employment as a performer and who meets any of the following criteria:

- has at least two (2) television (including free television, pay television, basic cable or direct-to-video) or theatrical credits;

- has had thirteen (13) weeks of employment as a performer in radio (including satellite radio) in a major market;

- has at least two (2) credits in a professional stage play (*e.g.*, Broadway, Off Broadway (as that term is understood in the live theater industry), under the LORT, COST or CORST contracts or as part of an Equity national tour);

- has been employed as a performer on an audio book or as a royalty artist on a sound recording which has been commercially released by a major label or a *bona fide* independent label; or

- has been employed as a principal performer, announcer, singer or dancer in a national television or radio commercial, interactive game or non-broadcast/industrial production.

- for original serial dramatic programs made for new media, has been employed as a principal performer pursuant to the terms of an AFTRA or SAG or SAG-AFTRA contract and is employed as a principal performer on the New Media production.

The Producer shall be entitled to rely on the representation of the performer as to whether he or she meets the definition of a "covered performer."

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____      Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____      Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____      Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

204

By _____     Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.


By _____     Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 48

As of November 10, 2010

**Re:     Committee on Non-Serial, Scripted Dramatic Production**

During the negotiation of the 2010 Network Code, the parties discussed issues which had arisen regarding implementation of the changes negotiated in 2007 to the Network Code provisions applicable to non-serial scripted dramatic production.  The parties agreed to establish an industry-union committee to address issues related to the subject.

<div style="margin-left: 50%;">

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS


By _____
   David P. White
   National Executive Director

Date _____

</div>

ACCEPTED AND AGREED TO:

By _____     Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.

By _____     Date _____
   Steve Eisenhardt
   NBC, Inc.

By _____     Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.

By _____     Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.

By _____     Date _____
   Helayne Antler
   CPT Holdings, Inc.

SIDELETTER 49

As of November 10, 2010

**Re:**    Committee on Value Added Promotional Announcements

During the negotiation of the 2010 Network Code, the parties discussed their concerns regarding 'Value Added Promotional Announcements' under Paragraph 10.  The parties agreed to establish an industry-union committee to address the subject.  Producers may bring other announcer-related issues to this committee, and there will be a mutually agreed upon agenda.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
      David P. White
      National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
      Marc Sandman
      American Broadcasting Companies, Inc.
      an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
      Steve Eisenhardt
      NBC, Inc.

By _____          Date _____
      Harry Isaacs
      CBS Broadcasting, Inc.

By _____          Date _____
      Ann Calfas
      20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
      Helayne Antler
      CPT Holdings, Inc.

207

SIDELETTER 50

As of November 16, 2011

**Re:** **Holding Areas**

During the negotiations for the 2011-2014 Network TV Code, AFTRA expressed concern over circumstances in which Performers engaged by a Producer who are waiting to rehearse or perform are in holding areas which are inadequately protected in AFTRA's view from the cold, heat or inclement weather.   The parties agreed that should SAG-AFTRA believe that such circumstances are occurring or will occur, it may request a meeting with the Producer to discuss its concerns, which the Producer agrees to consider in good faith.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
     David P. White
     National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____        Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

By _____        Date _____
     Steve Eisenhardt
     NBC, Inc.

By _____        Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.

By _____        Date _____
     Ann Calfas
     20th Century FOX and FOX Sports Productions, Inc.

By _____        Date _____
     Helayne Antler
     CPT Holdings, Inc.

SIDELETTER 51

As of November 16, 2014

**Re:    Live Linear Television**


The parties hereby memorialize the current practice of treating the streaming or other transmission of free television, basic cable and/or pay television programs simultaneous with their exhibition on television as part of the television exhibition right, requiring no additional payment or other obligation.  That is, each television exhibition includes the right to simultaneously stream or otherwise transmit the program.  The foregoing applies to simultaneous streaming, cellular transmission and any other means of transmission that currently exists or may hereafter be developed.


SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS


By _____
     David P. White
     National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.


By _____          Date _____
     Steve Eisenhardt
     NBC, Inc.


By _____          Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.


By _____          Date _____
     Ann Calfas
     20th Century FOX and FOX Sports Productions, Inc.


By _____          Date _____
     Helayne Antler
     CPT Holdings, Inc.

SIDELETTER 52

As of November 16, 2014

**Re:     New York City Earned Sick Time Act and Other Similar Laws**


The Union expressly waives, to the full extent permitted by law, the application of the New York City Earned Sick Time Act of 2013, the San Francisco Paid Sick Leave Ordinance (San Francisco Administrative Code Section 12W), the Newark Sick Leave for Private Employees Ordinance (City Ordinance 13-2010), and the Seattle Paid Sick and Safe Time Ordinance (Ordinance No. 123698), to all performers employed under this Agreement.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS


By _____
     David P. White
     National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.


By _____          Date _____
     Steve Eisenhardt
     NBC, Inc.


By _____          Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.


By _____          Date _____
     Ann Calfas
     20th Century FOX and FOX Sports Productions, Inc.


By _____          Date _____
     Helayne Antler
     CPT Holdings, Inc.

SIDELETTER 53

As of November 16, 2014

**Re:** **License of Non-Exhibit A Free Television, Pay Television or Basic Cable Programs to Secondary Digital Channels**

During the 2014 negotiations, the parties discussed the residual formula for exhibition of television programs on certain secondary digital channels. The parties agreed that instead of a fixed residual formula, Producer shall pay to the Union for ratable distribution to the performers a percentage residual formula of three and six tenths percent (3.6%) of distributor's gross receipts (as defined in Exhibit D of the Network TV Code) for any license to a secondary digital channel of any free television or basic cable program and six percent (6%) for any pay television program as to which a fixed residual would otherwise be payable that (i) has been out of production for at least three years and (ii) has not been exhibited under a fixed residual formula in syndication (except in the non-lead market) or pay television for at least three years in the case of a free television or pay television program or has not been exhibited under a fixed residual-formula in syndication (except in the non-lead market), pay television or basic cable for at least three years in the case of a basic cable program. However, for any free television series consisting of sixty-eight (68) or fewer episodes or any basic cable or pay television series consisting of forty (40) or fewer episodes, the series need only have been out of production for at least two years and not been exhibited under a fixed residual formula on basic cable, pay or free television (except syndication in the non-lead market) for at least one year. AFTRA Health & Retirement contributions shall be made in addition to the percentage payments made on pay television programs hereunder regardless of the date produced and on free television and basic cable programs produced on or after November 16, 1973, and the percentage payments shall be inclusive of Health and Retirement for free television and basic cable programs produced prior to November 16, 1973.

When the 'Distributor's gross receipts' derived from such license(s) are received from a related or affiliated entity that acts as the exhibitor of the program, then the 'Distributor's gross receipts' received by the Producer from the licensing of such rights shall be measured by the exhibitor's payments to unrelated and unaffiliated entities in arms' length transactions for comparable programs or series, or, if none, then the amounts received by the Producer from unrelated and unaffiliated exhibitors in arms' length transactions for comparable programs or series, or, if none, comparable exhibitor's payments to comparable unrelated and unaffiliated entities in arms' length transactions for comparable programs or series.

Notwithstanding the foregoing, the minimum payment pursuant to this provision for any program licensed to a related or affiliated entity shall be an aggregate amount for all performers of $150 for a 30-minute program, $300 for a 60-minute program $450 for a 90-minute program, and $600 for a 120-minute program.

The 'pro rata' share payable to each performer on a pay television program shall be distributed on the basis of time and salary units pursuant to Exhibit E of the Network Television Code. The 'pro rata' share payable to performers on non-serial dramatic programs produced on or after November 16, 2014 shall be distributed on the basis of 3-2-1. The 'pro rata' share payable to each performer on any other free television or basic cable program shall be distributed on the basis of a two-to-one ratio for principal performers against other performers. The pro rata share shall be limited to one and five tenths percent (1.5%) where the off camera announcer is the only covered performer.

The foregoing applies to free television, pay television or basic cable programs as to which a free television residual would otherwise be payable, whether produced under an agreement with SAG-AFTRA negotiated after November 16, 2014 or under any agreement with SAG, AFTRA or SAG-AFTRA negotiated prior to November 16, 2014.

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS


By _____
    David P. White
    National Executive Director


Date _____


ACCEPTED AND AGREED TO:

By _____       Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.


By _____       Date _____
    Steve Eisenhardt
    NBC, Inc.


By _____       Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.


By _____       Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.


By _____       Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 54

As of November 16, 2014

**Re:  Syndication Licenses for Canada Only**

If Producer licenses a non-Exhibit A program (including a program or series made for basic cable, but excluding any program or series made for syndication) for exhibition in syndication only in Canada, and residuals would otherwise be payable for that exhibition, it shall have the option to pay to the Union, for rateable distribution to the performers, seven and two-tenths percent (7.2%) (twelve percent (12%) for pay television) plus AFTRA Health & Retirement contributions, of distributor's gross receipts (as defined in Exhibit D of the Network TV Code) derived therefrom, in lieu of any other compensation required under this Agreement or any prior Agreement, as applicable, and such exhibition shall not count as a 'run' for purposes of calculating residuals.  The foregoing applies to television programs as to which free television residuals would otherwise be payable, whether produced under an agreement with SAG-AFTRA negotiated after November 16, 2014 or under any agreement with SAG, AFTRA or SAG-AFTRA negotiated prior to November 16, 2014.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
     David P. White
     National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____          Date _____
     Marc Sandman
     American Broadcasting Companies, Inc.
     an indirect wholly-owned subsidiary of ABC, Inc.

By _____          Date _____
     Steve Eisenhardt
     NBC, Inc.

By _____          Date _____
     Harry Isaacs
     CBS Broadcasting, Inc.

By _____          Date _____
     Ann Calfas
     20th Century FOX and FOX Sports Productions, Inc.

By _____          Date _____
     Helayne Antler
     CPT Holdings, Inc.

213

SIDELETTER 55

As of November 16, 2014

**Re: License of non-Exhibit A Dramatic Programs Made for Basic Cable to a Different Basic Cable Service**

A percentage residual formula of three and six tenths percent (3.6%) plus AFTRA Health & Retirement contributions on payments made hereunder on basic cable programs produced on or after November 16, 1973, and inclusive of Health and Retirement for basic cable programs produced prior to November 16, 1973, of distributor's gross receipts (as defined in Exhibit D of the Network TV Code) shall be paid for any license of a dramatic program or series made for basic cable, for which a fixed residual is otherwise payable, to a basic cable service that is not the service to which the program or series was originally licensed, provided the program or series (i) has not been in production for at least two years and (ii) has not been exhibited under a fixed residual formula on basic cable or free television (except syndication in the non-lead market) for at least eighteen (18) months.

When the 'Distributor's gross receipts' derived from such license(s) are received from a related or affiliated entity that acts as the exhibitor of the program, then the 'Distributor's gross receipts' received by the Producer from the licensing of such rights shall be measured by the exhibitor's payments to unrelated and unaffiliated entities in arms' length transactions for comparable programs or series, or, if none, then the amounts received by the Producer from unrelated and unaffiliated exhibitors in arms' length transactions for comparable programs or series, or, if none, comparable exhibitor's payments to comparable unrelated and unaffiliated entities in arms' length transactions for comparable programs or series.

Notwithstanding the foregoing, the minimum payment pursuant to this provision for any program licensed to a related or affiliated entity shall be an aggregate amount for all performers of $300 for a 30-minute program, $600 for a 60-minute program $900 for a 90-minute program, and $1,200 for a 120-minute program.

The 'pro rata' share payable to performers on non-serial dramatic programs produced on or after November 16, 2014 shall be distributed on the basis of 3-2-1. The 'pro rata' share payable to each performer on all other programs shall be distributed on the basis of a two-to-one ratio for principal performers against other performers. The pro rata share shall be limited to one and five tenths percent (1.5%) where the off camera announcer is the only covered performer.

The foregoing applies to basic cable programs as to which fixed residuals would otherwise be payable, whether produced under an agreement with SAG-AFTRA negotiated after November 16, 2014 or under any agreement with SAG, AFTRA or SAG-AFTRA negotiated prior to November 16, 2014.

SCREEN ACTORS GUILD - AMERICAN
FEDERATION OF TELEVISION AND
RADIO ARTISTS


By _____
     David P. White
     National Executive Director


Date _____

214

ACCEPTED AND AGREED TO:

By _____     Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.


By _____     Date _____
    Steve Eisenhardt
    NBC, Inc.


By _____     Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.


By _____     Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.


By _____     Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 56

As of November 16, 2014

**Re:   Stand-Ins**

Producers will use their best efforts to provide credentials to stand-ins that are substantially similar to the credentials that are provided to other freelance employees on the same production. In addition, the parties agree that should SAG-AFTRA believe that stand-ins are not receiving appropriate credentials, it may request a meeting with the Producer to discuss its concerns, which the Producer agrees to consider in good faith.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
    David P. White
    National Executive Director

Date _____

ACCEPTED AND AGREED TO:

By _____        Date _____
    Marc Sandman
    American Broadcasting Companies, Inc.
    an indirect wholly-owned subsidiary of ABC, Inc.

By _____        Date _____
    Steve Eisenhardt
    NBC, Inc.

By _____        Date _____
    Harry Isaacs
    CBS Broadcasting, Inc.

By _____        Date _____
    Ann Calfas
    20th Century FOX and FOX Sports Productions, Inc.

By _____        Date _____
    Helayne Antler
    CPT Holdings, Inc.

SIDELETTER 57

As of November 16, 2014

**Re:   High Budget Dramatic SVOD Programs**

The parties agree that with respect to 'High Budget' Dramatic Original or Derivative Programs produced for initial exhibition on subscription video-on-demand consumer pay platforms ("High Budget SVOD Programs"), as defined in Sideletter H of the 2014-2017 SAG-AFTRA Television Agreement ("TV Agreement"), the Producer shall, except as provided below, produce such programs incorporating the terms and conditions set forth in Paragraph E. of that Sideletter, but shall not otherwise be deemed a signatory to the TV Agreement. A Producer who is a party to the AFTRA Health and Retirement Funds and has not made contributions to the SAG Pension and Health Plans during the period January 1, 2010 to December 31, 2014 shall not be required to contribute to the SAG Plans for such High Budget SVOD Programs, unless the Producer elects otherwise, and may make contributions instead to the AFTRA Health and Retirement Funds. Further, a Producer shall make contributions with respect to performers employed on High Budget Derivative SVOD Programs to the same Plans or Funds to which contributions are or were made for performers employed on the Original Television Program on which the High Budget Derivative SVOD Program is based.

During the course of negotiations for the successor to 2011-2014 Network TV Code ("Code"), the parties discussed the applicability of Sideletter 29 with regard to Original or Derivative serial dramatic programs made for High Budget SVOD. While dramatic serial production is covered by Sideletter 29, the parties acknowledged the difficulty in distinguishing serial dramatic programs made for SVOD from other dramatic programs made for SVOD. The hallmarks of serials, as that term is understood under the Code, as distinguished from other dramatic programs, include but are not limited to the multiplicity of episodes, their exhibition pattern,  and very long story arcs, such as are in "General Hospital,", "The Young And The Restless," "The Bold And The Beautiful,"  and "Days Of Our Lives." The parties recognize that there are currently no known serials made for High Budget SVOD. The parties agree that if during the term of the successor to the 2011-2014 Code, a Producer commences production of a High Budget SVOD Serial as described, the terms and conditions of Sideletter H of the TV Agreement do not automatically apply. Rather, the parties agree to meet to discuss the appropriate terms and conditions of employment for covered performers on such productions.

SCREEN ACTORS GUILD - AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS

By _____
     David P. White
     National Executive Director

Date _____

217

ACCEPTED AND AGREED TO:

By _____          Date _____
   Marc Sandman
   American Broadcasting Companies, Inc.
   an indirect wholly-owned subsidiary of ABC, Inc.


By _____          Date _____
   Steve Eisenhardt
   NBC, Inc.


By _____          Date _____
   Harry Isaacs
   CBS Broadcasting, Inc.


By _____          Date _____
   Ann Calfas
   20th Century FOX and FOX Sports Productions, Inc.


By _____          Date _____
   Helayne Antler
   CPT Holdings, Inc.

Dear [Hiring Executive]:

The Union has made proposals to restrict the employment as performers of active members of the Producer's casting or production staffs, and their friends and relatives, who are not professional performers. The Union maintained that these non-professional individuals substitute for, replace and reduce employment opportunities in all performance categories ("principals," "under -5s," background actors) which are an integral and vital segment of the professional performers' talent pool.

The Union reiterates that (1) too often the hiring of these non-professional performers is done to bestow economic favors rather than for creative reasons; (2) many of these non-professional performers do not intend to become professional performers; and (3) the foregoing represents both an unfair treatment of professional performers and an unwarranted drain upon the economic resources of the AFTRA Health and Retirement Funds.

Without in any way commenting upon the merits of the Union's allegations, the industry does acknowledge the gravity with which the Union addresses this issue, and agrees that professional performers represent a talent pool of considerable importance to the industry's well being.

In addition, and with specific reference to SAG-AFTRA's assertion that some Producers hire non-professional performers for the sole purpose of enabling such non-professionals to earn the minimum required to qualify for coverage under the AFTRA Health and Retirement Plans, the industry joins SAG-AFTRA in censuring any Producer who does engage in such practice.

Therefore, the Producers have agreed to circulate this statement to their hiring executives on an annual basis.

Sincerely,

_____

[Company]

219

Dear [Casting Director]:

      When engaged by this Company, casting directors will adhere to the following Company policy:

(1)     A casting director shall not attend or lend his/her name to any acting school, workshop, seminar or like programs which promises a performer a guarantee of employment in exchange for his/her attendance at such program.

(2)     A casting director shall not attend or lend his/her name to any acting school, workshop, seminar or like programs which advertises the specific role(s) or motion picture(s) for which the casting director is currently casting.

(3)     A casting director is prohibited from accepting any fee from a performer in exchange for selection for a specific role or for viewing a performer's showcase performance.

(4)     Casting directors will continue to seek out performers through methods such as granting interviews, accepting submissions from acting schools, attending showcases and utilizing SAG-AFTRA resources.

Sincerely,

_____
[Company]

220

# SCHEDULE OF MINIMUMS FOR ANNOUNCERS OFF-CAMERA (VOICE OVER) – PARAGRAPH 4.B.(1) AND (2) MULTIPLE PERFORMANCES IN A CALENDAR WEEK

(1)     More than Ten Lines

Rates Effective: November 17, 2013

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 293.00 | 509.00 | 655.00 | 802.00 | 871.00 |
| Over 15 to 30 minutes | 462.00 | 809.00 | 1,038.00 | 1,267.00 | 1,385.00 |
| Over 30 to 45 minutes | 570.00 | 997.00 | 1,284.00 | 1,567.00 | 1,711.00 |
| Over 45 to 60 minutes | 645.00 | 1,127.00 | 1,452.00 | 1,772.00 | 1,935.00 |
| Over 60 to 90 minutes | 825.00 | 1,446.00 | 1,859.00 | 2,272.00 | 2,480.00 |
| Over 90 to 120 minutes | 1,009.00 | 1,767.00 | 2,272.00 | 2,775.00 | 3,026.00 |

Rates Effective: November 16, 2014

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 300.00 | 522.00 | 671.00 | 822.00 | 893.00 |
| Over 15 to 30 minutes | 474.00 | 829.00 | 1,064.00 | 1,299.00 | 1,420.00 |
| Over 30 to 45 minutes | 584.00 | 1,022.00 | 1,316.00 | 1,606.00 | 1,754.00 |
| Over 45 to 60 minutes | 661.00 | 1,155.00 | 1,488.00 | 1,816.00 | 1,983.00 |
| Over 60 to 90 minutes | 846.00 | 1,482.00 | 1,905.00 | 2,329.00 | 2,542.00 |
| Over 90 to 120 minutes | 1,034.00 | 1,811.00 | 2,329.00 | 2,844.00 | 3,102.00 |

Rates Effective: November 16, 2015

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 309.00 | 538.00 | 691.00 | 847.00 | 920.00 |
| Over 15 to 30 minutes | 488.00 | 854.00 | 1,096.00 | 1,338.00 | 1,463.00 |
| Over 30 to 45 minutes | 602.00 | 1,053.00 | 1,355.00 | 1,654.00 | 1,807.00 |
| Over 45 to 60 minutes | 681.00 | 1,190.00 | 1,533.00 | 1,870.00 | 2,042.00 |
| Over 60 to 90 minutes | 871.00 | 1,526.00 | 1,962.00 | 2,399.00 | 2,618.00 |
| Over 90 to 120 minutes | 1,065.00 | 1,865.00 | 2,399.00 | 2,929.00 | 3,195.00 |

Rates Effective: November 16, 2016

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 318.00 | 554.00 | 712.00 | 872.00 | 948.00 |
| Over 15 to 30 minutes | 503.00 | 880.00 | 1,129.00 | 1,378.00 | 1,507.00 |
| Over 30 to 45 minutes | 620.00 | 1,085.00 | 1,396.00 | 1,704.00 | 1,861.00 |
| Over 45 to 60 minutes | 701.00 | 1,226.00 | 1,579.00 | 1,926.00 | 2,103.00 |
| Over 60 to 90 minutes | 897.00 | 1,572.00 | 2,021.00 | 2,471.00 | 2,697.00 |
| Over 90 to 120 minutes | 1,097.00 | 1,921.00 | 2,471.00 | 3,017.00 | 3,291.00 |

(2)    Ten Lines or Less (Multiple Performances in One Calendar Week)

Rates Effective: November 17, 2013

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 293.00 | 509.00 | 654.00 | 802.00 | 871.00 |
| Over 15 to 30 minutes | 323.00 | 566.00 | 728.00 | 889.00 | 970.00 |
| Over 30 to 45 minutes | 341.00 | 599.00 | 768.00 | 939.00 | 1,024.00 |
| Over 45 to 60 minutes | 383.00 | 672.00 | 863.00 | 1,057.00 | 1,152.00 |
| Over 60 to 90 minutes | 448.00 | 783.00 | 1,009.00 | 1,233.00 | 1,345.00 |
| Over 90 to 120 minutes | 519.00 | 907.00 | 1,165.00 | 1,424.00 | 1,556.00 |

Rates Effective: November 16, 2014

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 300.00 | 522.00 | 670.00 | 822.00 | 893.00 |
| Over 15 to 30 minutes | 331.00 | 580.00 | 746.00 | 911.00 | 994.00 |
| Over 30 to 45 minutes | 350.00 | 614.00 | 787.00 | 962.00 | 1,050.00 |
| Over 45 to 60 minutes | 393.00 | 689.00 | 885.00 | 1,083.00 | 1,181.00 |
| Over 60 to 90 minutes | 459.00 | 803.00 | 1,034.00 | 1,264.00 | 1,379.00 |
| Over 90 to 120 minutes | 532.00 | 930.00 | 1,194.00 | 1,460.00 | 1,595.00 |

Rates Effective: November 16, 2015

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 309.00 | 538.00 | 690.00 | 847.00 | 920.00 |
| Over 15 to 30 minutes | 341.00 | 597.00 | 768.00 | 938.00 | 1,024.00 |
| Over 30 to 45 minutes | 361.00 | 632.00 | 811.00 | 991.00 | 1,082.00 |
| Over 45 to 60 minutes | 405.00 | 710.00 | 912.00 | 1,115.00 | 1,216.00 |
| Over 60 to 90 minutes | 473.00 | 827.00 | 1,065.00 | 1,302.00 | 1,420.00 |
| Over 90 to 120 minutes | 548.00 | 958.00 | 1,230.00 | 1,504.00 | 1,643.00 |

Rates Effective: November 16, 2016

| PROGRAM LENGTH | 1 Program | 2 Programs | 3 Programs | 4 Programs | 5 Programs |
|---|---|---|---|---|---|
| Over 5 to 15 minutes | 318.00 | 554.00 | 711.00 | 872.00 | 948.00 |
| Over 15 to 30 minutes | 351.00 | 615.00 | 791.00 | 966.00 | 1,055.00 |
| Over 30 to 45 minutes | 372.00 | 651.00 | 835.00 | 1,021.00 | 1,114.00 |
| Over 45 to 60 minutes | 417.00 | 731.00 | 939.00 | 1,148.00 | 1,252.00 |
| Over 60 to 90 minutes | 487.00 | 852.00 | 1,097.00 | 1,341.00 | 1,463.00 |
| Over 90 to 120 minutes | 564.00 | 987.00 | 1,267.00 | 1,549.00 | 1,692.00 |

## **ALPHABETICAL INDEX**

| **Subject** | **Section** | **Page** |
|---|---|---|
| **A** | | |
| Additional Rehearsal Days (not applicable to serials) | 13 | 32 |
| Additional Rehearsal Days - Dancers. | 5.A.2 | 11 |
| Additional Services | 57 | 61 |
| Admission to Premises | 86 | 97 |
| After-Shows... | 32 | 44 |
| AFTRA Rules ..... | 85 | 97 |
| Alcoholism & Drug Abuse - Statement of Objective of AFTRA-Industry Program | Exhibit G | 135 |
| Alcoholism & Drug Abuse.... | 97A | 107 |
| Amateur Programs | 75.D | 93 |
| Announcers | 10 | 28 |
| Announcers Appearing in Multiple Commercials | 26 | 42 |
| Announcers - On-Camera - Non-Dramatic Programs - Multiple Performances - Rates, Days and Hours | 2.B.(2) | 4 |
| Announcers - Notice of Discharge | 65 | 65 |
| Announcers - Off-Camera. | 4 | 8 |
| Announcers - Promo Fees........ | 10.A.(1) | 28 |
| Announcers - Promos - Customized Station Tags....... | 10.C | 29 |
| Announcers - Promos - Length of Session.. | 10.A.(4) | 28 |
| Announcers - Promos - Station and Network Identifications | 10.A.(3) | 28 |
| Announcers - Promos - Syndication Packages | 10.H | 31 |
| Announcers - Promos - Tags....... | 10.B | 28 |
| Announcers - Promos - Tags - Session Fee ......... | 10.D | 29 |
| Announcers - Public Service Announcements | 10.E | 29 |
| Announcers - Serials - Standard Non-Commercial | | 27 |

| Subject | Section | Page |
|---|---|---|
| Openings and Closings and Musical Signatures | 9.A | |
| Announcers – Sporting Events on Basic Cable..... | 7F | 23 |
| Announcers - Use of Promos on Basic Cable..... | 10.A.(1) | 28 |
| Arbitration | 95.C | 100 |
| Arbitration - AFTRA Party to All Arbitrations Under the Code...... | 95.C.(4) | 100 |
| Arbitration - Authority of the Arbitrator | 95.C.(5) | 100 |
| Arbitration - Complete Defense to Lawsuit. | 95.C.(3) | 100 |
| Arbitration - Limits on Effective Date of Award... | 95.C.(8) | 102 |
| Assistant Choreographer - H&R Contribution | 5.A.(13) | 14 |
| Auditions | 45 | 52 |
| Auditions - Dramatic Programs | 45.D | 53 |
| Auditions - Serials Performers in Running Parts...... | 45.F | 53 |
| Award Shows - Excerpts of Star Performers | 73.D.(1)(d) | 78 |

**B**

| Subject | Section | Page |
|---|---|---|
| Background Actor Rehearsal Commercial Performers and Announcers Off-Camera | 4.C | 10 |
| Background Actor Rehearsals - Background Actors | 8.A | 23 |
| Background Actors | 8 | 23 |
| Background Actors - Programs other than Serials and Variety - Program Fees, Rehearsal Days & Hours | 8.D.(1) | 25 |
| Background Actors - Programs other than Serials and Variety - Overtime | 8.D.(1) | 25 |
| Background Actors - Auditions (all programs) | 45.B | 52 |
| Background Actors - Definition | 48 | 55 |
| Background Actors - Definition for Purposes of Commercials | 27 | 42 |
| Background Actors - Doubling as Stand-Ins | 46.I | 54 |

| Subject | Section | Page |
|---|---|---|
| Background Actors - Preference of Employment - Programs other than Serials and Variety | 8.D.(2) | 24 |
| Background Actors - Program Fees, Rehearsal Days & Hours - Variety Programs | 8.A | 23 |
| Background Actors - Serials | 8.C | 24 |
| Background Actors - Special Rates for Large Groups - Serials and Variety | 8.E | 25 |
| Background Actors - Upgrades | 48 | 55 |
| Background Actors - Use of Recordings | 8.G | 26 |
| Basic Cable - Agreement re: New Programs | 69.C | 72 |
| Basic Cable Defined | Exhibit D-2.C. | 121 |
| Bond or Certified Check | 91 | 98 |
| Breakdown of Earnings | 61.D | 64 |
| Breakdown Services - Disability Role Notification | Sideletter 28 | 167 |

**C**

| Subject | Section | Page |
|---|---|---|
| Calls for Group Dancers | 45 | 52 |
| Cancelled Individual Engagements | 58 | 61 |
| Cancelled Program - Illness of Series Regular (not applicable to serials) | 59.E | 61 |
| Cancelled Programs | 59 | 61 |
| Cancelled Programs - Cancellation Due to Strike | 59.D | 61 |
| Cast Credit | 49 | 55 |
| Casting Directors - Limits | Letter | 208 |
| Certified Checks - Networks Exempt From Paragraph 67 | Sideletter 4 | 143 |

| Subject | Section | Page |
|---|---|---|
| Check-Off | 96 | 103 |
| Children's Programs | 77 | 95 |
| Choirs and Choruses on Non-Commercial Religious Programs | 75.D | 93 |
| Chorus Singers | 5.B | 16 |
| Chorus Singers - On-Camera | 5.B.(1) | 16 |
| Chorus Singers - Commonly Owned Stations - Program Fees, Rehearsal Days & Hours | 5.B.(3) | 17 |
| Chorus Singers - Doubling | 46.B | 53 |
| Chorus Singers - Off-Camera - Meal Period | 5.B.(2)(c) | 17 |
| Chorus Singers - Off-Camera - Session | 5.B.(2)(b) | 16 |
| Closed Circuit Programs | 74 | 90 |
| Commercial Copy | 24 | 41 |
| Commercial Performers and Announcers Off-Camera | 4 | 8 |
| Commercial Performers and Announcers Off-Camera - Background Actor Rehearsal | 4.C | 10 |
| Commercial Performers - Fees | 4.A | 8 |
| Commercials - Appearances on Multiple Commercials | 26 | 42 |
| Commercials by Background Actors in a Program | 46.I | 54 |
| Commercials by Performers on a Program | 46.G | 54 |
| Commercials by Singers or Dancers in a Program | 46.H | 54 |
| Commercials - Definition of Walk-on and Background Actor | 27 | 42 |

226

| Subject | Section | Page |
|---|---|---|
| Commercials on Segmented Programs | 41 | 49 |
| Commonly Owned Stations | 53 | 57 |
| Commonly Owned Stations - Background Actors - Variety Programs | 8.B | 24 |
| Commonly Owned Stations - Group Dancers | 5.A.(3) | 12 |
| Commonly Owned Stations - Principal Performers | 2.C | 6 |
| Commonly Owned Stations - Programs Replayed on Network | 53.D | 57 |
| Commonly Owned Stations – Replays | 53.E | 57 |
| Commonly Owned Stations - Singers - Program Fees, Rehearsal Days & Hours | 5.B.(3) | 17 |
| Commonly Owned Stations - Specialty Acts | 6.E | 21 |
| Commonly Owned Stations - Under Fives | 3.B | 7 |
| Compensation for Traveling and Location Work | 43 | 50 |
| Compilation Programs | 73.D.(8) | 80 |
| Compilation Programs - Pay Television | 73.D.(10)(a) | 81 |
| Compilation Videocassettes - Additional Option for Serials | 73.D.(10)(b) | 82 |
| Contractor for Group Singers or Group Dancers | 34 | 44 |
| Cosmetic Alterations and Nudity | 50 | 56 |
| Crediting - Limits of Crediting Rehearsal | 56.B | 60 |
| Crediting of Overscale | 56.A | 60 |
| Crediting – Serials | 56.C | 61 |
| Customized Station Tags - Promo Announcers | 10.C | 29 |

227

| Subject | Section | Page |
|---|---|---|
| Customized Tracks - Singers - Promotional Announcements | 10.G.(4) | 30 |
| Cycles - Serials - How Determined | 54A.G | 59 |
| **D** | | |
| Dance-Ins | 36 | 45 |
| Dancers - Additional Rehearsal Days | 5.A.(4) | 12 |
| Dancers – Auditions | 45.C | 53 |
| Dancers – Award Programs | 5.A.(16) | 15 |
| | 34.A | 44 |
| Dancers - Contractors for Groups | | |
| Dancers - Dancing with Masks a Hazardous Performance | Sideletter 8 | 147 |
| Dancers – Deputy | 34.C | 45 |
| Dancers – Doubling | 46.B | 53 |
| Dancers - Excess Days | 5.A.(4) | 12 |
| Dancers - Hazardous Routine | 5.A.(12) | 13 |
| Dancers - Knee Pads | 5.A.(9) | 13 |
| Dancers - Knee Work | 5.A.(10) | 13 |
| Dancers - Lip Sync | 5.A.(11) | 13 |
| Dancers - Non-Syndicated, Non-Primetime Programs | 5.A.(14) | 14 |
| Dancers - Notice of Discharge | 65 | 65 |
| Dancers - Program Fees, Rehearsal Days & Hours - Group Dancers | 5.A | 11 |
| Dancers - Safety – Floors | 5.A.(8) | 13 |

| Subject | Section | Page |
|---|---|---|
| Dancers – Shoes | 25.D | 41 |
| Dancers - Step Out Rate | 5.A.(7) | 12 |
| Deductions for Social Security and Taxes | 62 | 64 |
| Definition of a Line | 47 | 55 |
| Definition of Basic Cable | Exhibit D-2.C | 121 |
| Definition of Distributor's Gross Receipts - Supplemental Markets | Exhibit D-4 | 124 |
| Definition of Network Program | 71 | 73 |
| Definition of Walk-On & Background Actor | 48 | 55 |
| Definitions of Supplemental Markets | Exhibit D-2 | 120 |
| Direct Projection | Sideletter 2 | 141 |
| Disability Insurance | 63 | 64 |
| Disability Role Notification - Breakdown Services | Sideletter 28 | 167 |
| Discharge - Notice - Announcers, Singers, Dancers | 65 | 65 |
| Distributor's Gross Receipts – Allocation | Exhibit D-4.D | 125 |
| Distributor's Gross Receipts - Supplemental Markets | Exhibit D-4 | 125 |
| Doubling | 46 | 53 |
| Doubling - Chorus Singers | 46.C | 54 |
| Doubling – Dancers | 46.C | 54 |
| Dramatic Programs – Auditions | 45.D | 53 |
| Dramatic Programs - Performers Subject to Exhibit A | 2.A.(1) | 1 |

| Subject | Section | Page |
|---|---|---|
| Dramatic Programs - Program Fees, Rehearsal Days & Hours | 2.A.(2) | 1 |
| Dramatic Programs - Serials - Program Fees, Rehearsal Days & Hours - Principals | 2.A.(2)(b)(i) | 2 |
| Dressing Rooms | 51 | 56 |
| Dressing Rooms and Facilities – Locations | 51.E | 56 |
| Drug Abuse & Alcoholism - Statement of Objective of AFTRA-Industry Program | Exhibit G | 135 |
| Drug Abuse and Alcoholism | 97A | 107 |
| **E** | | |
| Engagements | 55 | 59 |
| Engagements - Notice to be Given | 55A | 59 |
| Excerpts of Legitimate Stage Productions For News & Public Affairs Programs | Sideletter 6 | 145 |
| Excerpts – Replays | 73.D | 78 |
| Excerpts - Replays - Award Shows - Star Performers | 73.D.(1)(d) | 78 |
| Excerpts - Replays - Flashbacks | 73.D.(1)(c) | 78 |
| Excerpts - Replays - For Promotional Purposes | 73.D | 78 |
| Excerpts - Replays - Payment for Use | 73.D.(2) | 79 |
| Excerpts - Replays - Recaps | 73.D.(1)(f) | 79 |
| Excerpts - Replays - Star Performer - Retrospective | 73.D.(1)(e) | 79 |
| Excess Days - Dancers | 5.A.(4) | 12 |
| Excess Feeds to Struck Stations | 103 | 114 |
| Exclusivity | 54 | 57 |

| Subject | Section | Page |
|---|---|---|
| **F** | | |
| Fees - Commercial Performers | 4.A | 8 |
| Fees For Use of Still Photographs on Dramatic Programs | Sideletter 9 | 148 |
| Fees - Supplemental Markets | Exhibit D-3.A | 121 |
| Flashbacks | 73.D.(1)(c) | 78 |
| Foreign Replays | 73.F | 84 |
| Form AFTRA Performer Contract | 68 | 66 |
| **G** | | |
| Game Show Contestants | 75.D | 93 |
| Grievance and Arbitration | 95 | 99 |
| Grievance and Arbitration - Time Limits | 95.A | 99 |
| Group Dancers - Additional Rehearsal Days | 5.A.(4) | 12 |
| Group Dancers - Excess Days | 5.A.(4) | 12 |
| Group Dancers - Lip Sync | 5.A.(11) | 13 |
| Group Dancers - Non-Syndicated, Non-Prime Time Programs | 5.A.(14) | 15 |
| Group Dancers - Notification of Dates and Locations of Rehearsals | 5.A.(15) | 15 |
| Group Dancers - Program Fees, Rehearsal Days & Hours | 5.A | 11 |
| Group Dancers - Safety-Floors | 5.A.(8) | 13 |
| Group Dancers - Step Out Rate | 5.A.(7) | 12 |
| Group Discount - Background Actors - Variety and Serials | 8.E | 25 |
| Group Noises | 46.E | 54 |

| Subject | Section | Page |
|---|---|---|
| Group Singers - Multiple Tracking and Sweetening | 5.B.(8) | 19 |
| Group Singers - Soloist/Duo | 5.B.(7) | 19 |
| Group Singers - Multiple Performances | 5.C | 20 |
| Group Singers Promotional Announcements | 10.G | 29 |
| Group Singers Promotional Announcements - Customized Tracks | 10.G.(4) | 30 |
| Groups and Choruses | 5 | 11 |
| . | | |
| Guaranteed Days of Employment (not applicable to serials) | 19 | 37 |
| Guaranteed Days of Employment - Strip Programs - (not applicable to serials) | 20.D | 38 |

**H**

| | | |
|---|---|---|
| H&R Contribution - Assistant Choreographer | 5.A.(13) | 14 |
| Hair - Requirement to Grow or Shave | 50 | 56 |
| Hazardous Performances | 39 | 47 |
| Hazardous Performances - Dancers Wearing Masks | Sideletter 8 | 147 |
| Hazardous Performances - Knee Work | Sideletter 23 | 162 |
| Hazardous Routine - Dancers | 5.A.(12) | 13 |
| Hazardous Substances and Smoke | 39.A | 49 |
| Health and Retirement Funds | 102 | 109 |
| Health and Retirement Funds - Exhibit A Programs | 102 Sec.1.A.(2) | 110 |
| Health and Retirement Funds - IAP | 102 Sec.3 | 113 |
| Health and Retirement Funds - AFTRA ICF | 102A | 114 |

| Subject | Section | Page |
|---|---|---|
| Health and Retirement Funds - Situation Comedies (other than Exhibit A) | 102 Sec.1.A.(1) | 110 |
| Health and Retirement Funds - For Services Only Corporations | 102 Sec.1.F | 111 |
| Health and Retirement Funds - Star Performers | 102 Sec.1.B | 111 |
| Health and Retirement Funds - Trustees | 102 Sec.2 | 112 |
| High Budget SVOD Programs | Sideletter 57 | 220 |
| Hold and Availability Calls | 55.C | 60 |
| Holding Areas | Sideletter 50 | 206 47 |
| Holidays (serial performers only) | 38.B | |

**I**

| Incidental Rehearsal | 25.E | 42 |
| Included Rehearsal Days (not applicable to serials) | 13.B | 32 |
| Included Rehearsal Days - Strip Programs - (not applicable to serials) | 20.C | 38 |
| Indemnification of Performer | 94 | 99 |
| Individual Contract - Standard Clause | 67 | 65 |
| Individual Contract - Standard Form | 68 | 66 |
| Individual Contracts | 66 | 65 |
| Individual Contracts Beyond the Term of the Code | 82 | 96 |
| International Television | 73.F | 84 |
| Interviewees on Entertainment Programs - Rates, Conditions and Exceptions | 75.E | 93 |

**K**

| Knee Pads - Dancers | 5.A.(9) | 13 |

| Subject | Section | Page |
|---|---|---|
| Knee Work - Hazardous Performances | Sideletter 23 | 162 |
| **L** | | |
| Late Payment Penalties | 61.B | 63 |
| Length of Contract | 1 | 1 |
| Letters of Adherence | 89 | 98 |
| License of Non-Exhibit A Free Television, Pay Television, Basic Cable Programs to Secondary Digital Channels............................................................ | Sideletter 53 | 214 |
| License of Non-Exhibit A Dramatic Programs Made for Basic Cable to a Different Basic Cable Service......................................................... | Sideletter 55.......... | 217 |
| Line- Defined | 47 | 55 |
| Lip Sync - Dancers | 5.A.(11) | 13 |
| Live Linear Television............................................................... | Sideletter 51.......... | 212 |
| Live Repeat Program | 28 | 43 |
| Live Signature Numbers | 9 | 27 |
| Loan-Out Companies- Health and Retirement Funds | 102 Sec.1.F | 111 |
| Location Work | 43.A | 50 |
| Location Work - Dressing Rooms and Facilities | 51.E | 56 |
| **M** | | |
| Meal Period - Off-Camera Singers | 5.B.(2)(c) | 17 |
| Meal Periods | 23 | 39 |
| Meal Periods - Exhibit A Interpretation of "12 minute grace period" | Sideletter 27 | 166 |
| Minimum Daily Call (not applicable to serials) | 17 | 36 |
| Minimum Daily Call - Strip Programs (not applicable to serials) | 20.A | 38 |
| Minimum Session (not applicable to serials) | 18 | 37 |

| Subject | Section | Page |
|---------|---------|------|
| Minimum Session - Strip Programs (not applicable to serials) | 20.B | 38 |
| Minors | 100 | 107 |
| Minors - Education | 100.E | 109 |
| Minors - Engagement and Special Working Conditions | 100.B | 107 |
| Minors - Interviews and Tests | 100.A | 108 |
| Minors - Supervision | 100.D | 108 |
| Minors - Work Hours | 100.C | 106 |
| Models | 33 | 44 |
| Modification of Present Contract | 80 | 95 |
| Multiple Categories of Performances | 46.E | 54 |
| Multiple Commercials | 26 | 42 |
| Multiple Performances - Non-Dramatic Programs - Announcers | 2.B.(2) | 4 |
| Multiple Performances - Group Singers | 5.C | 20 |
| Multiple Performances - Non-Dramatic Programs - Principal Performers | 2.B.(2) | 4 |
| Multiple Performances - Notice | 38 | 46 |
| Multiple Performances - Off-Camera Program Announcers | 4.B.(3) | 10 |
| Multiple Programs That are Part Commercial and Part Sustaining | 37 | 46 |
| Multiple Tracking and Sweetening - Singers | 5.B.(8) | 19 |

**N**

| | | |
|---------|---------|------|
| Network Program - Defined | 71 | 73 |
| News Inserts | 75.A.(2) | 92 |

| Subject | Section | Page |
|---|---|---|
| News Inserts and Service - Limit on Applicability | Sideletter 3 | 142 |
| News Inserts - Compilation Program of Inserts | 75.A.(3) | 92 |
| News Inserts - Compilation Program of Inserts - Replays | 75.C | 93 |
| News Programs - More than Two (2) Hours | 75.A.(1) | 92 |
| News Service | 76 | 94 |
| News Shows - Sixth (6th) or Seventh (7th) Performance | 2.B.(3) | 5 |
| News- Use of Performance by Another Network or Station | 75.B | 93 |
| New York City Earned Sick Time | Sideletter 52 | 213 |
| No Discrimination/Affirmative Action | 97 | 103 |
| No Discrimination/Affirmative Action - Data and Reports Required | 97.B | 105 |
| No Discrimination/Affirmative Action - Meetings With Producers re: Complaints | 97.C | 105 |
| No Discrimination/Affirmative Action - Meetings with serials re: Casting | 97.D | 106 |
| No Discrimination/Affirmative Action - Paragraph 97 Report | Exhibit H | 136 |
| No Discrimination/Affirmative Action - Policy | 97.A | 103 |
| No Discrimination/Affirmative Action - Stunt Performers | 97.F | 106 |
| No-Strike Clause | 93 | 99 |
| Non-Dramatic Programs - Program Fees, Rehearsal Days & Hours - Multiple Performances | 2.B.(2) | 4 |
| Non-Dramatic Programs - Program Fees, Rehearsal Days & Hours - Single Performances | 2.B.(1) | 3 |
| Non-Syndicated, Non- Prime Time Programs - Group Dancers | 5.A.(14) | 15 |

| Subject | Section | Page |
|---|---|---|
| Non-Waiver of Rights | 64 | 65 |
| Notice on Multiple Performances | 38 | 46 |
| Notices - Part, Rehearsal, Guaranteed Days | 55.A | 59 |
| Notification of Dates and Locations of Rehearsals - Group Dancers | 5.A.(15) | 15 |
| Nudity and Cosmetic Alterations | 50 | 56 |

**O**

| Subject | Section | Page |
|---|---|---|
| Off-Camera Program Announcer - Program Fees, Rehearsal Days & Hours | 4.B | 9 |
| Off-Camera Program Announcer - Program Fees, Rehearsal Days & Hours - More than Ten (10) Lines | 4.B.(1) | 9 |
| Off-Camera Program Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or less | 4.B.(2) | 10 |
| Off-Camera Program Announcer - Program Fees, Rehearsal Days & Hours - Multiple Performances | 4.B.(3) | 10 |
| Off-Camera Singers - Meal Period | 5.B.(2)(c) | 17 |
| Off-Camera Singers - Session | 5.B.(2)(b) | 16 |
| Off-Camera Announcers | 4 | 8 |
| Original Employment for Pay Television or Videocassettes | Exhibit E | 128 |
| Original Agreements Adopted | 90 | 98 |
| Overscale Contracts | 56 | 60 |
| Overtime | 15 | 33 |
| Overtime - Programs other than Serials and Variety - Background Actors | 8.D.(1) | 25 |
| Overtime - Programs Other than Serials | 15.A | 33 |
| Overtime - Serials | 15.B | 34 |

| Subject | Section | Page |
|---|---|---|
| **P** | | |
| Pay Television or Videocassettes - Rates and Terms for Original Employment | Exhibit E | 128 |
| Pay Television - Right to Exhibit On | 69.B | 72 |
| Payment | 61 | 63 |
| Payment - Breakdown of Earnings | 61.D | 64 |
| Payment - Due Dates | 61.A. | 62 |
| Payment for Multiple Sponsorship of Program | 40 | 49 |
| Payment - Penalties for Late Payment | 61.B | 63 |
| Payment - Replays - Due Dates and Late Payment Penalties | 61.C | 64 |
| Payment, Time of and Reports - Supplemental Markets | Exhibit D-5 | 125 |
| People Covered | 75 | 91 |
| People Covered - Amateurs | 75.D | 93 |
| People Covered - Game Show Contestants | 75.D | 93 |
| People Covered - Interviewees on Entertainment Programs | 75.E | 93 |
| Performances in Multiple Categories | 46.E | 54 |
| Performers Subject to Exhibit A | 2.A.(1) | 1 |
| Performers Who Speak Five Lines or Less | 3 | 6 |
| Postponed Programs - Non-Serials | 60.A | 62 |
| Postponed Programs - Serials | 60.B | 63 |
| Preemption by President or News Event | 59.B | 61 |

| Subject | Section | Page |
|---|---|---|
| Preference of employment - Programs Other Than Serials and Variety - Background | 8.D.(2) | 25 |
| Actors Previews | 30 | 43 |
| Prime Time Network Programs (See Exhibit A Index - below) | Exhibit A | 116 |
| Principal Performers - Inability to Downgrade | 55.B | 60 |
| Principal Performers | 2 | 1 |
| Principal Performers - Dramatic Programs | 2.A | 1 |
| Principal Performers - Dramatic Programs - Performers Subject to Exhibit A. | 2.A.(1) | 1 |
| Principal Performers - Dramatic Programs - Program Fees, Rehearsal Days & Hours | 2.A.(2) | 1 |
| Principal Performers - Non-Dramatic Programs - Program Fees, Rehearsal Days & Hours - Single Performances | 2.B.(1) | 3 |
| Principal Performers - Non-Dramatic Programs | 2.B | 3 |
| Principal Performers - Non-Dramatic Programs - Multiple Performances | 2.B.(2) | 4 |
| Principal Performers - Non-Serial Dramatic Programs | 2.A(2) | 1 |
| Producer Bound by Other Codes | 90 | 98 |
| Production Memoranda and Remittance Report | 87 | 97 |
| Production Prosecuted | 94 | 99 |
| Program Announcer - Program Fees, Rehearsal Days & Hours | 4.B | 9 |
| Program Announcer - Program Fees, Rehearsal Days & Hours - More Than Ten (10) Lines | 4.B.(1) | 9 |
| Program Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or Less | 4.B.(2) | 10 |
| Program Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or Less - Multiple Performances | 4.B.(3) | 10 |

| Subject | Section | Page |
|---|---|---|
| Program Auditions | 44 | 52 |
| Program Covered | 70 | 73 |
| Program Fees - Interviewees on Entertainment Programs | 75.E | 93 |
| Program Fees - Standard Non-Commercial Openings and Closings and Musical Signatures | 9A. | 27 |
| Program Fees, Rehearsal Days & Hours - Programs, Other Than Serials and Variety - Background Actors | 8.D.(1) | 25 |
| Program Fees, Rehearsal Days & Hours - Serials - Principals | 2.A.(2)(b) | 2 |
| Program Fees, Rehearsal Days & Hours - Group Dancers | 5.A. | 11 |
| Program Fees, Rehearsal Days & Hours - Groups and Choruses | 5 | 11 |
| Program Fees, Rehearsal Days & Hours - Non-Dramatic Program - Multiple Performances - Principals (Other Than Serials) | 2.A.(2)(a) | 1 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer | 4.B | 9 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - More Than Ten (10) Lines | 4.B.(1) | 9 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - Ten (10) Lines or Less | 4.B.(2) | 10 |
| Program Fees, Rehearsal Days & Hours - Off-Camera Program Announcer - Multiple Performances | 4.B.(3) | 10 |
| Program Fees, Rehearsal Days & Hours - Dramatic Programs (Other Than Serials) - Principal Performers | 2.A.(2) | 1 |
| Program Fees, Rehearsal Days & Hours - Non-Dramatic Programs - Single Performances - Principal Performers | 2.B.(1) | 3 |
| Program Fees, Rehearsal Days & Hours - Specialty Acts | 6 | 20 |
| Program Fees, Rehearsal Days & Hours - Sportscaster | 7 | 23 |
| Program Fees, Rehearsal Days & Hours - Single Programs- Under Fives | 3.A | 6 |
| Programs in Excess of Two (2) Hours | 12 | 32 |
| Programs on Commonly Owned Stations | 53 | 57 |

240

| Subject | Section | Page |
|---|---|---|
| Promotional Announcements | 10 ................................ | 28 |
| Promotional Announcements – First Run Syndication | 10.A.(5) ................................ 10.H.(4) ................................ | 28 31 28 |
| Promotional Announcements – Off Network Syndication | 10.A.(1) ................................ | |
| Promotional Announcements - Promo Fees | | |
| Promotional Announcements - Customized Station Tags | 10.C ................................ | 29 |
| Promotional Announcements - Group Singers | 10.G ................................ | 29 |
| Promotional Announcements - Length of Session | 10.A.(4) ................................ | 28 |
| Promotional Announcements - Radio | 10.A.(2) ................................ | 28 |
| Promotional Announcements - Series Regular | 10.F. ................................ | 29 |
| Promotional Announcements - Session Report | Exhibit I. ................................ | 137 |
| Promotional Announcements - Station and Network Identifications | 10.A.(3) ................................ | 28 |
| Promotional Announcements - Syndication Packages | 10.H. ................................ | 31 |
| Promotional Announcements - Sweepers | 10.I ................................ | 31 |
| Promotional Announcements - Tags | 10.B ................................ | 28 |
| Promotional Announcements - Tags Session Fee | 10.D ................................ | 29 |
| Promotional Announcements - Use of Promos on Basic Cable | 10.A.(1) ................................ | 28 |
| Promotional Uses of Recordings | 88 ................................ | 98 |
| Promotional Uses of recordings - Use on Basic Cable | Sideletter 20 ................................ | 159 |
| Public Service Announcements - Announcers | 10.E ................................ | 29 |

**R**

| Radio - Promotional Announcements | 10.A.(2) ................................ | 28 |
| Reading Session | 21 ................................ | 39 |
| Ready to Go Calls | 55.D ................................ | 60 |

| Subject | Section | Page |
|---|---|---|
| Recaps | 73.D.(1)(f) | 79 |
| Reconciliation Period - Serials - Principal Performers | 2.A.(2)(b)(ii) | 3 |
| Reconciliation Period - Serials - Under Fives | 3.C.(2) | 8 |
| Reconciliation Period - Serials - Background Actors | 8.C.(2) | 24 |
| Recorded Programs Covered by Code | 72 | 73 |
| Reduction of Hours/Days on Schedule Not Permitted | 55.A | 59 |
| Regular Rehearsal Days (not applicable to serials) | 13.C | 32 |
| Rehearsal Days (not applicable to serials) | 14 | 33 |
| Rehearsal - Strip Programs - (not applicable to serials) | 20 | 38 |
| Rehearsals and Rehearsal Rates (not applicable to serials) | 13 | 32 |
| Rehearsals - Limits on Crediting | 56.B | 60 |
| Remittance Report and Production Memoranda | 87 | 97 |
| Remotes | 42 | 50 |
| Replays | 73 | 74 |
| Replays - Domestic Replay in Foreign Language | 73.B(6) | 76 |
| Replays - Excerpts | 73.D | 78 |
| Replays - Excerpts - Award Shows - Star Performers | 73.D.(1)(d) | 78 |
| Replays - Excerpts Flashbacks | 73.D.(1)(c) | 78 |
| Replays - Excerpts for Promotional Purposes | 73.D.(1)(a) | 78 |
| Replays - Excerpts - Payment for Use | 73.D.(2) | 79 |
| Replays - Excerpts - Recaps | 73.D.(1)(f) | 79 |

| Subject | Section | Page |
|---|---|---|
| Replays - Excerpts - Star Performer - Retrospective | 73.D.(1)(e) | 79 |
| Replays - Fees Applicable | 73.B.(3) | 75 |
| Replays – First Run Syndicated Programs | 73.B.(2) 73.F | 74 84 |
| Replays - International Television | | |
| Replays - Payments for Replays on Entire Programs | 73.B | 74 |
| Replays - Programs on Commonly Owned Stations | 53.E | 57 |
| Replays - Reality Based Programs | 73.B.(4) | 75 |
| Replays - Release to Public Television | 73.B.(7) | 77 |
| Replays - Syndication Programs - Additional Terms | 73.C | 77 |
| Re-Recording After Final Performance Date | 29 | 43 |
| Rest Between Days | 16 | 35 |
| Rest Between Days - Serials | 16.B | 35 |
| Rest Periods | 22 | 39 |
| Retakes and Recording after Final Performance Date | 29 | 43 |
| Retroactivity | 79 | 95 |
| Review Board | 98 | 107 |
| **S** | | |
| Safety - Floors - Dancers | 5.A.(8) | 13 |
| Segmented Programs - Commercials | 41 | 49 |
| Separability | 99 | 107 51 |
| Serial Performers - Travelling and Location Work - Additional Provision | 43.E | |

| Subject | Section | Page |
|---|---|---|
| Serials - Additional Option for Compilation Videocassettes | 73.D.(10)(b) | 82 |
| Serials - Announcers - Standard Non-Commercial Openings and Closings and Musical Signatures | 9.A | 27 |
| Serials - Auditions of Performers in Running Parts | 45.F | 53 |
| Serials - Call Board | 38.D | 46 |
| Serials - Cast Credit | 49 | 55 |
| Serials - Compilation Programs | 73.D.(8) | 80 |
| Serials - Crediting | 56.C | 61 |
| Serials - Delivery of Deal Memo or Contract | 54A.F | 59 |
| Serials - Determination of Cycles and Guarantees | 54A.G | 59 |
| Serials - Exclusivity | 54 | 57 |
| Serials - Background Actors - Program Fees, Rehearsal Days & Hours | 8.C | 24 |
| Serials - Background Actors - Special Rates for Large Groups | 8.E | 25 |
| Serials - Foreign Broadcast (non-cable) | 73.F.(2) | 85 |
| Serials- Holidays | 38B | 47 |
| Serials - Length of Original Agreement | 54A.A | 58 |
| Serials - Length of Renewal Agreement | 54A.B | 58 |
| Serials - Meal Period | 23.C | 40 |
| Serials - Meetings Re: Non Discriminatory Casting | 97.D | 106 |
| Serials - Notice of Cancellation of Contract | 54A.D | 58 |
| Serials - Notice Requirements | 38 | 46 |

| Subject | Section | Page |
|---|---|---|
| Serials - Overtime | 15.B. | 34 |
| Serials - Postponed Programs | 60.B. | 63 |
| Serials - Program Fees, Rehearsal Days & Hours - Principals | 2.A.(2)(b)(i) | 2 |
| Serials - Program Fees, Rehearsal Days & Hours - Under Fives | 3.C | 7 |
| Serials - Program Fees, Rehearsal Days & Hours - Background Actors | 8.C | 24 |
| Serials - Reading Session | 21.B | 39 |
| Serials - Recaps | 73.D.(1)(f) | 79 |
| Serials - Reconciliation Period - Background Actors | 8.C.(2) | 24 |
| Serials - Reconciliation Period | 2.A.(2)(b)(ii) | 3 |
| Serials - Relocation | 54A.H | 59 |
| Serials - Requirement that Contract Guarantee a Minimum Number of Episodes | 54A.C | 58 |
| Serials - Requirement that Contract State a Per Episode Fee | 54A.C | 58 |
| Serials - Rest Between Days | 16.B | 35 |
| Serials - Restrictions on Canceling for Absence Due to Illness | 54A.E | 58 |
| Serials - Scripts in Advance | 55.A | 59 |
| Serials - Sixth (6th) or Seventh (7th) Days | 15.B.(2) | 34 |
| Serials - Term Contracts | 54A | 58 |
| Serials - Under Fives - Program Fees, Rehearsal Days & Hours | 3.C | 7 |
| Serials - Upgrading and Downgrading | Sideletter 1 | 140 |
| Serials - Vacations | 38A | 47 |

| Subject | Section | Page |
|---|---|---|
| Session - Off-Camera Singers | 5.B.(2)(b) | 16 |
| Session Fee - Tags - Promo Announcers | 10.D | 29 |
| Simulcasts | 104 | 114 |
| Singers | 5.B | 16 |
| Singers - Committee Established Re: Impact of Computerized Equipment | Sideletter 10 | 149 |
| Singers - Commonly Owned Stations- Program Fees, Rehearsal Days & Hours | 5.B.(3) | 17 |
| Singers - Contractors for Groups | 34.B | 44 |
| Singers - Doubling | 46.B | 53 |
| Singers - Multiple Performances | 5.C | 20 |
| Singers - Multiple Tracking and Sweetening | 5.B.(8) | 19 |
| Singers – Non Serial Dramatic Programs | 5.B.(3) | 17 |
| Singers – Notice of Discharge | 65 | 65 |
| Singers - Off-Camera - Meal Period | 5.B.(2)(c) | 17 |
| Singers - Off-Camera- Session | 5.B.(2)(b) | 16 |
| Singers - Producers to Send Letter to Licensee Recommending AFTRA | Sideletter 14 | 149 |
| Singers - Program Fees, Rehearsal Days & Hours - On-Camera | 5.B.(1) | 16 |
| Singers - Promotional Announcements | 10.G | 29 |
| Singers - Promotional Announcements - Customized Tracks | 10.G.(4) | 30 |
| Singers - Soloist/Duo | 5.B.(7) | 19 |
| Singers - Standard Non-Commercial Openings and Closing and Musical Signatures | 9.A | 27 |

| Subject | Section | Page |
|---|---|---|
| Sixth (6th) or Seventh (7th) Days - Serials | 15.B.(2) | 34 |
| Smoke and Hazardous Substances | 39A | 49 |
| Soloist/Duo - Singers | 5.B.(7) | 19 |
| Specialty Acts | 6.A | 20 |
| Specialty Acts - Overtime | 6.D | 21 |
| Specialty Acts - Rest Periods - Rehearsals | 22.B | 39 |
| Sportscasters | 7 | 21 |
| Sportscasters - Extended Programs (i.e., Olympics) | 7.E | 22 |
| Sportscasters - Pre-Game Shows | 7.E | 22 |
| Sportscasters - Spotters and Statisticians | 7.E | 23 |
| Standard Clause for Individual Contract | 67 | 65 |
| Standard Contract | 68 | 66 |
| Standard Non-Commercial Openings and Closings and Musical Signatures | 9A | 27 |
| Stand-ins Credentials. | Sideletter 56. | 219 |
| Stand-ins and Dance-Ins | 36 | 45 |
| Stand-Ins- Doubling as Background Actors | 46.I | 54 |
| Statement of Earnings | 61.D | 64 |
| Station and Network Identifications- Promo Announcers | 10.A.(3) | 28 |
| Step Out Rate - Dancers | 5.A.(7) | 12 |
| Still Photographs on Dramatic Programs | Sideletter 9 | 148 |
| Strikes Prohibited During Term of Code | 93 | 99 |

| Subject | Section | Page |
|---|---|---|
| Strip Programs - Guaranteed Days of Employment (not applicable to serials) | 20.D | 38 |
| Strip Programs - Included Rehearsal Days (not applicable to serials) | 20.C | 38 |
| Strip Programs - Minimum Daily Call (not applicable to serials) | 20.A | 38 |
| Strip Programs - Minimum Session (not applicable to serials) | 20.B | 38 |
| Strip Programs of More Than 45-60 minutes | 20.E | 39 |
| Strip Programs - Rehearsal (not applicable to serials) | 20 | 38 |
| Stunt Performers | 68A | 71 |
| Stunt Performers - Additional Stunt Work | 68A.A | 71 |
| Stunt Performers - No Discrimination/ Affirmative Action | 97.F | 106 |
| Stunt Performers - Safety | 68.A.C | 71 |
| Stunt Performers - Sanitary Wardrobe | 68A.B | 71 |
| Stunt Performers - Driving Guidelines | Exhibit F | 134 |
| Stunts | 39 | 47 |
| Supplemental Markets | Exhibit D | 120 |
| Supplemental Markets - Assignments of Rights | Exhibit D-6 | 126 |
| Supplemental Markets - Time of Payment and Reports | Exhibit D-5 | 125 |
| Supplemental Markets - Allocation of Distributor's Gross Receipts | Exhibit D-4.D | 125 |
| Supplemental Markets - Definition of Distributor's Gross Receipts | Exhibit D-4 | 124 |
| Supplemental Markets - Definitions | Exhibit D-2 | 120 |
| Supplemental Markets - Fees | Exhibit D-3.A | 121 |

| Subject | Section | Page |
|---------|---------|------|
| Supplemental Markets - Right to Exhibit In | 69.A | 72 |
| Supplemental Markets - Transfer of Rights | Exhibit D-3.B | 123 |
| Sustaining Programs | 11 | 32 |
| Sweepers - Promotional Announcements | 10.I | 31 |
| Sweetening - Singers | 5.B.(8) | 19 |
| Syndication Licenses for Canada Only | Sideletter 54 | 216 |
| Syndication Packages - Promo Announcements | 10.H | 31 |

**T**

| Tags - Customized Station Promo Announcers | 10.C | 29 |
| Tags - Promo Announcers | 10.B | 28 |
| Tags - Session Fees - Promo Announcers | 10.D | 29 |
| Talent Auditions, Video Tests, Voice Tests, Calls for Group Dancers | 45 | 52 |
| Term | 1 | 1 |
| Term Contracts - Serials | 54A | 58 |
| Title of Code | 105 | 114 |
| Transfer of Rights (Programs) | Exhibit B | 117 |
| Transfer of Rights (Promotional Announcements) | Exhibit J | 138 50 |
| Traveling | 43 | |

**U**

| Under Fives | 3 | 6 |
| Under Fives - Program Fees, Rehearsal Days & Hours - Serials | 3.C. | 7 |
| Under Fives - Program Fees, Rehearsal Days & Hours - Single Programs | 3.A. | 6 |

| Subject | Section | Page |
|---|---|---|
| Under Fives - Reconciliation Period for Serials | 3.C.(2) | 8 |
| Under Fives - Special Rates for Commonly Owned Stations | 3.B. | 7 |
| Understudies | 35 | 45 |
| Unfair Producer | 92 | 98 |
| Union Shop | 84 | 96 |
| Upgrades - Background Actors | 48. | 55 |
| Use of Recordings for Reference, File, Audition, Trailer or Promotional Purposes | 88 | 98 |
| **V** | | |
| Vacations | 38A. | 47 |
| Value Added Promotional Announcements - Committee | Sideletter 49 | 205 |
| Variety Programs - Commonly Owned Stations - Program Fees, Rehearsal Days & Hours - Background Actors | 8.B. | 24 |
| Variety Programs - Program Fees, Rehearsal Days & Hours - Background Actors | 8.A. | 23 |
| Variety Programs - Special Rates for Large Groups - Background Actors | 8.E. | 25 |
| Video Tests | 45 | 52 |
| Voice Over Program Announcer - Program Fees, Rehearsal Days & Hours | 4.B. | 9 |
| Voice Over Program Announcer - Program Fees, Rehearsal Days & Hours - More Than Ten (10) Lines | 4.B.(1) | 9 |
| Voice Over Program Announcer - Program Fees, Rehearsal Days & Hours - Ten (10) Lines or Less | 4.B.(2) | 10 |
| Voice Over Program Announcer - Program Fees, Rehearsal Days & Hours - Multiple Performances | 4.B.(3) | 10 |
| Voice Tests | 45 | 52 |
| **W** | | |
| Waiver of Cause of Action | 81 | 96 |

| Subject | Section | Page |
|---|---|---|
| Waivers Limited to Working Conditions | 78 | 95 |
| Walk-Ons - Definition | 48 | 55 |
| Wardrobe, Hairdress, Make-Up & Incidental Rehearsal | 25 | 41 |
| Warm-Ups | 31 | 43 |
| Warm-Ups - Fee for Members of Regular Production Staff (*e.g.,* Writers) | Sideletter 15 | 154 |

# EXHIBIT H

## 2018 MEMORANDUM OF AGREEMENT
## SAG-AFTRA NATIONAL CODE OF FAIR PRACTICE
## FOR NETWORK TELEVISION BROADCASTING

This Memorandum of Agreement reflects the complete understanding reached between the parties regarding agreed-upon modifications to the 2014-2018 National Code of Fair Practice for Network Television Broadcasting (the "Network Code"). All Industry and SAG-AFTRA proposals not enumerated herein and not otherwise withdrawn are deemed rejected. As soon as practicable, this Memorandum of Agreement will be reduced to formal contract language. The language in the Memorandum of Agreement is not contract language, except where the context clearly indicates otherwise. Except as modified herein, the terms of the 2014 Network Code shall remain unchanged.

1.     **Term**: July 1, 2018 through June 30, 2021.

2.     **Wages and Fees**

**A. General** - Increase the program fees in the following Paragraphs by **2.5%** effective July 1, 2018 (assuming the parties reach agreement on June 9, 2018 and SAG-AFTRA provides notification of ratification of the agreement within a reasonable period thereafter, otherwise initial increases to take effect the first payroll period following notice of ratification), **3%** effective July 1, 2019 and **3%** effective July 1, 2020 [1]:

| | |
|---|---|
| 2.A.(2)(a) [2] | 5.A.(1),(3),(7), (14) and (16) |
| 2.B.(1),(2) and (3) | 5.B.(1)(a), (2)(a), (3)(a) and (3)(b) |
| 2.C.(1) | 6.B. and E. |
| 3.A. and B. | 7.(A),(B),(C) and (D) |
| 4.A.(1),(2) and (3) | 9.A. |
| 4.B.(1) and (2) | 36.B(2) |

**B. Daytime Serials** - Increase the program fees in Paragraphs 2.A.(2)(b)(i) and 3.C.(1) by 1% effective July 1, 2018, 1.5% effective July 1, 2019 and 1.5% effective July 1, 2020.

**C. Background Actors**

i.     Paragraph 8.A (Variety Programs): Increase rates for all program lengths by 2% effective December 31, 2018 and by 2.5% effective July 1, 2020.

ii.     Paragraph 8.B (Variety Programs on Multiple Stations Commonly Owned): Eliminate the over 15 to 30 and over 30 to 45 minute rates. Increase the remaining rates and reduce the included hours for the remaining rates so they are as set forth below.

---

[1] Dates inserted for Contract drafting purposes as increases are effective on the date of the first payroll period following July 1, 2019 and July 1, 2020, but in acknowledgement of the fact that the Companies have different payroll periods. The same applies to the effective dates of the increases on payments for reuse in new media outside the free window.

[2] For non-serial dramatic programs, the day, three-day and weekly rates shall be the rates in the TV Code effective June 30, 2018 and increased as provided in this Section 2.A. For such programs first produced subsequent to July 1, 2018 the rates shall be the same as the non-legacy rates in the 2017-2020 SAG-AFTRA Television Agreement.

| Program length | Current included hours | Included hours (effective July 1, 2018) | Current rate | Rate effective December 31, 2018 |
|---|---|---|---|---|
| Up to 60 minutes | 8 | 7.5 | $117 | $128 |
| Over 60 to 90 minutes | 10 | 8.5 | $147 | $165 |
| Over 90 to 120 minutes | 13 | 10.5 | $171 | $188 |

iii.     Paragraph 8.C(1) (Daytime Serial Programs): Eliminate the 5 minute or less and over 5 to 15 minute rates. Increase the remaining rates and reduce the included hours (where indicated) for the remaining rates so they are as set forth below. In addition, **the rates below which are effective December 31, 2018 shall be increased by 1.5% effective July 1, 2020**.

| Program length | Current included hours | Included hours (effective July 1, 2018) | Current rate | Rate effective December 31, 2018 |
|---|---|---|---|---|
| Up to 30 minutes | 8.5 | 8 | $115 | $128 |
| Over 30 to 45 minutes | 9 | 9 | $134 | $147 |
| Over 45 to 60 minutes | 9 | 9 | $150 | $152 |
| Over 60 to 90 minutes | 9 | 9 | $180 | $182 |

iv.     Paragraph 8.C(2) (Additional Day Fees on Daytime Serial Programs): Increase the rates by 1% effective December 31, 2018 **and by 1.5% effective July 1, 2020**.

v.     Paragraph 8.D (Other than Serials and Variety): Effective December 31, 2018, increase the General Ability Background Actor rate from $115 to $120 and the Special Ability rate from $126 to $129. Increase both rates by 2.5% effective July 1, 2020.

vi.     Paragraph 8.E(3) (20% discount for large groups): Add language providing that the Producer may take a discount "of up to" 20%.

vii.     Paragraph 10A.(1) (Promotional Announcements): Increase the rate from $97 to $106 effective July 1, 2018, to $120 effective December 31, 2018 and to $123 effective July 1, 2020.

**D. Promotional Announcements -** Increase Paragraph 10.A.(1) On-Camera promo rate from $323 to $340 effective July 1, 2018 and the Off-Camera rate from $240 to $248 effective **December 31, 2018**.

**E. Stand-Ins** – Increase the applicable rate for all Stand-Ins covered by Paragraph 36.B.(1) from $26 to $27 effective July 1, 2018, **to $28 effective July 1, 2019 and to $29 effective July 1, 2020**.

**F. News Insert / News Service Fee -** Increase the rates in Paragraph 75A.(2) and 76A by 2.5% effective July 1, 2018.

**G. Extra Rehearsal Rate** – Increase the $28 Extra Rehearsal rate to $30 effective July 1, 2019.

**H.** Except as provided herein, all other rates, fees or allowances remain unchanged.

3.   **Health & Retirement / AICF (Paragraph 102/102.A)**

     **i.** Amend Paragraph 102 by increasing the contributions to the SAG-AFTRA Health Plan and the AFTRA Retirement Fund from 17% to 17.5% effective as of January 1, 2019. The foregoing increase in the retirement contribution rate to the AFTRA Retirement Fund set forth above is contingent upon the Trustees of the AFTRA Retirement Fund adopting an amendment to the AFTRA Retirement Fund Trust Agreement effective as of January 1, 2019 "decoupling" the increase in the retirement contribution rate to the AFTRA Retirement Fund, as set forth above, for contributions received under the Code on or after January 1, 2019 from the calculation of the retirement benefit and any other benefit paid on account of the employee's participation in the AFTRA Retirement Fund. This condition must be satisfied before the increase in the retirement contribution rate for the AFTRA Retirement Fund set forth above becomes effective. SAG-AFTRA shall have the right to allocate up to one-half percent (0.5%) of the negotiated increases in minimum rates in the second and/or third years of the Agreement to the AFTRA Retirement contribution rate in Paragraph 102 by giving notice to the Producers before December 31, 2018 and/or December 31, 2019, which allocated amounts shall be "decoupled" from benefit calculations and conditioned upon the same trustee amendment described above.

     **ii.** Increase contributions to the AICF from .1% to .3% effective January 1, 2019 with the understanding that contributions shall not be due on behalf of Background Actors.

     **iii.** Amend Paragraph 102.A. to clarify that there is no AICF contribution due on "gross compensation" when residuals are being paid pursuant to a gross receipts based formula that is inclusive of contributions to the SAG-AFTRA Health and AFTRA Retirement Fund.

     **iv.** The parties agree to recommend a merger of the AICF and IACF to the respective Trustees of the Funds.

4.  **Group Dancers and Singers (Paragraph 5)**

    Reduce the Included Rehearsal Hours for dancers under Paragraph 5.A(2) by three (3) hours on all but 5 minute or less and over 5 to 15 minute programs.

    Reduce the Included Rehearsal Hours for singers under Paragraph 5.B(1)(b) by one (1) hour on all but 5 minute or less and over 5 to 15 minute programs.

    **Modify paragraph 5(14)(b) to provide as follows: "On one (1) hour programs, producer may employ group dancers for the one-day rate. If such rate is used, it will cover eight (8) hours of work. Overtime for hours nine (9) and ten (10) or portions thereof will be paid at the overtime rate. If a dancer works more than ten (10) hours on such day, then the two day rate set forth above shall automatically apply."**

    **The overtime rate for Group Dancers on Award shows under Paragraph 5.(16) shall be increased from $45 to $48 effective July 1, 2018.**

5.  **Meal Periods (Paragraph 23) – Add a new paragraph which provides that:**

    **"Upon request, SAG-AFTRA will grant an automatic waiver** providing for a meal period of not less than a half hour in length for performers on all programs other than Daytime Serials **where the Producer caters a balanced meal**."

6.  **People Covered, Waivers (Paragraph 75, Sideletter 37)**

    a.  **Interviewees on Non-Dramatic Entertainment Programs (Paragraph 75E)**

        For star performers appearing as an interviewee on a non-dramatic entertainment program (*e.g., Ellen, The Tonight Show With Jimmy Fallon, Live With Kelly*), a flat payment of $285 (one half of the 15-minute rate) **$480, effective July 1, 2018** shall be required provided such interview:

        (1)  does not involve significantly more time than is reasonable and customary for an engagement of this type (which is usually not more than four (4) hours, exclusive of travel time) and

        (2)  is primarily in a "Q&A" format."

    b.  Non-Professional Groups Waivers (Sideletter 37) – designate as Sideletter 37(A) and modify as set forth below:

Re: Morning News Programs, Talk Shows, Magazine Shows and Holiday Specials

Ladies and Gentlemen:

SAG-AFTRA recognizes that certain waivers have previously been granted to Producers of morning news programs, where certain non-professional performance groups affiliated with religious, educational, charitable and other non-profit organizations have been excluded from the scope of this Agreement. SAG-AFTRA will not unreasonably deny and Producers agree that a waiver to morning news programs, talk shows, magazine shows and holiday specials (e.g., Christmas in Rockefeller Center, New Year's Eve Live, Dick Clark's New Year's Rockin' Eve, Disney Park's Christmas Celebration, A Home for the Holidays, Macy's Fourth of July Spectacular), shall be deemed granted subject to the following:

(1)     Members of the performance group shall be performing their own material or act, not material provided or arranged by the Producer.

(2)     The performance group shall not back-up a star performer. **(See Sideletter 37 (B)**.

(3)     Groups covered by this waiver shall be limited to one (1) appearance on that program within a calendar year.

(4)     This waiver shall not apply to groups like the Vienna Boys Choir or Harlem Boys Choir, which are deemed to be professional.

(5)     Producer shall notify SAG-AFTRA of the intention to utilize the provisions of this Sideletter prior to the appearance of the group on the program, or in no event later than twenty-four (24) hours after such appearance.

(6)     Other waivers of this nature shall not unreasonably be denied.

(7)     Professional performers who are members of such a group will receive, as a performance fee, payment of the appropriate rate, plus the applicable Health and Retirement contribution.

SAG-AFTRA shall also consider granting waivers for non-professional performance groups performing on the type of programs other than those set forth herein and/or in cases where the performance group does not meet the conditions for the automatic waiver set forth herein. In granting such waivers, SAG-AFTRA may seek a donation to the SAG-AFTRA Foundation in consideration of granting such waiver, in the amount of one thousand dollars ($1,000).

**Add a New Sideletter 37(B) as follows**:

**"Re:**  **Waivers for Morning News Programs, Talk Shows, Magazine Shows and Holiday
Specials**

During the negotiations of the 2018 Code, the parties discussed the following in connection with
the application of Sideletter 37(A) - Non-Professional Groups Waiver Morning News Programs,
Talk Shows, Magazine Shows and Holiday Specials:

i)      The criteria the Union considers in determining whether a performance group
affiliated with religious, educational, charitable or other non-profit organization is "non-
professional" for purposes of the application of the automatic waiver; and

ii)     Under what circumstances, if any, the Union would consider application of the
automatic waiver even in the event that the condition that the performance group is to
back up a star performer.

With respect to (i) above, the Union provided examples of some criteria it uses, which
include but are not limited to the following:

a)      Whether the performance group has performed as an opening act for a
professional artist (or appearing on their own as a featured act) on a concert tour;

b)      Whether the performance group has performed on Network Broadcast or
National Cable television, pay television or an SVOD service in the one (1) year
prior to the planned appearance for which a waiver was being sought;

c)      Whether the performance group has a professional recording contract with
a major label or a bona fide independent label.

With respect to (ii), the parties further discussed the following situations in which the
Producers believed the automatic waiver should be applied notwithstanding the fact that
the non-professional performance group was backing a star performer:

a)      The group appeared at the request of the star performer; or

b)      The group is affiliated with an organization that the star performer
actively supports; or

c)      The organization contacts the show and seeks an appearance on the
program as a means of promoting the organization.

Without agreeing that such circumstances listed above permit backing a star performer
pursuant to Sideletter 37, the Union agrees nonetheless that it will respond in an
expeditious manner and not unreasonably deny such a waiver."

**8. Promotional Programs (Paragraph 88)**

Add a provision to cover use of excerpts in promotional programs (including "behind the scenes") of up to sixty (60) minutes in length, without additional compensation due for use of the excerpts.

Add a new sideletter to the Agreement as follows:

"During negotiations for the 2018-2021 Network Code, the parties discussed how to distinguish between (i) a promotional program where no additional compensation is owed for use of excepts in such program, and (ii) a compilation program where compensation is owed pursuant to Paragraph 73(D) of the Code. **The parties agreed that a promotional program is not otherwise a "Best Of" program.**

A promotional program may contain one or more of the following, which would be an important element of the program. This list is for illustrative purposes only and is not meant to be exhaustive:

- Behind-the-scenes footage;
- "Making of" footage as that term is understood in the industry;
- Interviews with producers, writers, directors, cast, crew, and/or other individuals associated with the program or series;
- Footage of fan involvement/participation, such as a "question and answer" session.

Examples of how promotional programs may be used are:

- The program promotes an upcoming program, season or slate of programs for an exhibition system or producer;
- The program is made available to affiliates to exhibit in ways to drive viewership to watch the underlying program or series;
- The program is produced as "bonus material" that may be part of the DVD or similar exhibition such as EST and digital rentals.

The parties further agree that in order to be promotional, the program must be promoting a program or series that is currently or soon-to-be available."

**9. Sick Leave Law Waivers (Sideletter 52)** Modify as set forth below.

**1. Revise the waiver language to read as follows:**

"The Union expressly waives, to the full extent permitted by law, the application of the following to all performers employed under this Agreement: the New York City Earned Sick Time Act of 2013; Section 1-24-045 of the Municipal Code of Chicago; the Cook County Earned Sick Leave Ordinance (Ordinance No. 16-4229); the San Francisco Paid Sick Leave Ordinance (San Francisco Administrative Code Section 12W); the Paid Sick Leave Ordinance of Berkeley, California (Municipal Code Chapter 13.100); all requirements pertaining to "paid sick leave" in Chapter 37 of Title 5 of the Municipal Code of Emeryville, California (including, but not limited to, Chapter 37.0.1.e), 37.03, 37.07.a)1)B.ii. and 37.07.f)); the Oakland Sick Leave

Law (Municipal Code Section 5.92.030.); Chapter 4.62.025 of the Santa Monica Municipal Code (enacted by Ordinance No. 2509); the Seattle Paid Sick and Safe Time Ordinance (Ordinance No. 123698); Chapter 18.10 of Title 18 of the Municipal Code of the City of Tacoma, Washington (enacted by Ordinance No. 28275); Article 8.1 of Title 23, Chapter 2 of the Arizona Revised Statutes; Chapter 160 of the Ordinances of the Township of Bloomfield, New Jersey (enacted by Ordinance No. 15-10); the Paid Sick Time for Private Employees Ordinance of East Orange, New Jersey (Ordinance No. 21-2014; East Orange Code Chapter 140, Section 1 *et seq.*); the Paid Sick Time Law of Jersey City, New Jersey (Chapter 4 of the Jersey City Municipal Code); Chapter 8.56 of the Revised General Ordinances of the City of New Brunswick, New Jersey; Chapter 8, Article 5 of the Municipal Code of the City of Plainfield, New Jersey; the Sick Leave for Private Employees Ordinances of Elizabeth, New Jersey (Ordinance No. 4617); Irvington, New Jersey (Ordinance No. MC-3513); Montclair, New Jersey; Morristown, New Jersey (Ordinance No. O-35-2016); Newark, New Jersey (City Ordinance 13-2010); Passaic, New Jersey (Ordinance No. 1998-14); Paterson, New Jersey (Paterson Code Chapter 412) and Trenton, New Jersey (Ordinance No. 14-45); the New Jersey Paid Sick Leave Act (contained in N.J.S.A. 34:11-56a et seq.) and any other ordinance, statute or law requiring paid sick leave that is hereafter enacted. It is understood that in the event any other paid sick leave laws are enacted during the term of this Agreement which permit the parties to a collective bargaining agreement to waive application of such laws, the Union and the Producer shall memorialize any such waiver for any newly-enacted law by letter agreement."

## 2.   Add the following provision:

### California Sick Leave.

A. Accrual

Commencing July 1, 2018, eligible performers (as described in subparagraph B. below) shall be entitled to accrue paid sick leave on an up-front basis or hourly basis as follows:

    i.    Provided that advance notice is given to the performer, a Producer may elect to provide performers, upon their eligibility to use sick leave as provided below (*i.e.*, upon working thirty (30) days in California for the Producer within a one (1) year period and after their ninetieth (90th) day of employment in California with the Producer (based on days worked or guaranteed)), with a bank of twenty-four (24) hours or three (3) days of sick leave at the beginning of each year, such year to be measured, as designated by the Producer, as either a calendar year or starting from the performer's anniversary date. Under this elected option, such banked sick leave days may not be carried over to the following year.

    ii.    Alternatively, eligible performers shall accrue one (1) hour of paid sick leave for every thirty (30) hours that the performer renders services in California for the Producer, up to a maximum of forty-eight (48) hours or six (6) days. Performers are deemed to work forty (40) hours per week if they work on a weekly basis or eight (8) hours per day if they are employed on a daily basis or work for a partial workweek. For

performers employed on a program fee basis, all Included Rehearsal Hours for the Program Fee and any additional hours actually worked by the performer outside of the Included Rehearsal Hours shall be included as hours that the performer renders services for purposes of accrual.

A performer shall not forfeit sick leave earned during employment with the Producer before July 1, 2018; however, such sick leave shall be counted towards the maximum accrued sick leave set forth above. Nothing herein alters the administration of any sick leave accrued before July 1, 2018.

B. To be eligible to accrue paid sick leave, the performer must have worked for the Producer for at least thirty (30) days in California within a one (1) year period, such year to be measured, as designated by the Producer, as either a calendar year or starting from the performer's anniversary date. Sick leave may be used in minimum increments of four (4) hours or in increments equal to the daily minimum call for performers employed on a program fee basis where the daily minimum call is less than four (4) hours) upon oral or written request after the eligible performer has been employed by the Producer in California for ninety (90) days (based on days worked or guaranteed), such period to be measured, as designated by the Producer, as either a calendar year or starting from the performer's anniversary date. Reasonable advance notification of the need for sick leave is required if the use is foreseeable; otherwise, notice is required as soon as practicable. Sick days accrued on an hourly basis shall carry over to the following year of employment; however, the Producer may limit the use of such accrued time to no more than twenty-four (24) hours or three (3) days during each year of employment as defined by the Producer in advance.

C. For performers employed on a daily basis, a day of sick leave pay shall be equal to the performer's minimum daily rate (or fifty percent (50%) thereof for a four (4) hour increment of sick leave taken). For performers employed on a weekly basis, a day of sick leave pay shall be equal to one-fifth $(1/5^{th})$ of a performer's minimum weekly rate (or fifty percent (50%) thereof for a four (4) hour increment of sick leave taken). For performers employed on a program fee basis, Producer will pay sick leave in accordance with the law. Replacements may be hired on a *pro rata* basis regardless of any contrary provision in the Agreement. The performer shall not be required to find a replacement as a condition of exercising his or her right to paid sick leave.

D. Sick leave may be taken for the diagnosis, care or treatment of an existing health condition of, or preventative care for, the performer or the performer's 'family member.'2 Sick leave also may be taken by a performer who is a victim of domestic violence, sexual assault or stalking.

---

2 'Family member' means any of the following: (1) a biological, adopted or foster child, stepchild, legal ward or a child to whom the performer stands *in loco parentis*; (2) a biological, adoptive or foster parent, stepparent or legal guardian of the performer or the performer's spouse or registered domestic partner or a person who stood *in loco parentis* when the performer was a minor child; (3) a spouse; (4) a registered domestic partner; (5) a grandparent; (6) a grandchild; or (7) a sibling.

E. Accrued, unused sick leave is not paid out on termination, resignation or other separation of employment. If a performer is rehired by the Producer within one (1) year of the performer's separation from employment, the performer's accrued and unused sick leave shall be reinstated, and the performer may begin using the accrued sick leave upon rehire if the performer was previously eligible to use the sick leave or once the performer becomes eligible as provided above.

F. At the Producer's election, the Producer shall either:

> i. Show the amount of available paid sick leave on the performer's pay stub or a document issued together therewith; or

> ii. Include in the performer's deal memo or contract the contact information for the designated Producer representative whom the performer may contact to confirm eligibility and the amount of accrued sick leave available.

Producer shall notify the performer with respect to the year period (*i.e.*, calendar year or the performer's anniversary date) that the Producer selected to measure the thirty (30) day and ninety (90) day eligibility periods and the cap on accrual set forth in subparagraph B. above or, alternatively, if the Producer elected to provide performers with an up-front sick leave bank, the year period (*i.e.*, calendar year or the performer's anniversary date) that the Producer selected for the up-front bank of three (3) sick days as provided in subparagraph A.1. above.

G. Any Producer that has a sick leave policy, or paid leave or paid time off policy that permits the use of paid sick time and exceeds or substantially meets the requirements of this provision as of July 1, 2018, may continue such policy in lieu of the foregoing. Nothing shall prevent a Producer from negotiating a sick leave policy with better terms and conditions. There shall be no discrimination nor retaliation against any performer for exercising his or her right to use paid sick leave.

H. Any dispute with respect to sick leave for performers covered under this Agreement shall be subject to the grievance and arbitration procedures provided herein. The timing of sick leave payments under this provision and the charge for any late payments thereof, shall be governed by the provisions of the Paragraph 61 of the Network Code.

## 10. Data Production and Protection

A. Modify Sideletter 29 (Programs Made for New Media), Paragraphs B.5. and D.5. to add:

As soon as practicable for each production made for New Media (but excluding Experimental New Media Productions which the Producer has elected not to cover), Producer shall furnish a notice containing the following information to a designated representative of the Union (only one notice need be given per series, unless otherwise requested by the Union as provided below):

- The beginning and end dates of photography
- The length of the project in minutes (or, in the case of a series, the average length of each episode in minutes)
- For series, the total number of episodes being produced in each season
- Whether the budget is above or below $25,000 per minute of actual program material as exhibited on consumer pay platforms

  SAG-AFTRA may request the Producer update the foregoing information or to provide such information for a subsequent season of the series, and, if there are material changes to the information previously submitted, Producer shall respond to such request with the information known at the time of its response.

**B.** Add a new sideletter to the Code which provides that:

a. The Producer need only furnish the Union with the last four digits of the Social Security number, if available, of a performer or background actor; and

b. The Social Security number of a performer shall not be included on any sign-in sheet for an interview or audition.

c. The parties acknowledge that there are circumstances under which SAG-AFTRA may need a performer or background actors' full social security number. Where such information is provided, SAG-AFTRA will ensure that appropriate safeguards are taken to maintain confidentiality.

## 11. Diversity (Paragraph 97)

**A.** Update the demographic categories in Exhibit H / Paragraph 97 Report to include Middle Eastern/North African.

### B. Revise Paragraph 97(D) as follows:

"D. The parties agree that in order to promote the casting of performers belonging to all groups in all types of roles ~~in daytime television~~, each Producer ~~the three Networks (ABC, NBC and CBS)~~ shall, upon request, meet separately with SAG-AFTRA at least once per year for the purpose of discussing additional employment reflecting diversity and inclusion ~~of minorities and disabled persons~~, progress in that area since the last meeting, new opportunities that may be arising, and any other issues relevant to this paragraph of the Code. ~~Additionally, at the request of any independent Producer or AFTRA such Producer and AFTRA shall meet.~~ A party's alleged failure or refusal to participate in a meeting, as required by this subparagraph 97.D., shall be subject to the grievance and arbitration procedure.

Upon request by SAG-AFTRA for an Industry-wide meeting and by mutual agreement, the Networks will help facilitate such a meeting."

**C. Auditions** (New Sideletter): "Producer shall ensure that no auditions or meetings are conducted in private hotel rooms or residences where the Performer is alone with representatives of production. If there is no reasonable alternative forum for such a

meeting, Performers shall be entitled to attend the meeting with a second individual of their choosing who shall be allowed to maintain physical access to the Performer at all times during the meeting."

**D.** Add a new Paragraph 97.B to the Agreement as follows:

### "97.B.     HARASSMENT PREVENTION

"The Union and the Producers (the "Parties") agree that everyone should be able to work without fear of harassment or violence. The Parties further agree to work cooperatively with each other so that the principles of this Paragraph 97.B. are honored.

"(a)  The Producer is committed to maintaining a working environment that is free from unlawful harassment or violence.  In addition, the Producer is committed to protecting employees from retaliation for making claims of harassment. To that end, the Producer and employees shall comply with all applicable obligations pursuant to such laws and regulations and Producer's applicable policies.

"(b)  When an employee believes that this Paragraph 97.B. has been breached, such employee should immediately inform the Producer or its designated representative.  Should the employee request the assistance of the Union, the Union will refer the complainant to the Producer's applicable policies and encourage the complainant to notify the Producer. When authorized by the complainant, the Union representative shall immediately make the complaint known to a designated representative of the Producer.

The Producer shall investigate the complaint promptly in accordance with its policies.  The Parties agree that all employees potentially involved in such claim will cooperate fully in the investigation by the Producer.  Upon conclusion of the investigation, the Producer will take appropriate action if warranted.

"(c)  The Parties acknowledge the sensitive nature of these types of complaints and shall make reasonable efforts to maintain confidentiality as appropriate.

"(d)  Unlawful retaliation or reprisals against any employee who, in good faith, raises a bona fide complaint or participates in an investigation pursuant to this Paragraph 97.B. will not be tolerated.

"(e)  Violations of this Paragraph 97.B. or violations of the Producer's applicable policies shall be deemed misconduct under Paragraph 58.

"(f)  The matters covered in this Paragraph 97.B. are not subject to the provisions of Paragraph 95. Producer and any employee are permitted to negotiate that any matters covered in this Paragraph 97.B. may be subject to arbitration pursuant to a personal services agreement to the extent permitted by law."

Modify Sideletter 29 to make applicable to programs made for New Media.

## 12. Residuals (Paragraph 73)

### a. Non-Dramatic Strip Weekly "Best of" Show (Paragraph 73)

Add a paragraph that provides that if a non-dramatic weekly strip show does a "best of" program that is the fifth episode in the week of a four-day-per-week strip program, or the sixth episode in a week of a five-day-per-week strip program, when the fifth or sixth episode consists mainly of excerpts from that week's other episodes, the fifth or sixth episode shall be treated as a regular episode of the series, and will be subject to reuse fees as would any other episode.

### b. Non-Dramatic First Run Syndication Replays – (Paragraph 73(B)(2))

Except for first run syndication programs that feature a single host, provide for a second run residual of 20% (instead of 40%) for a **Non-Dramatic** first-run syndication program, for a run within one week of the initial broadcast. The 20% rate shall apply only to programs which have not yet broadcast as of July 1, 2018 and shall be in effect only during the first three (3) seasons of such program.

### c. Flashbacks (Paragraph 73D)

Modify (Paragraph 73(D)(1)(c)) as follows: "As flashbacks (brief scenes from one episode in a series used as part of a story in another episode of the same ~~in a~~ series) for dramatic programs (other than Daytime Serials) provided that a performer in the flashback who is not otherwise engaged to perform services on the program in which the flashback is utilized shall be entitled to one hundred percent (100%) of the applicable minimum program fee in effect at the time of use. ~~or if not under contract at the time of such broadcast, one hundred percent (100%) of his performance fee for the episode used in the flashback.~~

[When drafting 2018-2021 Code, insert language to cover flashbacks involving performers on daytime serial programs]

SAG-AFTRA agrees it will not pursue claims against any producer for additional flashback fees based upon any such payments made to performers under this provision prior to July 1, 2018.

### d. Foreign (Paragraph 73 (F))

Industry proposal for an optional residual formula for release of non-dramatic programs to foreign television at 6% of gross receipts withdrawn. SAG-AFTRA agrees that it will give good faith consideration to a Producer's request to apply the 6% formula where the Producer believes that the fixed residual serves as a barrier to licensing the program in foreign television.

### e. Add a new sideletter to the Agreement providing that in the event of a limited West Coast rerun of an awards program which has aired live and then is rerun beginning on the same day as the live broadcast, the residual payment shall be one-third of what would otherwise be payable.

## 16. New Media (Sideletters 29 and 30)

A. Renew the sunset clauses in Sideletters 29 and 30.

B. Increase the percentage applicable to the residual payment in Paragraph 2.B.1(i) and (ii) and Paragraph 2.B.(2)(i) and (ii) from the current five percent (5%) to five and one-half percent (5.5%) for television programs, the production of which commences on or after July 1, 2019.

C. Increase residual due for streaming of derivative new media programs in Paragraph 4.A.(2)a.(i) and (ii) for each 26 week period of streaming use from the current three and a half percent (3.5%) to five and a half percent (5.5%) for television programs, the production of which commences on or after July 1, 2019.

D. **Virtual MVPD**: Add a new provision 2.E to Sideletter 30 which provides:

"During the course of the 2018 negotiations, the parties discussed how the landscape of the free television marketplace has evolved from the past – when the exhibition of a given television program was only available to the viewer in the home on a television set on a linear channel at a specific scheduled time – to the current marketplace, commonly referred to as 'TV everywhere,' where the viewing public, in addition to viewing a program on a linear channel at a scheduled time, is also provided the time-shifted option to view the same program on a variety of digital devices on a video-on-demand ('VOD') basis. In addition, in the past, the bargaining parties agreed that television exhibitions on a linear channel provided through an MVPD, whether such channel was a free broadcast channel or a basic cable channel, were considered exploitation of free television rights even though the consumer paid a monthly fee to access such programming.

Consistent with the above, the bargaining parties agree that with respect to new internet-delivered "virtual MVPD" services, such as Sling TV and Sony's PlayStation Vue, and other like services, such as CBS All Access, (collectively referred to hereafter as "vMVPD Services"), any VOD rights which are associated with exhibition of the program on a linear channel on the vMVPD Service (commonly referred to as "stacking rights") shall be considered exploitation of free television rights and not a form of pay or subscription television. Such "stacking rights" shall be treated the same as if such programs were exhibited on traditional MVPDs.

Under this framework, the parties clarified the treatment of covered television programs[3] on vMVPD Services as described below. It is understood that in order to qualify as an "vMVPD Service" under this Sideletter, such service must include at least one free television or basic cable linear channel that is non-exclusive to that service and is generally made available for exhibition on other traditional and/or virtual MVPD services.

---

[3] It is understood by the parties that the provisions set forth herein apply to all television programs produced under this or any AFTRA or SAG-AFTRA Network Code, the principal photography of which commenced on or after November 16, 1973.

1. When the License for Linear Channel Exhibition of the Covered Television Program or Series on the vMVPD Service Includes On-Demand Availability

   a. When a linear channel on an MVPD is also offered on a vMVPD Service (such as when ABC is offered on Sling TV), no additional payment is required for the linear channel availability on the vMVPD Service.

   b. When a covered television program is available on demand on the vMVPD Service pursuant to a license agreement with a channel or network that includes the right to exhibit the covered television program or other episodes of the same series on a linear channel on the vMVPD Service, the same free streaming windows and residual formulas that apply to the on-demand availability of a covered television program on an MVPD are applicable. (See Paragraph 2.A. of this Sideletter.)

   c. The use of excerpts from a covered television program on the vMVPD Service pursuant to a license agreement with a channel or network that includes the right to exhibit the covered television program or other episodes of the same series on a linear channel on the vMVPD Service shall likewise be governed by the provisions of Paragraphs 2.B.(4) and 3 of this Sideletter.

   d. The fixed residual payment applicable under Paragraph 2.B.(2)(i) and (ii) of this Sideletter covers on demand availability on a free-to-the-consumer, advertiser-supported new media service and on an MVPD (or any similar service that exists or may hereafter be developed) and vMVPD Service.

   e. The on-demand availability provisions under Paragraph 2.B. of this Sideletter apply regardless of whether there are advertisements.

   f. When the Producer directly licenses the right to exhibit a covered television program on a linear channel available only on a vMVPD Service(s), the supplemental exhibition on such channel, as well as any associated stacking rights and the use of excerpts, shall be treated in the same manner as a license of a free television program to basic cable. The exhibition rights on the linear channel shall be subject to the applicable formula set forth in Exhibit D for release to Basic Cable, and the stacking rights and use of excerpts shall be subject to the same free streaming windows and residual formulas that apply to the on-demand availability and use of excerpts of a covered television program pursuant to Paragraphs 2.A. and 3 of this Sideletter.

2. When the License Is for On-Demand Availability on the vMVPD Service

   By contrast, when the Producer licenses the right to exhibit a covered television program, or one or more episodes of a covered television series, on an on-demand basis on the vMVPD Service, and such rights are not associated with the right to exhibit the program or episodes of the series on a linear channel on the vMVPD Service, the parties agree that Paragraph 1.A. of this Sideletter, which governs licenses to consumer pay new media platforms for a limited period or fixed number of exhibitions, shall apply. In addition, when a program is made exclusively for on-

demand availability on a vMVPD Service, it shall be treated as having been made for a subscription consumer pay new media platform subject to the provisions of Sideletter 29 governing Programs Made for New Media."

13.  **Over-the-Top Service of Pay Television Service**: Add a Sideletter which provides:

"The parties confirm that when a pay television service (such as HBO, Showtime or Starz) also provides to subscribers, without an additional subscription fee, over-the-top ('OTT') services (such as HBO Go, Showtime Anytime or Starz Play), the OTT service shall be treated as part of the linear pay television service for all purposes under this Agreement. Likewise, when a pay television service only provides OTT services (such as HBO Now and the OTT subscription services of Showtime and Starz), such OTT service, whether or not such service includes a linear channel of the pay television service, shall also be treated as part of the linear pay television service for all purposes under this Agreement.

It is understood that foreign sales of traditional pay television will be combined with foreign sales of OTT pay television for purposes of applying the six percent (6%) formula set forth in Exhibit E of this Agreement.

To the extent that a pay television program is exhibited on both the linear pay television service and the OTT service, the residual payment set forth in Exhibit E shall cover exhibition on both the linear pay television service and the OTT service. To the extent that a pay television program is exhibited on the OTT service, but not the linear pay television service, residuals are due for such exhibition under the existing formula under Exhibit E.

For example, if a variety program of a type generally produced for prime-time television is produced for HBO and exhibited in excess of ten (10) exhibition days or subsequent to one (1) year from the date of the initial exhibition on both HBO and HBO Now, the Producer would be obligated to pay six percent (6%) of the Distributor's gross receipts from such excess exhibition days. If, instead, the program is available on HBO Now but not HBO, the Producer would still be obligated to pay six percent (6%) of the Distributor's gross receipts from such excess exhibition days, even though the exhibition is solely on HBO Now."

The parties agree to the following unpublished sideletter:

"During the 2018 negotiations, the parties agreed that should a program be made for exhibition solely on an on-demand basis on the over-the-top service of a pay television (and not on its traditional linear service), the parties will discuss the appropriate treatment of such program."

14.    **License to Secondary Digital Channels (Sideletter 53) – Modify as set forth below**

As of July 1, 2018November 16, 2014

**Re: License of Non-Exhibit A Free Television, Pay Television or Basic Cable
Programs to Secondary Digital Channels**

During the 2018 2014 negotiations, the parties discussed the residual formula of
exhibition of television programs on certain secondary digital channels. The parties
agreed that instead of a fixed residual formula, Producer shall pay to the Union for ratable
distribution to the performers a percentage residual formula of three and six tenths
percent (3.6%) of distributor's gross receipts (as defined in Exhibit D of the Network TV
Code) for any license to a secondary digital channel of any free television or basic cable
program and six percent (6%) for any pay television program as to which a fixed residual
would otherwise be payable, provided that such program is out of production. that (i) has
been out of production for at least three years and (ii) has not been exhibited under a
fixed residual formula in syndication (except in the non-lead market) or pay television for
at least three years in the case of a free television or pay television program or has not
been exhibited under a fixed residual formula in syndication (except in the non-lead
market), pay television or basic cable for at least three years in the case of a basic cable
program. However, for any free television series consisting of sixty-eight (68) or fewer
episodes or any basic cable or pay television series consisting for forty (40) or fewer
episodes, the series need only have been out of production for at least two years and not
been exhibited under a fixed residual formula on basic cable, pay or free television
(except syndication in the non-lead market) for at least on year. For purposes of the
foregoing, 'out of production' means that all of the following have occurred: the program
has been cancelled; the final episode of the final season has aired or has been made
available; no above-the-line talent are obligated by contract to perform covered services
on the series in question; and no exhibitor has licensed rights to additional original
episodes of the series at the time the series becomes available for exhibition under the
license to the secondary digital channel. SAG-AFTRA Health Plan and & AFTRA
Retirement Fund contributions shall be made in addition to the percentage payments
made on pay television programs hereunder regardless of the date produced and on free
television and basic cable programs produced on or after November 16, 1973, and the
percentage payments shall be inclusive of Health and Retirement for free television and
basic cable programs prior to November 16, 1973. No IACF or AICF contributions shall
be due in connection with such payments.

When the 'Distributor's gross receipts' derived from such license(s) are received
from a related or affiliated entity that acts as the exhibitor of the program, then the
'Distributor's gross receipts' received by the Producer from the licensing of such rights
shall be measured by the exhibitor's payments to unrelated and unaffiliated entities in
arms' length transactions for comparable programs or series, or, if none, then the amounts
received by the Producer from unrelated and unaffiliated exhibitors in arms' length
transactions for comparable programs or series, or if none, comparable exhibitor's
payments to comparable unrelated and unaffiliated entities in arms' length transactions
for comparable programs or series.

Notwithstanding the foregoing, the minimum payment pursuant to this provision for any program licensed to a related or affiliated entity shall be an aggregate amount for all performers of $150 for a 30-minute program **(S225 for Non-Serial Dramatic programs)**, $300 for a 60-minute program **($450 for Non-Serial Dramatic programs),** $450 for a 90-minute program **($600 for Non-Serial Dramatic programs)**, and $600 for a 120-minute program **($750 for Non-Serial Dramatic programs)**.

The 'pro rata' share payable to each performer on a pay television program shall be distributed on the basis of time and salary units pursuant to Exhibit E of the Network Television Code. The 'pro rata' share payable to performers on non-serial dramatic programs produced on or after November 16, 2014 shall be distributed on the basis of 3-2-1. The 'pro rata' share payable to each performer on any other free television or basic cable program shall be distributed on the basis of a two-to-one ratio for principal performers against other performers. The pro rata share shall be limited to one and five tenths (1.5%) where the off camera announcer is the only covered performer.

The foregoing applies to free television, pay television or basic cable programs as to which a free television residual would otherwise be payable, whether produced under the SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting of 2018 ~~an agreement with SAG-AFTRA negotiated after November 16, 2014~~ or under any agreement with SAG, AFTRA, or SAG-AFTRA negotiated prior to July 1, 2018 ~~November 16, 2014~~.

## 15. License of Dramatic Programs Made for Basic Cable to Different Basic Cable Service (Sideletter 55)

Update the Sideletter as set forth below.

"A percentage residual formula of three and six tenths (3.6%) plus SAG-AFTRA Health Plan ~~&~~ and AFTRA Retirement Fund contributions on payments made hereunder on basic cable programs produced on or after November 16, 1973, and inclusive of Health and Retirement for basic cable programs produced prior to November 16, 1973, of distributor's gross receipts (as defined in Exhibit D of the Network TV Code) shall be paid for any license of a dramatic program or series made for basic cable, for which a fixed residual is otherwise payable, to a basic cable service once the program or series is out of production ~~that is not the service to which the program or series was originally licensed~~, provided that for a second or subsequent sale to the same basic cable service to which the program or series was originally licensed, all runs licensed under the license agreement for the initial cable exhibition, and subject to a fixed residual, have been exhausted. Producer shall be deemed to have exhausted all unused runs under the initial license agreement upon payment under the run-based residual formula of a number of runs under the second license to the same basic cable service equal to the number of all unused runs under the initial license. Producer shall allocate the 'Distributor's gross receipts' for the second license to the same basic cable service evenly across all runs licensed under the second license. ~~the program or series (1) has not been in production for at least two years and (ii) has not been exhibited under a fixed residual formula on basic cable or free television (except syndication in the non-lead market) for at least eighteen~~

(18) months. No IACF or AICF contributions shall be due in connection with such payments.

For all purposes of the foregoing, 'out-of-production' means that all of the following have occurred: the program has been cancelled; the final episode of the final season has aired; no above-the-line talent are obligated by contract to perform covered services on the series in question; and no exhibitor has licensed rights to additional original episodes of the series at the time the series becomes available for exhibition under the license to the basic cable service.

When the 'Distributor's gross receipts' derived from such license(s) are received from a related or affiliated entity that acts as the exhibitor of the program, then the 'Distributor's gross receipts' received by the Producer from the licensing of such rights shall be measured by the exhibitor's payments to unrelated and unaffiliated entities in arms' length transactions for comparable programs or series, or, if none, then the amounts received by the Producer from unrelated and unaffiliated exhibitors in arms' length transactions for comparable unrelated and unaffiliated entities in arms' length transactions for comparable programs or series.

Notwithstanding the foregoing, the minimum payment pursuant to this provision for any program licensed to a related or affiliated entity shall be an aggregate amount for all performers of $300 for a 30-minute program, $600 for a 60-minute program, $900 for a 90-minute program, and $1,200 for a 120-minute program.

The 'pro rata' share payable to performers on non-serial dramatic programs produced on or after November 16, 2014 shall be distributed on the basis of 3-2-1. The 'pro rata' share payable to each performer on all other programs shall be distributed on the basis of a two-to-one ratio for principal performers against other performers. The pro rata shall be limited to one and five tenths percent (1.5%) where the off camera announcer is the only covered performer.

The foregoing applies to basic cable programs as to which fixed residuals would otherwise be payable, whether produced under SAG-AFTRA National Code of Fair Practice for Network Television Broadcasting of 2018~~an agreement with SAG-AFTRA negotiated after November 16, 2014~~ or under any agreement with SAG, AFTRA, or SAG-AFTRA negotiated prior to July 1, 2018 ~~November 16, 2014~~."

## 16.   Stunt Performers (Paragraph 68.A)

Amend Paragraph 68.A.(C) to add a new (3) as follows:

"If there is a change in a planned stunt, the stunt performer shall be allowed an additional rehearsal upon request."

## 17.   Employment of Minors (Paragraph 100)

A.    Amend Paragraph 100.A. to add the word "auditions" in the first and second sentences.

B. Amend Paragraph 100.C as follows:

"C.  Work Hours

"(1)  Minors less than six (6) years of age are permitted at the place of
employment for six (6) hours (excluding meal periods, but including
school time, if any).

"(2)  Minors who have reached the age of six (6) but who have not attained
the age of nine (9) years may be permitted at the place of employment
for eight (8) hours (excluding meal periods, but including school time).

"(3)  Minors who have reached the age of nine (9) years but who have not
attained the age of sixteen (16) years may be permitted at the place of
employment for nine (9) hours (excluding meal periods, but including
school time).

"(4)  Minors who have reached the age of sixteen (16) years but who have
not attained the age of eighteen (18) years may be permitted at the place
of employment for ten (10) hours (excluding meal periods, but
including school time).

"(1̶5)  The workday for a minor shall begin no earlier than 5:00 a.m. and shall
end no later than 10:00 p.m. on evenings preceding school days. On
evenings preceding non-school days the minor's workday shall end no
later than 1:00 a.m. on the morning of the non-school day(s).

"(a)  Exceptions to "work hours":

"(i)  Where the Producer has obtained a waiver of the
minor's work hours from the applicable state agency,
SAG-AFTRA will be deemed to have granted an
automatic waiver of this provision, in accordance with
such state waiver.

"(ii)  SAG-AFTRA agrees to grant Producer's reasonable
requests for waivers of the work hours provision.

"(6)  A minor shall not work more than six (6) consecutive days. However,
for this purpose, a day of school only or travel only shall not be counted
as one of said consecutive days.

"(2̶7)  Producer shall set the first call at the beginning of the minor's
employment and dismissal on the last day of the minor's employment so
as to ensure that the minor will have a twelve (12) hour rest period prior
to and at the end of the employment. For example, if a minor's last day
of employment is Wednesday, and the minor will be attending school at

> 8:30 a.m. on Thursday, the minor must be dismissed by 8:30 p.m. on Wednesday."

**18.** **Safety**

Add a new sideletter to the Code which provides that: "In the event of an injury in the course of employment which results in medical attention, Producer will prepare and send to the Union as soon as practicable a **legible** report setting forth **the production's identifying information**, date, time, place, circumstances and nature of the injury claimed."

Representatives of SAG-AFTRA and representatives of the Industry will meet no later than three (3) months following the date of ratification to develop an agreed upon accident report form.

**Miscellaneous**

Nudity: Upon conclusion of the SAG-AFTRA primetime negotiations, the parties will discuss applicability of any agreed upon terms to the TV Code.

Standard Terms (Paragraph 68(4)): Correct reference to sixty (60) day period for retakes and recordings, as referenced in Paragraph 29.

Acceptors and Presenters on Award Programs: Finalize sideletter covering waiver as agreed during the 2014 TV Code negotiations.

Exhibit D: For supplemental releases, including SVOD, clarify whether H&R contributions are due on top or included within the residual.

Dramatic Programs Made for New Media: The parties agree that all non-serial Dramatic Original made for New Media programs shall be covered under the terms of the SAG-AFTRA Television Agreement and all Derivative New Media Dramatic programs shall be governed by whichever Agreement (SAG-AFTRA Television or this Agreement) that the original production was produced under.

Safety and Harassment Prevention Training: Discuss for Stunt Coordinators who are hired to work under the Code.

Stand-Ins / Dance-Ins: Shall be advised of their minimum call at the time of engagement.

**Sideletters 53 and 55: Agree to unpublished sideletter which provides as follows:**

**With regard to licenses of non-serial scripted dramatic made for basic cable programs or series entered into on or after July 1, 2018 and licensed pursuant to the terms of Sideletters 53 or 55, the parties to the 2018-2021 SAG-AFTRA TV Network Code agree to urge the producer who was the party to the underlying basic cable agreement, under which the program or series that is being licensed was produced, to meet with SAG-AFTRA to discuss whether the applicable residual percentage is 3.6% or 6% of the distributor's gross receipts.**

If no agreement is reached, the parties reserve their respective positions.

For those basic cable programs licensed prior to July 1, 2018 under Sideletters 53 or 55, SAG-AFTRA agrees to waive and forever relinquishes all known or unknown claims concerning whether the appropriate percentage for residuals payments made on distributor's gross receipts pursuant to either of these license agreements is either 3.6% or 6%.

<u>Discussion Item No. 2: Add a new Sideletter as follows:</u>

<u>"The parties agree that production staff or production personnel including casting should not be designated in ways which indicate they are representatives of the Union as opposed to representatives of production or casting (<i>e.g.</i>, "Union Coordinator", "SAG-AFTRA Manager", etc. are titles which could mislead employees into believing these are representatives of the Union when they are not.)"</u>

<u>Drafting</u>

1. Paragraph 12.B.2 change 1 hour to ½ hour.

2. Fix table of content and index page references.

3. All references to the AFTRA Health and Retirement Funds should be changed to reflect the "SAG-AFTRA Health Plan and the AFTRA Retirement Fund".

4. <u>Correct Exhibit D, Section 3(a)(i) to provide that for programs produced after November 16, 1973 and released in Supplemental Markets (except in-flight), after February 28, 1995, the payment shall be 3.6% of Distributor's gross receipts, including H&R contributions as provided for in the parties' February 28, 1995 Memorandum of Agreement.</u>

5. <u>Insert a footnote in Paragraph 102 of the 2018-2021 Network Code to reflect the fact the parties agreed in 3. of the 2014 MOA that the additional .5% increase in the Health and Retirement Fund contribution would be distributed solely to the AFTRA Retirement Fund.</u>

By _____   Date 6/9/18
Marc Sandman
American Broadcasting Companies, Inc.
an indirect wholly-owned subsidiary of ABC, Inc.

By _____   Date 6/9/18
Eryn Doherty
NBC, Inc.

By _____   Date 6/9/18
Harry Isaacs
CBS Broadcasting Inc.

By _____   Date 9 Jun 2018
Michael Campoto
20th Century FOX and FOX Sports Productions, Inc.

By _____   Date 6/8/17
Helayne Antler
CPT Holdings, Inc.

ACCEPTED AND AGREED:
SAG-AFTRA

By _____          Date 6/9/18
Ray Rodriguez
Chief Contracts Officer